UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :

     -v-                                              :                    S1 12 Cr. 171 (JPO)

MIKHAIL ZEMLYANSKY,                     :
    et al.,
                                                          :

           Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  FEB 2 9 2012

## GOVERNMENT'S MOTION FOR DETENTION

      The Government respectfully submits this memorandum in support of its motion

for detention of the following defendants: (1) Mikhail Zemlyansky; (2) Michael Danilovich, (3)

Yuri Zayonts; (4) Mikhail Kremerman; and (5) Matthew Conroy (collectively the "Detention

Defendants").[1]

      Each of the five Detention Defendants against whom the Government seeks

detention poses a risk of flight and is a danger to the community.  The relevant bail factors

establish that the detention of each of the Detention Defendants is appropriate and necessary to

protect the community and insure the defendant's presence at future court appearances.

## I.    The Charges

      Indictment S1 12 Cr. 171 (JPO) ("Indictment") charges the Detention Defendants

in four counts: Count One charges the Detention Defendants and three others with racketeering

conspiracy, in which the enterprise – the "No-Fault Organization" – engaged in a pattern of

---

[1]    The Government also may seek detention for other defendants not listed here,
depending in part on the substance of pre-trial reports and strength of any proposed bail
packages.

racketeering of mail fraud and money laundering as part of a widespread and massive scheme to defraud insurance companies of hundreds of millions of dollars under New York's no-fault insurance law, and then to launder the proceeds of that scheme through structuring, shell companies, and check cashers. Counts Two and Three charge the Defendants, and thirty-one others, with conspiracy to commit health care fraud and conspiracy to commit mail fraud in connection with the no-fault insurance scheme. Count Four charges the Detention Defendants and eight others with money laundering, both by reinvesting the proceeds of the no-fault insurance scheme back into the scheme and by concealing the source of the proceeds in order to extract profits from the scheme without alerting the insurance companies.

In total, the intended loss for all of the medical clinics associated with the Defendants' no-fault scheme is more than $279 million and the actual loss to the insurance companies is more than $113 million. This is the first time RICO has ever been used in a no-fault insurance case, and this is the largest single no-fault insurance fraud case in history.

## II.     The Defendants' Conduct

### A.     New York's No-Fault Insurance Law

Since 1974, New York's Comprehensive Motor Vehicle Insurance Reparations Act (the "No-Fault Law") has enabled the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault. The No-Fault Law requires payments for medical treatments to be made promptly, thereby obviating the need to file personal injury lawsuits in order to be reimbursed for medical treatment. Under the No-Fault Law, vehicle occupants can assign their right to reimbursement from an insurance company to others, including, but not

limited to, medical clinics that provided medical services to treat their injuries. If such an assignment were made, the medical clinics, or their agents, can bill the insurance company directly for services rendered and receive payment directly from the insurance company. Typically, insurance companies compensate the medical practitioners at a fixed rate for various medical services performed on these accident victims. In order to obtain damages separate and apart from the $50,000 available under the No-Fault Law, the vehicle occupant can file personal injury claims and lawsuits to show that he or she has sustained a "serious injury," as defined by statute, as a result of the accident.

In order for a medical clinic to be legally eligible for reimbursement under No-Fault Law, it must be incorporated, owned, operated, and controlled by a licensed medical practitioner. As a result, insurance companies will deny all billings from a medical clinic that is not owned, operated and controlled by a licensed medical practitioner.

**B.    The Defendants' No-Fault Scheme**

In order to take advantage of the patient-friendly provisions of the No-Fault Law, the Detention Defendants and their co-conspirators opened numerous medical clinics exist solely for the purpose of defrauding insurance companies under the No-Fault Law (the "No-Fault Clinics"). While purporting to be legitimate medical care clinics specializing in accident victims, these clinics were, in fact, medical fraud mills that routinely billed automobile insurance companies under the No-Fault Law for medical treatments that were either (i) never provided or (ii) unnecessary, because the person being treated did not medically need the treatments. The Defendants' scheme centered around the No-Fault Clinics and the various treatment modalities used by those clinics, and worked as follows:

