UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

UNITED STATES OF AMERICA,       :
                 :
   -v-             :
                 :   S1 12 cr. 171 (JPO)
MIKHAIL ZEMLYANSKY, et al.     :
                 :
     Defendants.     :
                 :
BORIS TREYSLER         :
                 :
     Moving Defendant.   :

---------------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANT BORIS TREYSLER'S PRETRIAL MOTIONS

Yours, etc.,

RAYMOND J. ZUPPA, ESQ.
For: Boris Treysler
1205 Franklin Avenue
Suite 340
Garden City, NY 11530
(516) 280-9833

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…..…………………………………………………….. 1

I.    THE FRAUDULENT INCORPRATION (MALLELA) THEORY IS LEGALLY INSUFFICIENT BECAUSE OF THE ABSENCE OF ANY INTENT TO INJURE THE INSURERS AND AS A RESULT IT SHOULD BE DISMISSED AND ALL MENTION OF IT STRICKEN FROM THE INDICTMENT……………………………………………1

    A. BACKGROUND: INCARCERATION NATION………………………………………1

    B. LEGAL ARGUMENT…………………………………………………...……2

        1. The Unique Issue…………………………………………………………..2
        2. Analogous State Law……………………………………………………5
        3. Federal Mail Fraud Law…………………………………………………14

II.   THE FIRST COUNT OF THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT IS DUPLICITOUS…………………………………………………………………19

III.  SUPPRESSION OF THE FRUITS OF THE ELECTRONIC INTERCEPTION……….24

IV.  MOTIONS FOR AN ORDER (a) REQUIRING THE GOVERNMENT TO ABIDE BY ITS OBLIGATIONS PURSUANT TO BRADY, and; (b) FOR AN ORDER, PURSUANT TO RULES 402 AND 404(B) OF THE FEDERAL RULES OF EVIDENCE AND RULE 12 (D) (2) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE, DIRECTING THE GOVERNMENT TO DISCLOSE ANY "BAD ACT" OR "SIMILAR COURSE OF CONDUCT" EVIDENCE IT INTENDS TO INTRODUCE AT TRIAL………..…………………………………………………..25

V.   THE MOTION FOR AN ORDER, PERMITTING THE DEFENDANT BORIS TREYSLER TO JOIN IN AND ADOPT BY REFERENCE, WHEREVER APPLICABLE, THE MOTIONS AND MEMORANDUMS OF LAW, ETC., OF HIS CO-DEFENDANTS…………………………………………………………...…………25

LEAVE TO MAKE FURTHER MOTIONS……………………………………………25

## PRELIMINARY STATEMENT

Through prior motion practice the general facts and allegations in this case are well known to the Court. I will therefore dispense with any up front discussion of facts or allegations.

With regard to "Point I" below – the motion to dismiss and strike those portions of the indictment that pertain to the fraudulent incorporation (Mallela) theory – the Defendant Treysler adopts and incorporates the citations to the record including facts, allegations, theories, etc., as well as the legal arguments, contained in the submissions of my esteemed colleague Mr. Frederick Phillip Hafetz on behalf of Defendant Yuriy Zayonts.

## Point I

## THE FRAUDULENT INCORPRATION (MALLELA) THEORY IS LEGALLY INSUFFICIENT BECAUSE OF THE ABSENCE OF ANY INTENT TO INJURE THE INSURERS AND AS A RESULT IT SHOULD BE DISMISSED AND ALL MENTION OF IT STRICKEN FROM THE INDICTMENT

### A.   BACKGROUND: INCARCERATION NATION

An article by Adam Liptak published in the New York Times on April 23, 2008 entitled "U.S. prison population dwarfs that of other nations" cited to the findings of a number of studies. This included the finding that:

> the United States has less than 5 percent of the world's population. But it has almost a quarter of the world's prisoners. Indeed, the United States leads the world in producing prisoners, a reflection of a relatively recent and now entirely distinctive American approach to crime and punishment. Americans are locked up for crimes — from writing bad checks to using drugs — that would rarely produce prison sentences in other countries. And in particular they are kept incarcerated far longer than prisoners in other nations. Criminologists and legal scholars in other industrialized nations say they are mystified and appalled by the number and length of American prison sentences.

The article noted that

> the United States has, for instance, 2.3 million criminals behind bars, more than any other nation, according to data maintained by the International Center for Prison Studies at King's College London … The United States comes in first, too, on a more meaningful list from the prison studies center, the one ranked in order of the incarceration rates. It has

751 people in prison or jail for every 100,000 in population. (If you count only adults, one in 100 Americans is locked up.)

"'In no country is criminal justice administered with more mildness than in the United States,' Alexis de Tocqueville, who toured American penitentiaries in 1831, wrote in 'Democracy in America'" according to the article. But not anymore.

> Far from serving as a model for the world, contemporary America is viewed with horror,' James Whitman, a specialist in comparative law at Yale, wrote last year in Social Research. 'Certainly there are no European governments sending delegations to learn from us about how to manage prisons.

Whitman, who has studied Tocqueville's work on American penitentiaries, was asked what accounted for America's booming prison population.

> Unfortunately, a lot of the answer is democracy — just what Tocqueville was talking about, he said. "We have a highly politicized criminal justice system."

As of 2010 America was still way out ahead as the number one nation for incarceration with five times the world average. Guerino, Harrison and Sabol, *Prisoners in 2010 (Revised)* (Washington D.C.: Bureau of Justice Statistics, 2011)

The "fraud in the incorporation" theory contained in this indictment and those indictments that will undoubtedly follow, if not dismissed, will surely assist in the American dream of remaining number one.

## B.   LEGAL ARGUMENT

### 1.   The Unique Issue

This Court will decide whether to criminalize a whole area of what are essentially breaches of contract. That is to put people in jail for a long time because they breached contracts.

