UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

       - v. -                    S1 12 Cr. 171 (JPO)

MIKHAIL ZEMLYANSKY, et al.,

             Defendants.

-------------------------------------------------------------------- X


# THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Daniel S. Goldman
Nicholas L. McQuaid
Carolina A. Fornos
Daniel S. Noble
*Assistant United States Attorneys*
    *- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

I.     THE ZEMLYANSKY WIRETAP EVIDENCE SHOULD NOT BE SUPPRESSED ...............1

   A.   THE GOVERNMENT'S MINIMIZATION WAS OBJECTIVELY REASONABLE ............1

      1.  Background .........................................................................................2

      2.  Applicable Law..................................................................................7

      3.  Discussion........................................................................................11

   B.   THE GOVERNMENT PROPERLY EXHAUSTED NECESSITY ON ZEMLYANSKY'S PHONE ..38

      1.  Applicable Law.................................................................................38

      2.  Discussion ........................................................................................40

   A.   BACKGROUND .............................................................................................43

   B.   DISCUSSION.................................................................................................46

      1.  Evidence of Fraudulent Incorporation Should Not Be Precluded........................47

      2.  The Motions to Dismiss the Fraudulent Incorporation Theory of Fraud Are Premature and Should Therefore Be Denied..............................................49

      3.  On the Merits, the Defendants' Fraudulent Incorporation of Medical Clinics Was One Type of Affirmative Misrepresentation That Satisfies Mail Fraud's First Element ...........................52

III.   THE TRISTATE SEARCH WARRANT WAS ENTIRELY LAWFUL AND CONSISTENT WITH FOURTH AMENDMENT REQUIREMENTS ...........................................................69

   A.   BACKGROUND .............................................................................................69

   B.   DISCUSSION.................................................................................................73

      1.  Defendants' Facial Challenges to the TriState Search Warrant Lack Merit .....................74

      2.  Suppression Is Not Proper Because the Good Faith Exception Applies in This Case ........84

      3.  Defendants' Delay Arguments Relating To The Execution Of The Tristate Search Warrant Lack Factual and Legal Basis .......................................................89

IV.   THE GOVERNMENT CONSENTS TO A HEARING ON MICHAEL BARUKHIN'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM HIS APARTMENT ...........................................91

V.   DEFENDANTS' MISCELLANEOUS MOTIONS SHOULD BE DENIED ...........................92

   A.   THE GOVERNMENT IS AWARE OF ITS *BRADY*, *KYLES*, AND *GIGLIO* OBLIGATIONS AND HAS FULLY COMPLIED TO DATE.......................................................92

   B.   404(B) EVIDENCE WILL BE TURNED OVER IN A TIMELY MANNER ...............94

   C.   THE GOVERNMENT HAS COMPLIED WITH ITS DISCOVERY OBLIGATIONS....................95

   D.   THE DEFENDANTS' REQUESTS FOR SEVERANCE ARE PREMATURE .....................95

   E.   THE DEFENDANTS' MOTION TO STRIKE SURPLUSAGE IS PREMATURE..............................97

   F.   THE DEFENDANTS' MOTION FOR A BILL OF PARTICULARS IS UNTIMELY AND WITHOUT MERIT.................................................................97

   G.   COUNT ONE OF THE INDICTMENT IS NOT DUPLICITIOUS .................................100

1

**CONCLUSION** .................................................................................................................................**102**

<u>PRELIMINARY STATEMENT</u>

The Government respectfully submits this Memorandum of Law in Opposition to a series of motions filed by various defendants on or about February 18, 2013, including (i) a motion by defendant Mikhail Zemlyansky to suppress evidence derived from wiretaps on his phone; (ii) motions by defendants Yuriy Zayonts, Michael Danilovich and Boris Treysler to dismiss the "fraudulent incorporation theory" of Counts Two and Three of the Indictment; (iii) a motion by defendant Vladislav Zaretskiy to suppress evidence obtained pursuant to a search warrant of TriState Billing; (iv) a motion by Michael Barukhin to suppress evidence obtained from his apartment pursuant to written consent; and (v) and other miscellaneous motions filed by a number of defendants.[1]   For the reasons that follow, all of the motions should be denied, with the exception of the motion to suppress by Michael Barukhin, for which the Government consents to a hearing.

I.       <u>THE ZEMLYANSKY WIRETAP EVIDENCE SHOULD NOT BE SUPPRESSED</u>

A.       **The Government's Minimization Was Objectively Reasonable**

Defendant Mikhail Zemlyansky moves to suppress all communications intercepted over his cellphone pursuant to four wiretap orders on the ground that the Government acted

---

[1]       These additional motions include: (i) requiring the Government's compliance with its *Brady* obligations, specifically material exculpatory information and impeachment evidence relating to the Government's witnesses; (ii) that prejudicial surplusage be stricken from the Indictment; (iii) that the Government provide some defendants with a bill of particulars; (iv) disclosure of any "bad act" or "similar course of conduct" evidence the Government seeks to introduce at trial and directing the Government to identify the witnesses through whom such evidence will be introduced; (v) that certain defendants be severed from trial of the other co-defendants; and (vi) dismissal of Count I as duplicitous. A number of defendants joined in the various motions of co-defendants.  For ease of reference, the Government refers to the motions by the name of the moving defendant.  To the extent a specific motion or part thereof has been rendered moot for any reason, those reasons are set forth herein.  Finally, to the extent the Government has failed to respond to any motions, it is an inadvertent oversight and not meant to concede the validity of the motions.

1

unreasonably in failing to minimize non-pertinent conversations.[2] The motion is without merit and should be denied without a hearing.

### 1.       Background

Based primarily on information provided by a cooperating witness and communications intercepted over co-defendant Michael Danilovich's cellphone[3], on March 1, 2011, the Government applied for and received authorization to intercept wire communications over Zemlyansky's cellphone (the "Zemlyansky Phone") for an initial 30-day period. (*See* Exh. 1). As set forth in the March 1, 2011 Affidavit of FBI Special Agent Donald Anspacher, the Government's investigation at that point in time had revealed that Zemlyansky was intimately involved in the no-fault insurance fraud scheme and other health care fraud schemes, including an effort to open a dental clinic in upstate New York that would be used to defraud Medicare and Medicaid. (*See* Exh. 1, 3/1/11 Affidavit of Special Agent Donald Anspacher ("Anspacher Aff.") ¶¶ 16, 20-21, 32, 34). The investigation had further revealed that Zemlyansky had participated in high-end illegal poker games organized by Molly Bloom in Manhattan. (*Id.* ¶¶ 5, 15, 25). In addition, the Government had identified certain locations through which the no-fault insurance

---

[2]        To the extent other defendants seek to join in Zemlyansky's motion to suppress wiretap evidence as "aggrieved person[s]," 18 U.S.C. § 2518(10)(a), they fail to show that they had any expectation of privacy in Zemlyansky's cellphone that would provide a basis for them to seek suppression of this evidence. *See United States* v. *Ruggiero*, 928 F.2d 1289, 1303 (2d Cir.1991) (holding that only an individual with a privacy interest in a subject telephone, or in the premises in which a telephone is located, has standing to contest the minimization procedures employed with respect to that telephone); *accord United States* v. *Marroquin-Corzo*, No. S1 10 Cr. 892(DAB), 2012 WL 3245473, at *8 (S.D.N.Y. Aug. 7, 2012); *United States* v. *Salas*, No. 07 Cr. 557(JGK), 2008 WL 4840872, at *8 (S.D.N.Y. Nov. 5, 2008).

        Although Boris Treysler's notice of motion purports to seek suppression of intercepted communications over his cellphone (*see* Boris Treysler Notice of Motion, at ¶ 3), his brief provides no basis for such relief (*see* Treysler Mot. at 24). To the extent Treysler "joins in the arguments made by . . . Zemlyansky" (Treysler Mot. at 24), such arguments have nothing to say about the Government's minimization efforts or the necessity of the wiretap as to Treysler's cellphone. In any event, Treysler does not point to any calls over his cellphone that were improperly minimized and, therefore, his motion should be denied. *See, e.g.*, *United States* v. *Kazarian*, No. 10 Cr. 895(PGG), 2012 WL 1810214, at *17 (S.D.N.Y. May 18, 2012) ("Failure to provide the required specificity warrants rejection of a defendant's minimization objections.").

[3]        Danilovich has not moved to suppress the wire communications intercepted over his cellphone.

fraud was perpetrated, including the Tanella Law Office, located at 2517 86th Street in Brooklyn, New York, and several fraudulently incorporated medical professional corporations ("PCs"), including an MRI Clinic, located at 2965 Ocean Parkway in Brooklyn.  (*Id.* ¶ 21).  The Government had also learned the identities of certain of Zemlyansky's co-conspirators, including Michael Danilovich, a/k/a "Misha," a/k/a/ "Slim," Yevgeniy Shuman, a/k/a "Zhenya," Michael Barukhin, Dmitry Bedny, a/k/a "Dave," and Robert Sukhman.  (*Id.* ¶ 5).  The Government had not, however, identified all of the individuals involved in the no-fault insurance fraud or operation of illegal gambling, the nature and scope of those individuals' crimes, the other individuals they worked for and with, their locations, or the location and use of fraudulent proceeds.  (*See id.* ¶ 54).  In addition, although the Government had learned that certain defendants' family members, including Danilovich's father (Mark Danilovich), sister-in-law (Diana Zaidman), and Leonid Kaplan's wife (Ogla Bard), were participants in the no-fault insurance fraud (*see id.* ¶¶ 30, 44), the investigation had not uncovered the full extent of other family members' involvement.[4]

Accordingly, the purpose of seeking interception of wire communications over the Zemlyansky Phone was broad.  For example, in the March 1, 2011 authorization order, Judge Alvin K. Hellerstein found that there was probable cause to believe that interception of wire communications over the Zemlyansky Phone would reveal, among other things: (1) the nature, scope, extent, and method of operation of the fraudulent schemes and illegal gambling; (2) the identities and roles of accomplices, aiders and abettors, co-conspirators, and other participants in,

---

[4]       Pursuant to the May 18, 2011 wiretap authorizing interception of communications over Boris Treysler's cellphone, the Government subsequently discovered that Treysler's wife was also intimately involved in the no-fault insurance fraud.  Specifically, calls between Treysler and his wife showed that she helped manage Treysler's fraudulent clinics, including patient billing, tracking litigation and arbitration of claims, and handling checks for doctors.

and the victims of, those illegal activities; (3) the receipt and distribution of contraband, money and other proceeds resulting from those illegal activities; (4) the existence and location of items used to further those illegal activities; (5) the existence and location of records used to record or receive the proceeds of those illegal activities; and (6) the location and source of resources used to finance the proceeds of those illegal activities.  (*See* Exh. 1, 3/1/11 Wiretap Order, at US000785).

Immediately upon obtaining the initial wiretap authority for the Zemlyansky Phone, one of the two Supervising Assistant United States Attorneys ("Supervising AUSAs") gave an oral presentation to the agents and translators concerning proper minimization procedures. (*See* Zemlyansky Exh. B, 3/15/11 Periodic Report, at US000813).  A copy of both the affidavit and wiretap order were made available to the agents and translators.  Each agent and translator who monitored wire communications over the Zemlyansky Phone was required to read the minimization instructions and sign them to indicate that they had done so.  (*See id.*; Exh. 2, 3/1/11 Minimization Instructions).  A copy of the minimization instructions was also made available in the wire room for their ongoing reference.  (*See* Zemlyansky Exh. B, 3/15/11 Periodic Report, at US000813).

The minimization instructions included directions regarding the treatment of calls between Zemlyansky and his wife, family members, and other individuals.  Specifically, the instructions stated, in pertinent part:

<u>Husband-Wife</u>
22.     We also treat certain communications between spouses as privileged. You are to discontinue monitoring if you discover that you are intercepting a personal communication solely between husband and wife.  If it appears that a third person is present during this communication, however, the communication is not privileged.  So, too, if the communication deals not with private

4

matters between husband and wife, but instead with ongoing as opposed to past violations of the law, it is not a privileged communication.

### Other Relationships

23.     No legal privilege exists with regard to communications between the subject and his or her paramour.  Similarly, no legal privilege exists with regard to communications between the subject and his children, or relatives.  Keep in mind, however, that our function is to intercept and record communications related to ILLEGAL ACTIVITIES [*i.e.*, mail fraud, wire fraud, bank fraud, health care fraud, and operating illegal gambling businesses], not indiscriminately to invade the privacy of our subject and others.  In general, follow the "spot monitoring" rules . . . if communications of this type are intercepted.

(Exh. 2, 3/1/11 Minimization Instructions, at ¶¶ 22-23).

The Government subsequently applied for and received authorization to continue to intercept wire communications over the Zemlyansky Phone for three additional 30-day periods on April 4, May 18, and June 28, 2011.  (*See* Exhs. 3-5).  Following the May 18, 2011 authorization order, which also authorized interception of wire communications over the cellphones of co-conspirators Robert Sukhman and Boris Treysler, one of the Supervising AUSAs gave another oral presentation to the agents and translators monitoring wire communications over the Zemlyansky Phone concerning proper minimization procedures.  (*See* Zemlyansky Exh. B, 6/2/11 Periodic Report, at US001131).  Again, written minimization instructions were posted in the wire room and the agents and translators were required to read and sign a copy.  (*See id.*; Exh. 6, 5/18/11 Minimization Instructions).[5]

---

[5]     Copies of Exhibit 2 (3/1/11 Minimization Instructions) and Exhibit 6 (5/18/11 Minimization Instructions) were turned over to the defendants on February 7, 2013.  The April 4, 2011 and June 28, 2011 wiretap orders were simply reauthorizations of the previous orders; accordingly, the minimization instructions provided on March 1, 2011 and May 18, 2011 remained in effect for those orders, respectively.

On July 12, 2011, FBI agents approached Robert Sukhman, informed him that he was a target of an ongoing investigation, and offered Sukhman the opportunity to cooperate with the Government.  On July 13, 2011, Sukhman met with the Government and agreed to proceed with the cooperation process by providing information to the Government. Based on Sukhman's willingness to provide information to the Government, the FBI stopped monitoring communications over Sukhman's cellphone.  In a July 15, 2011 periodic report to Judge Barbara S. Jones, who had signed the June 28, 2011 wiretap order, the Government disclosed Sukhman's decision to attempt to cooperate, but maintained that continued interception of communications over the Zemlyansky Phone was necessary.  (*See* Zemlyansky Exh. B, 7/15/11 Periodic Report, at US001314).  Interception of wire communications over the Zemlyansky Phone terminated approximately two weeks later, on July 27, 2011.

Between March 2 and July 27, 2011, over 50 different agents, contract monitors, and translators monitored the wire communications over the Zemlyansky Phone from a FBI wire room in Manhattan.  (*See* Exh. 1, Anspacher Aff. ¶ 80; Exh. 2, 3/1/11 Minimization Instructions, at US11359-US11362; Exh. 6, 5/18/11 Minimization Instructions, at US11382-US11385).  For each call intercepted, monitors and translators created contemporaneous "line sheets," which indicated whether the call was pertinent and included a brief synopsis.[6]  Because many calls were in Russian, translators worked with agents who did not speak Russian to monitor such conversations to determine pertinence and to summarize the conversations on line sheets. Although the Government attempted to ensure that translators were available to monitor Russian calls "real-time," this did not occur due to the unavailability of translators on a few occasions

---

[6]     For the Court's reference, the Government has provided a copy of the line sheets for all electronic and wire communications intercepted over the Zemlyansky Phone as Exhibit 7.  Copies of these line sheets were previously produced in discovery to the defendants.

over the four wiretaps.  The line sheets created by the agents, monitors and translators, in turn,

were reviewed regularly by the two Supervising AUSAs.  In addition, the Supervising AUSAs,

in conjunction with the case agents, prepared periodic progress reports that were submitted

approximately every ten days to the authorizing judges for their review.  (*See* Zemlyansky Exh.

B).

       During the course of the four wiretaps, approximately 3,747 voice calls (not including

text messages) were intercepted over the Zemlyansky Phone.  (*See* Exh. 8, Summary of Wiretap

Statistics).[7]  Of the 3,747 total calls intercepted, only approximately 626 lasted longer than two

minutes, and of those, 315 were determined to be pertinent.  Of the remaining 311 non-pertinent

calls, 237 were minimized. Accordingly, there were only approximately 74 calls – less than two

percent of the total 3,747 calls – that were non-pertinent and longer than two minutes, but not

minimized.  (*See id.*).

       ## 2.       Applicable Law

       Title III provides that every wiretap order must "contain a provision that the authorization

to intercept . . . shall be conducted in such a way as to minimize the interception of

communications not otherwise subject to interception." 18 U.S.C. § 2518(5).  "The minimization

requirement 'does not forbid the interception of all nonrelevant conversations, but rather

instructs the agents to conduct the surveillance in such a manner as to "minimize" the

interception of such conversations.'"  *United States* v. *Kazarian*, No. 10 Cr. 895(PGG), 2012 WL

---

[7]       Exhibit 8 was prepared based on the line sheets and data obtained from the FBI's Voice Box monitoring system for the wire communications intercepted over the Zemlyansky Phone.  The 3,747 total calls exclude malfunctioned calls and unmonitored calls, which if added would bring the total to approximately 4,188 intercepted calls.  Although it is unclear how Zemlyansky calculated the 4,119 total calls cited in his brief (*see* Br. 1), the difference in the parties' calculation is immaterial to the resolution of Zemlyansky's motion.  The Government uses the more conservative 3,747 total calls in the analysis herein.

1810214, at *13 (S.D.N.Y. May 18, 2012) (quoting *Scott* v. *United States*, 436 U.S. 128, 140 (1978)).

In *Scott* v. *United States*, 436 U.S. 128 (1978), the Supreme Court's seminal decision on the standard to be applied to motions to suppress based on inadequate minimization, the Court endorsed and adopted the position that whether there has been a violation of Title III's minimization requirement in any given case "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Id*. at 136.  Focusing on the language of Title III (among other things), the Supreme Court explained that in any evaluation of whether the statutory requirements were violated, "Congress . . . made it clear that the focus was to be on the agents' actions not their motives." *Id*. at 139.  The Government's performance of this duty must be objectively reasonable and reflect "honest effort." *United States* v. *Uribe*, 890 F.2d 554, 557 (1st Cir. 1989).  But "perfection is usually not attainable, and is certainly not legally required." *Id.*

With respect to how courts should engage in the "determination of reasonableness," the Supreme Court explained that "[b]ecause of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." *Scott*, 436 U.S. at 139.  The Supreme Court did, however, provide some guidance through its analysis of the particular case before it.  First, in looking at the issue of whether monitoring agents excessively monitored non-pertinent calls, the Supreme Court noted that comparing "percentages [of pertinent and non-pertinent calls] may provide assistance," but that reference to percentages alone was "not a sure guide to the correct answer." *Id*. at 140.  Second, the Supreme Court explained that consideration of "the circumstances of the wiretap" was "important," including whether the conspiracy under investigation is "widespread" and the "type of use to which the

8

telephone [being monitored] is normally put." *Id.* Finally, the Supreme Court observed that "[o]ther factors may also play a significant part in a particular case." *Id.* at 141. In particular, the Supreme Court found that "it may be important to determine at exactly what point during the authorized period the interception was made," because the lack of information "[d]uring the early stages of surveillance" may make the interceptions of calls reasonable at that stage, even though "[i]nterception of those same types of calls might be unreasonable later on." *Id.* at 141.

"Courts applying *Scott*'s objective reasonableness standard have evaluated the government's minimization efforts in the context of the entire wiretap, as opposed to a chat-by-chat analysis." *United States* v. *Goffer*, 756 F. Supp. 2d 588, 592 (S.D.N.Y. 2011) (internal quotation marks omitted). "[T]he mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute . . . . [N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated." *United States* v. *Bynum*, 485 F.2d 490, 500 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 903 (1974). Moreover, the minimization requirement does not extend to calls lasting two minutes or less. *See United States* v. *Capra*, 501 F.2d 267, 276 (2d Cir. 1974) (observing that two minutes is "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation" (internal quotation marks omitted)); *Bynum*, 485 F.2d at 500 (holding that calls less than two minutes were eliminated from consideration of the minimization requirement); *accord Kazarian*, 2012 WL 1810214, at *13.

In addition, courts have identified several measures which, if taken by the Government, support a finding of compliance with the minimization requirement of § 2518(5). These include: (1) maintenance of monitoring logs; (2) judicial supervision of the progress of the surveillance; (3) provision of written and oral instructions to monitoring personnel regarding the legal

9

requirements for minimization; (4) requiring all monitoring personnel to read the court orders and applications, and posting of the minimization instructions, court orders and applications at the monitoring plant; and (5) supervision by the prosecutor. *See, e.g.*, *United States* v. *Marroquin-Corzo*, No. S1 10 Cr. 892(DAB), 2012 WL 3245473, at *7 (S.D.N.Y. Aug. 7, 2012); *Kazarian*, 2012 WL 1810214, at *15-16; *United States* v. *Salas*, No. 07 Cr. 557(JGK), 2008 WL 4840872, at *8 (S.D.N.Y. Nov. 5, 2008).

"Once a prima facie showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, a substantial number of non-pertinent conversations have been intercepted unreasonably." *United States* v. *Rajaratnam*, No. 09 Cr. 1184(RJH), 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010).  "Where a defendant cannot make such a showing, courts generally reject a claim of improper minimization without a hearing." *Kazarian*, 2012 WL 1810214, at *14 (citing cases); *see also, e.g.*, *Salas*, 2008 WL 4840872, at *8 (denying motion to suppress wiretap evidence without a hearing); *United States* v. *Menendez*, S3 04 Cr. 219 (DAB), 2005 WL 1384027, at *4 (S.D.N.Y. June 8, 2005) (same).

10

3.      **Discussion**

a.      **Prima Facie Compliance With The Minimization Requirement**

The measures taken by the Government to minimize non-pertinent communications over the Zemlyansky Phone readily establish prima facie compliance with the minimization requirement.  Such measures included providing written and oral minimization instructions to agents and translators; requiring all agents and translators to read the court orders and applications; posting minimization instructions, court orders, and applications in the wire room; maintenance of contemporaneous monitoring logs (i.e., line sheets); submission of periodic reports to the court; and supervision by the AUSAs.  In short, the Government took all measures that have been recognized by courts to "increase the likelihood of compliance with § 2518(5)." *Salas*, 2008 WL 4840872, at *8; *see also, e.g.*, *Marroquin-Corzo*, 2012 WL 3245473, at *7; *Kazarian*, 2012 WL 1810214, at *15-16.