3

1) **The No-Fault Clinics.** As described above, pursuant to New York law, a medical clinic must be incorporated, owned, operated and controlled by a licensed medical practitioner in order to bill insurance companies for treatments to purported accident patients. Instead, however, almost all of the No-Fault Clinics were owned, operated, and controlled by non-medical practitioners of Russian descent (the "No-Fault Clinic Controllers"). The No-Fault Clinic Controllers essentially purchased the licenses of medical professionals by paying them a fee and/or salary (the "No-Fault Doctors")[2] to (1) incorporate the No-Fault Clinics, (2) lease the clinic property, (3) open the clinic bank account, (4) sign the bills for initial evaluations, and (5) make the excessive and unnecessary referrals for other unnecessary and excessive medical treatments and medical supplies. For those same clinics, the No-Fault Clinic Controllers (1) supplied the initial funds to establish the No-Fault Clinic, (2) identified the location for the clinic, (3) negotiated the rent, (4) sourced and paid for the equipment, (5) recruited patients (see below), and (6) received any profits from the clinic. This arrangement was, in and of itself, a fraud, and is one of two ways in which the Detention Defendants and their co-conspirators defrauded the insurance companies.[3]

The No-Fault Clinic Controllers also arranged for other similarly fraudulently incorporated entities to use space in the No-Fault Clinics to provide excessive and unnecessary treatments based on referrals from the clinic's No-Fault Doctor. Finally, in addition to the initial

---

[2]     As one example, a doctor charged in the S1 Indictment has incorporated 35 professional corporations since the late 1990's.

[3]     This "fraudulent incorporation" of the medical clinics is a fraud unto itself because insurance companies do not and would not make *any* payments for medical treatments billed to them by a medical clinic that is not owned, operated and controlled by the incorporating medical professional. *See State Farm* v. *Mallela*, 4 N.Y. 3rd 313 (2005).

evaluation and subsequent evaluation every 30 days, the No-Fault Doctors signed bills for range

of motion and functional capacity tests, which the No-Fault Doctors did not actually perform.

Instead, those tests were performed by technicians, if they were performed at all, but the No-Fault

Doctors billed for them because the insurance companies require that the No-Fault Doctor certify

that he/she provided the treatment – and not the technician – in order to pay out for such a

treatment.

When a patient arrived for treatment at the No-Fault Clinics, he or she was

evaluated by a No-Fault Doctor, who recommended a standard, usually uniform schedule of

treatment, regardless of actual medical need.  The standard schedule of treatments included

physical therapy, chiropractic and acupuncture, often as many as five times per week.  Nearly

every time a patient went to a No-Fault Clinic, the patient received all three of those treatments, a

course of treatment that expert physicians will testify to be medically unnecessary on its face.  In

addition, in almost every case, the No-Fault Doctor prescribed a near-identical assortment of

medical supplies, which are provided by a durable medical equipment ("DME") clinic in a black

garbage bag and are uniformly unnecessary and excessive.  Patients who have been interviewed

consistently said they were not told about these medical supplies nor instructed on how to use

them, but nearly every single patient received the initial supply.  In some cases, insurance

companies received bills for supplies that were not actually provided to the patients.

In addition, the No-Fault Doctors usually referred every patient for at least one

magnetic resonance imaging ("MRIs"), which usually corresponded to one or more areas of the

body about which the patient has complained, but were generally medically unnecessary.

Furthermore, the No-Fault Doctor also referred patients to other specialized medical clinics for

treatments ("Modality Clinics" or "Modalities"), such as psychology, x-rays, various neurological assessments, orthopedic treatments, and manipulation under anesthesia treatments ("MUA") (which are billed to the insurance companies for as much as $30,000 per patient and require the patient to be put under anesthesia so a chiropractor can "manipulate" them). Most of these modality treatments were performed at the No-Fault Clinics, with the exception of MRI, x-ray, MUA and orthopedic procedures, which were either performed in roving vans or at different offices.