And make no bones about it "no-fault coverage is contractual in nature ..." Rosa v. Allstate Insurance Company, 981 F.2d 669, (2d Cir. 1992); "Here, both the alleged pre-accident

promises and post-accident misrepresentations arise out of State Farm's contractual obligation to honor its policies and make no-fault payments as required by the no-fault regulations." State Farm Mutual Insurance Company v. Anikeyeva, 35 Misc.3d 1203(A), 950 N.Y.S.2d 726 (Supreme Court, Nassau County, 2012)

> As recently recognized in *Mandarino v. Travelers Property Casualty Ins. Co.,* 37 A.D.3d 775, 831 N.Y.S.2d 452 (2nd Dept. 2007), "the inclusion of terms in an insurance contract, which might be mandated by various statutes or regulations, does not necessarily alter the fundamentally contractual nature of the dispute between the insured (or is or her assignee), on the one hand, and his or her no fault' insurer on the other hand."

Pinnacle Open MRI, P.C. v. Republic Western Insurance Company, 18 Misc.3d 626, 637 (District Court Nassau County 2008)

Furthermore in no fault the insurance regulations provide for assignment from the injured claimant – which is often the policyholder – to the medical provider pursuant to 11 N.Y.C.R.R. §65-3.11. "When a valid assignment is made, the assignee steps into the assignor's shoes and acquires whatever rights the later had (see *Furlong v. Shalala*, 156 F.3d 384, 392 [2d Cir 1998])" In the Matter of the Estate of Jean I. Stralem, 303 A.D.2d 120, 122 (2nd Dep't. 2003) "Assignment of no-fault benefits" from a patient to a health care provider transfers all of the patient's rights, privileges, and remedies to the provider, such that the provider stands in the shoes of the patient and may pursue all of the remedies that would have been available to the patient. John T. Mather Memorial Hosp. v. Linzer, 32 Misc.3d 59, 928 N.Y.S.2d 872 (N.Y. Sup. App. Term 2nd 2011). In fact the Second Department held that under the No Fault Law and Regulations the term "'applicant' refers to both provider/assignees and injured persons." East Acupuncture P.C. v. Allstate Ins. Co., 61 A.D.3d 202, 209 (2nd Dep't. 2009).

The following must be stressed:

As far as my research and the research of colleagues this will be the first time that a Court

will decide this very unique issue – the criminalization of <u>Mallela</u>.

And to be clear this <u>Mallela</u> theory of criminal liability has absolutely nothing to do with the Government's legal theories regarding alleged fraud committed through: 1) the provision of so called medically unnecessary services which ethereal theory begs one quick question – medically unnecessary according to who – certainly the patient's view should be considered; or 2) real fraud – that is billing for services never provided or provided only as a sham.

The Government's <u>Mallela</u> theory for incarceration is exactly the same as the theory dealt with in the civil <u>Mallela</u> trilogy of cases which decided whether an insurance company can withhold payments from medical P.C.s that are in reality owned/controlled, and other multifarious vagaries, by a layperson:

> Nowhere in its complaint does plaintiff allege that the services provided by the PC Defendants to plaintiff's insureds were provided by unlicensed professionals. Rather, plaintiff contends only that the PC Defendants, by whom the servicing professionals were employed, fraudulently obtained certificates of authority to practice medicine. Nor does plaintiff claim that it was billed for services that were not actually rendered. Plaintiff admits in its complaint that, in the "light of the differences between the parties, there is uncertainty as to whether the defendants have violated the laws, regulations and public policies of the State of New York." (Compl.¶ 64.)

<u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 175 F.Supp.2d 401 (E.D.N.Y. 2001)

> The claims made in this case can therefore be distinguished from the broader claims recently made by insurers in other courts. These latter claims assert not only fraud in the corporate form, but more traditional forms of fraud as well. For example, they allege that parties billed for services that were not provided or were medically unnecessary, or billed services at the wrong rate …

> In the instant case, however, and despite the district court's encouragement, *see State Farm I,* 175 F.Supp.2d at 408, 423, State Farm did not add any such allegations when it amended its complaint. Accordingly, it does not argue that any of the services in question were not rendered, or were performed by non-licensed health professionals. All of appellant's arguments for declaratory judgment therefore turn on one central question: whether the illegal incorporation of a P.C. so fatally taints the services provided by the professionals employed by it **that these services-although legitimate and covered by no-fault automobile insurance in every other way-need** not be compensated by an insurer.

4

State Farm Mutual Automobile Insurance Co. v. Mallela, 372 F.3d 500, 504 (2d Cir. 2004)

(Citations omitted) (Emphasis added)

> Notably, State Farm never alleged that the actual care received by patients was unnecessary or improper. The patients insured by State Farm presumably received appropriate care from a health professional qualified to give that care. State Farm's complaint centers on fraud in the corporate form rather than on the quality of care provided.

State Farm Mut. Auto. Ins. Co. v. Robert Mallela, 4 N.Y.3d 313, 320 (2005)

    2.    Analogous State Law

Many of the reasons why the Second Circuit punted Mallela to the State of New York are present here. *See* State Farm Mutual Automobile Insurance Co. v. Mallela, 372 F.3d at 502-509. This case is solely about a host of New York statutes; a multiplicity of New York regulations; and the New York State Court of Appeals decision in State Farm Mut. Auto. Ins. Co. v. Robert Mallela, 4 N.Y.3d 313, 320 (2005); and Mallela's so called progeny – which is also New York State Law. Research demonstrates that there is no federal counterpart. In fact one is hard pressed to find an analogous set of statutes; regulations and State Court decisions in most other states.

As such deference to decisions rendered by a New York State Court would be warranted. Indeed the main decision I will discuss reads like a treatise on New York law with regard to criminal allegations of fraud that are deficient because such allegations lack injurious intent. As such it will block quoted copiously because the Court writes much better than the undersigned. This is law that is quite analogous to federal law regarding the federal mail fraud statute. *See*, People v Headley, 37 Misc.3d 815, 951 N.Y.S.2d 317 (Supreme Court, Kings County June 6, 2012)

In Headley the indictment alleged

5

that defendant and the codefendant Jacqueline Jackson fraudulently obtained paid assignments from the New York City Transit Authority (hereinafter NYCTA) to procure independent medical examinations (hereinafter IMEs) of plaintiffs who had sued the NYCTA. Defendant is charged with obtaining the NYCTA vendor assignments for his company by using a fictitious name. The People say he thus concealed the fact that he had also been retained as outside counsel for the NYCTA in the defense of personal injury lawsuits—a circumstance which, the People say, would have disqualified him from being paid to procure medical examinations.