Zemlyansky contends that the Government cannot satisfy its prima facie burden because (1) the line sheets purportedly contain "scores of conversations" that were "completely irrelevant to the investigation"; (2) monitoring agents were not provided wiretap instructions for the first two-and-a-half months of the wiretap; (3) the periodic reports to the court "lacked adequate, material information, regarding the government's minimization practices"; and (4) the wiretap was not properly supervised by a prosecutor.  (Memorandum of Law of Michael Zemlyansky, dated Jan. 18, 2013 ("Zemlyansky Mot."), at 5-9).  These arguments are without merit.

First, as to Zemlyansky's contention that the line sheets reveal "scores" of irrelevant calls, the proportion of non-pertinent and pertinent calls is a distinct and secondary inquiry from whether the Government has demonstrated prima facie compliance with § 2518(5).  Moreover, the burden of demonstrating that a "substantial number of non-pertinent conversations have been

11

intercepted unreasonably" rests squarely with the defendant.  *Rajaratnam*, 2010 WL 4867402, at

*27.  In any event, as the Supreme Court has observed, "the percentage of non-pertinent calls

[may be] relatively high and yet their interception [may] still [be] reasonable." *Scott*, 436 U.S. at

140.  As discussed below, even if "scores" of non-pertinent calls were intercepted in this case,

the Government's minimization efforts were objectively reasonable.

      Second, Zemlyansky's assertion that monitors were not provided wiretap instructions for

the first two-and-a-half months of the wiretaps is belied by the signed minimization orders

provided by the Government on or about February 7, 2013.  The more than 50 agents and

translators who monitored communications over the Zemlyansky Phone were provided

instructions prior to their commencement of monitoring the wiretaps.  Further, each of these

agents and translators signed the written instructions indicating that they had read and

understood such instructions.  (*See* Exhs. 2 and 6).

      Third, the periodic reports submitted to the court accurately advised the court as to the

progress of the wiretap.  Each report included, among other things, a statistical summary of the

telephone activity over the Zemlyansky Phone for the covered period, including (1) the total

number of intercepted calls; (2) the number of calls preliminarily flagged as "pertinent"; (3) the

number of calls over two minutes; and (4) the number of minimized calls.  (*See* Zemlyansky

Exh. B).  To the extent Zemlyansky argues that the periodic reports were materially inadequate

because they failed to disclose that the Government was "not legally executing the wiretap"

(Zemlyansky Mot. at 9), no such disclosure was necessary because the Government's

minimization efforts complied fully with the minimization instructions.

      Finally, Zemlyansky fails to show that the prosecutors' oversight of the wiretap was

deficient.  Although the requirements of "supervision" have not been precisely defined in the

minimization context, the Second Circuit elsewhere has considered what is "objectively reasonable" performance of a "supervisory role," concluding that "[a]bsent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake *de novo* investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent."  *Cecere* v. *City of New York*, 967 F.2d 826, 829 (2d Cir. 1992).  Here, the Supervising AUSAs instructed the agents and translators regarding the minimization requirements on two separate occasions, regularly reviewed the contemporaneous line sheets prepared by monitors, and worked with the agents to prepare detailed periodic reports for the authorizing court.  In light of the reasonableness of the minimization efforts in this case, as discussed further below, such efforts were more than adequate to fulfill the prosecutors' obligation to supervise the wiretaps.

Accordingly, the Government has met its burden of demonstrating prima facie compliance with the minimization requirement.

### b.    Zemlyansky Fails To Rebut The Prima Facie Showing of Compliance

Once the Government has met its burden of demonstrating prima facie compliance with Title III's minimization requirement, the burden shifts to the defendant to show that a "substantial number of non-pertinent conversations have been intercepted unreasonably." *Rajaratnam*, 2010 WL 4867402, at *27; *accord Goffer*, 756 F. Supp. 2d at 592-93.  Zemlyansky fails to meet this burden.

As an initial matter, Zemlyansky's analysis fails to assess the Government's minimization efforts in the context of the entire wiretap.  As set forth above, there were only approximately 74 non-pertinent calls longer than two minutes – less than two percent of the total 3,747 calls – that were not minimized, which is a far cry from the 18% of calls that Zemlyansky

13

claims were improperly minimized.  Moreover, Zemlyansky's analysis of the minimization of

calls between he and his wife, his children and parents, and other individuals of a "private"

nature, is fundamentally flawed.  Significantly, Zemlyansky ignores the numerous calls with his

wife that involved discussions about ongoing criminal conduct that was the very subject of the

Government's investigation.  In light of these incriminating communications, this case is easily

distinguished from *Goffer* – upon which Zemlyansky heavily relies – where the spousal calls at

issue were invariably innocent and non-pertinent.  In addition, with few exceptions, the non-

privileged calls between Zemlyansky and his parents, children, and other individuals of a

"private" nature – some of which were also pertinent – all fell within the two-minute "safe

harbor."  Accordingly, Zemlyansky fails to rebut the Government's prima facie showing of good

faith compliance with the minimization requirement and, therefore, his motion to suppress

should be denied.

### i.      *Minimization Was Objectively Reasonable Overall*

The reasonableness of the Government's minimization during the four wiretaps of the

Zemlyansky Phone is plain when properly viewed in the "context of the entire wiretap."  *Goffer*,

756 F. Supp. 2d at 592 (internal quotation marks omitted).  Of the 3,747 total calls intercepted,

only approximately 74 non-pertinent calls longer than two minutes – less than two percent of all

calls – were not minimized.  (*See* Exh. 8).  *See, e.g.*, *Marroquin-Corzo*, 2012 WL 3245473, at *9

(analyzing percentage of non-pertinent calls that were not minimized); *Salas*, 2008 WL 4840872,

at *7 (same).  Such a small percentage of non-minimized calls "weighs heavily in favor of

finding the minimization efforts [] were reasonable . . . ."  *Marroquin-Corzo*, 2012 WL 3245473,

at *9 (internal quotation marks omitted) (finding 2.1% of non-minimized, non-pertinent calls

reasonable); *see also Kazarian*, 2012 WL 1810214, at *16 & n.6 (finding reasonable agents'

14

minimization of "a significant percentage" of total calls); *Goffer*, 756 F. Supp. 2d at 592, 595, 597 (finding 18 "potentially violative" calls out of "more than 1,000" intercepted calls reasonable).

Although perfect minimization is always the goal, in reality, such perfection will rarely be achieved. *See Uribe*, 890 F.2d at 557 (observing that "perfection is usually not attainable, and is certainly not legally required"). As other courts have observed, the failure to minimize a certain number of non-pertinent calls within two minutes can be attributed, at least in part, to the reality that "[s]ome allowance must [] be made for the fact that conversations can shift topics, and it would be unreasonable for surveilling agents to minimize each call that did not begin as incriminating." *Salas*, 2008 WL 4840872, at *7; *see also United States* v. *Ianniello*, 621 F. Supp. 1455, 1471 (S.D.N.Y. 1985) (Weinfeld, *J.*) ("The statutory requirement of minimization does not mean that only communications exclusively devoted to criminal subjects may be intercepted."). Furthermore, a certain amount of improperly minimized calls represents the inevitability that "no electronic surveillance can be so conducted that innocent conversation can be totally eliminated." *Bynum*, 485 F.2d at 500; *accord Salas*, 2008 WL 4840872, at *7; *see also United States* v. *DePalma*, 461 F. Supp. 800, 819 (S.D.N.Y. 1978) (recognizing that "it is virtually impossible to completely exclude all irrelevant matter from intercepted conversations" (internal quotation marks omitted)).

The *Scott* factors further support a finding that, despite a small number of potential minimization errors, the Government nevertheless acted reasonably with regard to minimizing non-pertinent wire communications over the Zemlyansky Phone. In *Scott*, the Supreme Court instructed courts to look at: (1) the length of non-pertinent calls; (2) whether the non-pertinent calls were "one-time" calls; (3) the ambiguous nature of the conversations or pattern of calls,

15

including the use of coded language; (4) whether the conduct being investigated involved a widespread conspiracy; (5) the public or private nature of the target phone; and (6) the stage of the surveillance. *See Scott*, 436 U.S. at 140–42.

Although Zemlyansky contends that there were "scores" of lengthy non-pertinent calls intercepted, he points to only ten calls (*see* Br. 6 & Zemlyansky Exh. C), all but three of which (sessions 1254, 1286, and 6816) were well under three minutes in duration, *see, e.g.*, *Marroquin-Corzo*, 2012 WL 3245473, at *9 (finding fact that 200 of 329 non-minimized calls were less than three minutes weighed in favor of reasonableness), and two of which (sessions 2112 and 4043) were less than two minutes (excluding ring time).[8]

Aside from the length of the non-pertinent calls, the Government's minimization was also reasonable in light of other circumstances faced by the monitoring agents. First, monitoring was complicated by the need for agents to work real-time with translators to determine whether calls in Russian, or that lapsed into Russian, and that often used nicknames, were pertinent. *See, e.g.*, *Kazarian*, 2012 WL 1810214, at *16 (recognizing difficulty of monitoring conversations that "largely took place in various dialects of Armenian" and that "used nicknames"); *DePalma*, 461 F. Supp. at 820 (recognizing difficulty of monitoring conversations that "lapsed at times into foreign language"). Second, many of the calls were "one-time" calls, including many of the calls between Zemlyansky and other individuals that he claims were of a "private" nature. Third, because the Government was investigating what Zemlyansky concedes was a "widespread

---

[8]      Zemlyansky points to two non-pertinent calls (sessions 1254 and 1286) over 10 minutes that were not minimized. In session 1254, which was approximately 10 minutes in duration, Zemlyansky was on hold with StubHub for approximately five minutes, during which no dialogue was recorded. Similarly, in session 1286, which was approximately 14 minutes in duration, Zemlyansky was on hold with StubHub for almost 12 minutes during which no dialogue was recorded. Zemlyansky can hardly complain that the Government monitored portions of calls in which he was on hold and there was no dialogue, especially in light of the possibility that Zemlyansky could have received another call while on hold, which the Government could not have intercepted independently.

conspiracy" (Zemlyansky Mot. at  28), "more extensive surveillance [was] justified in an attempt

to determine the precise scope of the enterprise." *Scott*, 436 U.S. at 140; *see also DePalma*, 461

F. Supp. at 820.  Finally, because the authorized purpose of the wiretap was broad (*See* Exh. 1,

3/1/11 Wiretap Order, at US000785), the agents were permitted to intercept a correspondingly

broad array of calls.

Thus, when viewed in the context of the entire wiretap, the Government's minimization

efforts – which resulted in less than two percent of non-pertinent calls longer than two minutes

not being minimized – were objectively reasonable.

### ii.      *Minimization of Spousal Calls Was Reasonable*

Neglecting any assessment of the Government's minimization efforts in the context of the

entire wiretap, Zemlyansky attempts to meet his burden by claiming that 336 purportedly

privileged calls between he and his wife were improperly minimized.  Yet he simply ignores the

fact that, early in the monitoring process, the Government intercepted calls between Zemlyansky

and his wife pertaining to the very criminal conduct under investigation.  At a minimum, these

calls indicated that Zemlyansky's wife had knowledge of the no-fault insurance fraud and other

schemes; at most, the calls suggested that she might have participated in the schemes.

Accordingly, Zemlyansky cannot rely on the Government's monitoring of such spousal calls to

meet his burden of demonstrating unreasonable minimization.

As an initial matter, Zemlyansky contends that the spousal calls at issue were "privileged

and should have been minimized *immediately*."  (Zemlyansky Mot. at 11 & n.7).  But that is not

what the law requires.  As Judge Richard J. Sullivan recognized in *United States* v. *Goffer*, 756

F. Supp. 2d 588, in "declin[ing] to read into Title III a heightened requirement that applies to the

interception of privileged communications," *id.* at 594, courts interpreting Title III "have found

17

no such per se bar to the interception of privileged calls," *id.* at 593.  Instead, "the monitoring of privileged calls is subject to the same reasonableness standard that applies to non-privileged calls."  *Id.* at 593 (citing, *inter alia*, *United States* v. *Simels*, No. 08 Cr. 640(JG), 2009 WL 1924746 (E.D.N.Y. July 2, 2009)); *see also DePalma*, 461 F. Supp. at 821 ("As with all other interceptions under Title III, the minimization requirement with regard to [privileged] conversations is violated only if monitoring of such conversations is unreasonable under the circumstances.").  The fact that such communications might ultimately be inadmissible at trial "does not mean that their monitoring constitutes a violation of Title III."  *Goffer*, 756 F. Supp. 2d at 593.  Thus, even if the calls between Zemlyansky and his wife retained their privileged character, agents were permitted to monitor such calls as long as the monitoring was "reasonable."

Here, the Government's monitoring of the calls between Zemlyansky and his wife was objectively reasonable in light of the undeniable pertinence of at least 25 of the calls across the four wiretaps.[9]  Unlike the spousal calls in *Goffer*, where "[n]one of the[] calls provided agents with any incriminating evidence relating to the charges," 756 F. Supp. 2d at 591, Zemlyansky's conversations with his wife included discussions pertaining to ongoing criminal conduct under investigation.  Because such incriminating calls are outside the privilege, *see, e.g.*, *United States* v. *Shipp*, 578 F. Supp. 980, 991 (S.D.N.Y. 1984) (Weinfeld, *J.*) (holding spousal calls that "reveal[ed] extensive discussions of matters that may reasonably be inferred to concern drug dealings" were "outside the protection of the privilege"), the monitoring of Zemlyansky's calls with his wife within the two-minute safe harbor was reasonable, *see, e.g.*, *DePalma*, 461 F.

---

[9]       For the court's reference, draft transcripts of the 11 of the 25 pertinent calls between Zemlyansky and his wife cited herein are attached as Exhibit 9.

Supp. at 821 (observing that because "the Government had reason to believe that [the wife of a wiretap target] might have been a participant in the conspiracy," the "interception and monitoring of these conversations was not unreasonable").

A review of some of the 25 pertinent calls between Zemlyansky and his wife demonstrates why their continued monitoring was warranted.  In the very first call between Zemlyansky and his wife (session 44), recorded on March 2, 2011, Zemlyansky and his wife discussed Zemlyansky making "arrangements" with "Zhenya," *i.e.*, Yevgeniy Shuman, and another individual, "Russell," to visit "Lipkin."  Aleksander Lipkin, a former business associate of Zemlyansky, had pled guilty to conspiracy to commit bank fraud, wire fraud, and mail fraud in connection with a mortgage fraud scheme, and had been sentenced to 110 months' imprisonment in 2009.  *See* Judgment, *United States* v. *Lipkin*, S2 06 Cr. 1179 (S.D.N.Y. July 2, 2009) (ECF No. 538).  Prison meetings between Lipkin – a convicted fraudster – and Zemlyansky, Shuman, and Russell (another potential co-conspirator) was relevant to the investigation of Zemlyansky's current involvement in the no-fault insurance fraud and other fraudulent schemes, as well as to the identification of co-conspirators.  Moreover, the fact that Zemlyansky discussed such meetings with his wife indicated that she was aware of her husband's dealings with co-conspirators; that she might, at least, have knowledge of his involvement in the fraudulent schemes under investigation; and that he might speak to his wife about his ongoing criminal behavior.  In addition, during the same call, Zemlyansky's wife complained about Zemlyansky's tendency to "wanna go play poker," which was relevant to the investigation of Zemlyansky's involvement in illegal gambling.

Additional calls between Zemlyansky and his wife within the first two weeks of the wiretap can also "reasonably be inferred to concern" Zemlyansky's involvement in the no-fault

19

insurance fraud and dealings with co-conspirators, *Shipp*, 578 F. Supp. at 991, as well as his

wife's knowledge of those activities.  For example, on March 11, 2011, Zemlyansky told his

wife (in session 695) that he was going to be stopping by "Rob's office" for "another 20

minutes."  This call showed a direct link between Zemlyansky and Robert Sukhman's clinic,

which was one of the locations through which the no-fault insurance fraud was perpetrated.

Three days later, Zemlyansky spoke with his wife (in session 825) from an airport where he was

being met by "Zhenya," *i.e.*, Yevgeniy Shuman, to catch a flight.  Zemlyansky told his wife that

"Mike [Danilovich]," "Mike [Barukhin]," and "Dave [*i.e.*, Dmitry Bedny]" had dropped him off

at the airport and that they had just "arrived this morning . . . on the red eye."  When his wife

asked "How was their trip?", Zemlyansky responded:

> Good. They actually made some very good contacts, They met
> some fucking big people. And they met this, some, this – some
> chick, I don't know, she's like a – PR, she does a lot of PR, she's
> interested in working with us, she has uh, herself 18,000 tweeter
> followers.

Later in the same call, Zemlyansky told his wife that he was going to "meet with this guy" the

next day and that he was hoping to "make some good contacts also."  This discussion about the

travel plans, locations, and activities of Zemlyansky and his co-conspirators, as well as about

possible new schemes and harvesting additional "contacts," was relevant to the Government's

investigation of the widespread conspiracy.

        Subsequent calls between Zemlyansky and his wife yielded still more incriminatory

evidence against Zemlyansky.  On April 5, 2011, Zemlyansky and his wife discussed (in sessions

1999 and 2005) meeting together with an "accountant" located at East 16th Street and Avenue Z

in Brooklyn, whom the FBI learned prepared tax returns for various PCs involved in the no-fault

insurance fraud.  The next day, Zemlyansky told his wife (in session 2099) that he had just left

"Ocean Park" – one of Zemlyansky's MRI clinics through which the no-fault insurance fraud was perpetrated – and was going "to stop by 86th Street" – the Tanella Law Office – to "drop off some stuff Bridget needed [him] to drop off."  The FBI was aware that Bridget was a secretary at the Tanella Law Office who was involved in the preparation of fraudulent billings submitted to insurance companies.  Later in the same call, Zemlyansky told his wife that "Zhenya," *i.e.*, Yevgeniy Shuman, was "going to the accountant at 7:30," which connected Shuman to the preparation of tax returns for the fraudulent PCs.

Similarly, on June 6, 2011, Zemlyansky told his wife (in session 5312) that he had stopped by the "Utica" office – the Avenue N Clinic, which was another fraudulent PC located just off Utica Avenue in Brooklyn – and that he was "going to be home late" because he had "a ton of things to do," including "go back to 86th [Street]" with "Slim," *i.e.*, Michael Danilovich, to do a "bunch of paperwork and stuff."  This discussion was evidence of Zemlyansky's role in the preparation of fraudulent billings from the Tanella Law Office that were submitted to insurance companies.  Later in the same call, Zemlyansky told his wife that he had "found [his] boy, Berezin," and had set up a meeting with him the next day.  The FBI identified Berezin as a dentist whom Zemlyansky was trying to recruit to operate the dental practice in upstate New York in connection with a scheme to defraud Medicare and Medicaid.

The pertinent calls between Zemlyansky and his wife yielded not only incriminatory evidence against Zemlyansky, but suggested that Zemlyansky's wife had direct knowledge of – and might have played some role in – the no-fault insurance fraud.  For example, on May 1, 2011, Zemlyansky's wife told him (in session 3832) that her "mom was just driving to McDonalds" and "scratched like her entire side of her car" against a pole.  Zemlyansky's wife asked Zemlyansky if her mother should "call insurance and tell them that" her car was hit "when

21

she wasn't there?"  Zemlyansky responded:  "I guess she should, yeah."  It can reasonably be inferred from the fact that Zemlyansky's wife was proposing that her own mother commit insurance fraud that she was aware of the fraudulent nature of her husband's businesses, which also involved insurance fraud.

Based on other pertinent calls, Zemlyansky's wife seemed familiar with the use of lawyers and bank accounts in connection with the no-fault insurance fraud.  Various bank accounts were used to process the proceeds of fraudulent billings, as well as funds necessary to sustain the no-fault insurance scheme, using checks and/or wire transfers.  On June 6, 2011, Zemlyansky called his wife (session 5347) and asked her, "How much is the check for?"  After his wife told him the amount, Zemlyansky asked her about the particular bank and his wife told him: "[J]ust bring it, I'll fill everything else out."  The next day in another call (session 5398), after Zemlyansky told his wife that he "was in the bank," she asked if he had met "with the new attorney" – a reference to defendant Matthew Conroy.  Zemlyansky replied: "Yeah. Actually, everything is fine."  His wife then asked: "*So he's going to come on board?*" Zemlyansky said "Yeah, he already went to the bank[] to open [an] account."  In addition, during a July 13, 2011 call (session 7563), Zemlyansky's wife asked him: "Who does the direct deposit into your account?" She then asked specifically if it was "DZ," using only the initials of Diana Zaidman, the office manager of the Tanella Law Office who performed billing in connection with the no-fault insurance fraud.  After discussing deposits into Zemlyansky's "new account," Zemlyansky tells his wife to "just set up the password" and to call him "when [she's] done."  These calls demonstrated not only Zemlyansky's wife's knowledge of the no-fault insurance scheme – for instance, her awareness of Zemlyansky's need for a "new attorney" to "come on board" – but her possible participation in the fraud by assisting Zemlyansky with certain bank accounts.

In light of the numerous pertinent calls between Zemlyansky and his wife throughout the wiretaps, no pattern of innocence was established.  Accordingly, it was reasonable for agents to continue to monitor these spousal calls within the two-minute safe harbor and subject to spot-checking.  *See, e.g.*, *DePalma*, 461 F. Supp. at 821 ("[O]n at least one occasion, a conversation between DePalma and his girlfriend disclosed pertinent information concerning DePalma's alleged contacts with organized crime.  In such circumstances, no pattern of innocence could be established with finality and continued monitoring was warranted to determine pertinency.").  With very few exceptions, <u>all</u> non-pertinent calls between Zemlyansky and his wife two minutes or longer in duration were minimized.  (*See* Exh. 10, Calls Between Zemlyansky and Wife).[10]  Of the 336 spousal calls identified by Zemlyansky, 128 were minimized.  Of the 208 non-minimized calls, only 13 calls were longer than two minutes.  Of those 13 calls, eight were pertinent, leaving only five non-pertinent spousal calls longer than two minutes that were not minimized (sessions 1953, 2053, 6479, 6525, and 7905).[11]  Of these five calls, the Government submits that only two – sessions 6525 and 7905 – were potentially improperly minimized.[12]

Aside from these two calls, the Government submits that the 13 spousal calls cited by Zemlyansky in his brief (*see* Br. 12-13) were all reasonably monitored.  Two of these calls

---

[10]     Exhibit 11 and Exhibits 12, 14, and 15, discussed below, are charts based on line sheets and minimization data from the FBI's Voice Box system.  For each call, the chart shows (1) session number; (2) date and start time of the call; (3) classification (*i.e.*, pertinent or non-pertinent); (4) total duration; and (5) whether the call was minimized.  For minimized calls, the chart also shows (6) duration minimized; (7) duration monitored; and (8) duration until first minimized.