       2) **Modality Clinics.** Like the No-Fault Clinics, the Modality Clinics in this case were owned, operated and controlled not by licensed medical professionals, as required by law, but by other non-medical professionals, primarily individuals of Russian descent (the "Modality Controllers"). The Modality Controllers paid the No-Fault Clinic Controllers kickbacks in return for patient referrals. If the Modality Clinic billed for its own treatments, it paid a set amount of money per patient referral, such as $16 per acupuncture treatment. If the Modality Clinics' treatments were billed through the No-Fault Clinics, the Modality Controllers and the No-Fault Clinic Controllers arranged to split the money received from the insurance companies on a percentage basis – the most common arrangement was that the No-Fault Clinic received 60 percent of the proceeds and the Modality Clinic received 40 percent of the proceeds. Occasionally, the Modality Controller paid a portion of the kickbacks by check, often disguised with a memo line that read "rent." This served a dual function: it allowed the Modality Controller to pay the No-Fault Clinic Controller part of the kickback owed by check (as opposed to cash, which was harder to generate because the proceeds of the fraud were in the form of checks from insurance companies) and it also misrepresented to insurance companies that the

relationship between the Modality Clinics and the No-Fault Clinics was legitimate.

3) **Runners**. The No-Fault Clinics relied on certain individuals ("Runners") to identify and recruit drivers and passengers who were in car accidents and refer them to the No-Fault Clinics as patients (the "Patients"). Runners found Patients in several ways, including by (1) listening to police scanners, (2) paying kickbacks to hospital employees for referring accident patients, (3) paying contacts with tow-truck companies, or (4) just through word of mouth. In some cases, the car collisions were not actually accidents, but instead were staged for the sole purpose of committing no-fault insurance fraud. Under the No-Fault Law, a "staged" accident – which involves an individual who "intentionally causes his own injury" – nullifies the availability of reimbursement for medical treatment to the vehicle occupants, regardless of whether the treatments were legitimate or not. The Runners receive cash kickbacks from the No-Fault Clinic Controllers for each viable Patient referral. The amount of the kickback depended on the quality of police accident report and the likelihood that the particular automobile insurance company will pay for the medical treatment provided – not on the medical needs of the Patient. Usually, the kickback was between $2,000 and $3,000. Often, Runners paid the Patients some of that money (usually around $500) in order to entice them to regularly return to the No-Fault Clinics for treatment, many of which were unnecessary. In addition, the Runners often coached the Patients about what injuries the Patients should complain about to the No-Fault Doctors in order to allow as many referrals and treatments as possible. If a Patient did not complain sufficiently about various injuries, the No-Fault Doctor would tell the No-Fault Clinic Controller (or the Controller's agent who managed the Clinic), who would, in turn, instruct the Runner to tell the Patient to complain to the No-Fault Doctor about more injuries,

even though those injuries did not exist.

4) **Billing and Collection.**  In order to handle the significant number of bills and payment checks from the insurance companies, some members of the scheme established billing and collection companies, usually under the auspices of a law office, which handled paperwork for both No-Fault and Modality Clinics, and dealt with any disputes or arbitration that arose from the fraudulent billing.  If a bill were paid outright by an insurance company, the billing and collection entity received a small portion of the payment.  If a bill was contested by an insurance company, the billing and collection company took a larger percentage of any money recouped from the insurance company through arbitration or settlement.  While some of the No-Fault Clinics used billing and collection companies or other outside entities for their own billing and collections; other No Fault Clinics handled it themselves.  It was generally advantageous for a Clinic Controller to bill for his own treatments because the kickback arrangements were more favorable for Controllers who billed directly for the treatments they provided.

5) **Personal Injury Lawyers.**  The No-Fault Clinic also partnered with personal injury lawyers (the "Lawyers"), who filed personal injury lawsuits on behalf of purported accident patients to obtain additional funds separate and apart from the No-Fault Law. In order to file this lawsuit, the Patient had to reach a legal threshold of "serious injury," which can be achieved in several ways, including months of medical treatment, broken bones, or any type of surgery.  In order to improve the possible lawsuits, both Runners and Lawyers encouraged Patients to receive as many treatments as possible – and in some cases to have unnecessary procedures, including surgery – because the procedures would improve the personal injury lawsuits.  Some Lawyers had their own Runners who tracked down possible Patients and

8

then referred them to the No-Fault Clinics. Lawyers and No-Fault Clinic Controllers entered into kickback arrangements, whereby either the No-Fault Clinic Controller and Lawyers referred Patients to one another or where the Lawyer and No-Fault Clinic Controllers paid each other cash kickbacks for patients (or both). The Lawyers and their Runners also coached the Patients about what injuries to claim to the No-Fault Doctors to perpetuate the scheme (and which would also improve the patient's potential lawsuit).