Id. at 816.

The Defendant was charged with 11 counts of larceny and with conspiracy to commit

larceny in another.  As the Court noted:

Penal Law § 155.05 defines larceny, in pertinent part, as follows:

"1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.

"2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:

"(a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses . . . ."

The elements required to establish larceny by false pretenses are: (1) criminal intent to deprive the owner of property; (2) making a false material representation; (3) obtaining the property of another; and (4) reliance by the victim upon the representation.

Id. at 820 (Citations omitted)

The elements of fraud in the case at bar and Headley are identical.  In addition although

the circumstances are different the concepts and the People's theory of criminal liability in

Headley stand on all four corners with the Mallela portion of the indictment.  A painstaking

analysis of the facts demonstrates just how analogous Headley is:

Beginning in 2003, defendant, an attorney, acted as outside counsel for the NYCTA in personal injury lawsuits against the NYCTA. The People allege that defendant and codefendant Jacqueline Jackson, the Director of the Legal Support Unit (hereinafter LSU)

at the NYCTA, formed a business, Advance I.M.E. Co. (hereinafter Advance). The indictment alleges that on April 9, 2007, defendant, employing the pseudonym "James Douglas," submitted a business proposal on behalf of Advance at 80 Broad Street, New York, New York, to codefendant Jackson in her capacity as Director of the LSU. The proposal was approved by Jackson and called for Advance to receive assignments from the LSU to schedule IMEs of plaintiffs who had filed personal injury lawsuits against the NYCTA. In return, Advance would earn a fee of $400 per scheduled IME and IME report. In their memorandum of law in opposition to defendant Headley's motion to dismiss the indictment, the People add that defendant Headley had a long-standing personal relationship with codefendant Jackson. According to the indictment, defendant John Headley resided in the Brooklyn residence of Ms. Jackson from August through December 2008.

The overt acts listed under the conspiracy count in the indictment include an allegation that on June 16, 2008, defendant Headley paid Consolidated Edison $242.54 out of Advance's Bank of America account to satisfy the bill of Jacqueline Cutler, also known as Jacqueline Jackson, residing at 1489 East 46th Street, Brooklyn, NY. There is also an allegation in the list of overt acts that on June 14, 2008, defendant Headley drafted and signed a $676.57 check drawn on Advance's Bank of America account payable to National Grid for the billing account of Jacqueline Cutler, also known as Jacqueline Jackson, relating to the Jackson residence at 1489 East 46th Street, Brooklyn, NY.

The indictment further alleges, inter alia, the following:

"On April 9, 2007, defendant John E.. Headley, employing the pseudonyum of 'James Douglas', submitted a business proposal to defendant Jacqueline Jackson in her capacity as director of the LSU of the New York Transit Authority's Law Department, on behalf of Advance at 80 Broad Street, New York, New York.

"On April 9, 2007, Advance submitted to the NYCTA a copy of what purported to be a United States Department of Treasury, Internal Revenue Service W-9 form listing Advance at 80 Broad Street, New York, NY, and bearing the fabricated employer identification number of 680647760 and the signature of 'James Douglas.'

"From April 9, 2007 through May 2008, defendant Jackson directed her staff to give preference to Advance for assignment of IMEs required by the Law Department of the NYCTA in the defense of personal injury law suits handled by that department. More than 200 assignments were made to Advance, pursuant to defendant Jacqueline Jackson's direction, during that time period.

"On August 10, 2007, a business certificate for Advance bearing the signature of defendant John E. Headley dated August 9, 2007, listing its place of business as 8 East 58th Street, Brooklyn, NY, was filed with the Kings County Clerk's Office.

"On August 10, 2007, defendant Headley opened a business checking account at Bank of America in the name of 'DBA Advance I.M.E., Co.,' located at 80 Broad Street, New

York, NY, and he identified himself as the sole proprietor of this account.

> "At a meeting held in November 2008 at defendant Jacqueline Jackson's residence at 1489 East 46th Street, Brooklyn, New York defendant Jacqueline Jackson, in the presence of defendant John E. Headley, invited a witness known to the Grand Jury to join defendants Jacqueline Jackson and John E. Headley in the business of Advance with the NYCTA, but under a new name, in return for a $150 per invoice share of the business."

Id. at 817-819.

As in the indictment in the case at bar in Headley we have a misrepresentation as to who owns and/or controls the IME Corporation to the entity that will pay the IME Corporation -- NYCTA; the same misrepresentation on a federal tax form; wherein both misrepresentations were utilized to induce NYCTA to hire the IME Corporation such that the Defendant could personally profit; and a kickback scheme. Indeed as in the indictment in the case at bar the indictment in Headley alleged that the Defendant utilized the bank account of the IME Corporation.

> The People's theory uncannily matches the Government's theory in the case at bar:

> The People's theory is that by misstating a material fact, to wit, his identity as the principal of Advance, defendant acted knowingly and intentionally to defraud the NYCTA, and thus committed larceny by false pretenses. For the payments to Advance for more than 200 IME assignments in 2007 and 2008, defendant is charged with stealing in excess of 50 thousand dollars from the NYCTA—every dollar Advance was paid for its work.

Id. at 819.

The Defendant moved to dismiss the indictment charging Grand Larceny by means of fraudulent inducement and the other counts by arguing:

> that the indictment must be dismissed because there was no evidence of intent to defraud the NYCTA or that the NYCTA sustained any pecuniary loss as a result of defendant's use of a fictitious name. More particularly, defendant contends that the crimes with which he has been charged require that he had the intent to defraud the NYCTA, and that, while his conduct may have been deceptive, there is no evidence that he acted with an intent to "defraud." Relatedly, defendant asserts that the People have not shown that the NYCTA sustained a loss, a necessary element of larceny. Defendant argues that the basis of his

8

bargain with the NYCTA was for defendant to provide IMEs and reports to the NYCTA for a fee of $400 per examination plus report, that he did precisely that, and that defendant's concealment of his identity did not have any effect on the bargain. Thus, he argues, Advance provided the NYCTA with the exact product agreed to and defendant was fairly paid in accordance with the agreement.