[11]     These five calls are among the total 74 non-pertinent calls longer than two minutes that were not minimized during all four wiretaps.

[12]     Session 1953 (2:25 minutes) was only monitored for a few seconds at the end of the call; the full call was not in fact monitored.  Session 2053 (8:52 minutes) was a malfunction; there was no audio recorded.  Session 6479 (2:42 minutes) was initially marked pertinent, apparently because of Zemlyansky's references to "86th Street" and a "big game" in Manhattan, *i.e.*, an illegal poker game.  The fact that an agent listened to this call for more than two minutes believing it to be pertinent, only to have another agent later mark it non-pertinent, does not alter the reasonableness of the initial monitoring.  *See Marroquin-Corzo*, 2012 WL 3245473, at *9 ("[S]imply because the agents listened to the entirety of a call that they themselves ultimately deemed non-pertinent does not mean that the monitoring of that call was unreasonable.").

(sessions 1424 and 3352) were pertinent.[13]  In session 1424 (4:06 minutes), Zemlyansky and his

wife discussed the shooting of Kris Bortnovsky, an associate of Zemlyansky, in Florida.  Even if

this shooting was later determined to be unrelated to the no-fault insurance fraud and illegal

gambling under investigation, it was not unreasonable for the agents to monitor such a call at the

time in order to possibly gather information that could assist in a shooting investigation.  *See*

*DePalma*, 461 F. Supp. at 819 ("[T]he court should approach the issue of the reasonableness of

the Government's minimization efforts not with the benefit of hindsight, but rather in light of the

circumstances as they existed at the time of the interceptions.").  In the second pertinent call,

session 3352 (2:35 minutes), Zemlyansky discussed having visited both "Garden City," where

attorney Matthew Conroy's office was located, and to the "black neighborhood," which appeared

to be a reference the Atlantic Avenue clinic in Brooklyn operated by Zemlyansky, Shuman, and

Sukhman.

   Of the nine remaining non-pertinent calls cited by Zemlyansky, only three were two

minutes or longer, and these were minimized.[14]  The remaining six calls identified by

Zemlyansky (sessions 853, 6526, 8132, 8136, 8137 and 8147) were all less than two minutes in

duration.  In addition, sessions 8132, 8137, and 8147, all of which were continuations of session

8129, were minimized within 36 seconds, 49 seconds[15], and 1:52 minutes, respectively.  Session

8136, which was in the same chain of calls, was not minimized, but was only 31 seconds in

---

[13]  Zemlyansky's chart incorrectly states that session 853 was "mislabeled as pertinent." The call was in fact labeled "non-pertinent."

[14]  Session 877 was minimized within two minutes (not including ring time); session 7712 was minimized after just 58 seconds (Zemlyansky incorrectly states that session 7712 was not minimized until 2:11 minutes); and session 8129 was minimized at approximately 2:07 minutes.  This latter call concerned a potentially relevant meeting between Zemlyansky and "Dave," i.e., Dmitry Bedny, and two other individuals, "Nick" and "Anthony." Later in the same call, Zemlyansky also discussed "playing some cards," a reference to illegal gambling. Accordingly, the agent reasonably might have initially viewed this call as pertinent and, therefore, monitored slightly in excess of two minutes.

[15]  Zemlyansky incorrectly states that this call was minimized at 1:05 minutes.

duration.  Moreover, in session 8137, Zemlyansky mentioned co-defendant Michael Barukhin after the call was spot-checked, and in session 8147, Zemlyansky specifically mentioned "Molly [Bloom]'s games," which was relevant to the Government's investigation of illegal gambling.

In sum, because of the numerous pertinent incriminating calls between Zemlyansky and his wife throughout the wiretap, the Government's reliance on the two-minute safe harbor was reasonable in this case.  Moreover, among the 336 spousal calls – including the 13 discussed by Zemlyansky in his brief – at most only two were improperly minimized (sessions 6525 and 7905).  Accordingly, the Government's minimization efforts with regard to Zemlyansky's spousal calls were objectively reasonable.

### iii.    Minimization of Family Calls Was Reasonable

Zemlyansky also attempts to meet his burden by pointing to 283 calls with his children and parents that he claims were improperly minimized.  (See Br. 21 & Zemlyansky Exh. H).[16] As noted in the minimization instructions, such calls were not privileged and are, therefore, subject to the two-minute safe harbor and spot-monitoring unless a pattern of innocence is established.  With few exceptions, the Government's monitoring of these calls complied with the minimization requirement.

Of the 283 calls between Zemlyansky and his parents and children, approximately 22 calls (all between Zemlyansky and his parents) were marked pertinent, which classification Zemlyansky does not dispute.  (See Exh. 11, Calls Between Zemlyansky and Parents and Children).  Of the 261 non-pertinent calls, only 38 were two minutes or longer in duration, and thereby subject to the minimization requirement.  See Bynum, 485 F.2d at 500.  Of the 38 calls

---

[16]      One of the calls identified by Zemlyansky (session 5465) is actually a call between Zemlyansky and co-conspirator Robert Sukhman. Accordingly, the Government has excluded that call from its analysis.

lasting more than two minutes, only five calls were not minimized (sessions 105, 190, 826, 942, and 6816).[17]  All five of these calls were between Zemlyansky and his parents and were in Russian.  The first four of these calls took place within the initial 15 days of the wiretap, which was too short a period to establish any pattern of innocence.  Furthermore, it would have been difficult for monitors to recognize the identities of Zemlyansky's parents at this early stage. Indeed, in session 105, the line sheet indicates that Zemlyansky was speaking with an "U[nidentified] [F]emale."  The Government does not dispute that the remaining call, session 6816, was improperly minimized.[18]

Zemlyansky argues that the two-minute safe harbor should not apply to calls with his parents and children because these calls were immediately identifiable.  (Zemlyansky Mot. at 21 & n.7).  With respect to the calls between Zemlyansky and his parents, however, any pattern of innocence was precluded by the existence of several pertinent calls during the four wiretaps.[19]

*See, e.g.*, *DePalma*, 461 F. Supp. at 821.  For example, in a call intercepted on March 4, 2011 (session 187), Zemlyansky and his father had the following colloquy:

| | |
|---|---|
| ZEMLYANSKY: | So, Dad, did he come by? |
| FATHER: | Yeah, just now. |
| ZEMLYANSKY: | Everything fine? |
| FATHER: | Yeah . . . Did you not check the money, sonny? |
| ZEMLYANSKY: | There was two there, I counted, maybe there is more there now. |
| FATHER: | Mmmmm. |
| ZEMLYANSKY: | It's OK, Pop. |

---

[17]  These five calls are among the total 74 non-pertinent calls longer than two minutes that were not minimized during all four wiretaps.

[18]  Based on the Government's review of this call, it appears that session 6816 was monitored by an agent who did not speak Russian at a time when no Russian translator was available.  The call was recorded in its entirety and should have later been reviewed by a Russian-speaking monitor for pertinence and minimized. (*See* Exh. 1, Anspacher Aff. ¶ 83 (describing minimization process when translator is not reasonably available))

[19]  Draft transcripts of the English translations of the calls cited herein are provided for the Court's reference as Exhibit 12.

FATHER:             But I didn't count it, I just brought it home.
ZEMLYANSKY:         Pop, it's not a problem.

In light of the involvement of other defendants' family members in the no-fault insurance fraud, this discussion – which concerned Zemlyansky's father giving money to some person on behalf of Zemlyansky – could reasonably have been interpreted to suggest that Zemlyansky's father was somehow involved in handling proceeds of the no-fault insurance fraud.   Indeed, in a later series of calls over three days in April 2011 (sessions 2332, 2397, and 2427), Zemlyansky and his father discussed his father picking up a check for Zemlyansky and Zemlyansky retrieving the check from his father.

In other calls, Zemlyansky and his parents discussed certain fraudulent PCs, including Zemlyansky's MRI clinic.  In session 1994, Zemlyansky told his father to "come to one office" the next day because the "guys there need to do something."  When his father asked, "What office?", Zemlyansky told him it was the office on the corner of "Utica and Avenue N." Zemlyansky's father agreed to go the next day.  During the same call, Zemlyansky told his father about a meeting that he and his wife were having with the "accountant" on "16th and Z," and about "an appointment" that Zemlyansky had in Manhattan.  In session 5655, Zemlyansky's father mentioned having met "two broads working at [Zemlyansky's] MRI, who were at Bridget's wedding," further demonstrating Zemlyansky's father's familiarity with his son's fraudulent businesses and individuals involved with them.  Finally, in a call on July 18, 2011 (session 7916), Zemlyansky's mother asked him whether he would "close the MRI by next Wednesday?"  When Zemlyansky responded in the negative, his mother said that she would "do it next Wednesday."  Zemlyansky tells his mother that she should "do it this Wednesday" and that he would "give it to the doctor and we'll see."  Even if Zemlyansky's parents were not

involved in the no-fault insurance scheme, discussions about Zemlyansky's schedule, including meetings with his accountant and appointments in Manhattan, and his activities at the clinics were clearly relevant to the Government's investigation of that scheme.  In light of such pertinent calls, the Government's monitoring of the communications between Zemlyansky and his parents – none of which were privileged – within the two-minute safe harbor was reasonable.

With respect to calls between Zemlyansky and his children, the telephone numbers associated with such calls were the same as those associated with calls between Zemlyansky and his wife.  Accordingly, it was reasonable for the Government to monitor calls associated with those telephone numbers without immediate minimization.  Furthermore, during many of these calls, the telephone was passed to Zemlyansky's wife, which could potentially have yielded incriminating evidence.  In any event, as the wiretap progressed, agents regularly minimized calls between Zemlyansky and his children almost immediately, such as in sessions 2630 (minimized within 8 seconds), 3735 (minimized within 15 seconds), and 8481 (minimized within 10 seconds) – all of which Zemlyansky ignores.

Moreover, the interception of all but at most four of the nine calls between Zemlyansky and his children that he cites in his brief was reasonable.  Three of the nine calls (sessions 3667, 2247, and 8322), were only 20 seconds, 26 seconds, and 30 seconds in duration, respectively.  Similarly, session 2627 was minimized within approximately 40 seconds, and session 1957 was minimized within 42 seconds (not including ring time).  Such a short period of monitoring of these unprivileged calls was objectively reasonable.  In addition, session 6937 began with Zemlyansky's daughter speaking to Zemlyansky's father in Russian for approximately 40 seconds before Zemlyansky got on the phone; the call was minimized approximately 15 seconds after that.  It appears from the line sheet, which uses "U[nidentified] F[emale]" to refer to

28

Zemlyansky's daughter, that the agent did not identify Zemlyansky's daughter as the female voice, likely because she was speaking Russian. The remaining three calls that Zemlyansky cites (sessions 4796, 5428, and 7229) were each monitored for approximately 1:30 minutes, well within the two-minute safe harbor. Moreover, during the latter two calls, Zemlyansky's wife got on the telephone and the agent reasonably monitored to determine pertinence. Indeed, in session 5428, Zemlyansky told his wife that he was going "to drop off Mike," *i.e.*, Michael Danilovich, on their way back from Manhattan. When the topic of the spousal communication changed, the call was minimized.

In sum, these latter four calls between Zemlyansky and his children (sessions 4796, 5428, 6937, and 7229), and the one call between Zemlyansky and his parents (session 6816), represent at most five potentially improperly minimized calls out of the 283 calls identified by Zemlyansky. Accordingly, the Government's monitoring of this category of calls was objectively reasonable.

### iv.    *Minimization Of Other "Private" Calls Was Reasonable*

Zemlyansky next points to 116 calls with other individuals that he claims were of a "private" and "extremely personal" nature and, therefore, should have been minimized immediately. (Zemlyansky Mot. at 21-25). These calls fall into two different categories, referred to herein as "Category I" and "Category II." [20] Zemlyansky's complaints about the Government's monitoring of these calls are also insufficient to meet his burden.

---

[20]    Category I calls consist of non-privileged communications between Zemlyansky and prostitutes. Category II calls consist of non-privileged communications between Zemlyansky and paramours. The Government notes that one of the Category II calls, session 6530, is actually a call between Zemlyansky and co-conspirator Robert Sukhman. Accordingly, the Government has not included that call in its analysis.

Like the calls between Zemlyansky and his parents and children, none of the calls with

the individuals at issue here were privileged, and some in fact involved additional illegal activity.

As such, their monitoring within the two-minute safe harbor was clearly reasonable.  Further,

Zemlyansky cites no authority for the proposition that "private" or even "extremely personal"

calls must be minimized immediately.  To the contrary, courts have recognized that the

Government must be given some leeway to monitor even private calls based on "the fact that

conversations can shift topics, and it would be unreasonable for surveilling agents to minimize

each call that did not begin as incriminating." *Salas*, 2008 WL 4840872, at *7; *see also*

*Menendez*, 2005 WL 1384027, at *4 (holding that minimization was reasonable notwithstanding

recordings of the defendant "talking to friends and family members, talking about his dog and his

car, talking about his diet, and talking to his lawyer and his lawyer's secretary"); *Ianniello*, 621

F. Supp. at 1471 ("The statutory requirement of minimization does not mean that only

communications exclusively devoted to criminal subjects may be intercepted.").

Zemlyansky also asserts that the two-minute safe harbor does not apply to these calls

because they were "immediately identifiable" based on their context, the identity of the parties,

and the agents' purported ability to recognize the telephone numbers or voices of the parties

(Zemlyansky Mot. at 22).  He is wrong.  With respect to the 62 Category I calls, Zemlyansky's

assertion is belied by the approximately 34 different telephone numbers (and at least as many

different individuals) with which he communicated.[21]  Moreover, Zemlyansky communicated

with only three of these telephone numbers on more than one day; communications with the

remaining numbers were each limited to a single day.  Accordingly, it was not unreasonable to

apply the two-minute safe harbor to these "one-time" calls.  *See Scott*, 436 U.S. at 141

---

[21]     The telephone numbers associated with these calls are indicated on the corresponding line sheets (Exh. 7).

(observing that "where patterns of non-pertinent calls do not appear[,] . . . it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed").

Similarly, the 54 Category II calls involved communications with nine different telephone numbers, of which there were only two numbers that Zemlyansky called on more than two days during the four wiretaps at issue. With respect to the first of these telephone numbers, Zemlyansky communicated with this number on March 7, 2011 (session 266) – a very lengthy call that was minimized and spot-checked by the agent no less than 11 times. Zemlyansky did not communicate with this number again until a month later (session 2294), and then not again until the second week of June (session 5389), and, following that, not until the end of July (session 8609). Zemlyansky's communications with the second telephone number, which he first dialed on March 9, 2011 (session 488), were also widely dispersed throughout the wiretaps. After a few calls during three days in early March, Zemlyansky did not communicate with this number again until April 11, 2011 (session 2572). Until early July, calls between Zemlyansky and this telephone number were all spread at least one or two weeks apart. Accordingly, Zemlyansky's calls with these two telephone numbers were too infrequent and too far apart to establish any pattern of innocence. As such, it was appropriate for agents to monitor these calls within the two-minute safe harbor.

Of the 62 Category I calls (both pertinent and non-pertinent), only six calls were two minutes or longer in duration, and thereby subject to the minimization requirement. (*See* Exh. 13, Calls Between Others – Category I). Of these six calls, three calls (sessions 2178, 2191, and 2193) were minimized within two minutes. Of the remaining three calls, the Government concedes that session 1703 was improperly minimized, but submits that the monitoring of the

31

remaining two non-minimized calls (sessions 3673 and 4983) was reasonable under the circumstances.[22]  Similarly, of the 54 Category II calls (both pertinent and non-pertinent), 23 calls were two minutes or longer in duration, and thereby subject to the minimization requirement.  (*See* Exh. 14, Calls Between Others – Category II).  Of these 23 calls, all but three calls were minimized within two minutes.  Two of these calls (sessions 728 and 8609) were marked pertinent, which classification Zemlyansky does not dispute.  The third call (session 4667), which was approximately 2:08 minutes in duration (not including ring time), was the first call between Zemlyansky and this particular phone number.  Thus, there were at most four calls among the 116 identified by Zemlyansky that might not have been properly minimized, which itself demonstrates the objective reasonableness of the Government's monitoring of these calls.

The monitoring of the 29 calls cited by Zemlyansky in his brief does not alter this conclusion.  Of the 20 Category I calls cited by Zemlyansky, all but four (sessions 1703, 2178, 3673, and 4983) were less than two minutes, and session 2178 was minimized before two minutes.  As noted above, the Government concedes that session 1703 was improperly minimized, but submits that monitoring of sessions 3673 and 4983 was reasonable in the

---

[22]  First, session 3673 (4:22 minutes) was part of a sequence of calls associated with a particular telephone number on April 28, 2011.  This sequence was only the second time that Zemlyansky communicated with this telephone number during the wiretap; the first time was three weeks earlier on April 7, 2011.  Thus, there had been too few calls to establish any pattern of innocence.  *See, e.g.*, *DePalma*, 461 F. Supp. at 820 (observing that "[i]t was difficult to develop patterns of non-pertinent conversations because of the one-time-only nature of the calls").  Further, this second sequence of calls with this telephone number was monitored by a different agent who would not have been familiar with the other party with whom Zemlyansky was speaking; indeed, the caller was labeled "U[nidentified] F[emale]" in the line sheet.  Moreover, approximately 26 seconds of the call was ring time and halfway through the call Zemlyansky put the caller on hold for approximately 1:17 minutes.  Thus, only approximately 2:40 minutes of this call was actually monitored, which generally involved a discussion of driving directions.

Second, session 4983 (2:40 minutes without ring time) was the first time Zemlyansky dialed this particular telephone number.  Thus, the identity of the caller would have been unknown to the monitoring agent.  *See, e.g.*, *DePalma*, 461 F. Supp. at 820 ("At the instigation of the investigation, the agents reported calls from unknown parties whose identities were difficult to ascertain.").  The bracketed notation in the line sheet stating that the individual was "presumably" in an "office" also suggests that the monitor might have understood the call to reveal the identity of another co-conspirator.  Indeed, the Government's review of this call indicates that it was initially marked pertinent, but later changed by another agent to non-pertinent.

circumstances.  With respect to the nine Category II calls cited by Zemlyansky, five calls were one minute or less, and the remaining four calls (sessions 2294, 2322, 6532, and 6649) were all minimized.  Indeed, the line sheets and system data show that session 2294 (4:57 minutes) was minimized after only one minute, spot checked, and then minimized two more times.  The subsequent calls in this sequence were all less than one minute.  Similarly, both sessions 6532 and 6649 were each minimized and spot-checked no less than three times.[23]

In sum, there were at most four calls (sessions 1703, 3673, 4667 and 4983) among the 116 calls between Zemlyansky and other individuals of a "private" nature that were potentially improperly minimized.  Accordingly, the Government's minimization of these calls was objectively reasonable.

*v.*       ***Interception of Gambling Calls Was Reasonable***

Finally, while Zemlyansky complains about the "multitude" of conversations "concerning gambling" (Zemlyansky Mot. at 25), he fails to identify any such calls that were improperly minimized.  For this reason alone the court should reject Zemlyansky's argument.  *See, e.g.*, *Kazarian*, 2012 WL 1810214, at *17 ("Failure to provide the required specificity warrants rejection of a defendant's minimization objections.").

In any event, Zemlyansky concedes, as he must, that "operation of illegal gambling businesses" was listed as a target offense and, therefore, it was permissible for agents to intercept calls relevant to that crime.  As set forth in the periodic reports to the authorizing courts, several such pertinent communications involving Zemlyansky were intercepted during the wiretap.  (*See, e.g.*, Zemlyansky Exh. B, 3/15/11 Periodic Report, at US00816; 3/22/11 Periodic Report, at

---

[23]     Contrary to Zemlyansky's assertion that session 6649 "was not minimized until 4:40 minutes into the call" (Zemlyansky Mot. at 25), the Government's review of this call shows that it was in fact minimized for the first time at 1:40 minutes after it became clear that the call was non-pertinent.

US00823).  That Zemlyansky has not yet been charged with *operating* illegal gambling businesses, as he contends, does not alter the pertinence of these intercepted calls and, thus, the reasonableness of their interception.

* * *

In summary, the measures taken by the Government in this case to ensure compliance with Title III's minimization requirement were sufficient to satisfy its prima facie burden.  As such, the burden shifted to Zemlyansky to rebut the Government's showing of good faith compliance.  A review of the Government's minimization efforts in the context of the entire wiretap demonstrates that, at most, approximately 74 non-pertinent calls longer than two minutes – less than two percent of the total 3,747 calls – were not minimized.[24]  Such a low percentage of non-minimized calls strongly supports a conclusion that the Government's minimization efforts were objectively reasonable.  Furthermore, a review of the Government's minimization efforts with regard to the three categories of calls identified by Zemlyansky does not alter this conclusion.  At most, only 11 out of the 737 calls between Zemlyansky and his wife, parents, children, and other individuals of a "private" nature, were potentially improperly minimized.

Thus, after examining the totality of the circumstances in this case, Zemlyansky's motion should be denied without a hearing.  All of the evidence necessary to evaluate the objective reasonableness of the Government's minimization efforts – including the wiretap applications and orders, minimization instructions, periodic reports, line sheets, relevant minimization statistics, and recordings of the calls challenged by Zemlyansky – is now before the Court. Because Zemlyansky fails to raise any colorable claim of improper minimization in the face of this evidence, and there are no factual disputes that must be resolved, a hearing is unnecessary.

---

[24]     Under Zemlyansky's calculation of 4,119 calls, the percentage is 1.8%.

*See, e.g.*, *Kazarian*, 2012 WL 1810214, at *17 (denying motion to suppress wiretap evidence on grounds of improper minimization without a hearing); *Salas*, 2008 WL 4840872, at *8 & n.7 ("It is not clear what the defendant would seek to introduce at such a hearing because the defendant has made no colorable claim that the Government failed to meet its minimization requirement."); *United States* v. *Giovannelli*, No. 01 Cr. 749, 2004 WL 48869, at *3 (S.D.N.Y. Jan. 8, 2004) (denying a minimization hearing where "defendants have not adduced any material evidence that the Government failed to take appropriate steps to minimize the interception of communications not otherwise subject to interception").