### C.    The Money Laundering Scheme

In order to keep the no-fault insurance scheme in operation, the No-Fault Clinic Controllers and Modality Controllers continuously reinvested a portion of the proceeds of the fraud back into the scheme as follows: the No-Fault Clinics and Modality Clinics received proceeds of the scheme in the form of checks from the insurance companies made out to the professional corporation ("P.C.") under which the treatments were billed. These checks were either deposited directly into the bank accounts of the No-Fault Clinics and the Modality Clinics (the "Clinic Accounts"), or simply provided to check cashers to cash them. The primary purpose of using check cashers was to allow the Clinic Controllers to convert the checks into cash without raising red flags through repeated withdrawals from Clinic Accounts.

In addition, the Modality Clinic Controllers often paid a portion of the kickback money owed to the No-Fault Clinic Controllers by sending checks to the bank accounts of the No-Fault Clinics (the "No-Fault Clinic Accounts"). As discussed above, these payments were often characterized as "rent" payments for the use of space at the No-Fault Clinics by the Modality Clinics. From the No-Fault Clinic Accounts (which also directly received proceeds of the scheme in the form of checks from insurance companies for treatments billed under the No-Fault Clinics), payments would be made to the incorporating doctors, as well as other expenses

9

of the No-Fault Clinics, such as rent, electrical and other bills. In addition, in some cases, the No-Fault Clinic Controllers paid for some of their personal expenses directly from the No-Fault Clinic Accounts, including expensive limousines and jewelry, luxury items from Prada and Louis Vuitton, and personal credit card bills.

In addition to the laundering described above, it was also necessary for the Defendants to convert the criminal proceeds of the fraudulent scheme to cash in order to extract profits *and* to make cash payments to promote the carrying on of the scheme. Cash was king in the world of no-fault insurance fraud, and the Detention Defendants and their co-conspirators primarily used two techniques to convert the insurance company checks for bogus medical treatments into cash they needed:

(1)    When the Clinic Controllers received insurance checks made out to the No-Fault Clinics or Modality Clinics, they would sometimes deposit the checks directly into the Clinic Accounts.[4] In addition to the laundering described above, the Clinic Controllers also would write checks from the Clinic Accounts to certain shell companies they controlled (the "Controller Shell Companies"). Then, they would either pay for various personal expenses from the Controller Shell Companies, such as lavish trips to Mexico, Miami, and Atlantic City, personal credit card bills, and other luxury goods, or they would simply provide these checks to an individual who would cash these checks for a fee and return the funds to the Clinic Controllers. These funds could then be kept by the Clinic Controllers or used to pay Runners for their services in finding Patients or, in the case of the Modality Controllers, could be used to pay

---

[4]    The Clinic Controllers – both No-Fault Clinic Controllers and Modality Clinic Controllers – actually managed and controlled the Clinic Accounts, even though the signatories on those accounts were the No-Fault Doctors and Modality Professionals who incorporated the P.C.'s.

kickbacks to the No-Fault Controllers.

(2)     In many instances, the billing and collections companies controlled by the No-Fault Clinic Controllers would bill for treatments provided by other Modality Clinics who received referrals from the No-Fault Clinic Controllers. In those situations, the usual kickback arrangement allowed for the No-Fault Clinic Controllers who billed for the treatments to receive 60 percent of the total revenue from those bills. When insurance checks were received to the name of the Modality Clinics in the care of the No-Fault Clinic Controllers' billing and collections operations, the No-Fault Clinic Controllers would provide them to the Modality Controllers for deposit. They would then determine the amount of money that constituted the 60 percent kickback owed by the Modality Controllers to the No-Fault Clinic Controllers. A portion of the kickback owed to the No-Fault Clinic Controllers would be paid by check from the Modality Controllers to pay off various operating expenses at the No-Fault Clinics, such as rent and utilities. The remaining portion owed would be provided to the No-Fault Clinic Controllers in the form of checks structured to be less than $10,000 (to avoid reporting requirements), who would then cash the checks through a check casher for a fee and then return the funds to the No-Fault Clinic Controllers. The cash generated from these proceeds of the Modality Clinics would then be used to pay cash kickbacks to the No-Fault Clinic Controllers in return for referring patients to the Modality Clinics.