According to defendant, all of the IME reports for which defendant was paid by the NYCTA were analyzed and certified by NYCTA in-house counsel for accuracy, for sufficiency, and for suitability for exchange with plaintiffs' counsel. No report was rejected or deemed insufficient, and there has been no allegation that the medical examinations were improperly done.

Id. at 819-820.

The Defendant's argument in Headley's is directly applicable to the Government's Mallela allegations which, as discussed, merely assert as a basis for criminal liability that the medical P.C.s were not in truth owned and operated by licensed professionals; rather they were owned and operated by non-licensed laypersons.

Like the quality and price of the IMEs in the Headley case in the case at bar the Mallela argument assumes that medically necessary services were provided by licensed professionals to the patient/no fault claimants at the proper price. As such the insurance companies got exactly what they bargained for when they entered into contracts with their policyholders regardless of the misrepresentation as to ownership of the medical P.C.s which misrepresentation is totally irrelevant. Specifically the misrepresentation is irrelevant because the insurance companies according to their contracts must pay for the medically necessary medical treatment performed by licensed professionals upon covered persons that were injured in an accident.

And according to the Mallela theory that is exactly what the insurance companies got – claimants injured in auto accidents who received proper medically necessary treatment from licensed professionals at the right price.

Furthermore the insurance companies suffered no pecuniary loss because they received

their end of the bargain – treatment that was proper in all respects. As such there was no intent to injure the insurance companies because the laypersons knew that the medical P.C.s were providing claimants: proper medically necessary treatment from licensed professionals at the right price.

The Court adopted the Defendant's argument and dismissed the 11 fraud – Grand Larceny by fraudulent inducement – counts of the indictment as well as the conspiracy to commit Grand Larceny. The Court's reasoning is essential because it is dead on with the circumstances of this case. As stated this case involves multiple breaches of no fault contracts as demonstrated by the law cited to above. In Headley the Court warned of the dangers of applying criminal liability to such cases:

> Charges of larceny by false pretenses not infrequently originate in the context of a contractual relationship between the defendant and the complainant. Courts have struggled with the danger of applying criminal liability to conduct arising out of purely civil breaches of contract. "There is a very real danger that ordinary business transactions might be inhibited due to the risk of prosecuting one who is guilty of nothing more than a mere failure to pay his debts or an inability to perform contractual obligations." (*People v Churchill*, 47 NY2d 151, 157 [1979].) **"[C]riminal charges of false pretense are often instituted in reality to compel the payment of debt, and are easily fabricated."** (*People v Williams*, 135 Misc 564, 567 [Cayuga County Ct 1930]; *see also People v Lawrence*, 102 Misc 2d 32 [Crim Ct, NY County 1979].) "[T]he law does not criminalize every breach of contract, and will only call it a larceny when a party has effectively obtained property by a fraud to the detriment of the other party." (*People v Morris*, 28 Misc 3d 1215[A], 2010 NY Slip Op 51331[U], *40 [Sup Ct, NY County 2010].)

Id. at 819-820. (Emphasis added)

The Court enunciated the main factor – the test – for when criminal liability should be applied to a breach of contract.

> The most pivotal inquiry in determining whether larceny occurred in a contractual setting is whether the complainant received the bargained-for benefit. "There would . . . be no taking if the property received was what the alleged victim bargained for." (*People v Morris*, 2010 NY Slip Op 51331[U] at *38.) In order for the elements of larceny to be met, there must be a taking. If an owner consents to part with the property in exchange for a received benefit, there is no taking and no larceny.

The Court in Headley performed a detailed analysis of when a breach of contract amounts to criminal liability as presented below:

> In the following cases, there was clearly a criminal taking of property. By means of material false representations the defendants appropriated property of the complainants that the complainants had not knowingly consented to part with. The fraud went directly to the basis of the bargain because the complainants were deceived as to what they were actually getting—they paid for something they had bargained for but did not receive.

See the Court's description of

> ...People v Gross (51 AD2d 191 [4th Dept 1976]); ... People v Hudson Val. Constr. Co. (165 App Div 626 [3d Dept 1915]); ... People v Kirkup (4 NY2d 209 [1958]); ... People v Avino (34 AD3d 1251 [4th Dept 2006]); ... People v Cambria (204 AD2d 167, 168 [1st Dept 1994]; ... People v Caridi (2006 NY Misc LEXIS 4086 [Sup Ct, Rockland County 2006]); ... People v Drake (61 NY2d 359 [1984]);

> In the foregoing cases, the defendants falsely represented to the complainants that the defendants had delivered the bargained-for benefit. The defendants obtained complainants' money or property, thereby depriving the complainants of property and appropriating it to themselves.

Id. at 821-823.

The Court most importantly discussed cases wherein there was no Grand Larceny through fraud and gave the rational for such findings.

> In the cases discussed infra, there was no larceny because the complainants received the full benefit of the bargain and there was no evidence the defendants intended to deprive the complainants of property. Courts have repeatedly found that fraudulent misrepresentations that do not go to the essence of the product which is the subject of the contract, though intended to induce a party to enter a contract, do not constitute material misrepresentations. Put differently, if the parties to a contract consent to its terms and there are no conditions outstanding, that is, nothing remaining undone under the contract, there is no larceny even if the complainant was induced to enter the contract by the defendant's fraudulent misrepresentations. "[The complainant's] consent to the transfer of the property was full, and without conditions, and in such a case there can be no larceny, although the consent was obtained by fraud." (Zink v People, 77 NY 114, 130 [1879].)