### c.    Total Suppression Is Unwarranted and Would Be Unprecedented

Even if the Government acted unreasonably in intercepting non-pertinent communications over the Zemlyansky Phone, suppression of *all* calls would not be the appropriate remedy.  Moreover, such a remedy would be unprecedented.  Accepting, *arguendo*, that there were instances of improper minimization of wire communications over the Zemlyansky Phone, such transgressions must be viewed in light of "the number of interceptions, the number of demonstrated violations and the nature of human error."  *DePalma*, 461 F. Supp. at 823.  When the monitoring of the wiretaps at issue here is "[t]aken as a whole," it is clear "that proper minimization standards were observed by the Government in the circumstances of this case" and that the remedy of total suppression would be "drastic and excessive."  *Id.*

In *Scott*, the Supreme Court considered only the issue of how to identify a Title III violation, not the appropriate remedy for such a violation.  *See Scott*, 436 U.S. at 136 n.10 ("Given our disposition of this case we find it unnecessary to reach the Government's contention regarding the scope of the suppression remedy in the event of a violation of the minimization requirement.").  Nor has the Second Circuit "definitively resolved the question of whether the

35

government's violation of Title Ill's minimization requirement warrants total suppression of the wiretap or mere suppression of the offending calls." *Goffer*, 756 F. Supp. 2d at 595.  In *United States* v. *Principie*, 531 F.2d 1132 (2d Cir. 1976), the Second Circuit considered the arguments for across-the-board suppression upon a showing of inadequate minimization, but declined to adopt them.  *See id.* at 1140-41.  Instead, it suppressed only the calls that should have been, but were not, minimized.  *See id.*  Moreover, the court stated that total suppression was inappropriately "drastic" where law enforcement acted in "good faith" under circumstances that required them to make "delicate judgments about which calls were innocent and which incriminating" and where the violations were neither "blatant" nor "extensive."  *Id.*

As Judge Sullivan observed in *Goffer*, "district courts in this Circuit have favored the approach of suppressing only the improperly minimized calls." *Goffer*, 756 F. Supp. 2d at 595-96; *see also, e.g.*, *United States* v. *Funderburk*, 492 F. Supp. 2d 223, 247 (W.D.N.Y. 2007) ("Even if the investigating agents failed to use reasonable efforts to minimize particular intercepted communications as [the defendant] claims, suppression of all communications intercepted pursuant to any of the challenged wiretap orders is not the proper remedy absent a 'pervasive disregard of the minimization requirement.'") (quoting *United States* v. *Cirillo*, 499 F.2d 872, 881 n.7 (2d Cir. 1974)); *United States* v. *Pierce*, 493 F. Supp. 2d 611, 636 (W.D.N.Y. 2006) ("Even if the investigating agents failed to use reasonable efforts to minimize particular intercepted communications as [the defendant] claims, suppression of all communications intercepted pursuant to any of the challenged Intercept Orders is not the proper remedy absent a pervasive disregard of the minimization requirement." (internal quotation marks omitted)); *United States* v. *King*, 991 F. Supp. 77, 92 n.16 (E.D.N.Y. 1998) ("To the extent that there are certain calls that should have been minimized, the better approach would be to suppress those

36

particular calls."); *United States* v. *Orena*, 883 F. Supp. 849, 855 (E.D.N.Y. 1995)  ("[A] failure

to minimize interceptions requires suppression only of the unauthorized interceptions and not of

all conversations . . . overheard pursuant to the court-authorized surveillance.").  Although some

courts have noted the possibility of suppressing all evidence from a wiretap as a remedy for

improper minimization, those courts have made clear that the remedy "is reserved for the

particularly horrendous case . . . where the government has made effectively no effort towards

minimization whatsoever."  *United States* v. *Suggs*, 531 F. Supp. 2d 13, 24 (D.D.C. 2008)

(internal quotations omitted); *see also*, *e.g.*, *United States* v. *Hoffman*, 832 F.2d 1299, 1309 (1st

Cir. 1987) (rejecting defense request for total suppression of wiretap evidence and reserving

possibility for "a particularly horrendous case").  That is clearly not this case.

      In light of the very small number of potential minimization errors – at most two percent

of all intercepted calls – in the wiretaps at issue, it can hardly be said that such errors were

"pervasive" or "particularly horrendous," and thus warranting the unprecedented remedy of

across-the-board suppression.  Although Zemlyansky's "statistical review" purports to show that

the Government improperly monitored 18 percent of calls (Zemlyansky Mot. at 28), this analysis

is fundamentally flawed and, as demonstrated above, grossly exaggerates any minimization

errors in this case.

      Ultimately, regardless of whether the Government's minimization in this case could have

been more precise as to certain calls among the nearly 4,000 intercepted calls, Zemlyansky has

identified no case in which a court has ever found that imperfect, but substantial and diligent

efforts at minimization such as those employed here, were so horrendously deficient, or indicated

such pervasive disregard for the minimization requirement, that suppression was warranted as to

more than any specific calls that were improperly monitored.  Indeed, Zemlyansky is able to

point only to a single case – *United States* v. *Simels*, No. 08 Cr. 640(JG), 2009 WL 1924746
(E.D.N.Y. 2009) – in which a court in this Circuit has *ever* held that *any* procedures for
minimizing privileged conversations were so unreasonable as to warrant the relief that he seeks.
But *Simels* is nothing like this case.  In *Simels*, which concerned the reasonableness of *post-
interception* minimization, the Government "recorded the conversations without listening to
them, and then implemented procedures to minimize the dissemination of the intercepted
conversations to the agents and prosecutors who were investigating the defendants."  *Id.* at *6.
Obviously, the wiretaps at issue here involved no such facially invalid minimization procedure
and, therefore, *Simels* is inapposite.

In sum, given the limited number of potential minimization errors here at issue, this is not
a case in which the unprecedented remedy of total suppression of the wiretaps is warranted.

**B.**      **The Government Properly Exhausted Necessity on Zemlyansky's Phone**

**1.**      **Applicable Law**

Section 2518(1)(c) states that an application for the interception of telephonic
communications must include "a full and complete statement as to whether or not other
investigative techniques have been tried and failed or why they reasonably appear to be unlikely
to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  "Section 2518[(1)(c)] 'is
simply designed to assure that wiretapping is not resorted to in situations where traditional
investigative techniques would suffice to expose the crime.'"  *United States* v. *Torres*, 901 F.2d
205, 231 (2d Cir. 1990).  The statute requires disclosure of traditional and normal investigative
techniques by law enforcement officers.  *United States* v. *Bianco*, 998 F.2d 1112, 1127 (2d Cir.
1993).  The legislative history lists some examples:

> Normal investigative procedure would include, for example,

38

> standard visual or aural surveillance techniques by law
> enforcement officers, general questioning or interrogation under an
> immunity grant, use of regular search warrants, and the infiltration
> of conspiratorial groups by undercover agents or informants.

S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2190.

"[T]here is no requirement that any particular investigation procedures be exhausted before a wiretap may be authorized." *United States* v. *Young*, 822 F.2d 1234, 1237 (2d Cir. 1987). "Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision envisions is that the showing be tested in a practical and commonsense fashion." S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2190 (citations omitted); *see also United States* v. *Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984) (affidavits in support of wiretap applications are viewed in a common sense and realistic fashion). Although "generalized and conclusory statements that other investigative procedures would prove unsuccessful" do not suffice, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *United States* v. *Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (internal quotation marks omitted). Instead, "'the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.'" *Id.* (quoting *United States* v. *Diaz*, 176 F.3d 52, 111 (2d Cir. 1999)).

The authorizing judge's finding of necessity is owed "considerable deference" by the reviewing court, whose task is to ascertain whether "the facts set forth in the application were minimally adequate to support" the finding of necessity. *Concepcion*, 579 F.3d at 219; *see also United States* v. *Yannotti*, 541 F.3d 124, 124 (2d Cir. 2008). In a number of instances, the Second Circuit has reversed orders by district courts suppressing wiretap evidence because the

suppression orders failed to show the appropriate level of deference to the authorizing judge's finding of necessity. *See id.* (reversing Judge Scheindlin's suppression order because, with appropriate deference paid to Judge Marrero's initial assessment that alternative investigative techniques failed or were unlikely to be fruitful, the affidavit was "minimally adequate" to support a finding of necessity); *id.* at 217 (citing *United States* v. *Wagner*, 989 F.2d 69, 74 (2d Cir. 1993) ("revers[ing] the district court's suppression of evidence because it had not accorded sufficient deference to the initial decision to authorize a wiretap, on which the Government had relied")). Moreover, because wiretap orders are presumptively valid, *see Franks* v. *Delaware*, 438 U.S. 154, 171 (1978), the defendant bears the burden of proving that necessity was lacking, *see United States* v. *Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).

### 2.    Discussion

Zemlyansky invites this Court to second guess the necessity findings of Judge Jones by claiming that monitoring of his cellphone was no longer necessary after Robert Sukhman first agreed to provide information to with the Government on July 13, 2011. This Court, however, must give "considerable deference" to the authorizing judge's necessity findings, and ensure only that "the facts set forth in the application were minimally adequate to support the determination that was made." *Concepcion*, 579 F.3d at 217 & n.1. Having been advised of the fact of Sukhman's decision to attempt to cooperate in the July 15, 2011 periodic report, as well as the basis for the continuing necessity of monitoring communications over the Zemlyansky Phone, Judge Jones permitted the wiretap to continue for the two remaining authorized weeks. This Court should not disturb that finding.

The Government's June 27, 2011 wiretap application (*see* Exh. 6), as supplemented by the July 15, 2011 periodic report (*see* Zemlyansky Exh. B), were more than minimally adequate

to support Judge Jones' finding.  Zemlyansky nevertheless claims that it was no longer necessary to intercept communications over his cellphone because Sukhman was "intimately involved in the alleged criminal conduct" and, therefore could "supply the government with an insider's look at Zemlyansky's alleged criminal conduct."  (Zemlyansky Mot. at 37-38).  This is inaccurate. For one thing, it was unclear what role, if any, Sukhman played in Zemlyansky's fraudulent scheme to open a dental clinic in upstate New York.  As such, Sukhman would not have been in a position to assist in the Government's investigation of that scheme. Although Zemlyansky faults the Government for asserting that it was still necessary to intercept communications over his cellphone after only one meeting with Sukhman (*see* Br. 38), it was precisely because Sukhman's cooperation was still in the nascent phase that the wiretap of the Zemlyansky Phone remained necessary.  At that point in time, it was impossible to predict whether Sukhman would continue to cooperate, much less foresee the extent of the information or proactive assistance Sukhman's cooperation would yield.  *See, e.g.*, *United States* v. *Miller*, 116 F.3d 641, 664 (2d Cir. 1997) (upholding district court's necessity finding where defendant had "agreed to cooperate and then at various points refused to cooperate").  Although Zemlyansky asserts that "[c]ommon sense demands that the cooperator was exhausted before reauthorizing the wiretap" (Zemlyansky Mot. at 39), that is not what the law requires.  To the contrary, "there is no requirement that any particular investigation procedures be exhausted before a wiretap may be authorized."  *Young*, 822 F.2d at 1237.   Nor would it be realistic or possible to "exhaust" an individual who was not yet a cooperating witness.

Accordingly, Judge Jones' determination that the Zemlyansky Phone wiretap met the necessity requirement even after Sukhman agreed to attempt to cooperate should not be disturbed.

41

## II.    DEFENDANTS' FRAUDULENT INCORPORATION THEORY LACKS MERIT

In three separate motions, joined by a number of defendants, various defendants challenge the Government's allegations that the defendants conspired to commit mail fraud and health care fraud through the fraudulent incorporation of the professional corporations that billed insurance companies for treatments under the No-Fault Law.  Defendant Yuriy Zayonts seeks to "strike" this theory of fraud from the Indictment and to preclude evidence in support of such a theory at trial based on (i) the legal insufficiency of such a theory of fraud because there was no affirmative misrepresentation or omission, and because (ii) there was no intent to injure the insurers.[25]  (Memorandum of Law of Yuriy Zayonts, dated February 18, 2013 ("Zayonts Mot.").) Defendant Michael Danilovich argues that the mail fraud charge under the theory of fraudulent incorporation should be dismissed because the alleged object of the scheme is not a property interest under the mail fraud statute.  (Memorandum of Law of Michael Danilovich, dated February 18, 2013 ("Danilovich Mot.").)

The defendants' motions fail for several reasons.  First, as an initial matter, the defendant's premise that the Government has alleged two separate and distinct theories of fraud is a misreading of the Indictment and simply incorrect.  In fact, the Indictment alleges one widespread scheme to defraud insurance companies of money based on multiple material misrepresentations, including the medical necessity of the treatments *and* the fraudulent incorporation of the treating clinics.  Second, even if the theories were separate and distinct, evidence of fraudulent incorporation is directly probative of what the the Government's "other" theory of fraud – that is, that the treatments provided were medically unnecessary.  Evidence of

---

[25]    Defendant Boris Treysler also filed a motion to dismiss the fraudulent incorporation theory based on the same "intent to injure" rationale primarily under state law.  (Memorandum of Law of Boris Treysler, dated February 18, 2013 ("Treysler Mot.")

fraudulent incorporation is therefore central to the Government's alleged conspiracy to commit mail fraud and health care fraud, and evidence of those allegations is permissible to prove the charges beyond a reasonable doubt.

Third, the defendants' motions to dismiss a "theory of fraud" are premature; a grand jury has found probable cause for the fraud charges in returning the Indictment and the Government has a right to prove its case at trial.  Because the fraudulent incorporation of the medical clinics is part and parcel of the scheme to defraud, the defendant's motion to dismiss a portion of the charged conspiracy is not only unsupported by any Federal Rule of Criminal Procedure, statute or case, but is also plainly premature as the Government has not yet had an opportunity to present all of the evidence supporting its charges.

Finally, even if the Court were to reach the merits of the defendants' arguments at this premature stage, they plainly fail.  The Government has sufficiently alleged charges of conspiracy to commit mail fraud and health care fraud through a widespread and sophisticated scheme to defraud insurance companies under the No-Fault Law.  In executing the scheme, the defendants made various material misrepresentations, including misstatements regarding the ownership and control of the professional corporations used to bill insurance companies for medical treatments.  It is also sufficiently alleged that the scheme was intended to, and in fact did, induce the insurance companies to pay money for the treatments that they otherwise would not have paid.  The defendants have provided no persuasive justification for excluding any portion of the Government's facially sufficient allegations of this fraudulent scheme.

## A.    Background

On February 28, 2012, a grand jury sitting in this District returned a superseding indictment, S1 12 Cr. 171 (the "Indictment"), finding probable cause to charge the defendants in

43

four counts.  All four counts relate to crimes committed in connection with an ongoing scheme to fraudulently bill insurance companies for the provision of medical services to automobile accident victims under New York's no-fault insurance laws.

The Court is now familiar with the Indictment, which sets forth a complex and widespread scheme to defraud automobile insurance companies through New York's No Fault Comprehensive Motor Vehicle Insurance Reparation Act (the "No-Fault Law").  N.Y. Ins. Law § 5102 *et seq*.  As explained in the Indictment, the defendants created both no-fault medical clinics ("No-Fault Clinics") and clinics that provided specific additional medical treatments ("Modality Clinics") for the sole purpose of defrauding insurance companies under New York's No-Fault Law.  (Indictment ¶¶ 4, 7).  The Indictment describes with specificity a widespread scheme to defraud the insurance companies through two broad categories of material misrepresentations. First, the Indictment explains that the No-Fault Clinics and Modality Clinics routinely provided and billed for medical treatments that were either never provided and/or medically unnecessary. (Indictment ¶ 4).  The insurance companies, which were only required to compensate accident victims for medically necessary treatments, were therefore defrauded into paying for treatments for which they otherwise would not have paid.  Second, the Indictment explains that because New York law requires medical clinics to be owned and operated by licensed medical practitioners, insurance companies would have denied all billings from a No-Fault Clinic or Modality Clinic that was not, in fact, owned and operated by a licensed medical practitioner, but was instead owned, operated and controlled by a clinic controller.  (Indictment ¶¶ 6-7).  Under the No-Fault Law, any billing from a medical clinic that was not owned, operated and controlled by the medical professional under whose name the clinic was incorporated is a material misrepresentation because the insurance companies would not have paid had they known the

44

truth about who owned and controlled the clinic, and the insurance companies were therefore defrauded on any claim for payment from those fraudulently incorporated medical clinics.

In the Government's detention motion, filed on February 29, 2012, the defendants' sophisticated scheme is described in greater detail.  For example, the Detention Motion explained how, as alleged in the Indictment, the No-Fault Clinics systematically provided medically unnecessary treatments that were then billed to the insurance companies:  When a patient arrived for treatment at the No-Fault Clinics, he or she was evaluated by a No-Fault Doctor, who recommended a standard, usually uniform schedule of treatment, regardless of actual medical need.  The standard schedule of treatments included physical therapy, chiropractic and acupuncture, often as many as five times per week.  Nearly every time a patient went to a No-Fault Clinic, the patient received all three of those treatments, a course of treatment that expert physicians will testify to be medically unnecessary on its face.  In addition, in almost every case, the No-Fault Doctor prescribed a near-identical assortment of medical supplies, which are provided by a durable medical equipment ("DME") clinic in a black garbage bag and are uniformly unnecessary and excessive.  Patients who have been interviewed consistently said they were not told about these medical supplies nor instructed on how to use them, but nearly every single patient received the initial supply.  In some cases, insurance companies received bills for supplies that were not actually provided to the patients.

In addition, the Detention Motion explained in more detail how, although the medical professionals were the paper, or straw owners, of many of the No-Fault and Modality Clinics, in reality, the No-Fault Clinic Controllers and Modality Clinic Controllers were the true owners. The No-Fault Controllers essentially purchased the licenses of the No-Fault Doctors by paying them a fee and/or salary to (1) incorporate the No-Fault Clinics with the relevant New York State

45

authorities, (2) sign the lease for the clinic property, (3) open the clinic bank account, (4) sign the

bills for initial evaluations, and (5) make the excessive and unnecessary referrals and

prescriptions for other unnecessary and excessive medical treatments and medical supplies. So

while the No-Fault Doctors appeared in all formal respects to be the owners of the No-Fault

Clinics, including in all respects where a name or signature was necessary, it was actually the

No-Fault Clinic Controllers who (1) supplied the initial funds to establish the No-Fault Clinic,

(2) identified the location for the clinic, (3) negotiated the rent, (4) sourced and paid for the

equipment, (5) recruited patients, and (6) received any profits from the clinic.

  With respect to the Modality Clinics, doctors at the No-Fault Clinics referred nearly

every patient to various Modality Clinics for a standard schedule of treatments, including

magnetic resonance imaging ("MRI"), psychology, x-rays, various neurological assessments,

orthopedic treatments, and, in some cases, manipulation under anesthesia treatments ("MUA"),

even though those treatments were generally medically unnecessary. The Modality Controllers

provided kick-back payments to the No-Fault Clinic Controllers for each patient, providing an

obvious financial incentive – and motivation for fraud -- to the No-Fault Clinic Controllers to

ensure that each patient was referred to each modality.

**B.** **Discussion**

  The Indictment alleges that the defendants engaged in a sophisticated, widespread

scheme to defraud insurance companies of money that was paid to reimburse various

professional corporations practicing medicine for medical treatments provided to accident

victims under the No-Fault Law through material misrepresentations. Broadly speaking, the

defendants' motions attempt to cabin the "fraudulent incorporation theory" of fraud into a

separate and distinct charge that hinges on the regulatory framework created under the No-Fault

46

Law. In truth, the Indictment more than sufficiently alleges a single broad scheme to defraud insurance companies through multiple types of material misrepresentations, including, but not limited to, the corporate structure of the billing medical clinics, which are material to the insurance companies under the established and authorized regulatory framework of the No-Fault Law. The Government's allegations – which will be supported by admissible evidence at trial – easily satisfy the elements of fraud: (1) a scheme to defraud victims of (2) money or property, through the (3) use of the mails. The fraudulent incorporation of the medical clinics that submitted bills to, and received payments from, the insurance companies, is simply one type of misrepresentation that supports a scheme to defraud. Accordingly, the defendants' motions are not only premature, but they misunderstand the Government's theory of the case and misapply the case law to the allegations in the Indictment. For this and other reasons described below, the defendants' motions must be dismissed.

### 1. Evidence of Fraudulent Incorporation Should Not Be Precluded

In his motion, Zayonts half-heartedly, and without citation to supporting authority, seeks to preclude at trial relevant evidence related to the fraudulent incorporation of the medical clinics. This baseless attempt to preclude relevant evidence should be swiftly rejected by the Court.

As described above, the fraudulent incorporation and medical necessity allegations in the Indictment are part and parcel of the same scheme to defraud the insurance companies under the No-Fault Law. While misrepresentations related to either of these two requirements under the No-Fault Law are sufficient to support the first element of mail fraud, they are intertwined as part of the same scheme to defraud. Furthermore, evidence showing that the medical clinics were fraudulently incorporated is probative to show that the treatments provided were

47

unnecessary, and, moreover, it is powerfully probative evidence that the clinics were created

with the specific intent to defraud insurance companies under the No-Fault Law.  The

Government expects the evidence at trial to show that all of the defendants knew of the licensing

requirements for medical clinics under New York law, as well as the patient-friendly nature of

the No-Fault Law, and designed the medical clinics to avoid disclosing the true structure of the

clinics to the insurance companies.  The defendants made these misrepresentations about the

incorporation of the medical clinics because they knew the insurance companies would not pay

for any bills submitted by a fraudulently incorporated medical clinic, in part because the

fraudulent incorporation of the medical clinics is an indicia of the fraudulent intent of those

clinics.[26]  This evidence not only goes to the intent to defraud element of the fraud charges, but

also corroborates the other witnesses and evidence that will show that medical treatments were

provided to patients regardless of medical necessity.  For example, if a doctor knew of the

licensing requirements and also knew that he or she was not the actual owner of the medical

clinic, that evidence of intentional deception about the incorporation of the professional

corporation would be relevant to the allegations that the doctor knowingly prescribed

unnecessary treatments for patients.  Accordingly, separate and apart from the question of

whether the fraudulent incorporation of the medical clinics is, in and of itself, a material

misrepresentation sufficient to satisfy the first element of mail fraud, evidence related to

fraudulent incorporation should not be precluded.

---

[26]     Notably, the defendants' motions do not dispute the materiality of any misrepresentations to the insurance companies, nor do they dispute that the insurance companies would not have paid for any claim submitted by a fraudulently incorporated medical clinic. The motions simply allege, in various ways, that the defendants did not contemplate any harm to the insurance companies through their material misrepresentations.