## IV.     Applicable Law

### A.     The Bail Reform Act: 18 U.S.C. § 3142

Title 18 United States Code, Section 3142(e) provides that, "[i]f, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the [defendant]

as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." The Bail Reform Act lists four factors relevant to detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended the "safety of the community" language in Section 3142 was expected to be given a broad construction. See S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. *The Committee intends that the concern about safety be given a broader construction than merely danger of harm of personal violence.*") (emphasis supplied). Courts have, therefore, appropriately construed the statute to find that protection of the community from economic harm is a valid objective of bail conditions. See United States v. Madoff, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) (reviewing case law and concluding that there is "support for considering economic harm in evaluating danger to the community under § 3142 of the Bail Reform Act"); United States v. Schenberger, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (holding that "[a] danger to the community does not only include physical harm or violent behavior" and citing the Senate Committee Report language reproduced above); United States v. Persaud, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (concurring with the Magistrate Judge that "economic harm qualifies as a danger within the contemplation of the Bail Reform Act"); see also United States v. Reynolds, 956 F.2d 192,

12

193 (9th Cir.1992) (post-conviction for mail fraud and witness tampering, the Court held that "danger may, at least in some cases, encompass pecuniary or economic harm.").

## IV.   Defendants

Each of the Detention Defendants face maximum terms of imprisonment of twenty years' if convicted on Counts One (racketeering conspiracy), Three (mail fraud conspiracy), and Four (money laundering conspiracy) of the Indictment, and ten years' imprisonment if convicted on Count Two (health care fraud conspiracy) of the Indictment. As a result, in total, each of the Detention Defendants is subject to a maximum term of imprisonment of 70 years. Moreover, and as discussed below, because of the extraordinary economic harm that resulted from the defendants' No-Fault Scheme, each of the Detention Defendants faces a recommended sentence, pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), of life imprisonment.

### A.   Mikhail Zemlyansky and Michael Danilovich

Mikhail Zemlyansky and Michael Danilovich are two of the leaders of the Defendant's No-Fault Organization. Together they controlled two No-Fault Clinics, several Modality Clinics, and two billing and collection offices. Because of their close relationship with Matthew Conroy and the range of roles that they served in the scheme, Zemlyansky and Danilovich were acutely aware of substantial portions of the No-Fault Organization's fraudulent conduct and were directly responsible for significant parts of the fraud. Moreover, the entire scope of the criminal activity of the No-Fault Organization was reasonably foreseeable to them as leaders and central players in the business of no-fault insurance fraud in and around Brooklyn, New York.

#### 1.   Guidelines Analysis

13

Both Zemlyansky and Danilovich face a Guidelines Range of life if convicted of racketeering or mail fraud (converted to the statutory maximum of 70 years' imprisonment). Under § 2B1.1 of the Guidelines, the base offense level would be 7, pursuant to § 2B1.1(a)(1), because the offense of conviction has a maximum term of imprisonment of 20 years; there would be a 28-level enhancement, pursuant to § 2B1.1(b)(1)(O), because, as mentioned above, the entire intended loss of the scheme ($279 million) was reasonably foreseeable to them; there would be a 2-level enhancement, pursuant to § 2B1.1(b)(2)(A), because the offense involved more than 10 victims; there would be 2-level enhancement because the offense involved sophisticated means, pursuant to § 2B1.1(b)(10); and there would be a 4-level enhancement because they were leaders of the organization, pursuant to §3B1.1(a). As a result the total offense level would 43, resulting in a Guidelines Range of life imprisonment.[5]

## 2.    Ties to the Former Soviet Union

Zemlyansky and Danilovich are United States citizens, but were both born in the Soviet Union.[6] Zemlyansky was naturalized in 1995 and Danilovich was naturalized in 1996. Both speak fluent Russian. In addition, both Zemlyansky and Danilovich have recently traveled to the former Soviet Union — they traveled together to Odessa, Ukraine in July 2011.[4]

---

[5]    Based on the information currently available to the Government, Zemlyansky has no criminal history and would be in Criminal History Category I and Danilovich, who has a previous conviction for conspiracy to commit securities fraud, mail fraud and money laundering, for which he was sentenced to 30 months' imprisonment, would be in criminal history category II.