> In People v Morris (2010 NY Slip Op 51331[U]), the court found that there was insufficient evidence to support an indictment for grand larceny where the complainant received the full bargained-for benefit. False representations made by the defendant had

11

no bearing on the complainant's decision to retain a placement agent that it believed would be instrumental in securing a highly desirable investment. The court termed the false representations no more than an "advisory signal." The court found that there was insufficient evidence that the complainant relied on the representations in parting with its money.

In *People v Henning* (42 AD2d 286 [2d Dept 1973]), the general partner in six limited partnerships was charged with larceny by false pretenses for having allegedly made false statements to additional investors that they were replacing original investors. The Appellate Division held that there was no larceny because the investors received precisely what they bargained for, an interest in the partnership in the proportion that their investment bore to the original investment.

In *People v Kirk* (62 Misc 2d 1078 [Rockland County Ct 1969]), the County of Rockland was induced to enter into an employment contract with defendant based on his false representation that he possessed the requisite degree required by the County for appointment as a commissioner. The court ruled that the County was not deprived of any property as a result of the alleged false and fraudulent representation because the salary was paid to him for services rendered. Once the services were rendered, the money was no longer the property of the County, but belonged to defendant …

[See] *People v Deinhardt* (179 App Div 228 [2d Dept 1917]) … *People v Noblett* (244 NY 355 [1927]) …

… *People v Williams* (135 Misc 564 [1930]) … "Not every lie or dishonest or fraudulent act comes within the purview of the criminal law; all moral delinquencies cannot be prevented or punished, and the only safe rule in the administration of criminal justice is to confine its application to those acts which the law expressly condemns." (*Williams* at 567.) Clearly defendant's representation as to how he intended to pay for the merchandise did not go to the essence of the subject of the contract—the goods sold to defendant.

In the more recent case of *People v Vanguard Meter Serv.* (160 Misc 2d 685, 693 [Sup Ct, NY County 1994]), the city contracted with defendants for the installation of water meters. The installation work was done, but the defendants certified, as part of the process of obtaining their progress payments, that they had complied with contractual provisions, to wit, that they had paid their workers at prevailing wage rates and that pre-plumbing work had been supervised by master plumbers. These representations were false. The workers had actually been paid for piecework, substantially less than had they been paid prevailing hourly wages.

The People's theory was that the defendants had stolen the entire contract price, rather than any overpayment to the defendants based on the difference between the prevailing wage and the amount actually paid to the workers. The court rejected the People's theory as a dangerous expansion of the larceny statute. The People "seek to apply the statute not to the property obtained pursuant to the alleged promise, but rather to define such property as the very contractual act itself . . . [where] the People concede [that] the

primary consideration . . . was performed." (*Vanguard* at 692.) "The parties to a contract . . . cannot steal that contract." (*Id.* at 693.)

Id. at 823-826

 In the case at bar the Government's <u>Mallela</u> theory essentially states that the Defendants stole the entire contract price not based upon any misrepresentation as to costs but merely through the irrelevant allegation that the subject medical P.C.s were not truly owned/controlled by medical professionals.

 In any event the Court in <u>Headley</u> delivers its coup de grace by citing to a Second Circuit mail fraud case which aptly brings us full circle:

> Here, the People have charged defendant with stealing all the money he received under the contract on the theory that the NYCTA would not have entered into the arrangement at all had defendant not misrepresented his identity. In *Williams*, *Weisbard* and other cases discussed herein the complainants undoubtedly would never have entered into the contracts had they not been deceived by the defendants' false representations. But to fraudulently induce a party to enter into a contract does not constitute larceny ...

> In this case, no evidence of injury or loss to the NYCTA was shown from which an intent to deprive the NYCTA of property could be inferred. (Penal Law § 155.05 [1].) Defendant produced the IMEs and related reports that he was paid for ... Defendant did not misrepresent the nature or quality of the service he intended to, and did, provide. There is no showing that defendant intended "to get something for nothing," or that injury to the NYCTA was a reasonably probable result of defendant's use of a fictitious name. (*See United States v Regent Off. Supply Co.*, 421 F2d 1174 [2d Cir 1970].)

Id. at 827-828

> Read the above and compare it to the Government's indictment:

> At all times relevant to this Indictment, pursuant to New York State Law, all medical clinics in New York State must have been incorporated, owned, operated, and/or controlled by a licensed medical practitioner in order to be eligible for reimbursement under the No-Fault Law.  Insurance companies would deny all billings for medical treatment from a medical clinic that not actually owned, operated and controlled by a licensed medical practitioner.

(Paragraph 5 of Indictment)

 Now the Court most respectfully knows why the Government's <u>Mallela</u> based portion of

the indictment should be dismissed. Just like in <u>Headley</u> the Government's <u>Mallela</u> theory fails because the fraudulent inducement of a party to enter into a contract does not constitute criminal fraud. Not when the bargained for services were properly provided; wherein there was no misrepresentation as to the nature or quality of the services provided; and the insurance companies were not injured through any alleged irrelevant deception as to who actually owned and controlled the medical P.C.s.

The fact that the insurance company would not pay the layperson owned/controlled facility even if the treatment saved the life of a widow is of no consequence.

3.      Federal Mail Fraud Law

<u>United States v Regent Off. Supply Co.</u>, 421 F2d 1174 (2d Cir 1970) which is discussed by <u>Headley</u> is a Second Circuit mail fraud case. It and other federal cases that are on point will be briefly analyzed herein.

In <u>Regent Office Supply</u>, the Defendant corporation, through salespeople, sold stationary products to customers by telephone. *Id.* at 1176. With <u>Regent</u> the most important take away points are the following:

> The important substantive question on this appeal is: Does solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitute a 'scheme to defraud' or 'obtaining money by false pretenses' within the prohibition of <u>18 U.S.C. § 1341</u>? We hold that, as here presented, it does not and the convictions should be reversed.

<u>Id</u>. at 1179.

Most importantly some of the above false misrepresentations are analogous to <u>Mallela</u> in that they disguise the true ownership of the stationary products the sale of which was aided by misrepresentation. To wit the Defendants actually stipulated in writing as to their misrepresentations which included:

14

their agents 'secured sales' by making false representations to potential customers that:

***

(c) the agent was a doctor, or other professional person, who had stationery to be disposed of.