2.   **The Motions to Dismiss the Fraudulent Incorporation Theory of Fraud Are Premature and Should Therefore Be Denied**

   a.   **Applicable Law**

It is well-settled that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling* v. *United States*, 418 U.S. 87, 117 (1974); *see*, *e.g.*, *United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). To state an offense, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *Alfonso*, 143 F.3d at 776). On a pre-trial motion to dismiss an indictment, the Court should accept all factual allegations in the indictment as true. *See Boyce Motor Lines* v. *United States*, 342 U.S. 337, 343 n.16 (1952); *United States* v. *Clarke*, 05 Cr. 017 (DAB), 2006 WL 3615111 at *1 (S.D.N.Y. Dec. 7, 2006). Accordingly, in cases where the Government has not made a full proffer of the evidence it intends to present at trial, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *Alfonso*, 143 F.3d at 776-77. Motions to dismiss indictments are disfavored. *United States v. Finazzo*, 2011 WL 3794076 (E.D.N.Y. 2011) (unpublished) (citing *United States* v. *Bustos de la Pava*, 268 F.3d 157, 165 (2d Cir. 2001) ("dismissal of an indictment is an extraordinary remedy reserved for extremely limited circumstances implicating fundamental rights" (citation and internal quotation marks omitted)).

The scope of these rules is clear: the Court should not, through a motion to dismiss, impinge on the fact-finding function of the jury. *See United States* v. *Caputo*, 288 F. Supp. 2d

912, 916 (N.D. Ill. 2003) ("A court can decide all questions of law raised in a motion to dismiss and can make necessary preliminary findings of fact as long as the court does not invade the province of the jury. The jury is the fact-finder, so any arguments raised in a motion to dismiss that rely on disputed facts should be denied.").  It can, however, address questions of law or questions of fact that do not implicate "the general issue." Fed. R. Crim. P. 12.  "The 'general issue' has been defined as evidence relevant to the question of guilt or innocence." *United States* v. *Dransfield*, 913 F. Supp. 702, 707 (E.D.N.Y. 1996) (citations omitted).  For this reason, a district court, in ruling on a pre-trial motion to dismiss an indictment, may not "look[] beyond the face of [an] indictment and dr[a]w inferences as to the proof that [might] be introduced by the government at trial to satisfy ... [an] element [of the offense]." *United States* v. *Alfonso*, 143 F.3d at 777.

### b.    Discussion

The defendants assert that, notwithstanding the fact that a Grand Jury returned a true bill supporting the Indictment and its facially valid fraud allegations, the Court should nonetheless "dismiss" a *portion* of the fraud charge because the Indictment's preamble alleges a legally deficient theory of fraud.  (Zayonts Mot. at 1.)  The defendants further argue that the Court can rule on this motion because, accepting the Government's factual allegations in the Indictment and other materials submitted by the Government, no further factual development is necessary. (*Id.*)  The defendants are wrong.  The Indictment alleges a single scheme to defraud, of which the fraudulent incorporation of the medical clinics is one of several components; there is no basis in any rule, statute, or case law to support the dismissal of a discrete portion of an otherwise valid allegation of fraud, either with respect fraudulent incorporation or the Indictment as a whole .  Moreover, the Government has never provided a complete proffer of the evidence at trial, and as

50

a result, a ruling on the sufficiency of the evidence to support an element of a crime charged in the Indictment is both premature and improper.

Zayonts relies extensively on the Government's reference at the December 5, 2012 oral argument on the Motion for a Bill of Particulars ("Oral Argument") – which the Court denied – to a specific document of the type the Government would rely on to support its contention that the defendants' made affirmative misrepresentations to the insurance companies.  (Zayonts Mot. at 5-6, Ex. A (the "NF-3 Form").)  To be sure, the representations made in response to Question 17 of the NF-3 will be one example of misrepresentations made to the insurance companies, which is discussed in greater depth below. Yet that is just one type of affirmative misrepresentation the Government will introduce at trial.  At the Oral Argument, the Government provided the NF-3 Form to defense counsel and the Court in response to a question about what kinds of affirmative misrepresentations were made to insurance companies. Crucially, the Government never represented that the NF-3 Form was the only type of misrepresentation to support allegations that the defendants fraudulently incorporated medical clinics as part of the scheme to defraud.  In fact, the Government identified other types of misrepresentations made to the insurance companies about the fraudulent incorporation of the clinics.  (Tr. of Oral Argument, dated Dec. 5, 2012, at 30-31; *see also* Exhibit 15.)  At this preliminary stage, where the Government has not presented all of its evidence to support the charges in the Indictment, it is premature for the Court to rule on anything related to the fraudulent incorporation of the medical clinics, whether it be an independent theory of fraud, as characterized by the defendants, or simply a type of misrepresentation as alleged in the

Indictment.  Accordingly, the Court should not entertain the defendants' request for the Court to decide what is effectively a pretrial Rule 29 motion for a judgment of acquittal.[27]

### 3. On the Merits, the Defendants' Fraudulent Incorporation of Medical Clinics Was One Type of Affirmative Misrepresentation That Satisfies Mail Fraud's First Element

On the merits of their arguments, the defendants assert several technical arguments why the fraudulent incorporation "theory of fraud" is legally insufficient.  Zayonts sets forth two different arguments: (1) that the defendants made no affirmative misrepresentation or omission that would satisfy the fraud statutes requirement of an illegal act, and (2) that the insurance companies did not suffer any contemplated harm to support a fraud charge.[28]  Danilovich argues that the victim-insurance companies were not deprived of a property interest sufficient to support a mail fraud conviction.

For the reasons that follow, all of these arguments are without merit.  The Government has properly alleged a cognizable conspiracy to commit mail fraud and health care fraud, whereby it must prove beyond a reasonable doubt that the defendants engaged in a scheme to

---

[27]    The defendants assert that the fraudulent incorporation "theory of fraud" is "novel," noting that there is no reported federal decision sustaining such a theory as the basis for a mail or wire fraud prosecution.  (Zayonts Mot. at 11-12.)  To be sure, the Government also is not aware of any published decision in a federal court responding to a facial challenge to a mail fraud charge based on material misrepresentations as to the fraudulent incorporation of medical clinics.  However, in the case of *United States* v. *Chervin*, 10 Cr. 918 (RPP), which has often been cited by the defendants in this case, Vadim Chervin was convicted by a jury after trial, at which Judge Patterson instructed the jury on the fraudulent incorporation of the medical clinic in that case.  (*See Chervin* Trial Tr. at 976 (attached as Exhibit 16)).  In addition, the Manhattan District Attorney's office obtained a conviction in New York County Supreme Court based on a theory of fraudulent incorporation in *People* v. *Gregory Vinarsky et al.*, Ind. Nos 840/2008 and 843/2008 (N.Y. Sup. Ct. 2011).  Furthermore, both Judge Koeltl and this Court have accepted guilty pleas based solely on factual allocutions by defendants supporting misrepresentations as to the incorporation of medical clinics.  *See* Transcript dated Nov. 7, 2011, *United States* v. *Baraque*, 10 Cr. 821 (JGK) (attached as Exhibit 17); Transcript dated March 4, 2013, *United States* v. *Mikhalov*, 12 Cr. 171 (JPO) (attached as Exhibit 18); Transcript dated March 8, 2013, *United States* v. *Sandler*, 12 Cr. 171 (JPO) (attached as Exhibit 19).  Finally, the fact that no Court has ruled on the legal sufficiency of the fraudulent incorporation theory further mitigates in favor of waiting until a full factual record is developed following a trial.

[28]    Treysler essentially adopts the arguments made in Zayonts' second argument, with additional references to state court cases.  To the extent Treysler's memorandum of law addresses issues relevant to this case, the Government addresses them in conjunction with Zayonts' argument.

defraud the insurance companies, in part, by knowingly making material misrepresentations to the insurance companies about the ownership and structure of their medical clinics that caused the insurance companies to pay undeserved money to the defendants.  If the Government can meet its burden in a criminal prosecution of proving each element of fraud beyond a reasonable doubt, as it can here, then a jury can convict the defendants under this theory.

### a.  Applicable Law

#### i.     The No-Fault Law

Under the Comprehensive Motor Vehicle Insurance Reparation Act (the "No-Fault Law"), automobile insurance companies are required to reimburse all drivers and passengers for "basic economic loss on account of personal injury arising out of the use or operation of a motor vehicle," up to $50,000, for "all necessary expenses."  N.Y. Ins. Law §§ 5102(a), (b).  As relevant here, "all necessary expenses" include "(i) medical, hospital . . ., surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services; (ii) psychiatric, physical therapy (provided that treatment is rendered pursuant to a referral) and occupational therapy and rehabilitation; and . . . (iv) any other professional health services."  *Id.* § 5102(a)(i), (ii), (iv).  In addition, the No-Fault Law provides for the possibility of a cause of action for personal injury in the case of "serious injury," which is defined to include a variety of significant and permanent injuries, as well as a "medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." *Id.* § 5102(3)(d), 5104(a).

Various sets of regulations have been implemented by the New York State Superintendent of Insurance since the inception of the No-Fault Law.  11 N.Y.C.R.R. § 65-3.1 *et seq*.  On August 2, 2001, new regulations were filed, which became effective on April 5, 2002. Under those regulations, an insured may assign his or her benefits directly to the health care provider, which can receive direct payment for the services provided.  11 N.Y.C.R.R. § 65-3.11(a).  Notably, "[e]xecution of an authorization to pay benefits shall not constitute or operate as a transfer of all rights from the eligible injured person to the provider."  *Id.* § 11(b)(1). Section 65-3.16(a)(12) further states: "A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed."

New York Education Law § 6507(4)(c) directs the New York State Department of Education to issue a certificate of authority to a "qualified professional services corporation," including medical practice, that is organized under Section 1503 of the New York Business Corporation Law.  Section 1503(b) requires that this certificate of incorporation

> (i) shall state the profession or professions to be practiced by such corporation and the names and residence addresses of all individuals who are to be the original shareholders, directors and officers of such corporation, and (ii) shall have attached thereto a certificate or certificates issued by the licensing authority certifying that each of the proposed shareholders, directors and officers is authorized by law to practice a profession which the corporation is being organized to practice and, if applicable, that one or more of such individuals is authorized to practice each profession which the corporation will be authorized to practice.

Furthermore, Section 1504(a) of the New York Business Corporation Law requires that "[n]o professional service corporation . . . may render professional services except through individuals

54

authorized by law to render such professional services as individuals."  Furthermore, under

Section 1508, "[n]o individual may be a director or officer of a professional service corporation

unless he is authorized by law to practice in this state a profession which such corporation is

authorized to practice and is either a shareholder of such corporation or engaged in the practice

of his profession in such corporation. N.Y. Bus. Corp. Law § 1508(a).  Finally, Section 1507

states that "[a] professional service corporation may issue shares only to individuals who are

authorized by law to practice in this state a profession which such corporation is authorized to

practice."

  The New York Court of Appeals has determined that the regulations promulgated under

the No-Fault Law are valid.  *State Farm Mut. Auto. Ins. Co.* v. *Mallela*, 4 N.Y. 3d 313, 321

(N.Y. 2005) ("*Mallela NY*").  Noting that in an *amicus curiae* brief, "the Superintendent asserts

that he promulgated this rule to combat rapidly growing incidences of fraud in the no-fault

regime, fraud that he has identified as *correlative* with the corporate practice of medicine by

nonphysicians," *Mallela NY*, 4 N.Y. 3d at 321 n.3 (emphasis added), the Court held that "on the

strength of [Section 65-3.16(a)(12)], carriers may look beyond the face of licensing documents to

identify willful and material failure to abide by state and local law."  *Id.* at 321.  The Court

unequivocally held that fraudulently incorporated medical clinics were not entitled to

reimbursement under the No-Fault Law. *Id.* at 320.

*ii.*   ***Mail Fraud***

  The three elements of mail fraud are (1) a scheme to defraud victims of (2) money or

property, through the (3) use of the mails. *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir.

2004). "The first element focuses on the intent to harm; the second element is concerned with the

precise nature of that harm, and requires that the harm be concrete." *United States* v. *Walker*, 191

55

F.3d 326, 335 (2d Cir. 1999). "Proof of fraudulent intent, or the specific intent to harm or defraud the victims of the scheme, is an essential component of the 'scheme to defraud' element." *United States* v. *Walker*, 191 F.3d 326, 334 (2d Cir. 1999). The Government need not show that the intended victim was actually defrauded, and may rely on proof that the defendants contemplated some actual harm or injury to their victims. *United States* v. *Starr*, 816 F.2d 94, 98 (2d Cir.1987); *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.1970).

"'Materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.'" *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir.2000) (quoting *Neder v. United States*, 527 U.S. 1, 25 (1999)). Both affirmative misrepresentations and the omission of information that the defendant has a duty to disclose violate the mail and wire fraud statutes. *See Autuori*, 212 F.3d at 118 (citation omitted). Moreover, "it is just as unlawful to speak half truths or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.* (citation and internal quotation mark omitted).

       **b.**      **Discussion**

              ***i.***      ***The Defendants Made Affirmative Misrepresentations to Defraud the Insurance Companies***

In arguing that the Government does not allege an affirmative misrepresentation to satisfy the requirements of the crime of mail fraud and health care fraud, Zayonts simply makes an improper factual argument that is properly within the province of the jury. At the core, Zayonts argues that Question 17 of the NF-3 Form only asks for the name of the owner of the billing professional corporation – nothing more – and because "the doctors who incorporated the PCs are, indeed, the owners of the PCs," there is no affirmative misrepresentation because the NF-3 Form does not ask who controls or operates the PCs. (Zayonts Mot. at 6-7.) This argument

misinterprets the Government's allegations.  As the Indictment alleges, the importance of the

fraudulent incorporation of the medical clinics lies discretely in the fact that by falsely stating

that the incorporating medical professional is the true owner of the medical clinic, the defendants

made affirmative misrepresentations that satisfy the first element of mail fraud.  The question of

ownership is a factual one that can only be determined by a jury.[29]

       Zayonts mistakenly attempts to draw a distinction between "ownership" of a PC and

"control" of that PC in arguing that the licensing requirements for professional corporations

under New York law – and Question 17 of the NF-3 Form itself – make no mention of control.

(Zayonts Mot. at 9.)   This argument simply misses the point.  Control and operation of a PC are

*factors* that a fact-finder would consider in determining which individual (or individuals) is the

true owner of a PC.[30]  The Government's subsequent amplification of the allegations in the

Indictment assert that, although medical professionals incorporated the PC and opened the PC

bank account, as they knew to be required by New York law and the insurance companies, they

did not, among other things, (1) fund the clinic, (2) hire the clinic's staff, (3) control the bank

account, (3) choose the clinic location, (4) pay the rent, (5) recruit patients, (6) refer patients to

personal injury attorneys, or (6) receive the profits – all hallmarks of actual ownership.  The

defendants are free to make arguments relating to the true ownership of the clinics to a jury, but a

jury, and not the Court, is the correct forum for that argument.

       Even focusing solely on Question 17 of the NF-3 Form, the defendants affirmatively

misrepresented to the insurance companies (and the New York State Department of Education)

---

[29]     Notwithstanding the fact that Zayonts professes to "assume – for purposes of this argument only – the truth of the government's factual allegations," (Zayonts Mot. at 1), the crux of this argument is that the Government's allegations about the ownership of the billing PCs are factually incorrect.

[30]     In fact, even the New York Court of Appeals recognized that New York State licensing requirements "prohibit non-physicians from *owning or controlling* medical service corporations."  *Mallela NY*, 4 N.Y.3d at 320-21 (emphasis added).

that the No-Fault Doctor was the true owner of the billing PC, even though he or she was not. This is precisely the type of "half truth[]" that "omit[s] to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Autuori*, 212 F.3d at 118 (citation and internal citations omitted); *see also United States* v. *Kone*, 303 Fed. Appx. 38, 2008 WL 5246048 (2d Cir. 2008) (unpublished) (affirming jury charge attributing misleading half truths to affirmative misrepresentation theory of fraud); *but see United States* v. *Kahale*, 789 F. Supp. 2d 359, 379 (E.D.N.Y. 2009) (citing *Autuori*'s language about misleading half truths in relation to a fraud by omission theory).[31]

In short, the Indictment adequately alleges a scheme to defraud insurance companies by making misrepresentations about the true ownership of the billing P.C., which materially affected whether the insurance companies reimbursed the P.C.'s for the medical treatments provided under the No-Fault Law.  The question of ownership of the billing PC's is a factual one for the jury to determine and should not be addressed by the Court here. *See, e.g.*, *United States* v. *Finazzo*, No. 10 Cr. 457 (RRM), 2011 WL 3794076, at *6-8 (E.D.N.Y. Aug. 24, 2011) (denying motion to dismiss under similar circumstances).

> ii.     ***The Defendants Made Misleading False Statements to Defraud the Insurance Companies***

---

[31]     Moreover, at the bottom of the NF-3 Form, right above where the signature is required, there is a warning that criminal and civil charges may arise if the signatory makes a claim "containing materially false information or conceals the for the purpose of misleading[] information concerning any fact material thereto."  (*See* Zayonts Mot., Ex. A).  Separate and apart from the affirmative misrepresentation about the actual owner of the PC, this warning creates precisely the type of duty to disclose contemplated by a theory of fraud by omission.  *See Autuori*, 212 F.3d at 119 ("A duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading.").  Although the case law in this Circuit is not clear under what theory of fraud – affirmative misrepresentation or material omission – misleading half-truths falls, it is clear that the Government properly alleges that the failure to provide the insurance companies with all of the facts surrounding ownership of the billing PC is a material half-truth that satisfies the "material misrepresentation" prong of the first element of mail fraud and health care fraud.

Zayonts and Treysler attempt to argue that the Government's allegations of fraud in this case to hinge entirely on the Court of Appeals opinion in *Mallela NY*, which was a civil case in which the plaintiff conceded that all treatments were otherwise legitimately provided. The relevance of *Mallela NY* to these charges, however, is simply that it conclusively determined that misrepresentations about the incorporation of the medical clinics is material to the insurance companies. Contrary to Zayonts' argument, the Government's allegations of fraud are not based on a violation of *Mallela*, nor are the factual allegations here the same as those in *Mallela*. Rather, here, the defendants are charged with engaging in a wide-ranging scheme to defraud the insurance companies by, *inter alia*, making material misrepresentations about the incorporation of medical P.C.'s. Unlike *Mallela*, the allegations in the Indictment are that the No-Fault Clinics were established as sham clinics designed to defraud insurance companies by billing for unnecessary treatments and affirmatively misleading insurance companies about the fraudulently incorporated clinics, which, in addition to being a material misrepresentation of its own, is also an indicia of fraud to the insurance companies. If the Government can prove through admissible evidence – such as the fraudulent incorporation of the medical clinics, unnecessary medical treatments, kick-back payments among the defendants and co-conspirators, and money laundering to promote and conceal the scheme – that the defendants knowingly intended to defraud insurance companies by making material misrepresentations that caused the insurance companies to make payments of money they otherwise would not have made – the contemplated harm – then the defendants should be convicted of mail fraud.[32]

---

[32]    Similarly, Zayonts' argument that the insurance companies are obligated to reimburse the medical clinics if a properly licensed professional actually provided the services – and therefore no harm was contemplated -- is essentially the same argument that Judge Sifton adopted in *State Farm Mut. Auto. Ins. Co.* v. *Mallela*, 175 F. Supp. 2d 401, 407 (E.D.N.Y. 2001) (*Mallela I*) and *State Farm Mut. Auto. Ins. Co.* v. *Mallela*, No. CV-00-4923 (CPS), 2002 WL 31946762 (E.D.N.Y. Nov. 21, 2002) ("*Mallela II*"), but which was roundly rejected by the Court of

Furthermore, it is irrelevant to this case whether, hypothetically, the same treatment provided to a patient by a properly incorporated medical clinic, or even billed directly to the insurance company by the patient, would have properly triggered an insurance company's obligation to reimburse for that treatment.  Those are simply not the facts of this case; as a result, they are of no moment to a jury's decision about whether the defendants committed the crime of fraud on the evidence presented to it.  It is a self-evident component of a fraud scheme that some similar yet legitimate set of circumstances would *not* support a fraud conviction; indeed, nearly every fraud scheme is designed to mimic a legitimate transaction, because otherwise it would not be effective.  The question here – for the jury, not the Court – is whether factual allegations supported by evidence at trial can satisfy the Government's burden to prove each element beyond a reasonable doubt, not whether some other set of hypothetical facts that are not part of the Government's evidence would somehow undermine a given element of the crime.[33]

In an effort to support his misguided argument, Zayonts cites, without analysis, to several Second Circuit cases where the Circuit has rejected mail or wire fraud charges based on the fact that no harm to the victims was contemplated.  (Zayonts Mot. at 10 (citing *Starr*, *Regent*, *United States* v. *Novak*, 443 F.3d 150 (2d Cir. 2006); *United States* v. *Shellef*, 507 F.3d 82 (2d Cir. 2007)).  This argument rests on the fundamentally false premise of completely distinct theories of fraud, discussed in detail above.  Even assuming *arguendo* that the theories are distinct, each of these cases is easily distinguishable from the allegations here, which set forth, without real

---

Appeals.  *Mallela NY*, 4 N.Y. 3d at 320, 321 ("The fact remains that the reimbursement goes to the medical service corporation that exists to receive payment only because of its willfully and materially false filings with state regulators.").  For the same reason, Zayonts' argument that the insurance companies suffered no harm fails.

[33]      Of course, the defendants may present evidence of an alternative set of facts and make any arguments to the jury from that evidence that they introduce to undermine the Government's theory of the case.

dispute, that the harm to the insurance companies through the affirmative misrepresentations about the nature of the incorporation of the medical clinics resulted in the deprivation of money.