[6]    Based on the information currently available to the Government, Zemlyansky and Danilovich were likely both born in what is now Ukraine.

[4]    Zemlyansky also visited Ukraine in August 2010.

### 3.   Discussion

Zemlyansky and Danilovich stand accused of a massive fraud scheme that generated substantial profits, much of which was laundered and converted into cash through the use of check cashers and shell companies.  In light of the fact that they face a Guidelines sentence of life and could legitimately be sentenced to the statutory maximum amount of prison time, if convicted of the charges against them.

The evidence against Zemlyansky and Danilovich is strong, and includes:  (1) testimony from cooperating witnesses who dealt with them regularly in connection with the No-Fault Organization's activities, and who can testify about Zemlyansky and Danilovich's participation in the charged no-fault insurance fraud since at least 2009; (2) recordings of extensive wiretap interceptions of telephone calls and text messages from their own cellular telephones between October 2010 and July 2011, which reveal their control of both No-Fault Clinics and numerous Modality Clinics and demonstrate their involvement in billing and collection for their own clinics as well as other Modality Clinics; (3) financial records demonstrating their control over several different clinics and a money trail connecting those clinics to shell companies that Zemlyansky and Danilovich control; and (4) law enforcement testimony and surveillance photographs showing Zemlyansky and Danilovich at various medical clinics and their interactions with various co-conspirators.

In addition to the strong incentives to flee created by the strength of the evidence and the potential punishments they face, Zemlyansky and Danilovich have an obvious and attractive possible destinations to which to flee — the former Soviet Union, particularly Russia and Ukraine.  Both were born in the former-Soviet Union, both speak fluent Russian, and both are undoubtably aware that the United States does not have extradition treaties with Russia or

Ukraine.  Zemlyansky and Danilovich have powerful incentives to choose to return to those countries, rather than risk a significant term of incarceration by staying in the United States. Finally, Zemlyansky and Danilovich have the wherewithal to flee.  As described above, the proceeds generated from the insurance companies through the no-fault fraud was routinely converted into cash through sophisticated money laundering schemes.  There is every reason to believe that Zemlyansky and Danilovich have retained some portion of the millions of dollars of cash proceeds they extracted and laundered, and that they will continue to have access to that money – which they have undoubtedly hidden from law enforcement – after they are arrested.

Zemlyansky and Danilovich are also dangers to the community because they can continue to do economic harm through ongoing participation in no-fault insurance schemes. During this time period, they have not maintained regular jobs; in fact, it is fair to describe them as professional criminals.  As described above, Zemlyansky and Danilovich have caused extensive economic harm over the past four years through their control of their No-Fault and Modality Clinics, yet they were not the paper owners of those clinics, nor were they involved in the clinics' day-to-day operations.  There is nothing about the fact of the current charges that would prevent them from continuing in the same course of conduct. This is particularly so in the case of Danilovich, who has a previous fraud conviction for which he served 30 months' imprisonment, which did nothing to deter him from continuing to commit frauds on a massive and pervasive scale.

Zemlyansky and Danilovich are a flight risk and are dangers to the community. They are committed, professional criminals who are potentially facing the rest of their lives in prison, and therefore they have an obvious incentive to flee.  Moreover, they also have an obvious

destination to which they could flee in order to avoid prosecution, and have the ability to do so through the proceeds of their crime.

Accordingly, the Government respectfully submits that both Zemlyansky and Danilovich should be detained pending trial.