(d) stationery of friends of the agent had to be disposed of because of a death and that the customer would help to relieve this difficult situation by purchasing it.

Id. at 1176.

The Second Circuit focused on the following: The salespeople made false representations to customers about referrals, among other things, but they made no false representations as to the quality or price of the stationary offered. Id. at 1180-1183. The Second Circuit reversed defendants' conviction for mail fraud because "the falsity of their representations was not shown to be capable of affecting the customers understanding of the bargain or of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception." Id. at 1182.

The degree to which this case is on point is deadly.

See also United States v. Starr, 816 F.2d 94 (2d Cir.1987). In Starr, the Defendants were owners of a bulk mail service that charged customers the amount of postage for the mail plus a fee for their services. The Defendants manipulated the mailings in such a way that they managed to deceive the Postal Service into delivering high postage mail at lower-priced bulk rates, enabling the defendants to pocket the difference between the amount customers paid for the high postage mail and the lower rates. Id. at 96. The Second Circuit held that the defendants did not commit mail fraud since the customers received exactly what they paid for. Id. at 98. Although the customers assumed the money they paid defendants would be directed to a lawful purpose, "that defeated expectation alone [did] not affect the nature or quality of the services" defendants provided. Id.

15

Focusing on the last sentence you could not find more analogous case law. See also United States. v. Novak, 443 F. 3d 150, 156 (2d Cir. 2006); United States v. Shellef, 507 F. 3d 82, 108 (2d Cir. 2007). ("But we are concerned here only with the sufficiency of the indictment, not the sufficiency of the evidence. The jury here might have erroneously convicted Shellef and Rubenstein even though it concluded that the defendants did not misrepresent an "essential element" of the bargain, but rather made "simpl[e] fraudulent inducements to gain access to" Allied and Elf products ... Because we cannot rule out that possibility, we do not think a jury can be permitted to convict either defendant on the "no-sale" theory. *See Szur,* 289 F.3d at 208 (concluding that a remand is required where the jury may have convicted on a legally invalid theory)")

If Mallela is criminalized slippery slope arguments abound. Having both prosecuted no fault insurance fraud and represented insurance companies in no fault cases I can envision a Salem Witch Trial/McCarthy like rush to label medical P.C.s as fraudulently incorporated.

Witness a recent decision of the Supreme Court, State of New York. Valley Psychological, P.C. v. State Farm Mutual Automobile Insurance Company, Index No. 3182/2008 (Sup. Ct. of New York, Co. of Saratoga, Justice Ferradino, Stephen A., March 25, 2010)

> The plaintiff, the assignee of the no-fault insurance claim rights of numerous individuals insured by the defendant, has once again been left with no real choice but to commence an action to seek payment from the defendant. The plaintiff seeks reimbursement on approximately one hundred and forty-three claims for psychological treatment provided to the defendant's insured involving automobile accidents. The plaintiff contends payment is due because the defendant failed to timely deny coverage or seek verification of the insurance claims in violation of the no fault insurance law and regulations. See, Insurance Law Section 5106(a); 11 NYCRR Section 65-3.5. The defendant counters that Valley Psychological is owned, operated and controlled by Andrew Blumenthal, a non-professional, in violation of New York 11 NYCRR 65-3.16(a) (12) and is therefore ineligible to collect no-fault benefits for the claims in dispute in this case.

(Id. at Pages 1-2)

State Farm moved for additional discovery in the form of financial documents and the examination before trial. The Plaintiff cross moved for summary judgment or the alternative an order pursuant to CPLR 3124 compelling defendant to disclose various items.

The Court's analysis is of particular relevance. First the Court took issue with certain "employee statements" introduced by State Farm which the Court called "a collection of speculative presumptions created by an overzealous insurance investigator." (Page 6) Next the Court commented:

> Likewise, the fact that Jonathan Kogan is not paid what the defendant thinks he should be paid out of an account compared to what he pay his business manager is not evidence of fraudulent incorporation. Considering the time the defendant alone asks of Dr. Kogan to attend EUO's and supply materials in support of its claims it is no wonder he needs to employ a business manager.

Id.

The Court commented on State Farm's claim based upon uncertified documents that an employee of Valley pled guilty to a felony in Florida: "Such inflammatory submissions are neither persuasive or instructive." Id. The Court continued:

> The court has considered the other "evidence" developed by the defendant's investigators and finds most of it nothing more than speculations fuelled by hyperbole.

Id.

The Court then noted that its prior findings had not changed:

> Dr. Kogan does not personally provide all the services. Employees of the plaintiff perform some of the services such as intakes and psychotherapy sessions. Not unlike many professionals Dr. Kogan does not perform the administrative tasks associated with running the day to day operations of Valley Psychological. He retains someone to handle almost all administrative aspects for the business. This is not unlike doctors, lawyers or accountants who hire business managers. These facts do not provide evidence of fraudulent incorporation.

Id. at 7.

What immediately follows is extraordinary:

> The defendant seems to have made the plaintiff its white whale. Its relentless pursuit is able to be fuelled by the might of the corporate enterprise behind the defendant. As stated earlier the defendant has pursued its hunt for over five years in various venues and has yet to establish its defense. Perhaps its goal is merely to drive the plaintiff out of business by refusing to pay claims and forcing the plaintiff to incur ongoing litigation costs. The defendant appears to have lost sight of its statutory and regulatory obligations in its quest to prove a defense at all costs.

Id.

The Court granted plaintiff summary judgment.

As it currently stands it is hard to be a medical provider in No Fault as demonstrated above. Add arrest to the mix – people are falsely arrested every single day in this country – and you have doctors that will leave No Fault in droves. Only the hacks will remain.