In *Regent*, the Court found that the "solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, [does not] constitute a 'scheme to defraud' or "obtaining by false pretenses' within the prohibition of 18 U.S.C. s 1341." *Id.* at 1179. Here, however, unlike in *Regent*, the misrepresentations were not related to peripheral matters. Rather, the misrepresentations of ownership of the PCs pertained directly to the bargain between the medical clinics and the insurance companies – whether the insurance companies must pay for treatments provided by fraudulently incorporated clinics.[34]

*Starr* and *Novak* involved allegations of fraud against the wrong victim. *Starr*, 816 F.2d at 95-99 (holding that customers of bulk mailing company, which were the alleged victims, got what they bargained for, even though the United States Postal Service was defrauded by the defendants); *Novak*, 443 F.3d at 156 (holding that the alleged victims of a labor union kickback scheme – the contractors – received the services they paid for, even though the members of the union suffered harm for payments for no-show jobs). Under the teachings of *Starr* and *Novak*, the defendants' argument might have merit if the Government alleged that the scheme was to defraud the *patients* under the No-Fault Law because they received treatment from a fraudulently

---

[34]     Similarly, Treysler's extensive reliance on *People* v. *Headley*, a Kings County Supreme Court case is misplaced.  951 N.Y.S. 2d 317 (N.Y. Sup. 2012). In *Headley*, the People alleged that the defendant defrauded the New York City Transfer Authority ("NYCTA") by conspiring with a NYCTA employee to direct contracts for independent medical examinations ("IME") to a company established by the defendant and his co-conspirator.  *Id.* at 817-18.  The court found that that there was no evidence that the IME's provided to NYCTA were not legitimate and properly administered.  *Id.* at 827.  The court held that because there was "no loss" to the defendant, the breach of contract did not meet the elements of larceny. *Id.* at 828.  In *Headley*, however, the alleged material misrepresentation was that the defendant had two conflicts of interest, not that the services weren't properly provided according to the terms of the contract.  Here, of course, the misrepresentations related to a material, court-authorized rationale for denying the claim, something that was not available to NYCTA in *Headley*.  *Headley* therefore falls under the rationale of *Regent* and is inapposite here.

incorporated medical clinic.  Like *Starr* and *Novak*, the Government would have alleged that the scheme would have been directed at the wrong victim.  But here, the Government has alleged that the insurance companies were the victims of the defendants' scheme, just as the Postal Service was the true victim in *Starr*.  Whereas in *Starr*, "the clients dealt with the defendants just as they would have dealt with an honest business," *Walker*, 191 F.3d at 336, here, the insurance companies would not have paid the claims submitted by fraudulently incorporated professional corporations if they were aware of all of the facts.  *Starr* and *Novak* are therefore inapposite.[35]

Instead, the legal sufficiency of the harm caused by fraudulent incorporation is supported by Second Circuit case law.  In *United States* v. *Schwartz*, 924 F.2d 410 (2d Cir. 1991), the defendants were charged with, among other things, committing wire fraud against a company that sold night vision goggles with several express terms and conditions in the contract that involved a number of technical permitting and regulatory requirements that the defendants did not follow.  *Id.* at 420.  Even though the price of the contract was not altered by the defendants conduct, a representative from the victim-company testified that it would not have sold its product to the defendants if the defendants did not guarantee these collateral conditions.  *Id.* at 420-21.  In distinguishing *Starr* and *Regent* as cases where "the defendants' false representations were collateral to the bargain and did not cause any discrepancy between benefits reasonably

---

[35]     *Shellef* also is inapposite.  In its fraud charge, the Government essentially alleged that the defendant defrauded the victim because it misrepresented that it would export the product at the center of the contract, but instead the defendant sold it domestically.  *Shellef*, 507 F.3d at 109.  The Court held that because "the indictment states only that [the defendant's] misrepresentation induced [the purported victim] to enter into a transaction it would otherwise have avoided," and did not assert that the defendant's misrepresentation had "relevance to the object of the contract," it was not legally sufficient.  *Id.* (citations omitted).  However, after recognizing that the facts "closely resemble those in *Schwartz*, the Court clarified that it was motivated by a concern that a "jury here might have erroneously convicted [the defendants] even though it concluded that the defendants did not misrepresent an "essential element" of the bargain, but rather made "simpl[e] fraudulent inducements to gain access to" the victims' products.  *Id.* (citing *Schwartz*, 924 F.2d at 421).  This concern placed the case squarely under *Regent*, not *Schwartz*, because it was not clear whether the jury might have convicted the defendants simply based on misrepresentations to gain access rather than the fact that the defendants sold domestically products they promised to export.

anticipated and actual benefits received," *id.* at 120, the Court held that the defendants'

"misrepresentations went to an essential element of the bargain between the parties and were not

simply fraudulent inducements to gain access to Litton equipment." *Id.* at 121.

Similarly, in *United States* v. *Frank*, 156 F.3d 332 (2d Cir. 1998), municipalities

contracted for, and paid for, disposal of waste at a site that complied with regulations as to how

far from shore the waste must be disposed.  Yet the defendants dumped the waste at a site that

was illegally closer to shore and, not surprisingly, was also cheaper.  *Id.* at 335.  Furthermore, a

representative of one of the municipality victims testified that the defendants' "short-dumping"

could have subjected the municipality to fines and to the loss of its environmental permit.  *Id.*

Even though the municipalities got what they paid for – that is, their waste was disposed of – the

Court found that the defendants' short-dumping at a cheaper cost intended to harm the

municipalities.  *Id.*

*Schwartz* and *Frank* support the Government's fraudulent incorporation allegations.  The

fraudulent incorporation of the medical clinics was an essential part of the "bargain" between the

insurance companies and the medical clinics, and easily satisfies the requirement that there be

some harm contemplated against the victim.  As *Mallela NY* made clear, the fraudulent

incorporation of the medical clinics is not simply some technical failure of the corporate

structure, but is instead a sign that the actual treatments were fraudulent, as well.  More

importantly, the fraudulent incorporation of the medical clinics is an independent basis for the

insurance companies to deny the medical claims. Unlike in *Starr* and *Novak*, where the

Government essentially alleged harm done to the wrong victim, but similar to *Schwartz* and

*Frank*, where a collateral part of the contract was held to be central to the bargain, here, the

scheme to defraud the insurance companies contemplated significant harm because, if they had

the benefit of all of the facts, they would not paid for the services, nor would they be required to. *See United States* v. *Rowe*, 56 F.2d 747, 749 (2d Cir. 1932), ("A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him."). By misleading the insurance companies as to the true nature and structure of the medical clinic, the defendants' lies and half-truths denied the insurance companies all of the information necessary and relevant to their own, court-authorized analysis as to whether a particular medical treatment must be reimbursed. Such misleading, material half-truths were designed to induce insurance companies to pay treatments they would not have paid if they possessed all of the relevant facts, which sufficiently supports a charge of mail fraud.

### iii.   *The Insurance Companies Were Defrauded of a Money Interest, Not a Property Interest*

In his motion, Danilovich argues that the fraudulent incorporation theory of mail fraud – but not health care fraud – does not allege a cognizable property interest because it relies upon the insurance companies' non-discretionary requirement to pay for medical services provided. (Danilovich Mot. at 4.) Danilovich further makes the counterintuitive argument that, because medical clinics owned by non-doctors are "ineligible for reimbursement," insurers are prohibited by law to reimburse such clinics for medical treatments, and therefore misrepresentations as to the ownership of the medical clinics does not invoke the insurance companies' "right to control" its assets and fails to satisfy the "property" element of the statute. (Danilovich Mem. at 5.) This bootstrapping argument misunderstands the nature of the charge, misapplies the law, and further fails even under the inapposite case law relied upon by Danilovich.

64

As an initial matter, and a dispositive one, the insurance companies' interest is a money interest, not a property interest, therefore rendering Danilovich's argument misplaced. Moreover, Danilovich improperly bootstraps this case into the Second Circuit's "right to control" line of cases before improperly characterizing the insurance companies' ultimate decision to withhold payment as outside the scope of those cases. Yet this is simply not a "right to control" case, because the harm to the insurance companies is not a deprivation of *where* they spend their money but rather *whether* they spend their money. Yet even if the Court were to consider Danilovich's incorrect legal argument, the argument ignores the crucial, intermediate procedural step authorized by the No-Fault Law when the misrepresentations are made and the actual harm occurs. For any one of these reasons, the Court should discard this argument.

Notwithstanding Danilovich's best efforts to complicate the Government's fraud allegations, this is a straight-forward case alleging that the defendants engaged in a scheme to defraud insurance companies by, among other things, misrepresenting the true ownership of the billing corporations in order to obtain undeserved pecuniary benefits. *See, e.g.*, *Walker*, 191 F.3d at 335 ("[T]he government was able to prove that defendants received substantial amounts of money from their clients in the form of legal fees, thus satisfying the [money or property] element."). In the face of this obvious analysis, Danilovich, without citing a relevant case to support this argument, attempts to frame the insurance companies' interest as a non-discretionary decision to withhold property. But that is a fallacious premise. For the purposes of determining whether there was a deprivation of money, there is no difference between withholding payment and making a payment. In fact, it is irrelevant under the mail fraud statute whether the perpetrator even gains anything from his scheme to defraud; rather, the statute requires some contemplated injury to the victim, such as payment of money that would otherwise not be paid.

65

*See Starr*, 816 F.2d at 98; *Regent*, 421 F.2d at 1180.  In any event, there is ample evidence here that the defendants were successful in extracting hundreds of millions of dollars from the insurance companies, which satisfies the second element of the mail fraud statute.

Danilovich attempts to rely on *Cleveland* v. *United States*, 531 U.S. 12, 26-27 (2000), and *McNally* v. *United States*, 483 U.S. 350 (1987), to support his flawed argument.  *Cleveland* and *McNally*, however, relate to the Government's *intangible* property interests in a state's interest in video poker licensees and the provision of honest services by public officials, respectively.  *See Cleveland*, 531 U.S. at 26-27 ("We conclude that § 1341 requires the object of the fraud to be "property" in the victim's hands and that a Louisiana video poker license in the State's hands is not "property" under § 1341); *McNally*, 483 U.S. at 352 ("The prosecution's principal theory of the case, which was accepted by the courts below, was that petitioners' participation in a self-dealing patronage scheme defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly.")  Notably, neither case dealt with the *tangible* "money" prong of the mail fraud statute, such as a defendant's scheme to defraud a private insurance company of money, as in the case here.  *Cleveland* and *McNally* therefore are inapposite.

In order to evade this simple inquiry, Danilovich attempts to hinge his argument on the false premise that the insurance companies' decision to withhold payment to fraudulently incorporated medical clinics is a "right to control" its property under Second Circuit law, and that the insurance companies' decisions to withhold payment to fraudulently incorporated medical clinics is not a discretionary decision so it does not satisfy this standard.  *See United States* v. *Wallach*, 935 F.2d 445, 462–63 (2d Cir. 1991) ("Examination of the case law exploring the "right to control" reveals that application of the theory is predicated on a showing that some

person or entity has been deprived of potentially valuable economic information. . . . Thus, the

withholding or inaccurate reporting of information that could impact on economic decisions can

provide the basis for a mail fraud prosecution."); *see also United States* v. *Rossomando*, 144 F.3d

197, 201 n. 5 (2d Cir. 1998) ("[T]he concrete harm contemplated by the defendant is to deny the

victim the right to control its assets by depriving it of information necessary to make

discretionary economic decisions."); *United States* v. *Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir.

1994) ("[L]ack of information that might have an impact on the decision regarding where

government money is spent ... is not a tangible harm and therefore does not constitute a

deprivation of section 1341 'property' ... [unless] the information withheld either [is] of some

independent value or [ ] bear[s] on the ultimate value of the transaction.").  This case, however,

does not invoke the insurance companies' right to control *where* assets are distributed.  Rather, it

addresses the critical issue of whether insurance companies were defrauded of money that they

would not have otherwise paid to the defendants.  As a result, the "right to control" line of cases

is misapplied in this case.[36]

Moreover, as Danilovich appears to acknowledge, (Danilovich Mot. at 6 n.3), the

insurance companies' money interest is discretionary.  The No-Fault Law and its regulations do

not, and cannot, *require* insurance companies to make payments for *any* treatments provided by

licensed professionals, regardless of necessity or the bona fides of the billing P.C., thereby

rendering the review of insurance companies' "non-discretionary."[37]  Nor does the No-Fault Law

---

[36]        Even under the "right to control" theory, the fraudulent incorporation of the medical clinics is a cognizable
harm because the information withheld from the insurance companies – the true owner of the PC and the fraudulent
incorporation of the medical clinic – directly bears on the value of the transaction, that is, whether the treatment is
reimbursable or not.

[37]        The policy rationale for the No-Fault Law and its regulations is of no moment to the issue here: whether
the defendants engaged in a scheme to defraud the insurance companies of money through the use of the mails.  (*See*
Danilovich Mot. at 6.)  The Government has a heavy burden to show that the defendants structured the medical

nor its regulations confer upon insurance companies "a regulatory interest of the State."
(Danilovich Mot. at 7.)  Rather, insurance companies are authorized under the No-Fault Law
regulations to "look beyond the face of licensing documents to identify willful and material
failure to abide by state and local law."  *Mallela NY*, 4 N.Y. 3d at 321.  In fact, *Mallela NY*
specifically contemplated that, in looking beyond the face of the licensing documents, insurance
companies should investigate for fraud, not technical violations.  *Id.* at 322.  Accordingly, in
order to determine whether bills submitted by medical clinics require reimbursement, the
insurance companies must *first* determine whether the medical clinics are fraudulently
incorporated, which is the specific subject of the alleged misrepresentations.  Once that
determination is made, the insurance companies can rely on the regulations to deny
reimbursement if fraudulent or pay the claims if a billing medical clinic is not fraudulent.  But
the intent to defraud, and the subsequent harm, have already occurred during the contemplated
investigation stage.  Just as in *Schwartz* and *Frank,* the insurance companies must administer
their role to reimburse accident victims under the regulations implemented under the No-Fault
Law.  But where, as here, medical clinics make affirmative misrepresentations with the intent to
defraud the insurance companies into making otherwise undeserved payments under the No-
Fault Law, the defendants have committed mail fraud.  Simply put, that is precisely what is
alleged here.

---

clinics with the specific intent to defraud the insurance companies of money.  The underlying rationale as to why
New York State law permits the insurance companies to deny claims to fraudulent incorporated clinics has no
bearing on whether the Government can prove the elements of mail fraud beyond a reasonable doubt.

III.    **THE TRISTATE SEARCH WARRANT WAS ENTIRELY LAWFUL AND**
        **CONSISTENT WITH FOURTH AMENDMENT REQUIREMENTS**

Defendant Vladislav Zaretskiy, joined by defendants Yuriy Zayonts and Mikhail Kremerman (together, the "Moving Defendants") seek to suppress *all* evidence seized from the offices of TriState Billing, on February 29, 2012, on the grounds that the TriState Search Warrant was both overbroad, (Zaretskiy, et al. Mot. at 7-12),  and insufficiently particular, (Zaretskiy, et al. Mot. at 12-13).  In addition, the Moving Defendants ask that the Court suppress all evidence from seized computers due to delays by the Government in searching the contents of those computers.  The motion should be denied.

A.    **Background**

On February 27, 2012, the Honorable Cheryl Pollak, United States Magistrate Judge, Eastern District of New York, issued search warrants for the six premises that were connected to the defendants' widespread no-fault scheme, including four billing offices, one of which was TriState Billing, 28 Dooley Street, Third Floor, Brooklyn, New York ("TriState Search Warrant").  Probable cause for the issuance of the six search warrants, including the TriState Search Warrant, was provided by the Affidavit of Federal Bureau of Investigation Special Agent Michael D. Kelley, which described in detail the Government's investigation into the defendants' operation of a massive insurance fraud scheme, the evidence of this scheme, and the role of these different premises in the scheme (the "Kelley Affidavit").

Among other things, the Kelley Affidavit described the process by which the controllers of both No-Fault and Modality Clinics billed insurance companies directly for patient treatments, received payments from the insurance companies, and converted portions of those payments into cash to pay kick-backs to other participants in the scheme (including patient runners, plaintiffs

lawyers, and other clinic owners).  (Kelley Aff. ¶ 5(d)-(g); ¶ 6(a)-(d)).  In order to convert the

insurance company payments into cash, and in order to further disguise their involvement in the

operations of the clinics, the clinic controllers, among other means, used check cashers.  (Kelley

Aff. ¶ 6(a)-(d)).

      The Kelley Affidavit also described the roll of billing offices in the scheme.  (Kelley Aff.

¶ 5(h)).  Billing offices were set up by members of the scheme for the express purpose of

handling "the significant number of bills and paychecks," as well any other paperwork from No-

Fault or Modality Clinics, including disputes or arbitrations from the fraudulent billings made to

insurance companies.  (Kelley Aff. ¶ 5(h); ¶ 5(h)).  Further, in order to maintain the fiction that

the clinics were being run by the various medical professionals who incorporated them, the

controllers of the clinics obtained stamps for those medical professionals and professional

corporations which were kept at the billing offices so that they could be used in connection with

the fraudulent billings.  (Kelley Aff. ¶ 5(h)).

      The Kelley Affidavit described the role of defendants Yuriy Zayonts and Mikhail

Kremerman.  Zayonts and Kremerman were Modality Clinic Controllers who had provided

neurological testing to patients from No-Fault Clinics controlled by a cooperating witness ("CW-

1") in exchange for kickbacks.  (Kelley Aff. ¶ 12(a)).  According to CW-1, Zayonts and

Kremerman used TriState Billing as the billing office for their Modality Clinics, and CW-1 had

met with them there on several occasions.  (Kelley Aff. ¶ 12(a)).  This information was

corroborated by a second cooperating witness ("CW-2"), who regularly cashed checks for

Zayonts knew that Zayonts controlled a business at 28 Dooley Street (the street address for

TriState Billing) which Zayonts used for billing.  (Kelley Aff. ¶ 12(b)).

Finally, Special Agent Kelly drew upon his training and experience as a Special Agent with the FBI, his debriefings of CW-1, and conversations with other officers, and described the sorts of documents that were generally maintained by participants in the kind of scheme described in the affidavit, which included medical billing records, ledgers, bank records, signature stamps, and other checks and financial instruments.  (Kelley Aff. ¶ 22, ¶ 25).  In addition to paper records, Special Agent Kelley explained that many of those records were likely stored on electronic media, and thus requested permission to seize and search computers and computer equipment found at TriState Billing.  (Kelley Aff. ¶ 24, 26).

Based on his description of the scheme, Special Agent Kelley requested authority to seize a narrow set of items from TriState Billing, all of which were closely tied to the ways in which the billing offices in general, and TriState Billing in particular, were used in connection with the fraud.  The items were listed in an attachment to the Kelley Affidavit which was also attached to the search warrant signed by Judge Pollak ("Attachment A").  The limited set of items listed in Attachment A included ledgers relating to patient medical treatment and calendars and patient appointment records (related to the use of billing offices to bill for patient treatments); signature stamps (also related to the billing and check-cashing process); bank account information, checks, and financial instruments (related to the use of TriState Billing by Zayonts and Kremerman in connection with cash kick-backs and by Zayonts in connection with check cashing); and computer equipment and the cellphones belonging to the subjects of the investigation (related to the electronic storage of the other items to be seized).  In addition, Attachment A informed the agents that the purpose of the search was to seize evidence of the "federal criminal offenses of

71

wire fraud; mail fraud; health care fraud; and/or money laundering."[38]   (Kelley Aff. Attachment A, ¶ 9(1)).

Judge Pollak signed the TriState Search Warrant on February 27, 2012, and the search warrant was executed by the FBI two days later.  Before the search warrant was executed, the members of the search team were briefed on the investigation by Special Agent Kelley.  During the briefing, Special Agent Kelley reviewed the information in the Kelley Affidavit and also reviewed the specific items listed in Attachment A.  Special Agent Kelley was in contact with the search team via cellphone and also visited the search location and reviewed the materials that were being seized to confirm that those material were consistent with the while they were executing the TriState Search Warrant.

During the search of TriState Billing, pursuant to the TriState Search Warrant, the FBI recovered 20 computers, several forms of electronic media, 34 ink stamps of medical professionals and professional corporations, as well as documentary materials and financial records.[39]   More specifically, agents seized:

- two calendars from 2011 and 2012 with entries for pickups and appointments at No-Fault Clinics involved in the scheme;
- a blank checkbook for a professional corporation involved in the scheme;
- *signed*, blank checks for three professional corporations associated with the scheme;
- A checkbook for No Limits Funding with stubs for numerous checks made out Zayonts, Kremerman and co-defendant Vladislav Zaretskiy, including some to shell companies controlled by them;

---

[38] While Attachment A could have been worded more carefully, a reasonable law enforcement would have understood that the description of the crimes in paragraph 9(1) of Attachment A was applicable to all of the items in search.

[39]      Notwithstanding the fact that the moving defendants have been in possession of a detailed list of what was seized from TriState Billing since on or about May 15, 2012, and were told that the materials would be made available for their review at their convenience, no counsel for any of the Moving Defendants has reviewed any of the materials.

- TriState Billing Corporation checks to various medical professionals, defendants, among others;
- Credit card bills for Yana Soskil and Michael Kremerman, as well as a bounced check to one of the neurology PC's controlled by the Moving Defendants; and
- A binder entitled "Information of Our Clients," which included materials related to approximately 12 PC's involved in the scheme.

Notably all of the items seized were directly relevant to the crimes described in the Kelley Affidavit and were either from 2011 or 2012.