**B.      Yuri Zayonts and Mikhail Kremerman**

Yuri Zayonts and Mikhail Kremerman were leaders of the another operating branch of No-Fault Organization.  Together they controlled No-Fault Clinics in Brooklyn, Manhattan and the Bronx, as well as numerous Modality Clinics (primarily neurology) and a billing and collection company.  They both have extensive knowledge of the charged No-Fault Organization because the range of roles that they served in the scheme, and were also directly responsible for significant portions of the No-Fault Organization's activities.  For example, the No-Fault Clinic they control and operate in the Bronx is reputed to be the largest Clinic in New York City.

**1.      Guidelines Analysis**

Both Zayonts and Kremerman face a Guidelines Range of life if convicted of racketeering or mail fraud.  Under § 2B1.1 of the Guidelines, the base offense level would be 7, pursuant to § 2B1.1(a)(1), because the offense of conviction has a maximum term of imprisonment of 20 years; there would be a 28-level enhancement, pursuant to § 2B1.1(b)(1)(O), because, as mentioned above, the entire intended loss of the scheme ($275 million) was reasonably foreseeable to them; there would be a 2-level enhancement,  pursuant to § 2B1.1(b)(2)(A), because the offense involved more than 10 victims; there would be 2-level enhancement because the offense involved sophisticated means, pursuant to § 2B1.1(b)(10); and there would be a 4-level enhancement because they were leaders of the organization, pursuant to

§3B1.1(a).  As a result the total offense level would 43, resulting in a Guidelines Range of life imprisonment.[5]

### 2.   Ties to the Former Soviet Union

Zayonts and Kremerman are United States citizens, but were both born in the Soviet Union.  Zayonts was naturalized in 2000 and Kremerman was naturalized in 2002.  Both speak fluent Russian.

### 3.   Discussion

Similar to Zemlyansky and Danilovich, Zayonts and Kremerman led a massive fraud scheme that generated substantial profits, much of which was converted into cash.  The charges they are facing carry maximum sentences of 70 years' imprisonment, and thus they have strong incentives to obstruct justice and to flee.

The evidence against Zayonts and Kremerman is strong, and includes:  (1) testimony from cooperating witnesses who can testify about their participation in the charged no-fault insurance fraud since at least 2010; (2) consensual recordings with Zayonts and Kremerman in which they discuss their control of existing modality clinics and their relationship with Matthew Conroy – specifically, that Conroy counseled their doctor to avoid billing certain types of treatments to patients from a certain insurance company; (3) consensual recordings of Zayonts and Kremerman's co-conspirators in which one of their No-Fault Doctors acknowledges that the doctor is, in fact, a paid employee and does not control the clinic; and (4) financial records demonstrating their control over Modality and No-Fault Medical Clinics and the laundering of the

---

[5]        Based on the information currently available to the Government, neither Zayonts nor Kremerman have any criminal history and both would be in Criminal History Category I.

proceeds of those clinics through check cashers and shell companies, which ultimately were used to pay for extravagant personal expenses.

For the same reasons discussed above for Zemlyansky and Danilovich, Zayonts and Kremerman have ties to the former Soviet Union that exacerbates the risk of flight created by the substantial sentences they are facing. Moreover, like Zemlyansky and Danilovich, Zayonts and Kremerman are likely have access to cash from their fraudulent activities that they have hidden from the Government, and are therefore likely have the financial wherewithal to flee.

Finally, Zayonts and Kremerman are also dangers to the community because they can continue to do economic harm through no-fault insurance schemes. As discussed above with respect to Zemlyansky and Danilovich, Zayonts and Kremerman are professional criminals and nothing about the current charges or the standard bail conditions (including the possibility of home detention with electronic monitoring) will prevent them from continuing their scheme.

In sum, Zayonts and Kremerman are a flight risk and are dangers to the community. They are facing the rest of their lives in prison, they have an obvious destination to which they can flee, and have the ability to do so through the proceeds of their crime. They are also dangers to the community, who can continue to create economic harm and to commit their crimes while under any bail condition designed by the Court.

Accordingly, the Government respectfully submits that both Zayonts and Kremerman should be detained pending trial.