Witness the following case:

In Hampton v. State Farm Mutual Automobile Insurance Company, WD 66791 (Court of Appeals of Missouri, Western District, January 8, 2008) the Court upheld an 8 million dollar punitive damages award against State Farm. The Plaintiffs automobile was stolen. Plaintiffs reported the theft and made a claim. State Farm concocted a story claiming that the Plaintiffs actually ditched the vehicle in order to collect insurance money. State Farm threatened the claimants with jail if they pursued their claim. The claimants pursued their insurance claim.

As a result State Farm's falsified reports and evidence was passed on to the National Insurance Crime Bureau ("NICB") with the purpose of having it pushed upon law enforcement. The NICB did as they were told and the Hamptons were arrested. They were subsequently cleared and brought suit for malicious prosecution and punitive damages.

> State Farm alleges that the four-million dollars punitive damage award to each plaintiff, totaling an eight-million dollar award, violates its rights under the United States Constitution and under the Kansas punitive damage statute. State Farm argues that the trial court should have declined to award punitive damages, or in the alternative, that the amount of punitive damages awarded was excessive.

The Court held: "the amount of punitive damages was reasonable."

The NICB is a familiar face in this case. They appear in various applications – the Affidavits of law enforcement. And the Government can correct me if I am wrong but they also tabulated the Government's loss amounts. In fact the Government has turned over various reports and compilations generated by the NICB and utilized in this case. The NICB is a non-governmental insurance industry trade organization that lobbies and investigates such that insurance companies do not have to pay claims.

As a result of the criminalization of <u>Mallela</u> New York will have a crippled class of No Fault rate paying citizens that could properly be labeled "Victims of <u>Mallela</u>."

### **Point II**

### **THE FIRST COUNT OF THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT IS DUPLICITOUS**

"An indictment is duplicitous if it joins two or more distinct crimes in a single count. *United States v. Murray,* 618 F.2d 892, 896 (2d Cir.1980)." <u>U.S. v. Araci</u>, 968 F.2d 1512 (2d Cir. 1992)

The Defendant is a aware that

A duplicitous indictment, which alleges several offenses in the same count, must be distinguished from "the allegation in a single count of the commission of a crime by several means." *Id.* The latter is not duplicitous.

<u>Id</u>. at 1518.

Most importantly the Defendant is also aware that

A conspiracy indictment presents "unique issues" in the duplicity analysis because "a single agreement may encompass multiple illegal objects." *Murray,* 618 F.2d at 896. In this Circuit "it is well established that '[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for "[t]he conspiracy is the crime and that is one, however diverse its objects." ' " *Id.* (citations omitted); *see also Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942) ("Whether the object

of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.").

Id.

The Second Circuit noted that the policy considerations underlying the prohibition against duplicitous indictments are varied.

As we previously have stated, these considerations include:

avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

Id.

Important policy considerations underlie the rule that two or more distinct crimes should not be alleged in a single count of an indictment. If an indictment is duplicitous, a general verdict of guilty will not reveal whether the jury found defendant guilty of only one crime and not the other, or guilty of both ... Moreover, a guilty verdict on a duplicitous indictment does not indicate whether the jury found defendant guilty without having reached a unanimous verdict on the commission of a particular offense. Thus, the prohibition of duplicity is said to implicate a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution.

U. S. v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)

Count One of the indictment charges Racketeering Conspiracy at Paragraphs 1 through 22 involving the violation of the RICO statute predicated upon mail fraud and money laundering violations. That is fine.

The problem lies in the fact that while the indictment purports to allege one conspiracy – the so called "No-Fault Organization" – the language of the indictment actually lays out multiple conspiracies that violated RICO predicated upon mail fraud and money laundering violations.

At Paragraph 1 the conspiracy is defined as consisting of Zemlyansky, Danilovich,

Zayonts, Kremerman, Conroy, Barukhin, Ostrumsky, Treysler as defendants along with "others known and unknown." However by Paragraph 14 we get different permutations of the above supposedly single conspiracy.

> One operating branch was organized and directed by Mikhail Zemlyansky ... Michael Danilovich ...[1] the defendants. The second operating branch was organized and directed by Yuriy Zayonts ... and Mikhail Kremerman, the defendants. These operating branches intertwined and overlapped, both directly and through intermediaries, including other members of the No-Fault Organization, as described in more detail below. Each operating branch owned, operated and controlled multiple No-Fault Clinics and many Modality Clinics, all of which submitted their bills to insurance companies through other entities they controlled. Both operating branches also laundered the proceeds of the scheme through shell companies, structured checks, and check cashers.

Now it appears that there are at least two conspiracies. It can certainly be read that way by the clear and unambiguous language of the indictment.

In fact Treysler, Ostrumsky and Conroy are not yet directly mentioned – and we do not know if they are indirectly mentioned – so they can be out there participating in their own conspiracy. We have multiple paragraphs that came before the subject paragraph describing the criminal activity they are allegedly committing. But we need not conjecture since additional conspiracies are described in the indictment.

At Paragraph 15 under the heading "The Defendants" there is a description of how Zemlyansky and Danilovich referred "Patients to other Modality Clinics" some of which they owned and some of which were "owned operated and controlled" by Zayonts and Kremerman. The Paragraph goes on to state that Zemlyansky and Danilovich were "Modality Controllers for two MRI clinics in Brooklyn, New York, as well as for numerous acupuncture and chiropractic clinics in and around New York City. The remainder of the paragraph discusses the activities of Zemlyansky and Danilovich regarding billing insurance companies through their "No-Fault Clinics" and "Modality Clinics" as well as Zemlyansky and Danilovich's money laundering.

---

[1] I am deleting the a/k/a designations such as "Fat Mike."

Paragraph 16 described the activities of Zayonts and Kremerman with regard to "numerous medical clinics" including "No Fault Clinics" and "numerous fraudulent neurology clinics." This included getting "Patient referrals" from Zemlyansky and Danilovich in exchange for kickbacks. The rest of the paragraph described Zayonts and Kremerman's money laundering activity and insurance billing activity.

Viewing the indictment shows us at least two conspiracies so far. We cannot read the minds of the Government nor accept an explanation. The indictment says what it says.