## B.   Discussion

The Kelley Affidavit set forth the requisite probable cause for each of the items seized pursuant to the execution of the TriState Search Warrant, which was not overly broad.  With respect to particularity, the warrant described with precision the types of documents that could be seized and thus provided appropriate and understandable limitations.  Moreover, even assuming, *arguendo*, that the TriState Search Warrant was somehow deficient – which it was not – suppression is not proper where law enforcement agents had more than ample basis to rely in good faith on a magistrate judge's authorization for that search. Finally, the defendant's argument of delay based on the *Metter* decision is simply wrong – the delays in searching the computers are not unreasonable but instead are an understandable by-product of the issues posed by the large volume of electronic materials seized in this case.[40]

---

[40]     As a preliminary matter, neither Zayonts nor Kremerman has established that each has a legitimate expectation of privacy in the offices of TriState Billing such that they can even assert a Fourth Amendment challenge to the items seized in that location.  *See United States v. Rahme,* 813 F.2d 31, 34 (2d Cir.1987).  The Second Circuit has recognized that "[i]t is well-settled that a corporate officer or employee in certain circumstances may assert a reasonable expectation of privacy in his corporate office, and may have standing with respect to searches of corporate premises and records."  *See United States* v. *Chuang*, 897 F.2d 646, 649 (2d Cir. 1990).  Further, "[t]he question of whether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched."  *Id.*

     In this case, although "possession does not itself establish a legitimate expectation of privacy," *Rahme,* 813 F.2d at 34, Zaretskiy has at least provided a declaration that states that he is "the sole owner and shareholder" of TriState Billing Corporation, and has provided evidence of that fact, (*see* Mazurek Decl., Ex. A), such that one could reasonably infer a possessory or proprietary interest in the premises.  With respect to Zayonts and Kremerman,

73

1.      **Defendants' Facial Challenges to the TriState Search Warrant Lack Merit**

   a.      **The TriState Search Warrant Was Supported By Probable Cause for All Items to Be Searched and Seized Such that the Search Warrant Does Not Offend the "Breadth" Requirement of the Fourth Amendment**

      i.      ***The Kelley Affidavit Sets Forth Probable Cause For Every Item Listed in Attachment A***

The Supreme Court has long recognized that the Fourth Amendment's commands "are practical and not abstract," and consequently "affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion." *United States* v. *Ventresca*, 380 U.S. 102, 108 (1965).  Put succinctly, reviewing courts must uphold a magistrate's finding of probable cause "so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Illinois* v. *Gates*, 462 U.S. 213, 236 (1983) (internal quotations omitted); *United States* v. *Clark*, 638 F.3d 89, 93 (2d Cir. 2011) ("[A] court reviewing a challenged warrant . . . 'must accord considerable deference to the probable cause determination of the issuing magistrate.'" (quoting *Walczyk* v. *Rio*, 496 F.3d 139, 152 (2d Cir. 2007).  Moreover, a "showing of a sufficient nexus between the alleged criminal activities and the premises to be searched 'does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience.'" *United States* v. *Morgan*, 690 F. Supp. 2d 274, 284 (S.D.N.Y. 2010) (quoting *United States* v. *Singh*, 390 F.3d 168, 182 (2d Cir. 2004)); *see also Gates*, 462 U.S. at 238 (recognizing that the task of a judge reviewing an application for a search warrant is to "make a practical, common-sense

---

however, neither has made any showing that they were corporate officers, employees of TriState Billing, or otherwise had some expectation of privacy in the areas searched.  Accordingly, the motion to suppress as to Zayonts and Kremerman should be dismissed for lack of standing.

decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). Any doubt should be resolved in favor of upholding the warrant. *See, e.g.*, *United States* v. *Ornelas*, 517 U.S. 690, 699 (1996).

The issues of overbreadth and lack of particularity are similar in focus but are distinct. *United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at * 7 (S.D.N.Y. Jan. 6, 2010). A warrant is overbroad if items authorized to be seized by the search warrant were not supported by probable cause, *id.*, while a warrant is insufficiently particularized if the warrant, on its face, fails to provide the necessary guidelines for the search by the executing officers. *Id.*; *see United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013); *United States v. Villar*, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. April 24, 2007). As discussed further, the search warrant for TriState Billing that was signed by Magistrate Judge Pollak was not overbroad and provided sufficient guidance to the executing officers. Accordingly, the defendants' motion should be denied.

### ii.      *The TriState Search Warrant Was Not Overbroad*

With respect to overbreadth, the question is whether the magistrate judge authorized "the seizure of specific items for which there is no probable cause." *Hernandez*, 2010 WL 26544 at *8. As always, a finding of probable cause requires a practical or fair probability. As is true with other challenges to whether a warrant is supported by probable cause, the magistrate judge's finding that probable cause exists is entitled to great deference and the task of the reviewing court "is simply to determine that the magistrate judge had a substantial basis for that determination," *Hernandez*, 2010 WL 26544 at *8 (quoting *Gates*, 462 U.S. at 239) (quotation

marks omitted), and any doubts should therefore be resolved in favor of upholding the warrant.
*Id.*

Applying a common-sense approach, the defendants' arguments that the items seized
pursuant to the TriState Search Warrant were not supported by probable cause plainly fail.  As
detailed above, each item seized was supported by particularized allegations relating to the
specific types of evidence, as well as by broader assertions about the kinds of evidence generally
maintained by participants in the scheme.

The defendants argue that that the categories of materials listed in Attachment A amount
to the "seizure of every piece of paper and computer at TriState's place of business" and are not
crafted to limit the search to those items that would fall within the "ambit of any alleged
criminality." (Zaretskiy et al. Mot. at 8-9).  For example, the defendants argue that the agents
were free to seize patient records even without any specific showing that the particular patient
records at issue were connected to the scheme.  But this argument ignores the specific allegations
in the affidavit that: (1) that clinic controllers billed insurance companies directly for fraudulent
treatments that were administered to patients in order to receive payment for those treatments,
(Kelley Aff. ¶ 5(e)-(f)); (2) clinic controllers opened billing companies for the express purpose of
handling "the significant numbers of bills" generated by the scheme and that the billing
companies "deal with any disputes or arbitration that arise from fraudulent billing," (Kelley Aff.
¶ 5(h); (3) that Zayonts and Kremerman were controllers of Modality Clinics, (Kelley Aff. ¶
9(c)); and (4) that Zayonts and Kremerman "maintained their billing for their modality clinics" at
TriState Billing, (Kelley Aff. ¶ 12(a)).  Based on those specific allegations, Judge Pollak was
easily justified to conclude that there was a fair probability that any patient records found at
TriState Billing, a billing office established in part to handle the billing of insurance companies

for fraudulent treatments provided to patients, would be evidence of the scheme to defraud the insurance companies detailed in the Kelley Affidavit.

Finally, the search warrant in this case, which provided for specific and targeted categories of documents that could be seized, is consistent with similar search warrants in this District where overbreadth challenges have been rejected.  In fact, in *United States v. Hernandez*, Judge Baer rejected a challenge to a warrant that listed categories of documents that are far broader than the categories set forth in this case.  In *Hernandez*, the affidavit in support of the challenged search warrants "described[d] a large-scale tax fraud operation that involved numerous actors, 'the filing of tens of thousands of federal and state tax returns and millions of dollars of fraudulently obtained tax refunds," and the search warrant allowed to seize categories of documents such as "client files." *Id*. at *8.  In rejecting an overbreadth challenge, the Court noted that "[i]n conjunction with this complex scheme, the affidavit describe[d] the materials typically kept by individuals who prepare and file tax returns, and sets out the categories of documents which became 'Attachment B' to both warrants."  *Id*.

Here, like in *Hernandez*, the Kelley Affidavit set forth in detail the large-scale insurance fraud scheme that involved the use of billing companies to fraudulently bill insurance companies for tests that were not medically necessary, or not performed in the first instance.  The scheme involved using these billing offices to handle all of the billing and collection of these tests, arbitration and disputes arising from such billing, as well as paychecks related to such billing. Notwithstanding the fact that the scheme here is at least as broad as the scheme in *Hernandez*, the categories of documents set forth in Attachment A of the search warrant were narrower and more closely related to the alleged criminal activity described in the Kelley Affidavit – as well as

to specific allegations about activities conducted out of TriState Billing – than those approved in *Hernandez*.

Further, as is the case here, the search warrant upheld in the *Hernandez* did not specify a particular time frame for the items seized, but Judge Baer rejected the assertion that the lack of time limitation rendered the warrant overbroad, noting that the "Second Circuit has yet to consider the effect the lack of a time frame has on a search warrant's breadth or its particularity." *See Hernandez*, 2010 WL 26544, at *9. As *Hernandez* recognized, this is a case-by-case determination, but, significantly, "[u]nlike in a more straightforward, 'single-act' criminal cases, a time frame is less relevant to a warrant's breadth where the criminal acts are complex and necessarily extend over a significant period of time." *Id.* (citations omitted)). Thus, "[g]iven the complex nature of the criminal scheme and the number of years in which it was ongoing, a lack of specific time frame in the search warrants is not sufficient in of itself to render the warrants constitutionally overbroad." *Id.* (citations omitted). The same holds true in the present case – the fraud scheme described in the Kelley Affidavit is complex, involving numerous entities and conspirators interacting in sophisticated ways. Further, as described in the Kelley Affidavit, the scheme spanned several years, beginning as early as 2007, and continued through the date of the search warrants in February 2012.

### iii.   TriState Billing Was Permeated With Fraud Such That Everything Inside the Premises Could Be Seized

"Courts have consistently held that where a business is totally illegal, a search warrant may properly authorizer the seizure of *all* documents of the business." *See Nat'l City Trading Corp.* v. *United States*, 635 F.2d 1020, 1026 (2d Cir. 1980) (emphasis in original). Indeed, "[t]he more extensive the probable wrongdoing, the greater the permissible breadth of the warrant."

78

*United States* v. *Bowen*, 689 F.Supp.2d 675, 683 & n.6 (S.D.N.Y. 2010) (citations omitted).  This logic underlies the "all records exception" recognized by courts in this district which "allows for the seizure of all of an enterprise's records when the enterprise is primarily engaged in unlawful activity and sufficient evidence is presented of the pervasiveness of that unlawful activity within the enterprise."  *Id.* at 683; *see also United States Postal Serv.* v.  *C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989) ("When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements.").

To invoke the "all records exception," "it is not necessary that the affidavit . . . set forth specific factual evidence demonstrating that *every part* of the enterprise in question is engaged in fraud . . . Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are just the tip of the iceberg."  *Bowen*, 689 F.Supp.2d at 683 (internal quotations and citations omitted).  In the present case, a common-sense reading of the Kelley Affidavit supports the conclusion that TriState Billing was a business so permeated with fraud that a wholesale seizure of all of its records was proper under the "all records exception."

As set forth in the Kelley Affidavit, the purpose of controllers like Zayonts and Kremerman establishing billing companies, such as TriState Billing, was to "*handle all of the paperwork* for No-Fault Clinics, and also deal with *any disputes or arbitration* that arise from the *fraudulent billing*."  (Kelley Aff. ¶ 5h (emphasis added)).  Indeed, once established, the billing companies played a central role in completing the process through which the members of the fraud extracted money from the insurance companies as it was the billing companies that handled the day-to-day billing and collection of the fraudulent treatments that were the heart of the

scheme.  In addition, the Kelley Affidavit set forth evidence from at least two cooperating

witnesses that TriState Billing maintained the billing for Modality Clinics and that the

cooperating witnesses either received kickbacks from these controllers of Modality Clinics or

regularly cashed checks for these Modality Clinic controllers who operated out of TriState

Billing.   (Kelley Aff. ¶ 12a, b).  As such, Magistrate Judge Pollak could have reasonably

concluded that the entire function of TriState Billing was to engage in the fraud scheme, which,

in turn, supports a wholesale seizure of all business documents at TriState Billing.

      Accordingly, TriState Billing was so permeated with fraud that a wholesale seizure of all

documents under the "all records exception" – even though the agents did not seize all

documents – would have been proper in this case.

### b.  The TriState Search Warrant Satisfies the Fourth Amendment's Particularity Requirement

      While overbreadth addresses the requirement that the scope of the warrant be supported

by the probable cause on which the warrant is based, "particularity is the requirement that the

warrant must clearly state what is sought." *Levy*, 2013 WL 664712 at * 5 (quoting *United States

v. Cioffi*, 668 F.Supp.2d 385, 390 (E.D.N.Y. 2009).  Here, in addition to their overbreadth

challenge, the defendants also maintain that the warrant lacked particularity in that it set forth no

restrictions with respect to the category of documents to be seized and failed to either attach or

incorporate the Affidavit such that agents executing the search had "unbridled discretion."

(Zaretskiy, et al. Mot. at 12).  These arguments also fail.

      The Fourth Amendment "specifies only two matters that must be particularly described in

the warrant: [1] the place to be searched and [2] the persons or things to be seized." *United

States* v. *Grubbs*, 547 U.S. 90, 97 (2006) (internal quotation marks omitted).  With respect to the

"things" to be seized, "[a] warrant must be sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *United States* v. *Shi Yan Liu*, 239 F.3d 138, 140 (2d. Cir 2000) (internal citations and quotation marks omitted). In determining whether a Search Warrant is sufficiently particular, the Court should only consider the warrant itself and any attachments or documents incorporated by reference in the warrant. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

### i.   *Attachment A to the TriState Search Warrant Identifies With Reasonable Certainty the Items to Be Seized*

Attachment A to the TriState Search Warrant, which identified various types of documents (*e.g.,* bank account information, ledgers documenting patient medical treatment, signature stamps, thumb drives) as well as the type of crimes that were being investigated, provided more than enough specific guidance to the agents who executed the TriState Search Warrant about what items they were allowed to seize. In addition, because of the nature of the scheme at issue – a sweeping and complex scheme to defraud insurance companies – and the nature of the entity being searched – a business established for the express purpose of furthering the fraud – the Fourth Amendment's particularity requirements were relaxed for this search.

The use of categories of documents has been routinely recognized as an appropriate means to limit the discretion of agents who are executing a search warrant. *See Andresen* v. *Maryland*, 427 U.S. 463, 482-83 (1976) (upholding search warrant listing types of evidence to be seized); *United States* v. *Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990) (reversing district court's finding that warrant's description of category of records to be seized was "insufficiently particularized" when "the warrant supplied sufficient examples of the type of records that could be seized – bank records, business records, and safety deposit box records"); *United States* v.

81

*Cohan*, 628 F.Supp. 2d 355, 361 (E.D.N.Y. 2009) ("[Defendant's] claim that the warrant lacks

particularity because it lists so many types of documents is foreclosed by *Andresen*'s observation

that the number of different categories of documents is immaterial so long as each type of

document is clearly delineated . . . ."); *United States* v. *Paccione*, 738 F. Supp. 691, 708

(S.D.N.Y. 1990) ("A warrant authorizing the seizure of a large quantity of accurately described

business records at a given location does not pose the danger of giving unbridled discretion to

seize to the executing agents; it thus constitutes a valid warrant, so long as it is supported by

probable cause.").   When categories are coupled with an indication on the face of the attachment

of the "statutes and conduct that give rise to the search and seizure," as is the case here, courts in

the Second Circuit have routinely upheld search warrants as sufficiently particular.  *See, e.g.,*

*Levy*, 2013 WL 664712 at *9-10; *United States v. Dupree*, 781 F.Supp.2d 115, 148 (E.D.N.Y.

2011); *Hernandez,* 2010 WL 26544 at *10.

    Moreover, Courts have recognized that "[t]he degree to which a warrant must state its

terms with particularity varies inversely with the complexity of the criminal activity

investigated."  *United States v. Cohan,* 628 F.Supp.2d 355, 362 (E.D.N.Y. 2009) (*quoting United*

*States* v. *Regan*, 706 F.Supp. 1102, 1113 (S.D.N.Y. 1989)) (quotation marks omitted).  Where

"complex financial crimes are alleged, a warrant properly provides more flexibility to the

searching agents."  *Dupree*, 781 F.Supp.2d at 149.  The fraud in this case, as laid out in the

Kelley Affidavit, was sprawling and complex.  It involved a variety of actors and complicated

financial transactions (including fake rent checks and shell companies) to disguise the scheme.  It

was therefore appropriate to provide greater latitude to the agents through less particularized

search terms in the search warrant.  Viewed in that light, it is even more apparent that the terms

in Attachment A were sufficiently specific.

Defendants argue that the TriState Search Warrant authorized the "wholesale seizure of virtually every financial record … without limiting the items seized to the particular target subjects . . . time frame or . . . fraudulent scheme," (Zaretskiy et al. Mot. at 13), and was therefore a general warrant under the Second Circuit's decision in *United States* v. *George*, 975 F.2d 72 (2d Cir. 1992). In *George*, the Second Circuit concluded that a search warrant that both used a catch-all phrase "any other evidence relating to the commission of a crime" in a search warrant that also failed in any way to identity the specific crimes at issue, amounted to a general warrant and therefore violated the Fourth Amendment. *See George*, 975 F.2d at 76. Because Attachment A to the TriState Search Warrant contains no such catch-all phrase and also identifies the crimes that are being investigated, *George* is plainly inapplicable.

While *George* provides little guidance for evaluating the search warrant here, *United States v. Levy*, 2013 WL 664712, is factually analogous and thus instructive. In *Levy*, Judge Crotty upheld against a particularity challenge a search warrant that was similar, and, if anything, less targeted then the search warrant here. Like the TriState Search Warrant, the search warrant in *Levy* indicated that the crimes being investigated were wire fraud, conspiracy to commit wire fraud, and money laundering, and then listed categories of documents that were broader than those listed in Attachment A. For example, one category authorized the seizure of "[a]ddress books, Rolodexes, diaries, spreadsheets, calendars, identification documents, photographs, video, and audio recordings, and other documents reflecting information concerning the identities of potential co-conspirators and any potential victims of the offense." *Levy*, 2013 WL 664712 at *3. There was no indication in the *Levy* search warrant of any particular target subjects, time frame, or the specific scheme at issue. Judge Crotty nonetheless found that the search warrant was sufficiently particular because it both "sufficiently identified the suspected crimes" and the

"types of materials to be seized." *Id.* at \*9.  Where, as here, the affidavit identified items that were more narrowly tailored than the search warrant in *Levy*, and where, as here, the search was for a business that was established for the express purpose of effectuating the fraudulent scheme at issue, the Tristate Search Warrant is sufficiently particular.

### ii.    Because TriState Billing Was Completely Permeated by Fraud, the Need for Particularity Was Obviated

In addition, for the reasons detailed above, TriState Billing was entirely permeated by fraud, triggering the all-records exception described in *Nat'l City Trading Corp.* and its progeny. As other courts in this Circuit have recognized, where the all-records exception applies, the search warrant does not have to be particularized.  *See C.E.C. Servs.*, 869 F.2d  at 187; *United States v. Falkowitz*, 214 F. Supp. 2d 365, 388 (S.D.N.Y 2002).  For this reason, and because the search warrant was, in any event, adequately particularized, the defendants motion should be denied.

## 2.    Suppression Is Not Proper Because the Good Faith Exception Applies in This Case

### a.    The Good Faith Exception Is Applicable In this Case

Assuming *arguendo* that the TriState Search Warrant is overly broad or lacking in particularity – which it is not – it is well established that a deficient warrant does not "automatically dictate the suppression of all physical evidence seized."  *Clark*, 638 F.3d at 99. Indeed, "suppression is 'our last resort, not our first impulse' in dealing with violations of the Fourth Amendment."  *Id.* (quoting *Herring* v. *United States*, 555 U.S. 135 (2009)).  As a result, the Supreme Court has long recognized an exception to the exclusionary rule for "evidence obtained on objectively reasonable reliance on a subsequently invalidated search warrant." *United States* v. *Leon*, 468 U.S. 897, 922 (1984).

84

The logic of this "good faith exception" is simple: "the nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.*; *see also United States* v. *Ross*, 456 U.S. 798, 823 n.32 (1982) (noting that "a warrant issued by a magistrate normally suffices to establish" that an agent has "acted in good faith in conducting the search"). Indeed, "[t]he animating principle of the exclusionary rule is deterrence of police misconduct, but the extent to which the rule is so justified varies with the culpability of the law enforcement conduct." *Clark*, 638 F.3d at 99 (internal quotations omitted). Accordingly, evidence seized pursuant to the TriState Search Warrant should remain admissible, "even if the warrant lacks probable cause or is technically deficient," because the agents here have "relied upon it in objective good faith." *United States* v. *Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

While the government carries the burden to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant, the Supreme Court has "signaled that most searches conducted pursuant to a warrant would likely fall within this [good faith] protection." *Clark*, 638 F.3d at 100 (quoting *Leon*, 468 U.S. at 922). Nevertheless, against this "presumption of reasonableness," the Supreme Court has identified four circumstances where the good faith exception would not apply, none of which are found in this case:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Id.* (quoting *Moore*, 968 F.2d at 222).

In this case, nothing in the record suggests that Judge Pollak was knowingly misled by the government. Further, Judge Pollak did not "wholly abandon [her] judicial role in the manner

85

condemned in *Lo-Ji Sales, Inc.* v. *New York*, 442 U.S. 319 (1979)," where the issuing magistrate accompanied law enforcement to the scene of the search and "reviewed items for himself and decided which could be seized."   *Clark*, 638 F.3d at 100.

Nor is the TriState Search Warrant so facially deficient that the executing officers could not have reasonably presumed the search warrant to be valid.  A warrant is facially defective when it "omits or misstates information specifically required to be contained therein, *i.e.*, 'the place to be searched, and the persons or things to be seized.'"  *Id.* at 102 (quoting U.S. Const. amend. IV).  As detailed in the government's particularity analysis in Section II.A.2., *supra*, the TriState Search Warrant plainly states the place and the things to be searched, and does not contain "completely inaccurate" information.  *Id.* (quoting *Massachusetts* v. *Sheppard*, 468 U.S. 981, 988 n.5 (1984) (form warrant for narcotics searches used to authorize search for murder evidence)).

Finally, the Kelley Affidavit was not so lacking in its indicia of probable cause as to preclude reasonable reliance.  *See Clark*, 638 F3d at 103 (noting that use of the good faith exception is barred based on this factor "most frequently . . . when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations"); *United States* v. *Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996), *aff'd on reh'g*, 91 F.3d 331 (2d Cir. 1996) (describing a lacking affidavit as containing "bare-bones description[s] . . . almost calculated to mislead" and material from a prior illegal search).  Instead, the Kelley Affidavit contained "sufficient information as to render the agents' reliance on the magistrate's authorization reasonable," as it revealed, among other things: (i) an overarching conspiracy to commit mail fraud, health care fraud, money laundering, and racketeering; (ii) that members of the conspiracy fraudulently "established billing and collection companies . . . to handle all of the paperwork," such as bills

and paychecks, for the fraudulent clinics; (iii) that TriState Billing had in fact handled "the billing and collection for some of the clinics" involved in the conspiracy; and (iv) independent corroboration from two cooperating witnesses that two of the named defendants "control[]" and "maintain their billing for their [fraudulent clinics] at [TriState Billing]."  (Kelley Aff. ¶¶ 4, 21-22).  *See also* Section II.A.1.  In sum, "[i]t is the magistrate's responsibility to determine whether the [agent's] allegations establish probable cause," and ordinarily, "an [agent] cannot be expected to question the magistrate's probable cause determination . . . ."  *Leon*, 468 U.S. at 921.

Where, as here, the fact that other Courts in this District have upheld similar search warrants against both overbreadth and particularity challenges, there is no basis to conclude that the warrant signed by Judge Pollak was facially deficient such that the agents could not have presumed it to be reliable.  Further, because the  allegations in the affidavit also supported the possible application of the "all records exception," whose application would obviate the issues of overbreadth and particularity, the agents had a second, independent reason, to reasonably rely on the signed search warrant.