19

C.     **Matthew Conroy**

Matthew Conroy was the principle legal advisor to the members of the No-Fault

Organization, including the other leaders of the organization, Zemlyansky, Danilovich, Zayonts,

and Kremerman.  Conroy counseled his co-conspirators on several aspects of the scheme,

including the selection of No-Fault Doctors to fraudulently incorporate the No-Fault and Modality

Clinics and strategies for avoiding detection by insurance company investigators and law

enforcement.  Conroy prepared clinic doctors for examinations under oath with insurance

company investigators and coached them to make false statements designed to disguise the true

roles played by the No-Fault Doctors and the Controllers.  Conroy also advised Controllers on

how to deal with possible investigation by federal law enforcement.  Finally, Conroy participated

in the No-Fault Organization's money laundering.  Among other things, Conroy provided checks

from his attorney escrow account to co-conspirators, which were then converted into cash using

professional check cashers.

1.     **Guidelines Analysis**

Conroy faces a Guidelines Range of life if convicted of racketeering or mail fraud

(converted to the statutory maximum of 70 years' imprisonment).  Under § 2B1.1 of the

Guidelines, the base offense level would be 7, pursuant to § 2B1.1(a)(1), because the offense of

conviction has a maximum term of imprisonment of 20 years; there would be a 28-level

enhancement, pursuant to § 2B1.1(b)(1)(O), because, as mentioned above, the entire intended loss

of the scheme ($275 million) was reasonably foreseeable to him; there would be a 2-level

enhancement,  pursuant to § 2B1.1(b)(2)(A), because the offense involved more than 10 victims;

there would be 2-level enhancement because the offense involved sophisticated means, pursuant

to § 2B1.1(b)(10); there would be a 4-level enhancement because Conroy was a leader of the

organization, pursuant to §3B1.1(a); and 2-level enhancement because Conroy abused a position of trust, pursuant to § 3B1.3.  As a result the total offense level would 45, resulting in a Guidelines Range of life imprisonment.[6]

### 2.      Discussion

Conroy served as a principle advisor and coordinator to the No-Fault Organization. In that role he repeatedly counseled his criminal co-conspirators on how to hide their fraudulent activities and was directly involved in the money laundering aspects of their scheme.

The evidence against Conroy is strong and includes: (1) testimony from a cooperating witness who can testify about Conroy's participation in the charged no-fault insurance fraud since at least 2010; (2) consensual recordings with Conroy in which he acknowledges that he has coached doctors in advance of examinations under oath; (3) recordings of wiretap interceptions of telephone calls between Conroy and Zemlyansky and Danilovich in which Conroy coordinates a response to an investigation of a No-Fault Clinic by federal agents; (4)  consensual recordings of Conroy's co-conspirators in which they acknowledge his role in coaching doctors on their testimony at examinations under oath; and (5) financial records demonstrating Conroy's role in laundering money on behalf of his co-conspirators.

Based on Conroy's repeated efforts to help his co-conspirators hide their fraudulent scheme from insurance company investigators and law enforcement, there is a significant danger that Conroy will engage in further obstruction.  Conroy's extensive involvement in the scheme and his training as a lawyer means that he is uniquely well-positioned to attempt to impede the investigation into his own conduct and to protect his co-conspirators.

---

[6]      Based on the information currently available to the Government, Conroy has no criminal history and would be in Criminal History Category I.

Conroy also has a strong incentive to flee. He is facing a significant prison sentence and also the strong possibility that he will lose his professional license. Conroy participated directly in the laundering aspects of the scheme, and there is reason to believe that he has retained some portion of the cash proceeds the No-Fault Organization extracted and laundered, and that he will continue to have access to that money after he is arrested, which could then used to fund his flight.

In sum, Conroy is both a danger to the community, because of the possibility that he will obstruct justice, and a risk of flight, because he has both an incentive and the ability to flee. Accordingly the Government submits that Conroy should be detained.

## III.    Conclusion

For all of the foregoing reasons the following defendants should be detained pending trial: (1) Mikhail Zemlyansky; (2) Michael Danilovich; (3) Yuri Zayonts; (5) Mikhail Kremerman; and (5) Matthew Conroy.

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____

Daniel S. Goldman
Nicholas L. McQuaid
Jason H. Cowley
Carolina A. Fornos
Assistant United States Attorneys
(212) 637-2200