Furthermore just because the Zemlyansky/Danilovich conspiracy worked with the Zayonts/Kremerman conspiracy does not mean that they are one conspiracy. Indeed there would no problem in separating out the Zemlyansky/Danilovich and Zayonts/Kremerman conspiracies into two separate counts and include their joint conspiracy as a third count. This is true for all the above described conspiracies.

Most importantly they indictment does not say that Zemlyansky/Danilovich and Zayonts/Kremerman worked only with each other. Indeed the amount of work that is done together is never quantified. And the vagueness of multiple clinics tends to argue that the both conspiracies had robust business on their own without relying on each other.

Where are Barukhin, Ostrumsky, Treysler and Conroy. Paragraph 17 describes how Conroy "advised and directed" Zemlyansky, Danilovich, Zayonts and Kremerman in "various aspects of their criminal activity." Conroy could be involved in three conspiracies: the Zemlyansky/Danilovich conspiracy; the Zayonts/Kremerman conspiracy; and the grand conspiracy.

When we get to Paragraph 18 we find Barukhin the "financial partner of" Zemlyansky/Danilovich who handled the medical billing and collections for various clinics he

22

owned and operated with Zemlyansky/Danilovich. So Barukhin has nothing to do with Zayonts/Kremerman.

This brings us to Paragraph 18 where we find Ostrumsky and Treysler who separately "owned, operated and controlled multiple No-Fault Clinics" and "referred patients to Modality Clinics owned, operated and controlled by" Zemlyansky/Danilovich in return for "kickbacks." The rest of the paragraph describes Treysler and Ostrumsky's money laundering.

Again this is easily another conspiracy – the Treysler/Ostrumsky conspiracy – that does an un-quantified amount of business with Zemlyansky/Danilovich.

Paragraphs 21 through 22 reunite all eight of the RICO Defendants for the boilerplate statutory language finale.

We can only estimate the number of separate and discreet conspiracies described by the indictment. And while some cross paths, others do not. How is Conroy involved with Treysler and Ostrumsky. There is no involvement according to portions of the indictment. There is also no involvement between Treysler/Ostrumsky and Zayonts/Kremerman according to portions of the indictment. Yet other portions of the indictment conclude that they are all one conspiracy.

The indictment alleges one conspiracy not only without support but with competing and contradictory allegations. The indictment's allegation of one conspiracy is done in by the language of the indictment itself. A sort of indictment suicide at least as it pertains to the single conspiracy. To wit if the Government received a conviction of all eight RICO Defendants based upon the one big conspiracy theory the verdict would have to be tossed because not all eight defendants conspired with each other according to and admitted by portions of the indictment.

Moreover if Boris Treysler or any other RICO Defendant beats this at trial the Government can come back with an indictment based upon the other smaller "branch"

conspiracies described above. Boris can assert double jeopardy. The Government can assert the following: "you beat the big single conspiracy that was alleged in the indictment. Look at the indictment. It distinctly said one single conspiracy involving all 8 RICO Defendants." Boris Treysler does not have the infinite resources of the United States Government. He should not have to face the argument.

Here a general verdict of guilty will leave the Defendants and the Courts wondering "guilty of what." The big conspiracy or the smaller ones that are clearly discernible in the indictment. We just will not know.

Does this morass of overlapping conspiracies give Boris Treysler the notice to prepare his defense. How do we counteract the notion given by the indictment that Treysler is affiliated with Zayonts/Kremerman or Conroy and visa-versa when according to the less clear parts of the indictment Treysler is not.

According to the indictment Zemlyansky/Danilovich form some sort of hub I would assume. But it is an ill-defined hub. How much business did Zemlyansky/Danilovich do with the other discernible conspiracies which based on the indictment appears to be doing fine without them. This is true of all the little separate conspiracies.

In short the biggest problem with the indictment is that it states that all eight RICO Defendants are associated in a number of paragraphs. Other paragraphs of the indictment demonstrate without stating such that not everyone is connected.

### Point III

### SUPPRESSION OF THE FRUITS OF THE ELECTRONIC INTERCEPTION

The Defendant Boris Treysler joins in the arguments made by my esteemed colleague Ronald P. Fischetti Esq. on behalf of Mikhail Zemlyansky.

24

### Point IV

**MOTIONS FOR AN ORDER <u>(a)</u> REQUIRING THE GOVERNMENT TO ABIDE BY ITS OBLIGATIONS PURSUANT TO <u>BRADY</u>, and; <u>(b)</u> FOR AN ORDER, PURSUANT TO <u>RULES 402</u> AND <u>404(B)</u> OF THE FEDERAL RULES OF EVIDENCE AND <u>RULE 12 (D) (2)</u> OF THE FEDERAL RULES OF CRIMINAL PROCEDURE, DIRECTING THE GOVERNMENT TO DISCLOSE ANY "BAD ACT" OR "SIMILAR COURSE OF CONDUCT" EVIDENCE IT INTENDS TO INTRODUCE AT TRIAL**

The Defendant Boris Treysler joins in the arguments made by my esteemed colleague

Glenn Garber Esq. on behalf of Billy Geris M.D.

### Point V

**THE MOTION FOR AN ORDER, PERMITTING THE DEFENDANT BORIS TREYSLER TO JOIN IN AND ADOPT BY REFERENCE, WHEREVER APPLICABLE, THE MOTIONS AND MEMORANDUMS OF LAW, ETC., OF HIS CO-DEFENDANTS**

For purposes of efficiency as discussed in Court the above relief should be granted.

### <u>LEAVE TO MAKE FURTHER MOTIONS</u>

It is possible that additional information may come to the attention of the defense, both

through the relief this Court may grant, and through further proceedings during the pendency of

this case.  In such event, the Defendant respectfully requests that the Court entertain further

motions, as may be appropriate for relief in the future, as such need becomes recognizable.


DATED:        January 18, 2013
              Garden City, New York


                        Respectfully,

                        RAYMOND J. ZUPPA
                        The Zuppa Firm PLLC
                        1205 Franklin Avenue
                        Suite 340
                        Garden City, New York 11530
                        (516) 280-9833