In addition, in assessing the applicability of the good faith exception to the defendants' particularity challenge, the Court can and should consider the role played by Special Agent Kelley in the execution of the search and the evidence that was seized, both of which demonstrate that the search was in fact quite targeted, and in no way was a general search.  *See United States v. Rosa*, 626 F.3d 56, 65 (2d Cir. 2010) (applying the good faith exception to an insufficiently particularized warrant based on the participation of the affiant in the execution of the warrant and its review of the items that were seized pursuant to the warrant.)  As described above, Special Agent Kelley, while not on the search team himself, was heavily involved in the execution of the TriState Search Warrant, briefing the search team before the search, maintaining

regular communication while the search was conducted, and also physically visiting the search location and reviewing the evidence that was seized, to ensure it complied with the purposes of the search.  The results of the search also demonstrate good faith.  The items seized are all clearly responsive to the purposes of the warrant as described in the Kelley Affidavit and are probative evidence of the Defedants' participation in the scheme to defraud insurance companies that Special Agent Kelley described.

Accordingly, even if the TriState Search Warrant were deemed to be deficient, the good faith exception to the exclusionary rule applies in this case.

### b.      Blanket Suppression Is Improper

The defendants' motion repeatedly argues for blanket suppression of all evidence. (Zaretskiy, et al. Mot. at 1, 2, 11, 13, 15).  For the reasons already explained herein, no suppression is warranted because the TriState Search Warrant was not overly broad, contained the requisite particularity so as to comply with the Fourth Amendment requirements, and – even if the Court were to find the warrant deficient – the good faith exception to the exclusionary rule applies.  But in addition, it is well-established that the remedy for a deficient warrant is not suppression of *all* evidence, but rather, only the portion seized pursuant to the deficient portion of the warrant.  "When a warrant is severed (or redacted) the constitutionally infirm portion — usually for lack of particularity or probable cause — is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted."  *United States* v. *George*, 975 F.2d 72, 79 (2d Cir. 1992)); *see also Paccione*, 738 F.Supp. at 709 ("To the extent that any items outside the scope of these valid search warrants were seized, the proper remedy would be suppression and return of *those* items, not suppression of *all* items seized under the warrant.") (emphasis in original).

88

Accordingly, the defendants' motion for blanket suppression of all evidence from

TriState Billing should be denied.  The categories of evidence described in Attachment A are

plainly discrete and thus severable from one another.  Should the Court determine that certain

portions of the warrant are either overbroad or insufficiently particular, the offending portions of

the warrant should be severed, any items seized pursuant to those categories should be

suppressed, and the motion should still be denied with respect to the remaining categories.  *See*

*Villar*, 2007 WL 1075041 at *31-*34 (applying severance on a category-by-category basis to a

search warrant that was overbroad and insufficiently particular).

### 3.   Defendants' Delay Arguments Relating To The Execution Of The Tristate Search Warrant Lack Factual and Legal Basis

Finally, the defendants argue that the TriState Search Warrant has been executed

unreasonably based on the Government's alleged delay in completing its off-site review of the

seized computers.  (Zaretskiy, et al., Mot. at 14).  They further accuse the Government of

"operating without any written protocol to govern and limit the scope of their searches."  (*Id.*at

14-15).  Both of these arguments lack merit.

As a preliminary matter, the Government has not delayed in searching the computers and

*United States* v. *Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), cited by the defendants, is

inapposite.  In *Metter*, a securities fraud case against seven defendants, the Court suppressed

computer evidence following a 15-month delay in reviewing the seized evidence.  The holding in

*Metter* was based on the fact that the government had utterly failed to commence the post-

seizure, off-site review of the computers and had "no plans whatsoever to *begin* review of that

[electronic] data to determine whether any irrelevant, personal information was improperly

seized."  *Metter*, 860 F. Supp. 2d at 215 (emphasis in original).  In addition, the Government

failed to "present[ ] any evidence or arguments to the effect that it failed to fulfill this obligation due to limited resources," and thus the court inferred that the Government "had no intention of fulfilling its obligation as promised in the search warrants." *Id.* at 216.  None of these failures, however, are present here.

In the present case – involving 36 defendants, more than 60 computers, and an excess of 10 *terabytes* of electronic data – the FBI's Computer Analysis Response Team ("CART") imaged all of the hard drives within six months of seizure.  These hard drives, in turn, were all made available to defense counsel.  Thereafter, CART began the tedious process of systematically uploading all of the data into a system that would enable the agents to review the information on the hard drives, and by approximately November 2012, the agents began the review process, which continues through today.  Thus, in this case, the Government has long *commenced* its review of the evidence in question, and the Government fully intends on fulfilling its obligations as detailed in the TriState Search Warrant.[41]

In addition, the Government has, on two occasions, met with defense counsel to discuss the process by which the computer materials would be made available to defense counsel.  After these meetings and continued consultations, the parties jointly decided to work with a Government-approved vendor who, with assistance from the United States Attorney's Office, has created a searchable database of the computer material that has been made available to the parties.  As part of this process, the parties also discussed possible claims of attorney-client privilege with respect to the materials on the data base.  The resolution of the discussions

---

[41]      The Government respectfully submits that even if the FBI had delayed in searching the computers – which it did not – suppression of evidence would be improper as held in *Metter*.  As the Court in *Metter* recognized, "there is no established upper limit as to when the government must review seized electronic data to determine whether the evidence seized falls within the scope of the warrant."  *Metter*, 860 F.Supp.2d at 215 (citations omitted).

regarding possible claims of attorney-client privilege, which were not concluded until October 2012, was a necessary precondition to the Government beginning its review of those materials.

Finally, the defendants argue that the Government will be searching the computers without any written protocols with respect to the computer materials. This argument is without merit. Both the search warrant affidavit and Attachment A provide clear guidance as to what may the agents may search for on the computers and makes plain that agents are limited in their search of the computers to evidence of mail fraud, health care fraud, and money laundering. (TriState Search Warrant Attachment A ¶ 9 & ¶ 9(1)).

In sum, in this case, no suppression of electronic evidence is warranted where the Government not only expeditiously provided hard drives to defense counsel, but undertook to search the data contained therein.

## IV.   THE GOVERNMENT CONSENTS TO A HEARING ON MICHAEL BARUKHIN'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM HIS APARTMENT

Defendant Michael Barukhin seeks to suppress evidence obtained as a result of a search and seizure of his residence on the grounds that the written consent he provided to law enforcement agents was not freely and voluntarily given. While the Government believes Barukhin's motion is without merit, it concedes that Barukhin's affidavit, if credited (as it must) at this stage, creates a material dispute of fact warranting a hearing. The Court has previously scheduled a hearing date of April 19, 2013. The Government respectfully requests that the parties be provided the opportunity to submit simultaneous pre-hearing briefing on April 12, 2013.

## V.    DEFENDANTS' MISCELLANEOUS MOTIONS SHOULD BE DENIED

Defendants Billy Geris and Mark Shapiro request that the Court direct the Government to immediately disclose certain categories of materials, including materials whose disclosure is required by *Brady v. Maryland,* 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995), *United States v. Giglio*, 405 U.S. 150 (1972); Rule 404(b) of the Federal Rules of Evidence; Rule 16 of the Federal Rules of Criminal Procedure.  (Geris Mot. at 6-9); (Shapiro Mot. at 7-13).  The same defendants also move for a bill of particulars.  Shapiro further moves for a severance from his co-defendants.  Defendants Michael Danilovich and Shapiro also move to strike surplusage from the Indictment.  Finally, Defendant Treysler moves to dismiss Count One as duplicitous. For the reasons stated below, the motions should be denied.

### A.    The Government Is Aware of Its *Brady*, *Kyles*, and *Giglio* Obligations And Has Fully Complied to Date

Billy Geris has asked that the Government be ordered to disclose all *Brady*, *Kyles*, and *Giglio* material immediately.  As the Government stated in its initial discovery letter, the Government recognizes its obligations under *Brady*, *Kyles*, and their progeny.  To date, the Government is unaware of any *Brady* or *Kyles* material, but will produce any such material reasonably promptly after it is discovered.  *See United States* v. *Coppa*, 267 F.3d 132, 144 (2d Cir. 2001).  Because the Government has made a good-faith representation to the Court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady* and *Kyles*, the defendant's request for an order directing the Government to turn over those materials should be denied.  *See*, *e.g.*, *United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on Government's representations that "it is aware of its obligations under *Brady*

. . . and will produce any *Brady* material to the defense well before trial"); *United States* v. *Yu*, No. 97 CR 102 (SJ), 1998 WL 57079, at *4-*5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government provide early disclosure of *Brady* material because Government acknowledged its continuing obligation to provide exculpatory material upon its discovery and assured that it would comply with that obligation); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

The Government is also aware of its obligations under *Giglio* and it progeny, and will provide *Giglio* material (along with 3500 material) in a timely manner prior to trial. Courts in this Circuit have repeatedly refused to compel disclosure of impeachment or *Giglio* material in advance of trial. In *Coppa*, the Second Circuit held that the Government is not required to produce *Giglio* material until it produces 3500 material, so long as the Government provides the *Giglio* material in time for its effective use at trial. 267 F.3d at 145-46; *see also United States* v. *Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach a witness is insufficient to require its production in advance of trial."); *United States* v. *Greyling*, No. 00 Cr. 631 (RCC), 2002 WL 424655, at *2 (S.D.N.Y. Mar. 18, 2002) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *Gallo*, 1999 WL 9848, at *8 (denying defendants' motions to require the early production of *Giglio* and 3500 material based on Government's representations that it would provide the information sufficiently in advance of each witness's testimony to allow adequate time to prepare for cross-examination); *United States* v. *Mejia*, No. 98 Cr. 4 (JGK), 1998 WL 456257, at *1 (S.D.N.Y. Aug. 5, 1998); *United States* v. *Gutierrez-Flores*, No. 94 Cr. 393 (CSH), 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994).

93

In keeping with its general practice in this District, as supported by the above-referenced case law, the Government intends to produce impeachment material at the same time as Section 3500 material.  Although the Government customarily produces that material on the Friday before the first day of trial for most witnesses, the Government will agree to produce this material two weeks before trial, which will allow defense counsel more than adequate time to prepare for cross-examination of Government witnesses at trial.

**B.     404(b) Evidence Will Be Turned Over in a Timely Manner**

Defendants Geris and Shapiro seek notice and discovery of the Government's intent to use any evidence of his prior bad acts under Federal Rule of Evidence 404(b) at trial.  Their motions are premature and should be denied.

Rule 404(b) sets no time limit for the Government to disclose evidence it intends to offer pursuant to the rule.  Such a limitation would be unworkable, because the Government cannot predict whether it will offer such evidence until the proof and the anticipated defenses begin to crystallize as the trial date nears.  *See United States* v. *Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988).  Indeed, the Second Circuit has approved disclosure of Rule 404(b) evidence as late as several days before, and even during trial, depending on the circumstances of the particular case.  *See United States* v. *Valenti*, 60 F.3d 941, 945 (2d Cir. 1995) (notice four days prior to trial sufficient where Government provided documents to defense on same day they were obtained); *United States* v. *Matthews*, 20 F.3d 538, 16 551 (2d Cir. 1994) (notice during trial sufficient when balanced against need to avoid indirect disclosure of identity of Government witness).

94

In the instant case, the Government respectfully suggests that it provide notice of any additional Rule 404(b) evidence it intends to offer, as well as a RICO enterprise letter, 30 days before trial.  The Government respectfully submits that such notice is more than adequate under the governing law in this Circuit, and that the defendants' motions should therefore be denied.

## C.      The Government Has Complied With Its Discovery Obligations

Defendant Shapiro moves for an order compelling the Government to comply with its disclosure obligations pursuant to Rule 16 of the Federal Rules of Criminal Procedure.[42]  Shapiro speculates that the Government may have patient records and expert reports that it has not turned over, but that it may seek to introduce at trial as part of its case-in-chief against Shapiro.  Shapiro is wrong.  In a conversation with Shapiro's counsel on or about March 7, 2013, the Government informed defense counsel that it had recently gathered some patient records related to Shapiro's involvement in the scheme, and that it was expecting more to come in the near future.  Once the Government gathered all of its records, which should occur by the end of next week, it would produce those materials promptly.  Shapiro's motion should therefore be denied as moot.

## D.      The Defendants' Requests for Severance Are Premature

Defendant Shapiro moves for a severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure.   Shapiro argues that he will suffer spillover prejudice from co-defendants who played larger roles in the charged conspiracies.  Shapiro's motion for a severance should be denied as premature.

Rule 14 of the Federal Rules of Criminal Procedure, in relevant part, provides:

---

[42]      Danilovich also moves for an order directing the Government to produce contemporaneous notes of his post-arrest statements.  The requested information has been provided and that portion of his motion is moot.

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or defendants in an indictment . . . or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

A motion to sever is "committed to the sound discretion of the trial court."  *Casamento*, 887 F.2d at 1149.  Generally, where "defendants . . . are jointly indicted [they] should be jointly tried." *United States* v. *Ventura*, 724 F.2d 305, 312 (2d Cir. 1983); *United States* v. *Feliciano, Jr.*, 2002 WL 575662, No. 01 Cr. 448, at *4 (S.D.N.Y. April 16, 2002); *see also United States* v. *Lyles*, 593 F.2d 182, 191 (2d Cir. 1979) (presumption in favor of joint trials "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials") (quoting *United States* v. *Borelli*, 435 F.2d 500, 502 (2d Cir. 1970)).

A defendant who seeks severance must shoulder an "extremely difficult burden" of showing that he would be so prejudiced by the joinder that he would be denied a constitutionally fair trial.  *Casamento*, 887 F.2d at 1149; *see also United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993); *Torres*, 901 F.2d at 230.  It is insufficient for a defendant seeking severance merely to show that he may suffer some prejudice, or may have a better chance for acquittal at a separate trial.  *Torres*, 901 F.2d at 230.  Instead, the defendant must show that he may suffer prejudice so substantial that a "miscarriage of justice" will occur.  *United States* v. *Friedman*, 854 F.2d 535, 563 (2d Cir. 1988).

Shapiro's severance motion is premature.  There are currently more than 20 defendants pending trial, and some plea negotiations are ongoing.  The exact configuration of defendants with whom any given defendant will proceed to trial has yet to be determined.  The Court has already indicated only a limited number of defendants will be tried together at one time and the

96

Government will submit a severance plan next week that will propose which defendants it believes should be tried together in the first trial in this case, which the Court has scheduled for June 17, 2013, and any subsequent trials.  Accordingly, the Government respectfully requests that the individual defendants wait until trial tranches are determined before filing motions to sever.  At that time, the Government will address the arguments specific to those particular defendants.

**E.      The Defendants' Motion to Strike Surplusage Is Premature**

Defendants Michael Danilovich and Shapiro move to strike surplusage in the Indictment. Specifically, Danilovich seeks to strike any reference in the Indictment to unspecified "other crimes," (Danilovich Mot. at 10-11), and Shapiro seeks to strike reference to Russia or persons of Russian descent, (Shapiro Mot. at 6-7).  Their motions are both premature and likely moot. First, the defendants' motion is premature because the Court has not yet indicated whether, at trial, the Court intends to provide the jury with copies of the Indictment and/or read the Indictment to the jury.  To the extent the Court only intends to summarize the Indictment for the jury, the defendants' motion would then be moot.  If the Court does intend to provide or read the Indictment to the jury, the Government will negotiate with the trial defendants redactions to the Indictment to address any concerns about prejudicial surplusage.  To the extent the Government and the trial defendants are unable to agree on particular redactions, the issue can then be raised with the Court and resolved.

**F.      The Defendants' Motion for a Bill of Particulars Is Untimely and Without Merit**

Defendants Geris and Shapiro also move for a bill of particulars pursuant to Rule 7 of the Federal Rules of Criminal Procedure.  (Geris Mot at. 3-5; Shapiro Mot. at 13-18).  The

Defendants, who are both Medical Doctors, both request the same categories of information –
(1) additional detail regarding their respective involvement in providing unnecessary treatments,
including list of any treatments that the Government alleges were never provided or were
medically unnecessary; (2) additional detail regarding their participation in billing insurance
companies through fraudulently incorporated professional corporation – including the identity of
individuals who actually owned certain medical clinics with whom Geris and Shapiro were
associated; and (3) generalized requests for details about their involvement in the scheme – such
as lists of all of their overt acts or all the members of the conspiracy.  (Geris Mot. at 5; Shapiro
Mot. at 14-15).  The motion for a bill of particulars should be denied.

      As a preliminary matter, the motion is untimely.  At a conference on September 20, 2012,
at which both Geris and Shapiro were present, the Court set a schedule in which motions for a
bill of particulars would be litigated separately from the other motions in the case.  On October
5, 2012, Defendant Yuri Zayonts filed a motion for a bill of particulars on behalf of *all
defendants* which primarily sought  specification of the "false and fraudulent representations to
the victims of the frauds."  (Zayonts Bill of Particulars Mot. at 2).  The motion was denied by the
Court on the record, following oral argument, at a conference held on December 5, 2012.  Both
Geris and Shapiro were also present for the December 5 conference.

      The motion should also be denied on the merits.  The arguments raised by the defendants
are the same arguments raised by all defendants – including these defendants – less than four
months ago, in the previous bill of particulars motion, which were rejected by the Court.  In both
instances, the defendants have acknowledged that they understand the general theories of fraud
that the Government will seek to prove at trial – unnecessary treatment and fraudulent
incorporation – but seek additional details about the proof that the Government would offer at

trial to show the defendants' involvement in those schemes.  With respect to the first motion for

a bill of particulars, the Court concluded that "there is sufficient particularity in the

Government's submissions for the defendants' to understand, for purposes of preparing for trial,

the alleged fraud," (Tr. of Oral Argument, dated Dec. 5, 2012, at 67), and denied the defendants'

request.  The same is true with the requests made by Geris and Shapiro.  As discussed in the

Government's response to the initial motion for a Bill of Particulars, the charges in this case have

been explained in more than sufficient detail through the Indictment itself and other documents

filed during the course of the litigation (including the Government's Bill of Particulars response).

In addition, the Government has further aided the defendants through an organized and

systematic discovery production.  Those sources of information are more than sufficient to allow

the defendants to understand the charges against them and to adequately prepare for trial.[43]

Moreover, the defendants have failed to demonstrate that they have availed themselves of

the various tools at their disposal, including the discovery in the case, to understand the case and

to avoid resorting to a Bill of Particulars.  *See United States* v. *Bortnovsky*, 820 F.2d 572, 574

(2d Cir. 1987) (noting that if the information the defendant seeks "is provided in the indictment

or in some acceptable alternative form," such as discovery, no bill of particulars is required).  For

instance, to date, neither defendant has reviewed relevant materials recovered during searches

executed by the FBI on February 29, 2012, including:

- Signature stamps in the name of "Mark Shapiro" recovered from the apartment of co-defendant Michael Barukhin and at DZ Services, a billing company associated

---

[43]      Neither no Geris nor Shaprio makes any meaningful effort to distinguish their motions from the previous motion for a Bill of Particulars.  Defendant Geris makes no reference to the earlier Bill of Particular motion. Defendant Shapiro acknowledges the previous motion but simply states that his "unique situation" warrants a Bill of Particulars, without explaining why he is entitled to a Bill of a Particulars in the case when the rest of the defendants are not.  In essence, this motion is a motion for reconsideration of the Court's earlier ruling without addressing the standard for a motion for reconsideration, a standard the Defendants have not and cannot meet.

with Mikhail Zemlyansky and Michael Danilovich, among others;

- A patient ledger for Clearview P.C. recovered at DZ Services (Shapiro was a reading radiologist for Clearview);

- Insurance company checks made out to Billy N. Geris recovered at DZ Services.

The defendants argue that their role in the fraud is narrower than many of the other co-defendants in the case and that less of the evidence is relevant to them than to other defendants. This assertion, if true, simply demonstrates that Geris and Shapiro are more easily able to focus on the relevant evidence and have even less of a need for a Bill of Particular than other defendants in the case (whom the Court has held are also not entitled to a Bill of Particulars).

In sum, should the Court reach the merits of the motion, it should be denied for the same reasons cited by the Court in denying the previous motion for a Bill of Particulars.

**G.     Count One of the Indictment is not Duplicitous**

Defendant Treysler moves to dismiss Count One of the Indictment as duplicitious. Treysler argues that the Indictment describes multiple "separate and discreet (sic)" conspiracies operating within a "grand conspiracy," (Treysler Mot. at 22), and that Count One should therefore be dismissed.  His motion is premature and, in any event, without merit, and should be denied.

An indictment is duplicitous "if it joins two or more distinct crimes in a single count." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).  Even when a count of an indictment is duplicitous, it is only "impermissibly duplicitous" when the manner in which the count is charged "risks unfairness to the defendant."  *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981).

As Treysler acknowledges, applying duplicity analysis to conspiracy indictments present "unique issues, for a single agreement may encompass multiple illegal objects." *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980). In addition, a wide variety of criminal relationships may give rise to a conspiracy. A single conspiracy "may be found where there is mutual dependence among the participants, a common aim or purpose or a permissible inference from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989). "Each member of the conspiracy is not required to have conspired directly with every other member of the conspiracy; a member need only to have 'participated in the alleged enterprise with a consciousness of its general nature and extent.'" *United States v. Ohle*, 678 F.Supp.2d 215, 222 (S.D.N.Y. 2010) (quoting *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989)).

If the Indictment, on its face, sufficiently alleges a single conspiracy, then "'the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury.'" *United States v. Rajaratnam*, 736 F.Supp.2d 683, 688 (S.D.N.Y. 2010) (quoting *Ohle*, 678 F.Supp.2d at 222); *Aracri*, 968 F.2d at 1519 ("Whether the government has proved a single conspiracy or has instead proved multiple other independent conspiracies is a question of fact for a properly instructed jury."). Here, the Indictment alleges a single conspiracy and that allegation is a sufficient basis to deny Treysler's motion to dismiss Count One. Moreover, the conspiracy charged in Count One is a racketeering conspiracy, which statutorily requires the Government to prove at least two, separate predicate offenses. *Cf. Aracri*, 968 F.2d at 1518 (discussing duplicitous indictment where two or more crimes are joined in a single count).

Finally, the fact that the Government's evidence in this case may support smaller conspiracies operating under the umbrella of a larger conspiracy does not support a finding that Count One is duplicitous, or even that there were multiple conspiracies. *See United States v. Smith*, 789 F.2d 196, 200, 202 (3d Cir. 1986) ("[A] finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance. . . . [A] single conspiracy could consist of a master conspiracy with one common objective but with several subsidiary schemes."). Accordingly, Treysler's motion is without merit and should be denied.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court deny all pretrial motions, with the exception of Michael Barukhin's motion to suppress, to which the Government consents to a hearing.

Dated: New York, New York
       March 13, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                    By:    _____/s/_____
                              Daniel S. Goldman
                              Nicholas L. McQuaid
                              Carolina A. Fornos
                              Daniel S. Noble
                              Assistant United States Attorneys
                              212-637-2200