UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                    :

UNITED STATES OF AMERICA         :

                        :         12 Cr. 171 (JPO)

      -against-         :

                        :     MEMORANDUM AND

MIKHAIL ZEMLYANSKY, *et al.*,   :        ORDER

                        :

               Defendants.  :

                        :

----------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      The Indictment in this case charges 36 defendants with conspiracy to commit

racketeering, health care fraud, mail fraud, and money laundering in connection with an

allegedly fraudulent no-fault insurance scheme.  Presently before the Court are several pretrial

motions filed by certain Defendants.  Oral argument on these motions was held on April 19,

2013.  For the reasons set forth below, the motion to suppress evidence seized from the Tri-State

Billing office is granted, while Defendants' other motions are denied.[1]

## I.     Motion to Strike the Fraudulent Incorporation Theory from the Indictment

      Defendants Yuriy Zayonts, Michael Danilovich, and Boris Treysler, joined by several

other Defendants, move to strike portions of the Indictment insofar as they are based on the

Government's theory of "fraudulent incorporation," arguing that the theory is legally insufficient

to support a conviction for mail fraud or health care fraud (or conspiracy or RICO charges

premised on those offenses).

---

[1] An evidentiary hearing on Defendant Michael Barukhin's motion to suppress evidence (Dkt.
No. 446) was held on May 2, 2013.  That motion was denied for the reasons stated on the record
on that date.

**A.     Background**

The Indictment charges a complex scheme to defraud automobile insurance companies through New York's No Fault Comprehensive Motor Vehicle Insurance Reparation Act (the "No-Fault Law"), N.Y. Ins. Law § 5102 *et seq*.  With respect to the fraudulent incorporation theory, the Indictment alleges as follows:

> 5.  At all times relevant to this Indictment, pursuant to New York State Law, all medical clinics in New York State must have been incorporated, owned, operated, and/or controlled by a licensed medical practitioner in order to be eligible for reimbursement under the No-Fault Law.  Insurance companies would deny all billings for medical treatments from a medical clinic that was not actually owned, operated and controlled by a licensed medical practitioner.

> 6.  In actuality, the No-Fault Clinics were not owned, operated, and controlled by a licensed medical practitioner; instead, the actual owners, operators, and controllers of the No-Fault Clinics were individuals who were not licensed medical practitioners and who were not identified on documents filed with the New York State authorities (the "No-Fault Clinic Controllers").  The No-Fault Clinic Controllers, among other things, paid a fee and/or salary to licensed medical professionals (the "No-Fault Doctors") so that the No-Fault Doctors would (1) incorporate a professional corporation under which a No-Fault Clinic could bill insurance companies; (2) open a bank account for the Clinic; (3) sign the lease for the Clinic property; (4) sign the Clinic's bills for treatments under the No-Fault Law; and/or (5) make the excessive and unnecessary prescriptions and referrals for additional treatments and medical supplies to other fraudulent medical clinics.  In addition, the No-Fault Clinic Controllers, among other things, invested the initial funds to establish the No-Fault Clinics; identified the locations for the Clinics; negotiated the rent for the Clinics' leases; sourced and paid for the Clinics' equipment; arranged for Patients to receive treatment; and/or received most, if not all, of any proceeds from the No-Fault Clinics.

> 7.  Furthermore, the No-Fault Clinic Controllers arranged for other similarly fraudulently incorporated entities to provide excessive

> and unnecessary medical treatments based on referrals from the No-Fault Doctors (the "Modality Clinics"). . . .  In return, the No-Fault Clinic Controllers received cash kickbacks for each referral from other individuals who fraudulently owned, operated and controlled the Modality Clinics (the "Modality Clinic Controllers").   Similar to the No-Fault Clinics, many of the Modality Clinics were fraudulently incorporated by licensed medical practitioners who did not own, operate and/or control the Modality Clinics (the "Modality Professionals").

(Indictment ¶¶ 5-7.)

New York's No-Fault Law requires automobile insurance companies to reimburse drivers and passengers for "[a]ll necessary expenses" up to $50,000 resulting from personal injuries arising out of motor vehicle accidents.  N.Y. Ins. Law § 5102.  Pursuant to regulations promulgated by the New York State Superintendent of Insurance, an insured may assign his or her benefits to the health care provider, which may then receive direct payment for the services provided.  11 N.Y.C.R.R. § 65-3.11(a).  The regulations further provide:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the [New York] Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

11 N.Y.C.R.R. § 65-3.16(a)(12).

The New York State Department of Education is authorized to issue a certificate of authority to a "qualified professional service corporation" that is organized pursuant to Section 1503 of the New York Business Corporation Law.  N.Y. Educ. Law § 6507(4)(c).  Section 1503 provides that such an entity's certificate of incorporation

> (i) shall state the profession or professions to be practiced by such corporation and the names and residence addresses of all individuals who are to be the original shareholders, directors and

3

> officers of such corporation, and (ii) shall have attached thereto a certificate or certificates issued by the licensing authority certifying that each of the proposed shareholders, directors and officers is authorized by law to practice a profession which the corporation is being organized to practice and, if applicable, that one or more of such individuals is authorized to practice each profession which the corporation is authorized to practice.

N.Y. Bus. Corp. Law § 1503(b).  Section 1507(a) of that statute provides that "[a] professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice . . . ."  Section 1508 states that "[n]o individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession which such corporation is authorized to practice and is either a shareholder of such corporation or engaged in the practice of his profession in such corporation."

In short, New York licensing requirements are structured so as to "prohibit non-physicians from owning or controlling medical service corporations."  *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320-21 (2005).

In *Malella*, the New York Court of Appeals, answering a question certified by the Second Circuit, held both that the above-referenced regulations are valid, and that "fraudulently incorporated" medical corporations "are not entitled to reimbursement" from insurers under the No-Fault Law.  *Id.* at 320, 322.  Noting "[New York] State's prohibition against lay ownership of shares in medical corporations (and the accompanying potential for fraud)," as well as "the strength of the regulation [11 N.Y.C.R.R. § 65-3.16(a)(12)]," the Court determined that insurance carriers "may look beyond the face of licensing documents to identify willful and material failure to abide by state and local law."  *Id.* at 321.  Such a rule, the Court held, was consonant with the Superintendent's regulation, which had been promulgated "to combat rapidly

4

growing incidences of fraud in the no-fault regime, fraud that [the Superintendent] has identified as correlative with the corporate practice of medicine by nonphysicians." *Id.* at 320 n.2.

### B.      Discussion

On a motion to dismiss the Indictment, the Court assumes the truth of the allegations in the Indictment.  *See United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999).  Thus, in cases where the Government has not proffered the evidence it intends to present at trial, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss the indictment."  *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998).

Defendants contend that the Indictment's fraudulent incorporation theory is legally insufficient for several reasons.  They argue (1) that the alleged facts do not establish any affirmative misrepresentation or omission sufficient to support a charge of fraud; (2) that the alleged facts fail to support any contemplated injury to the insurers; and (3) that the fraudulent incorporation theory fails to implicate a cognizable property interest of the insurers.  Each of these arguments is addressed in turn.

### 1.      Affirmative Misrepresentation or Omission

"The [federal] fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."  *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (citation omitted).  Defendants argue that, even assuming the allegations in the Indictment to be true, no misrepresentation were made regarding who "owned," "operated," or "controlled" the relevant clinics or professional corporations ("PCs").  Thus far, the Government has identified one type of document that, it claims, evidences such a misrepresentation:  the "NF3" form—a standard form submitted by PCs to insurers to request payment on claims that have been assigned by insured patients.  The NF3 form, entitled

"VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER

OF HEALTH SERVICE," contains the following language in Item 17:

> IF THE PROVIDER OF SERVICE IS A PROFESSIONAL
> SERVICE CORPORATION OR DOING BUSINESS UNDER
> AN ASSUMED NAME (DBA), LIST THE OWNER AND
> PROFESSIONIAL LICENSING CREDENTIALS OF ALL
> OWNERS (Provide an additional attachment if necessary).

In the blank space following this language on the form, the PCs included the name of a medical

doctor or other professional.  The Government argues that because the person named was not the

"true owner" of the PC, but was only the "paper owner" or "straw owner," this constitutes an

affirmative misrepresentation to the insurer on the NF3 form.[2]   According to Defendants, the

Government has simply "invent[ed] a new doctrine of law called 'true ownership' in an attempt

to avoid the conclusion that no affirmative misrepresentations of ownership was made to the

insurance companies."  (Zayonts Rep. at 1.)

Defendants do not offer a persuasive reason for concluding that the statements of

ownership on the NF3 forms were, as a matter of *law*, not affirmative misrepresentations.

Defendants simply assert, absent citation to any authority, that "the doctors who incorporated the

PCs are, indeed, the owners of the PCs." (Zayonts Mem. at 7.)  According to Defendants, this

must be the case, because the certificates of incorporation of the PCs list the doctors as the

original shareholders, directors, and officers of the PCs.  It is simply irrelevant to the question of

---

[2] It is true, as Defendants emphasize, that this representation made in the NF3 form goes only to
"ownership," and not to "operation" or "control" of the PC. The Government concedes,
however, that the "misrepresentation of fraudulent incorporation" underlying its theory in this
case "goes to the actual ownership of the medical clinics."  (*See* Gov't Letter dated April 25,
2013, Dkt. No. 596.)

ownership, argue Defendants, whether those doctors then "turn[] over the business operation of [the] PC[s] to [] non-professional[s]."  (Zayonts Mem. at 9.)

The Court disagrees that the issue of who "owns" a PC can necessarily be resolved simply by examining the PC's certificate of incorporation.  Rather, the question of "ownership" is considered a question of fact, or a mixed question of law and fact.  *See, e.g.*, *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006); *In re Meyer*, 151 F.3d 1033, 1998 WL 538160, at *4 (7th Cir. Apr. 21, 1998); Am. Jur. 2d, Trial § 663 (2013).  Thus, the question of who actually owned the PCs at the time the NF3 forms were filled out— and, by extension, the question whether Defendants misrepresented the identity of the owners— is properly viewed as one for the jury, to be answered based on the evidence presented at trial.

Moreover, to the extent that Defendants are arguing that the *evidence* thus far identified by the Government—i.e., the NF3 form—is insufficient to establish a misrepresentation as to ownership of the PCs, such an argument is properly the subject of a Rule 29 motion, and is, at this juncture, premature.  *Accord United States v. Piper*, No. 12 Cr. 41, 2012 WL 4757696, at *2 (D. Vt. Oct. 5, 2012). [3]  Although the Government has now committed itself to misrepresentations of "actual ownership" for its fraudulent incorporation theory in this case, that position does not preclude it from offering other evidence probative to the indicia of ownership—which presumably may include evidence regarding the operation and control of the PCs.

---

[3] Similarly, it is premature to decide at this stage whether the evidence at trial will warrant an instruction on finding fraud on the basis of a material omission (based on a duty to disclose) or a "half truth."  *See, e.g.*, *Autuori*, 212 F.3d at 118.  The Court notes that the lack of a fiduciary relationship between the PC and the insurer is not dispositive of the duty to disclose that may give rise to a finding of fraud by omission.  A duty to disclose may arise from other sources, and such sources would appear to include the No-Fault regulatory framework combined with a required disclosure such as the NF3 form.

### 2.     Injury to Insurers

Defendants also argue that the fraudulent incorporation theory is legally insufficient because it does not establish any intent to cause injury to the insurers.  While fraud does not require actual injury to the victim, it does require "that some actual harm or injury was *contemplated* by the schemer."  *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (citation omitted) (emphasis in original); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("[The Government] must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims.  Only a showing of intended harm will satisfy the element of fraudulent intent.").

Relying on Judge Sifton's reasoning in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401 (E.D.N.Y. 2001) ("*Mallela I*"), Defendants contend that "there can be no injury because the insurer has an underlying obligation—unrelieved by Regulation 65-3.16(a)(12) or any other provision of New York Law—to make direct payment to the insured for treatment rendered by a licensed professional."  (Zayonts Mem. at 15.)  When a patient assigns his or her claim to a fraudulently incorporated PC, Defendants argue, the PC's ineligibility to receive payment (by virtue of the regulation) results in a "windfall" to the insurer, and "[w]indfalls are not injuries."  (*Id.*)

This argument lacks merit, most importantly because it fails to account adequately for the New York Court of Appeals' 2005 decision in *Mallela*.  There, the Court of Appeals definitively held that, as a matter of New York law, fraudulently incorporated PCs "are not entitled to reimbursement" by insurers.  4 N.Y.3d at 320.  Thus, irrespective of whether a *patient* would be entitled to reimbursement if he had *not* assigned his claim to a PC, it is clear (and has been clear since 2005) that where such an assignment has occurred, and where the PC is not owned by a

licensed professional, an insurer has a *right* to refuse payment on the claim.  A misstatement about a PC's ownership, if made with the intent to deceive the insurer into making payment it would otherwise withhold, is a misstatement made with the intent to cause injury to the insurer. Whether properly characterized as a "windfall" or not, the insurer's entitlement to withhold reimbursement in these circumstances is an interest in money or property, the deprivation of which can be an injury under the fraud statutes.  For these reasons, the cases cited by Defendants—in which no injury to the victim was intended or contemplated—are inapposite.  *Cf. Starr*, 816 F.2d at 98 (no fraud where the alleged victims received the benefit of the bargain); *United States v. Novak*, 443 F.3d 150, 156 (same); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970) (a business's making of "false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain," but which instead are collateral to the sale, does not constitute a scheme to defraud).

The fact that *Mallela* was a civil case is simply beside the point, as New York law, as construed by the New York Court of Appeals in *Mallela*, does not create the substantive federal offenses at issue.  Rather, the Court here looks to New York law simply to determine whether a material misrepresentation has been made and whether it was made with the intent to defraud. On those issues, *Mallela* is crystal clear.

### 3.  Property Interest of Insurers

Defendant Danilovich argues that the fraudulent incorporation theory is legally insufficient for a different reason:  that an insurer's right to withhold payment is not a cognizable property interest under the mail fraud statute.  Because the insurer's right to withhold funds from layperson-owned PCs is a non-discretionary *obligation*, he argues, it does not implicate the insurer's "right to control" its assets, as contemplated by the line of Second Circuit decisions

9

recognizing deprivations of such a "right to control" as satisfying the "property" element of the mail fraud statute. *See, e.g.*, *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).

The Indictment, however, does not rely on a deprivation of the insurers' "right to control" their property. Rather, it rests simply on the alleged deprivation of their monetary interest in nonpayment of claims—where PC-claimants are "ineligible" for payment under New York law. That monetary interest is a legally cognizable interest in money or property under the mail fraud statute.

Danilovich also argues that the insurers' interest in nonpayment is based on a state regulation promulgated for public policy reasons, conferring only an "incidental benefit" on insurers. (Danilovich Mem. at 6-7.) But the fact that the insurer's interest arises from a state regulation (as construed by the New York Court of Appeals in *Mallela*) does not make it any less of a cognizable interest in money or property. Here, that interest is tangible and economic—distinguishing it from the state's interest in video poker licenses considered by the Supreme Court in *Cleveland v. United States*, 531 U.S. 12 (2000). *Compare id.* at 22 (processing fee received by state as part a regulatory regime not sufficient to establish a property interest) *with Pasquantino v. United States*, 544 U.S. 349, 355-56 (2005) (the right to collect excise tax constitutes a property interest, because it is a "straightforward 'economic' interest"). Moreover, Danilovich's contention that the regulation's benefit to insurers "is designed solely to further the State's interest in deterring the unauthorized practice of medicine" (Danilovich Mem. at 6) is belied by the New York Court of Appeals' discussion of the applicable regulation in *Malella*. As the Court noted, the regulation was promulgated "to combat rapidly growing incidences of fraud in the no-fault regime, fraud that [the Superintendent] has identified as correlative with the corporate practice of medicine by nonphysicians." 4 N.Y.3d at 320 n.2. The phrase "fraud in the

no-fault regime" is a reference to fraudulent claims made to insurers, as suggested by the Court's reference to "our State's prohibition against lay ownership of shares in medical corporations (and the accompanying potential for fraud)." *Id.* at 321. Thus, while the regulation was indeed promulgated for public policy reasons, among those reasons was the goal of combating a type of fraud whose immediate victim is insurers.

### C.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss the fraudulent incorporation theory from the indictment is denied.

## II.     Motion to Suppress Evidence Seized from the Tri-State Search

The Fourth Amendment commands that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Thus, the Warrants Clause both "requires particularity and forbids overbreadth." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009). "Although somewhat similar in focus, these are two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Hernandez*, No. 09 Cr. 625, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (citations omitted). Arguing that the Government violated both of these requirements, Defendants Vladislav Zaretskiy, Yuriy Zayonts, and Mikhail Kremerman have moved to suppress all evidence seized from the offices of Tri-State Billing Corp. ("Tri-State") during a search conducted pursuant to a warrant on February 29, 2012.

A.      **Background**

On February 27, 2012, Magistrate Judge Cheryl Pollak of the Eastern District of New York issued search warrants for six premises, including Tri-State.  Probable cause for the Tri-State warrant was based upon the affidavit of Michael D. Kelley, a special agent with the Federal Bureau of Investigation, Eurasian Organized Crime Squad ("the Kelley Affidavit").  The Tri-State warrant appears to have been issued based upon two separate sections of the Kelley Affidavit, located in Paragraphs 5 and 12.  Paragraph 5 of the Kelley Affidavit states in relevant part:

> h. In order to handle the significant number of bills and paychecks, some members of the scheme established billing and collection companies, usually under the auspices of a law office.  These entities handle all of the paperwork for No-Fault Clinics, and also deal with any disputes or arbitration that arise from the fraudulent billing.  In order to manage the billing and collections for the clinics, the members of the scheme often obtain signature stamps from the incorporating medical professionals for the clinics so that they can bypass the step needed to get the signature of the licensed medical professional.  In truth, the members of the scheme who operate the billing and collections entities actually control the clinics, so that signature stamp is a necessary piece of equipment to effectively perpetuate [*sic*] the fraud.

Paragraph 12 of the Kelley Affidavit, the sole paragraph concerning the probable cause for searching "Premises #2" (i.e. Tri-State) in particular, states:

> a.  CW-1 reports that he knows that ZAYONTS and KREMERMAN maintain their billing for their Modality Clinics at PREMISES #2.  CW-1 knows this, in part, because CW-1 has met with ZAYONTS and KREMERMAN at that location on several occasions, most recently on February 1, 2012.  In fact, CW-1 reports that he received kickbacks from the Modalities controlled by ZAYONTS and KREMERMAN at PREMISES #2.
>
> b. Yet another cooperating witness ("CW-3"), who was arrested on bank fraud charges, confirms that CW-3 regularly cashed checks

for ZAYONTS, and that ZAYONTS controls a business location at
28 Dooley Street (PREMISES #2) which is involved in billing.

The Kelley Affidavit was not incorporated by reference into the Tri-State warrant. "Attachment

A," the sole attachment to the Tri-State warrant, lists the "Items to Be Searched For and Seized."

Those items are as follows:

1. Bank account information;
2. Ledgers documenting patient medical treatment, tests provided, and other records related to patient care;
3. Signature stamps;
4. Calendars and patient appointment records;
5. Cellphones of TARGET SUBJECTS found at SUBJECT PREMISES;
6. Checks, cash, and other financial instruments;
7. Computers;
8. Thumb drives;
9. In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for either on site or off site review:

> 1. Any computer equipment and storage device capable of being used to commit, further or store evidence of the federal criminal offenses of wire fraud; mail fraud; bank fraud; health care fraud; and/or money laundering;
> 2. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;
> 3. Any magnetic electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;
> 4. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;
> 5. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage device or data to be searched;

6. Any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

7. Any passwords, password files, test keys, encryption codes or other information or other information necessary to access the computer equipment, storage devices or data; and

8. Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, routing configuration software.[4]

## B.     Standing

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) (citing cases). Thus, any defendant challenging a warrant must show a reasonable expectation of privacy in the place searched and the items seized. "The question of whether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched." *United States v. Chuang*, 897 F.2d 646 (2d Cir. 1990); *see also United States v. Kazarian*, No. 10 Cr. 895, 2012 WL 1810214, at *18 (S.D.N.Y. May 18, 2012) ("Where the premises searched is a business, defendants seeking suppression must establish both that they are associated with the business and that they have a legitimate expectation of privacy in the part of the business that was searched.").

Tri-State was incorporated in New York State on April 7, 2011, and Zaretskiy is its sole shareholder and President. (Dkt. No. 456, Ex. A.) Kremerman and Zayonts have submitted sworn declarations attesting that they both "participated in managing and running the operations of Tri-State Billing Corp. and shared [Zaretskiy's] interests in the company." (Dkt. No. 535,

---

[4] Hereinafter, the Tri-State warrant and Attachment A shall simply be referred to as "the Tri-State warrant."

Exs. 1-2.)  These three Defendants therefore have standing to challenge the Tri-State search.  No

other Defendants in this action have demonstrated a possessory or proprietary interest in Tri-

State, or any other basis for a reasonable expectation of privacy in the office.  Thus, to the extent

that other Defendants in this case request the suppression of evidence seized pursuant to the

warrant that purported to authorize a search of Tri-State, their motions are denied.

### C.    Particularity

The Fourth Amendment requires that warrants state with particularity the items to be

searched and seized.  This requirement traces directly back to the Framers' experience of tyranny

before this Nation's founding: "The Fourth Amendment was a response to the English Crown's

use of general warrants, which often allowed royal officials to search and seize whatever and

whomever they pleased while investigating crimes or affronts to the Crown. . . .  The principal

evil of the general warrant was addressed by the Fourth Amendment's particularity

requirement."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011).  Though born of specific

historical experiences, the particularity requirement retains modern vitality.  Its core purposes

include "preventing general searches, preventing the seizure of objects upon the mistaken

assumption that they fall within the magistrate's authorization, and preventing the issuance of

warrants without a substantial factual basis."  *United States v. Young*, 745 F.2d 733, 759 (2d Cir.

1984).  Law enforcement agents are thus barred from executing warrants that purport to

authorize "a general, exploratory rummaging in a person's belongings."  *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 467 (1971); *see also Maryland v. Garrison*, 480 U.S. 79, 84 (1987)

("By limiting the authorization to search to the specific areas and things for which there is

probable cause to search, the requirement ensures that the search will be carefully tailored to its

justifications, and will not take on the character of the wide-ranging exploratory searches the

Framers intended to prohibit."); *United States v. George*, 975 F.2d 72, 74 (2d Cir. 1992)

("Because everyone has some kind of secret or other, most people are anxious that their personal

privacy be respected.  For that very human reason the general warrant, permitting police agents

to ransack one's personal belongings, has long been considered abhorrent to fundamental notions

of privacy and liberty.")

     Courts implement the particularity requirement by insisting that warrants not "leave to

the unguided discretion of the officers executing the warrant the decision as to what items may

be seized."  *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990) (citations omitted).  In other

words, a warrant must contain sufficient specificity "to permit the rational exercise of judgment

[by the executing officers] in selecting what items to seize."  *United States v. Shi Yan Liu*, 239

F.3d 138, 140 (2d Cir. 2000) (citation omitted); *see also George*, 975 F.2d at 75 (explaining that

warrant is sufficiently particular only if it "enable[s] the executing officer to ascertain and

identify with reasonable certainty those items that the magistrate has authorized him to seize").

     It is clearly established that supplementary documents, including affidavits submitted to a

magistrate judge to demonstrate probable cause, can particularize a warrant *only* if attached and

incorporated into the warrant by reference.  *See United States v. Rosa*, 626 F.3d 56, 64 (2d Cir.

2010) ("[W]e may no longer rely on unincorporated, unattached supporting documents to cure an

otherwise defective search warrant."); *George*, 975 F.2d at 76 ("Resort to an affidavit to remedy

a warrant's lack of particularity is only available when it is incorporated by reference in the

warrant itself and attached to it."); *cf. Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (noting that

"[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting

documents"); *United States v. Walker*, 463 F. Supp. 2d 348, 363 (W.D.N.Y. 2006) (reading a

warrant as including facts set forth in an affidavit where the warrant stated: "see *attached*

16

Affidavit as to of [*sic*] Items to be Seized, all of which are fruits, evidence and instrumentalities of violations of 18 U.S.C. § 922(g)(1) all of which are more fully described in the affidavit filed in support of this warrant which is incorporated herein by reference" (emphasis added)).

In the Second Circuit, there is no settled formula for determining whether a warrant lacks particularity. Nonetheless, in a thoughtful and scholarly opinion, Judge Karas has noted "two factors that, above others, tend to define a warrant's insufficient particularity." *United States v. Vilar*, No. No. 05 Cr. 621, 2007 WL 1075041, at *22 (S.D.N.Y. Apr. 4, 2007):

> First, warrants are generally found to be insufficiently particular where nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken. Second, warrants will frequently lack particularity where they include a general, catch-all paragraph or provision, often one authorizing the seizure of any or all records of a particular type.

*Id.* (quotation marks, citations, and alterations omitted). Courts do not require that a defendant demonstrate both of these deficiencies; rather, one or the other will typically render a warrant unconstitutional. *See George*, 975 F.2d at 75-76 (holding that warrant lacked particularity because it does not alert the searching officers to the crimes at issue); *United States v. Buck*, 813 F.2d 588, 591 (2d Cir. 1987) (holding warrant lacked particularity because it contained catch-all provisions).

The factors identified by Judge Karas are not exhaustive: lack of particularity may result from, or at least be suggested by, other circumstance-specific considerations. For example, "[i]n a number of out-of-circuit decisions, courts have found warrants for the seizure of records constitutionally deficient where they imposed too wide a time frame or failed to include one altogether." *United States v. Cohan*, 628 F. Supp. 2d 355, 365-66 (E.D.N.Y. 2009) (citations omitted). While the Second Circuit has not yet definitively addressed the necessity of temporal

limitations, "[a]mongst the district courts in this circuit . . . there is general agreement that a time frame is *relevant*, [though] there is no apparent consensus as to when one is required."  *Id.* at 366 (collecting cases) (emphasis in original).

### 1.      Limitations by Crime

Nothing on the face of the Tri-State warrant informs the searching officer for which crimes the search is being undertaken.  *Accord United States v. Hickey*, 16 F. Supp. 2d 233, 239 (E.D.N.Y. 1998) (warrants lacked particularity where "none identified the nature of the suspected wrongdoing triggering the searches"), *motion for reconsideration granted on other grounds*, 48 F. Supp. 2d 214 (E.D.N.Y. 1998); *Roberts v. United States*, 656 F. Supp. 929, 935 (S.D.N.Y. 1987) (warrant containing "no restriction to any specific wrongful transaction to which documents were related" lacked sufficient particularity), *rev'd on other grounds*, 852 F.2d 671 (2d Cir. 1988).

The warrant first enumerates eight categories of "Items to be Searched For and Seized," including bank account information, ledgers documenting patient medical treatment, computers, signature stamps, calendars and other patient appointment records, and financial instruments.  At no point prior to or during the enumeration of these eight items does the warrant offer any indication of the relevant criminal allegations.  The officers are thus directed to these categories without a single word of guidance regarding the type of criminal offense under investigation.

Only in a single subsection of Item 9 does the warrant refer to any criminal offenses, namely "wire fraud; mail fraud; bank fraud; health care fraud; and/or money laundering."  The Government asserts that the language of Item 9(1) of the warrant provides notice of the "statutes and conduct that give rise to the search and seizure" at issue.  (Gov't Mem. at 82; *see also id.* at 72 n.38 ("While Attachment A could have been worded more carefully, a reasonable law

enforcement [officer] would have understood that the description of the crimes in paragraph 9(1) of Attachment A was applicable to all of the search.").).)  The Court disagrees.

As the Tri-State warrant explains, Item 9 is meant to guide the officer in "search[ing] for the items described above that may be maintained *in electronic media*" (emphasis added).  By clear implication, Item 9 does not pertain to any physical evidence.  As a result, to the extent that Items 1-8 consist of non-electronic evidence—and Items 1-6 are all either physical evidence or the kind of evidence that may exist in either physical or electronic form—nothing in Item 9 limits the scope of the warrant as to those items by specifying criminal offenses.  Thus, an officer tasked only with conducting a physical search might well miss this supposed limit, as might any officer who reads the warrant in a straightforward fashion and observes that the reference to these federal crimes is confined to a specific subsection of the electronic evidence.  *Accord United States v. Otero*, 563 F.3d 1127, 1132-33 (10th Cir. 2009) (noting that, when the items to be searched and seized are separated into different sections, the structure of the warrant may prevent an incorporation of a particular limitation to the remainder of the warrant); *see also id.* at 1133 ("There is no explicit or even implicit incorporation of the limitations of the first five paragraphs.  The computer-related paragraphs do not even refer to the rest of the warrant.  In fact, the presence of limitations in each of the first five paragraphs but absence in the second four suggests that the computer searches are *not* subject to those limitations.").

Further, even as to electronic evidence, Item 9 does not provide any actual limitation based on criminal offense.  Item 9 begins by stating that, "[i]n order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize *the following items* for either on site or off site review" (emphasis added).  The warrant then contains eight subsections, seven of which lack any

reference to any federal criminal offense.  These eight subsections, however, each afford the searching offers an *individually sufficient basis* for searching and seizing items found at Tri-State.  This is made apparent by the fact that each subsection refers to "Any" evidence of a particular sort, and the fact that these subsections are linked conjunctively by "and" at the end of subsection 7.  Thus, "[i]n order to search for [Items 1-8] that may be maintained in electronic media," Item 9 allows the searching officers to seize any of eight different kinds of evidence, and only one out of those eight evidentiary categories refers to a federal criminal offense.  The other seven subsections, which allow seizure of virtually any electronics, as well as any documentation, reference manuals, software, physical keys, encryption devices, passwords, financial records, and electronic communication that might bear on the search and seizure of electronic evidence, make no reference to any federal crime and do not incorporate by reference the federal crimes described in subsection 9(1).  In other words, Items 9(2) through 9(8) allow for extremely broad electronic searches, and are, by the logic of the warrant, not narrowed by any references to the crimes committed.  An officer would see no offense-based limit on her ability to seizure virtually any electronics found on the premises.

Moreover, as is explained in more detail *infra*, Item 7—"Computers"— and Item 8—"Thumb Drives"—are not limited by Item 9, as computers and flash drives cannot be "maintained in electronic media."  Thus, at most, Item 9(1) limits an officer's ability to search and seize electronic evidence *aside from* computers and thumb drives.

Although the Government compares the language putatively limiting the language in the Tri-State warrant to language in three other warrants recently discussed by courts in this district, the differences between those warrants and this one illuminate the serious particularity problem

here.  (*See* Gov't Mem. at 82 (likening the Tri-State warrant to those discussed in *United States v. Hernandez*, *United States v Dupree*, and *United States v. Levy*).

In *United States v. Hernandez*, Judge Baer found sufficient particularity in warrants that described the property to be searched for and seized as "Evidence of crimes; contraband, fruits of crimes, or other items illegally possessed; or property designed for use, intended for use, or used in committing violations of [18 U.S.C. §§ 187 (false/fictitious/fraudulent claims against the United States), 1028 (identification document fraud), 1341 (mail fraud), 1342 (use of fictitious names in schemes via U.S. mail), 1344 (bank fraud), conspiracy to do the same, and 26 U.S.C. § 7206 (tax-related fraud and false statements), and conspiracy to do the same]."  2010 WL 26544, at *10.  Because the "warrant itself indicate[d] that only documents related to violations of various criminal fraud statutes related to identity, mail, and tax fraud" should be searched for and seized, and the categories included in an attachment were "all tax or business accounting related sorts of items," Judge Baer concluded that "the warrant for the Cove Street Residence directed and limited executing agents to particular types of tax-related business documents."  *Id.*  Thus, where a warrant indicated that the *whole* search was based on suspicion of certain kinds of fraud, and then instructed the searching officers to obtain documents "related to violations" of the specified statutes, Judge Baer concluded that the search was limited by the indicated offenses.

Judge Crotty relied upon comparable reasoning in *United States v. Levy*, where the search warrant "identified the Levys' residence as the property to be searched, and stated that it was believed to conceal '[e]vidence, [f]ruits, and [i]nstrumentalities of criminal violations of Title 18, United States Code, Sections 1343 and 1349, as further described in 'Attachment B.'"  No. 11 Cr. 62, 2013 WL 664712, at *2 (S.D.N.Y. Feb. 25, 2013).  Attachment B, in turn, "described the property to be seized as:  Evidence, fruits, and instrumentalities of violations of Title 18, United

States Code, Sections 1343 (Wire Fraud), 1349 (Conspiracy to Commit Wire Fraud), and 1956

and 1957 (Money Laundering)," and then specifically identified certain categories of such

evidence. *Id.* Judge Crotty concluded that, "[b]y specifically identifying the statutes and

conduct that gave rise to the search and seizure, the Search Warrant sufficiently identified the

suspected crimes for which there was probable cause, and which the materials to be seized

evidenced." *Id.* at *9. Again, the specified offenses covered the entire search warrant and the

warrant plainly indicated that the evidence to be seized had to relate to those crimes.

Similarly, in *United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011), Judge

Matsumoto concluded that a warrant did not suffer from this form of non-particularity because

"section (1) of Exhibit A to the search warrant clearly states that the '[t]he items to be seized are

evidence or instrumentalities of violations of 18 U.S.C. §§ 1341, 1343, 1344 and 1349 . . . .'" *Id.*

at 149. The warrant also "enumerated and particularized" the different categories of documents

it covered, and "thus describe[ed] the types of evidentiary documentation of the listed offenses."

*Id.* Because the warrant "explicitly made clear to the executing officers that the offenses being

investigated in this case are mail, wire, and bank fraud, and attempts and conspiracy to commit

the same, pursuant to 18 U.S.C. §§ 1341, 1343, 1344 and 1349 and that the items to be searched

and seized were evidence of those offenses," Judge Matsumoto concluded that the searching

officers had received sufficient guidance. *Id.* at 149-150.

Unlike the warrants in *Hernandez*, *Levy*, and *Dupree*, the Tri-State warrant does not

direct searching officers to seize evidence *related to*, or *concerning*, any particular crime or type

of crime. By comparison, for the reasons set forth above, as to all or nearly all of the evidence

whose seizure was authorized by the Tri-State warrant, the warrant simply says nothing about the

criminal offenses under investigation. Indeed, even if language of Item 9(1)—the sub-section

that does refer to specific offenses—somehow applied to each and every category of materials specified in the warrant, that language states only that the officers may seize all of the electronic material "*capable of being used* to commit, further or store evidence of the federal criminal offenses of wire fraud; mail fraud; bank fraud; health care fraud; and/or money laundering."  A capability requirement is not the same as a relevance requirement; indeed, it is hard to imagine what electronic material is not "capable" of being used to further or store evidence of any of these statutes.  The Tri-State warrant is thus quite different in kind from the warrants upon which the Government relies to assert sufficient particularity.

In sum, there is no offense indicated as to any physical evidence.  There is no offense indicated as to computers and thumb drives (Items 7 and 8).  There is no offense indicated as to seven subsections of material that may be searched for and seized "[i]n order to search for the items described above that may be maintained in electronic media."  There is no relevance requirement imposed on the single subsection of Item 9 that does mention specific offenses.  And as to that single subsection, it is not clear that it authorizes officers to search for and seize anything that could not be searched for and seized pursuant to one or another of the broad categories set forth elsewhere in the warrant.  Even acknowledging that "[t]he nature of [this] crime . . . may require a broad search," *Dupree*, 781 F. Supp. 2d at 149, there is a difference between a broad search based on a valid warrant and a general search based on a warrant that, on any reasonable interpretation, is silent as to the federal criminal offenses for which evidence is sought.

### 2.    The Scope of the Categories to Be Searched and Seized

The Tri-State warrant contains excessively broad categories of items to be searched for and seized, and thereby permits a searching officer to rummage through and seize nearly any

conceivable paper and electronic document at Tri-State.  This failing provides an independent

basis for deeming the warrant deficient.  *See Buck*, 813 F.2d at 591 (finding impermissibly broad

a warrant rife with "general boilerplate terms, without either explicit or implicit limitation on the

scope of the search"); *see also Wheeler v. City of Lansing*, 660 F.3d 931, 941 (6th Cir. 2011) (in

the context of a search of a house for stolen goods, categories in a warrant are overbroad where

they "provid[e] no basis to distinguish the stolen items from [the defendant's] own personal

property"); *Hernandez*, 2010 WL 26544, at *10 (the categories of items to be seized from a

business lack particularity where they "could have encompassed most all of the business records

on the premises").

        The Tri-State warrant allows for the seizure of categories of materials that other courts

have recognized to be impermissibly broad.  For instance, it covers "[c]hecks, cash, and other

financial instruments" without indicating any individuals, entities, offenses, time frame, or

relevance.  *See United States v. Gigante*, 979 F. Supp. 959, 966-67 (S.D.N.Y. 1997) (describing

as "broad and vague" a warrant item authorizing seizure of all "financial, banking, safe deposit,

investment, asset, tax, bookkeeping, and accounting records—along with underlying, supporting,

and related documentation—of or referring or relating to [certain individual and entities]" where

the warrant did not adequately specify to whom or what these items had to relate).  The warrant

also reaches all "calendars and patient appointment records," without any indication of which

calendars, which patients, which doctors, or which clinics were under investigation.  *See United

States v. Lazar*, 604 F.3d 230, 238 (6th Cir. 2010) (evaluating a warrant permitting the seizure of

all patient records from two medical offices and finding that "[a]s regards records of patients

whose names did not appear on a patient list presented to the issuing Magistrate Judge, the facts

of this case . . . require suppression of those files.  This facial deficiency was so evident,

24

moreover, that no officer could reasonably presume the warrants valid"); *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 705 (9th Cir. 2009) ("Category 24—SDI's rolodexes, address books, and calendars—amounts to the laziest of gestures in the direction of specificity . . . this category practically begs the search team to find and to seize the contact information of every person who ever dealt with SDI.").  By the same token, in referring to "[l]edgers documenting patient medical treatment, tests provided, and other records related to patient care," the Tri-State warrant authorizes the officers to search through and seize virtually any such document in the office, with no limitation as to offense, patient, time period, clinic, or doctor.

Next, the warrant indiscriminately permits the search of all "Computers" and "Thumb drives."  Courts have disallowed such broad, un-particularized grants of authority to search teams.  *See Rosa*, 626 F.3d at 58 (a warrant permitting officers to search, *inter alia*, "computer equipment" and "electronic digital storage media" lacks particularity); *United States v. Graziano*, 558 F. Supp. 2d 304, 316 (E.D.N.Y. 2008) ("[T]here are Fourth Amendment limits to every search that apply with equal force to searches of computers.  Thus, although courts are ill-suited to micromanage in advance how the computer will be searched, law enforcement must establish the basis for searching the computer and particularize the evidence being sought during such search."); *United States v. Hunter*, 13 F. Supp. 2d 574, 584 (D. Vt. 1998) ("Section IV simply called for the seizure of '[a]ll computers . . . [a]ll computer storage devices . . . [and a]ll computer software systems,' detailing only examples of what types of computer paraphernalia were included.  This section is a catch-all paragraph, which lacks sufficient limitation." (record citation omitted)).[5]

---

[5] The Second Circuit has unequivocally rejected the argument that the particularity requirement should be relaxed when dealing with electronic information.  *See Rosa*, 975 F.2d at 63 n.2 ("We

The Tri-State warrant also permits the seizure of "Cellphones of TARGET SUBJECTS found at SUBJECT PREMISES," a category that would have been sufficiently narrow had the warrant incorporated by reference the Kelley Affidavit.  As it stands, however, neither the warrant nor Attachment A defines "TARGET SUBJECTS," leaving the officers executing the warrant to assign their own meaning to this term.  The upshot is that the searching officers enjoyed impermissibly broad discretion to seize and peruse, *carte blanche*, the cell phone of any person found in Tri-State at the time of the search, be they target subjects, unwitting employees, or innocent customers.

In addition to the breadth of these categories, several of them also suffer from ambiguity. For example, the reference to "financial instruments" could afford a reasonable officer extremely broad discretion in deciding what items fall within this term's scope.  Indeed, that point was illustrated at the suppression hearing, where Agent Steven Naum acknowledged that he was not sure whether the reference to financial instruments would have authorized the seizure of financial contracts, insurance policies, or titles to real estate.  He did think, however, that it would cover ATM cards and credit cards.  That uncertainty is understandable, especially given that the warrant provides no context, reference to certain crimes, indications of target subjects, or any other information that would narrow an ambiguous term's vast sweep.

---

reject the Government's contention that all of the electronic equipment seized from Rosa's apartment could be searched without a warrant because it was subject to *later* forfeiture.  The Government's position that the entire contents of Rosa's computers and related storage media could be searched under the terms of this warrant leads to the evisceration of the Fourth Amendment's requirement of an *ex ante* probable cause determination."  (citation omitted)); *accord United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1179 (9th Cir. 2010) (Kozinski, J., concurring) ("The process of sorting, segregating, decoding and otherwise separating seizable data (as defined by the warrant) from all other data should also be designed to achieve that purpose and that purpose only.").  Indeed, the Second Circuit has stated that the particularity requirement is "much more important" when a warrant allows for the searching of electronics.  *Rosa*, 975 F.2d at 62 (quoting *Otero*, 563 F.3d at 1132).

At bottom, missing from all of these categories—and from the warrant in general—are any instructions to the officers to search for and seize records related to the five modality clinics at the center of the alleged conspiracy in question, related to particular suspects in the case, limited to the time period of the suspected conspiracy, related to the crimes alleged, or any other limits.

Together, the Tri-State warrant authorized the officers to search for and seize almost everything that one could expect to find at a billing office: any cash or checks, any document that might be considered to be some sort of "financial instrument," all patient records and everything else related to patient records, and all bank information.  In addition to all that physical evidence, the warrant authorized the unlimited search and seizure of all computers and thumb drives, as well as virtually anything electronic and anything related to the use or operation of those electronics.  The warrant also allowed the officers to seize the cell phones of unspecified "TARGET SUBJECTS," which on the face of the warrant provided the officers with discretion to seize the phone of any person found on the premises.  As explained below, the warrant lacked probable cause to justify the breadth of this search.  Of immediate concern here, however, is the fact that it conferred on the searching officers discretion to seize virtually everything short of any diaries, clothing, and love letters that employees may have brought to work.  The broad, undefined, and ambiguous terms of this search warrant render it, for all practical purposes, a prohibited general warrant to search Tri-State for evidence of a crime.

### 3.  Failure to Temporally Limit the Warrant

Also missing from the Tri-State warrant is any temporal limitation on the items to be searched.  *See Hernandez*, 2010 WL 26544, at *11 (noting that a "temporal limitation" is an "indic[ium] of particularity" (citing *United States v. Capital Grp., Inc.*, 211 F.R.D. 31, 58 (D.

Conn. 2002)).  As Judge Hall has observed, "[a] warrant's failure to include a time limitation, where such limiting information is available and the warrant is otherwise wide-ranging, may render it insufficiently particular."  *United States v. Costin*, No. 5 Cr. 38, 2006 WL 2522377, at *12 (D. Conn. July 31, 2006) (collecting cases); *accord United States v. Abrams*, 615 F.2d 541, 545 (1st Cir. 1980) (holding, in a case concerning the search of billing records at doctors' offices for evidence of Medicare and Medicaid fraud, that "[a] time frame should also have been incorporated into the warrant").  Although "[t]he complexity and duration of the alleged criminal activities" of this case may render temporal limitation "less significant," *Hernandez*, 2010 WL 26544, at *11, the absence of such a limit reinforces the Court's conclusion that the Tri-State warrant functioned as a general warrant.  *See Valar*, 2007 WL 1075041, at *23 (noting that the "patent lack of particularity is only compounded by the absence of any date restriction on the items to be seized").

### 4.  Confusing Provisions in the Tri-State Warrant

An additional basis for concluding that the Tri-State warrant lacked particularity rests in the confusing relationship between Item 9 and the remainder of the warrant.  Specifically, Item 9 indicates that law enforcement personnel may search for and seize broad categories of electronic equipment and related material "to search for the items described above that may be maintained in electronic media."  The clear suggestion is that the search of electronic media is somehow limited by Item 9 and its various subsection—even though it is doubtful that the combination of those broad subsections actually imposes any limit.  But then the warrant also *separately* allows for the search of "[c]omputers" and "[t]humb drives," categories which are not limited by Item 9's plain language at all and to which it would be nonsensical to apply Item 9.

28

The oddity of separately including unlimited terms for "computers" and "thumb drives," and then including a laundry list of purportedly limiting electronics-related provisions that partly overlap with those blanket terms, could well create confusion on the part of an officer committed to properly executing the warrant. *See Abrams*, 615 F.2d at 550 (Campbell, J., concurring) (noting that a warrant description may be "confusing, hence lacking in particularity"). Perhaps the law enforcement officers tasked with searching the computers and thumb drives would have assumed that those searches are limited to the documents enumerated in the other categories of the warrant—but then again, perhaps not. On the face of the warrant, it is unclear how these provisions interact, though one potential—albeit bizarre—reconciliation would be that computers and thumb drives are subject to unlimited search and seizure, while all other electronics and related documents may be searched and seized for evidence of the sort contained in Items 1-6. In any event, the critical point is that these confusing warrant provisions leave all such questions to the discretion of the searching officers and do not provide guidance. As the *George* Court explained, the very purpose of the particularity requirement is to "curtail[] the officers' discretion when executing the warrant . . . ." 975 F.2d at 76; *see also Shi Yan Liu*, 239 F.3d at 140 (noting that the particularity requirement mandates sufficient specificity "to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize"). In addition to the reasons set forth *supra*, because the Tri-State warrant's lack of clarity fails to coherently guide discretion in the search of electronics, it violates the Fourth Amendment.

### 5. The All-Records Exception

Under certain, limited circumstances, a warrant lacking in particularity can be saved by the so-called "all records exception." "Under that exception, all records of a business may be seized if there is probable cause to believe that the entire operation is permeated with fraud."

*Hickey*, 16 F. Supp. 2d at 240 (collecting cases); *see also United States v. D'Amico*, 734 F. Supp. 2d 321, 360 (S.D.N.Y. 2010) ("When there is probable cause to believe that an entire business is 'pervaded' or 'permeated' with fraud, seizure of all records of the business is appropriate, and broad language used in a search warrant will not offend the particularity requirement." (citations omitted)).  "The principle is not so much an 'exception' to the particularity requirement of the Fourth Amendment as a recognition that a warrant—no matter how broad—is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based.  The more extensive the probable wrongdoing, the greater the permissible breadth of the warrant." *Hickey*, 16 F. Supp. 2d at 240.

　　　　To trigger the all records exception, "it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud." *United States v. Burke*, 718 F. Supp. 1130, 1139 (S.D.N.Y. 1989).  "Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are just 'the tip of the iceberg.'" *Id.* at 1139-40 (citation omitted).  Nonetheless, to satisfy that evidentiary requirement, the Government must have provided the magistrate judge with sufficient probable cause to believe that the "*entire* [business] operation is a scam." *Id.* at 1140 (emphasis added); *accord Hickey*, 16 F. Supp. 2d at 241 ("The Fourth Amendment requires more than mere extrapolation to activate the [all records] principle.  It may be that the crimes associated with the [fraud for which there was probable cause to search] are representative of the other activities of the defendant corporations, but perhaps not.  A perusal of the information before the magistrate judge—and, indeed, the information available now—is simply too scant to permit such a determination.")

In cases where the all records exception has been applied, the affidavit submitted in support of the warrant contained detailed information that would provide reason to believe that all or nearly all of the business under investigation was illegal.  For example, courts have applied the all records rule where government agencies received 250 complaints about an enterprise's fraudulent activity and interviewed 20 former employees, *see Burke*, 718 F. Supp. at 1140 (discussing *United States v. Brien*, 617 F.2d 299 (1st Cir. 1980)); where a defendant had used a variety of similar names for a single business premises, interviews with former employees and customers evidenced illegal activity, the defendant had been overheard using a false name on the business phone, and where the defendant's manner of doing business suggested illegality, *see United States v Smith*, No. 05 Cr. 293, 2007 WL 2088938, at *4 (W.D.N.Y. July 19, 2007); and where investigation of telephone calls, bank records, and the flow of mail, joined to interviews of other participants, participation in a conference call, and evidence obtained by following the defendant, provided probable cause to believe a defendant's "entire business operation was illegal," *see United States v. Markey*, 131 F. Supp. 2d 316, 319-22, 326 (D. Conn. 2001) *aff'd sub nom. United States v. Simpson*, 69 F. App'x 492 (2d Cir. 2003); s*ee also United States v. Oloyede*, 982 F.2d 133, 140 (4th Cir. 1992) (applying exception where an affidavit presented "[d]ocumentation in over 50 cases . . . , two confidential informants outlined in great detail the procedures associated with appellants' operation, and a review of 26 files disclosed that *each file* contained fraudulent documents." (emphasis added)); *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1021-22 (2d Cir. 1980) (applying all records exception where the affidavit in support of the warrant listed forty complaints about the enterprise, twenty of which had been investigated, and a pattern of conduct was identified by the investigator); *Hernandez*, 2010 WL 26544, at *10 (applying exception where patterns of activity and inactivity were linked to fraud,

office was only used at night, three different business names related to the preparation of tax returns were associated with the office despite being only one business, Electronic Filing Information Numbers (EFINs) registered to different locations and individuals were nevertheless traced back to the location, and high rates of fraudulent returns were filed from EFINs associated with the location).

Courts have held the Government to this probable cause showing and have refused to apply the all records exception where there is insufficient reason to believe that a business is permeated with fraud. Thus, in *United States v. Burke*, Judge Mukasey concluded that the exception did not apply where an affidavit described six fraudulent transactions involving Salvador Dali prints at Barclay Galleries, described four fraudulent statements made to a seventh customer about Dali prints, noted a few other misrepresentations, and indicated that the Government believed the operation involved a boiler room operation. 718 F. Supp. at 1140. Noting that the Government had not shown that Barclay was therefore a "pervasively fraudulent enterprise," Judge Mukasey emphasized that there was enough room at Barclay for other, non-fraudulent operations and it was known that Barclay sold prints by artists other than Dali. *Id.* He explained:

> Although fraudulent activities in one line of business may show that others too are fraudulent . . . this is not such a case. To the contrary, as [the] affidavit makes clear, the government long before these searches had limited its investigation of Barclay to the sale of Dali prints . . . . Nor did the government make any showing that the sale of Dali prints was inseparable from the sale of prints by other painters.

*Id.* at 1141. Thus, a lack of probable cause concerning the scope of the fraud, and the extent to which fraud actually permeated a business, barred invocation of the all records exception.

Similarly, in *United States v. Hickey*, Judge Hurley found the exception inapplicable where the affidavit spoke to a single overriding scheme and a few acts of possessing firearms, but did not provide probable cause to believe that two corporations, in particular, were *permeated* with fraud rather than *involved* in fraud. 16 F. Supp. 2d at 241. Given "the limited information provided to the magistrate judge," he concluded that "there was insufficient information . . . to permit a determination of whether all of the business activities of Hickey's Carting, Grand East, Competition Carting, and Grand Carting—either under a 'tip of the iceberg' analysis or otherwise—were permeated with fraud." *Id.* (quotation marks and citations omitted).

Judge Karas echoed this logic in *Vilar*, where the affidavit made "no explicit allegation that the Amerindo entities were permeated with fraud," "the wrongdoing alleged in the Affidavit touch[ed] on but a fraction of [the entities'] assets," and "the Warrant application sufficiently identifie[d] only two victims of Defendants' alleged conduct." 2007 WL 1075041, at *21. In finding the all records exception inapplicable, he concluded that "[t]his falls far short of the evidence presented in cases where the all-records exception has been applied, as those cases involved rampant misconduct and little, if any, legitimate business activities." *Id.*

As explained *supra*, the issuance of the Tri-State warrant was based upon two separate sections of the Kelley Affidavit, found in Paragraphs 5(h) and 12. Together, these paragraphs indicate: (1) that billing offices are necessary to the thriving of No-Fault schemes, and that, generally speaking, the individuals who operate the billing offices "actually control" the clinics involved in the No-Fault schemes themselves; (2) that, according to one cooperating witness ("CW"), Zayonts and Kremerman's billing was done at Tri-State (a fact the CW knew because he had received a kickback from Zayonts and Kremerman at that location); and (3) that,

according to a second CW, Zayonts "control[led] a business . . . involved in billing" at the

building where Tri-State was located.

This evidence falls short of probable cause to believe that Tri-State was "pervaded" by

fraud. Even assuming that the Kelley Affidavit provides probable cause to believe that Zayonts

controlled, in whole or in part, Tri-State—and this is a questionable assumption, since Tri-State

occupied only a single floor of the building in question—there is no basis in the affidavit for the

inference that illegal activities pervaded the office.[6]  The affidavit offers no information about

the size or scope of Tri-State's business, its clients, whether only part of the office deals with the

kind of billing at issue in the alleged scheme, the manner in which or degree to which it is

controlled by the No-Fault scheme, or any other specifics about the Tri-State office or the

business conducted therein.  The Kelley Affidavit does not affirm that the investigators spoke

with employees of the business; that they have surveilled its mail or its other communications;

that they researched its operations; or that the manner in which Tri-State actually conducted

business suggested pervasive illegality.  Looking only at the Kelley Affidavit, Tri-State could

just as easily have been a business that provided an array of mostly legitimate administrative and

---

[6] Courts have made quite clear that the all records exception is inapplicable where the company to be searched "maintained a legitimate business." *Dupree*, 781 F. Supp. at 153 n.16; *see also Vilar*, 2007 WL 1075041, at *21.  As it turns out, it may be that Tri-State *was* a completely illegitimate business.  In determining whether or not there was probable cause, however, the Court cannot take into consideration whether the search was ultimately vindicated.  *See United States v. Martinez*, 428 U.S. 543, 565 (1976) (noting that a purpose of the warrant requirement "is to prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure").

billing services to a plethora of customers as a billing company set up solely as an arm of the No-Fault scheme.[7]

    This case is thus distinguishable from the cases cited by the Government, where the affidavits offered enough information to ground a probable cause determination of pervasive illegality.  The magistrate judge was given too little information, and information that was too scant and conclusory in character, to conclude that Tri-State was pervaded by fraud.  *See Vilar*, 2007 WL 1075041, at *21; *Hickey*, 16 F. Supp. 2d at 241; *Burke*, 718 F. Supp. at 1140.

---

[7] The Government makes much of Paragraph 5(h), in which Agent Kelley makes the assertion, unmoored to any citation or concrete evidence, that "[i]n truth, the members of the scheme who operate the billing and collections entities actually control the clinics."  Even if Agent Kelley's statement were true, the Court finds that it still would not trigger the all records exception, since probable cause to believe in actual control is not coextensive with probable cause to believe that a business is pervaded by fraud.  A fraudulent scheme may include a business that devotes five percent of its work to the scheme and ninety-five percent to perfectly legitimate dealings.  In any event, there are two other distinct and individually sufficient reasons to conclude that Paragraph 5(h) does not trigger the all records exception.  First, this paragraph appears to reflect Kelley's own summary of the other allegations, rather than a distinct basis for probable cause, and as such the Court must examine the facts alleged in support of probable cause rather than a conclusory assertion layered on top of those facts.  Second, to the extent that this paragraph is meant to provide probable cause for an all records search, the absence of any supporting information from a CW or other investigatory efforts pointing either to pervasiveness or control renders it deficient.  Were courts to hold otherwise, any officer could simply assert her honest belief of pervasive foul play, without gesturing to any supportive evidence, and take advantage of an exception designed for cases where there is enough probable cause to believe that the normal particularity limits should be substantially relaxed.  *See Beck v. Ohio*, 379 U.S. 89, 97 (1964) ("If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police.").  Further, if Agent Kelley was relying on information provided by a CW for his belief that Tri-State was actually controlled by others in the No-Fault Scheme, his failure to set forth the basis for his belief undermines the adequacy of this proffered probable cause basis.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.").  Paragraph 5(h) may be probative to the extent that it purports to provide general background regarding the patterns and practices of No-Fault clinic schemes, but to the extent that Paragraph 5(h) purports to attest that "in truth" the Tri-State billing center is a complete sham, it fails to do so.

Accordingly, the all records exception does not apply to the Tri-State search.

### 6.    Conclusion

In light of the Tri-State warrant's failure to limit the search through reference to criminal offenses, inclusion of vague and impermissibly broad terms, lack of temporal limitation, and use of confusing language that confers too much discretion on the executing officers, the Court concludes that the Tri-State warrant violated the particularity requirement.

### B.    Overbreadth

In determining whether a warrant is overbroad, courts must focus on "whether there exists probable cause to support the breadth of the search that was authorized." *Hernandez*, 2010 WL 26544, at *8 (citation omitted).  "The magistrate's determination that probable cause exists is entitled to 'great deference,' and the task of the reviewing court 'is simply to ensure the magistrate had a substantial basis' for that determination." *Id.* (citation omitted).

"[P]robable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 238).  A warrant permitting "fairly broad" types of materials is permitted if "the affidavit in support of the search warrant application provides the necessary basis for a determination of probable cause to seize items in each of these categories." *Hernandez*, 2010 WL 26544, at *8.  Moreover, if the criminal scheme at issue is of a "complex nature" and has been ongoing for a number of years, "a lack of a specific time frame in the search warrants is not sufficient in and of itself to render the warrants constitutionally overbroad." *Id.* at *9.

Without question, the Kelley Affidavit provides probable cause for the search and seizure of materials from Tri-State relating to the five modality clinics at issue.  However, as explained

above, the Affidavit did not justify a search of the sweeping list of items enumerated in the Tri-State warrant.  The Government lacked probable cause, for example, to search and seize *all* patient care records, bank account information, and patient appointment information within Tri-State.  Accordingly, the Tri-State warrant is overbroad.

### C.      Good Faith

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009).  "Indeed, exclusion 'has always been our last resort, not our first impulse.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).  Under the so-called "good faith" rule, the Government can introduce evidence obtained in violation of the Fourth Amendment unless the "police conduct [was] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144.  Deterrence is implicated where an officer engages in "deliberate, reckless, or grossly negligent conduct," as well as in circumstances that demonstrate "recurring or systemic negligence." *Id.*[8]  The good faith inquiry into deterrence and culpability is objective and is "'confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Id.* at 145 (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)).  However, the good faith exception should not be read so as to "swallow the exclusionary rule." *Davis v. United States*, 131 S. Ct. 2419, 2439 (2011) (Breyer, J., dissenting).

---

[8] When multiple officers are involved in an illegal search, "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." *Leon*, 468 U.S. at 922 n.24.

### 1.      Good Faith and Overbreadth

Suppression is appropriate where probable cause is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923.  "Such a concern most frequently arises when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations."  *Clark*, 638 F.3d at 103 (collecting cases).  Although the Kelley Affidavit does not contain sufficient detail to provide probable cause for the full breadth of the Tri-State warrant, it contains more than enough probable cause to save that warrant at the good faith stage.  It cannot be said that an officer would have acted with the requisite culpability, or in a manner meriting deterrence, in concluding that the warrant was based on sufficient probable cause to justify its scope.  *See Herring*, 555 U.S. at 141-143.

### 2.      Good Faith and Lack of Particularity

The Tri-State search was conducted pursuant to a warrant whose lack of particularity resulted primarily from the officers' failure to incorporate by reference the Kelley Affidavit.  In that affidavit, Agent Kelley sought to demonstrate probable cause and described with greater specificity the parameters of the intended search.  The officer who oversaw execution of the search had never read the affidavit, nor did he or his fellow agents possess a copy of it while executing the search.  The Government argues that suppression is nonetheless inappropriate because its agents acted in good faith as that term is defined in *Herring*.  This argument is not persuasive.

In *Groh v. Ramirez*, a *Bivens* case decided just under a decade ago, the Court held that an agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF") had violated clearly established law when he executed a search warrant that lacked particularity.  540 U.S. at 554-57.  Rejecting

38

the ATF agent's argument that the search was proper because the original warrant application

had included an affidavit conferring the requisite particularity, the Court held that "[t]he Fourth

Amendment by its terms requires particularity in the warrant, not in the supporting documents."

*Id.* at 557; *see also id.* ("The fact that the *application* adequately described the 'things to be

seized' does not save the warrant from its facial invalidity." (emphasis in original)).  As the

Court explained:

> The presence of a search warrant serves a high function, and that
> high function is not necessarily vindicated when some other
> document, somewhere, says something about the objects of the
> search, but the contents of that document are neither known to the
> person whose home is being searched nor available for her
> inspection.

*Id.* (quotation marks and internal citation omitted).[9]

The ATF agent also argued that "a search conducted pursuant to a warrant lacking

particularity should be exempt from the presumption of unreasonableness if the goals served by

the particularity requirement are otherwise satisfied."  *Id.* at 560.  According to the agent, "the

search in this case satisfied those goals . . . because the scope of the search did not exceed the

limits set forth in the application."  *Id.*  The *Groh* Court unequivocally rejected this position on

several grounds.  First, the Court reasoned that, "unless the particular items described in the

affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the

affidavit present at the search), there can be no written assurance that the Magistrate actually

found probable cause to search for, and to seize, every item mentioned in the affidavit."  *Id.*

(citing *McDonald v. United States*, 335 U.S. 451, 455 (1948) ("Absent some grave emergency,

the Fourth Amendment has interposed a magistrate between the citizen and the police. This was

---

[9] The Court reserved judgment on whether the analysis would change if the warrant expressly
incorporated the warrant by reference.  *See Groh*, 540 U.S. at 557-58.

done . . . so that an objective mind might weigh the need to invade [the citizen's] privacy in order to enforce the law")).  Second, "[t]he mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request."  *Id.* at 561.  Thus, the absence of the affidavit meant that any restraint in the conduct of the search "was imposed by the agents themselves, not by a judicial officer"—a violation of the particularity requirement's core purpose.  *Id.* (quotation mark and citations omitted).  Finally, the Court explained that "[a] particular warrant also 'assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'"  *Id.* at 561 (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)).  In other words, even if the ATF agent had exercised discretion to remain within the bounds of the affidavit, the warrant available to the family whose home was being searched did not afford them notice of the agent's lawful authority.  In sum, central purposes of the Fourth Amendment called upon the Supreme Court to reject the notion that agents can execute a facially deficient search warrant, and then later claim the legal benefits of an unincorporated affidavit by asserting that they complied with its secret terms.

Turning to qualified immunity, the Court emphasized that "the particularity requirement is set forth in the text of the Constitution" and "no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid."  *Id.* at 563.  Further, the warrant was so facially deficient that a reasonable officer could not reasonably have presumed it to be valid.  *Id.* at 565.  In the course of its analysis, the Court observed that "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer."  *Id.* at 565 n.8 (quoting *Malley v. Briggs*, 475 U.S. 335, 344 (1986)).  In a final footnote, the Court rejected the dissent's argument that it valued "the

40

correctness of paper forms" over "substantive rights," pointing out that "[t]his substantive right is not protected when the officer fails to take the time to glance at the authorizing document and detect a glaring defect that [the dissent] agrees is of constitutional magnitude." *Id.* n.9 (citation omitted).

Several years after *Groh*, the Supreme Court decided *Herring*. In *Herring*, the Court declined to suppress the fruits of a search executed pursuant to a warrant that was mistakenly reported to be outstanding by the computer database of a neighboring county. Outlining the good faith standard described *supra*, the Court emphasized the price of suppression and cautioned that judges must look for culpability and deterrence benefits before suppressing. 555 U.S. at 140-44; *see also id.* at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."). Examining the data entry error by a low-level clerk in a neighboring town far removed from the arrest and investigation, the *Herring* Court concluded that it was "the result of isolated negligence attenuated from the arrest." *Id.* at 137. This low culpability finding and the limited benefits of deterrence did not justify suppression. *See id.* at 148-49.

As the Sixth Circuit noted shortly after *Herring* was decided, "*Herring* does not purport to alter that aspect of the exclusionary rule which applies to warrants that are facially deficient warrants *ab initio*." *Lazar*, 604 F.3d at 237-38; *see also id.* at 237 ("This case does not involve the sort of police error or misconduct present in *Herring*. Like *Groh,* it instead deals with particularization of search warrants and whether they are facially deficient."). Indeed, whereas

*Herring* had addressed "isolated negligence" and expressly distinguished that standard from deliberate or reckless misconduct, 555 U.S. at 148, *Groh* specifically held that the ATF agent's conduct reflected disregard of clearly established law and amounted to more than mere "lack of due care," 540 U.S. at 565. *Groh*'s logic was clear: while "our case law requires more than negligent behavior before depriving an official of qualified immunity," this heightened culpability standard is satisfied where a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid.[10] *Id.* at 565. As one scholar noted in 2011, a natural reconciliation of the Court's qualified immunity and criminal procedure doctrines suggests that violations of clearly established law (e.g., the conduct in *Groh*) will also meet the "threshold of gross negligence required by *Herring*." Jennifer E. Laurin, *Trawling for* Herring*: Lessons in Doctrinal Borrowing and Convergence,* 111 Colum. L. Rev. 670, 732 (2011). After all, "[s]uch conduct is 'gross negligence' or recklessness, in that, as *Groh* also reasoned, it contravenes law so clearly established, and manifests a deficiency so apparent, that a reasonable official should have known that her actions created a high risk of constitutional harm." *Id; see also United States v. Carroll*, No. 12 Cr. 57, 2012 WL 5350364, at *6 (E.D.N.C. Oct. 29, 2012) ("[I]f the

---

[10] The Ninth Circuit has shed helpful light on the parameters of *Herring*:

> *Herring*'s emphasis on an objective reasonableness standard is paramount here where the officers made a mistake of law, rather than a mistake of fact. In *Herring*, the police officers made a mistake of fact—whether an arrest warrant existed for the defendant. Here, the officers made a mistake of law—they did not realize that a seizure must last no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant. Our precedent distinguishes between mistakes of fact and mistakes of law because mistakes of law can be deterred more readily than mistakes of fact.

*U.S. v. Song Ja Cha*, 597 F.3d 995, 1005 (9th Cir. 2010) (internal citations omitted).

officer may properly be charged with the knowledge that a valid search warrant contains an essential temporal component, an officer who fails to record the relevant time frame has committed a 'deliberate, reckless, or grossly negligent' act." (citation omitted)).[11]

In *United States v. Rosa*, on highly unusual facts, the Second Circuit concluded that the *Herring* good faith inquiry is relevant to potential suppression of evidence resulting from the execution of a facially deficient warrant.  626 F.3d at 64-65.  On September 26, 2007, Deputy Sheriff Burke of the Oswego County Sheriff's Office began investigating possible child exploitation by an individual, Rosa, after two mothers called 911 to report abuse.  *Id.* at 58.  Burke spoke with the two women and their sons, and learned that the suspect had shown the boys child pornography on his computer and engaged in sexual misconduct with them.  *Id.*  At 2:00 a.m., Burke and a colleague informed Investigator Bryan Blake of their findings.  *Id.*  Blake prepared a detailed affidavit and, at 4:10 a.m., obtained a search warrant for Rosa's residence.  *Id.* at 59.  This warrant, which authorized broad search of the residence and the electronics therein, *Id.* at 58, lacked facial particularity and neither attached nor incorporated by reference Blake's substantial affidavit.  *Id.*  At 5:00 a.m., Blake personally oversaw a team of officers who executed the warrant.  *Id.* at 59.  Blake later performed a forensic analysis of the computer and related storage media.  *Id.*

The *Rosa* court held the warrant unconstitutional, as it "failed to describe with particularity the evidence sought and, more specifically, to link that evidence to the criminal activity supported by probable cause."  *Id.* at 62.  It also acknowledged that *Groh*'s bar on the

---

[11] *But see* Craig M. Bradley, *Is the Exclusionary Rule Dead?*, 102 J. Crim. L. & Criminology 1, 18 (2012) (speculating that, due to personnel changes in the mid-2000s, the Court may in the future decide to read *Groh* differently and depart from the *Groh* Court's holding that police cannot prevail merely by demonstrating that they limited searches to what a fully incorporated warrant would have permitted—in short, "*Groh* is a dead *Herring*").

use of unincorporated and unattached affidavits to cure defective warrants had abrogated a Second Circuit case holding to the contrary.  *Id.* at 63 (recognizing that *Groh* abrogated *United States v. Bianco*, 998 F.2d 1112 (2d Cir. 1993)).

Reaching the Government's good faith argument, the *Rosa* court noted that a Fourth Amendment violation does not always justify suppression.  *Id.* at 64 (discussing *Herring*, 555 U.S. 140).  It added that "[n]ot every facially deficient warrant . . . will be so defective that an officer will lack a reasonable basis for relying on it."  *Id.* at 66.  Turning to the crux of its analysis, *Rosa* then explained that, while "the objective inquiries underlying the good faith exception and qualified immunity are the same, *see Groh,* 540 U.S. at 565 n.8, application of the exclusionary rule requires the additional determination that the officers' conduct was 'sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system,' *Herring,* 129 S. Ct. at 702."  *Id.* at 66.  *Rosa* therefore suggests that the good faith requirement can be overcome only when an officer acts in an objectively unreasonable manner—an inquiry that overlaps with the qualified immunity context—*and* when the deterrence and culpability concerns articulated in *Herring* favor suppression.  Applying this test, *Rosa* concluded that the good faith exception barred suppression because the unusual circumstances before it rendered the officers' conduct an act of "isolated negligence."  *Id.* at 65.

Thus, in some circumstances, there will be daylight between (1) a finding that an officer acted in an objectively unreasonable manner and (2) a finding that the deterrence and culpability concerns identified in *Herring* weigh in favor of suppression.  For that reason, courts must independently test each requirement before suppressing.  But these factors will likely align in the vast majority of cases where the applicable Fourth Amendment law is clearly established.  Under

44

the applicable standard of objective reasonableness, officers are presumed to be aware of clearly established constitutional law and may thus be presumed to act with gross negligence, recklessness, or deliberation when they violate it. *See George*, 975 F.2d at 77 ("[T]he 'standard of reasonableness . . . requires officers to have a reasonable knowledge of what the law prohibits.'" (citing *Leon*, 468 U.S. at 919, n.20)). Indeed, since *Rosa*, the Court has reaffirmed that "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer who obtained or relied on an allegedly invalid warrant." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 n.1 (2012) (Roberts, C.J.) (quotation marks omitted) (citing *Malley v. Briggs*, 475 U.S. 335, 344 (1986); *Groh*, 540 U.S. at 565, n.8). Moreover, *Herring* itself makes plain that deterrence is directly implicated where an officer acts deliberately, recklessly, or with gross negligence, and that the relevant inquiry into good faith focuses on whether "a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." 555 U.S. at 144-145 (quotation marks omitted). Accordingly, the culpability standards and deterrence considerations that form the heart of *Herring*'s good faith inquiry will ordinarily, though not always, be satisfied where a police officer acted in an objectively unreasonable manner by violating clearly established Fourth Amendment law.

As explained *supra*, the *Rosa* court faced an unusual situation that drove a wedge between the requirements of *Groh* and *Herring*. To support its conclusion that the officers' conduct constituted an act of "isolated negligence," and therefore lacked the objectively deliberate character required to justify suppression, *Rosa* signaled to a number of fact-specific considerations.

First, and most importantly, the entire course of events unfolded under intense "time pressure[]" in the "three hours from 2:00 a.m. to 5:00 a.m.[,]" forcing the officers to act "with necessary speed in the early hours of the morning." *Rosa*, 626 F.3d at 64-66.  It is a familiar rule of Fourth Amendment doctrine that courts "allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Garrison*, 480 U.S. at 87.  Indeed, *Groh* acknowledged that its analysis of whether the ATF agent had acted with the requisite culpability may have changed if some "sort of exigency [had] existed when [the agent] drafted the affidavit, the warrant application, and the warrant, or when he conducted the search." 540 U.S. at 565 n.9 (discussing *Garrison*, 480 U.S. at 87).  The rush of events in *Rosa*, as officers raced in the middle of the night to capture an active sex offender, called for application of the exigency-based principle articulated in *Garrison* and *Groh*.  *Rosa* thus recognized that the officer's culpability constituted negligence under these frenzied circumstances.

 Second, over the course of just a few hours, Blake served as the affiant, the officer in charge of executing the search, and the officer tasked with searching the digital media seized. While this triple role would not have obviated one of the *Groh* Court's main concerns about unincorporated and unattached affidavits—namely, notice to the person being searched that the officers were acting with lawful authority, 540 U.S. at 561—it contributed to *Rosa*'s finding that Blake's execution of the warrant without his original affidavit constituted an act of isolated negligence.

Finally, *Rosa* considered a number of other factors in concluding that Blake's conduct reflected isolated negligence.  The warrant at issue was not grossly deficient, the underlying affidavit—with which Blake was intimately familiar—"specifically requested that the search

warrant be limited to obtaining evidence of these crimes"; the warrant was based on a strong

showing of probable cause; there was no evidence that Blake had misled the town justice in his

warrant application; and there was no evidence that the officers searched for or seized any items

unrelated to the crimes for which probable cause had been shown.  *Rosa*, 626 F.3d at 64-65. [12]

Of course, many of these additional factors, including a showing of probable cause, lack

of gross deficiencies, and truthful statements to the issuing magistrate, are simply requirements

for *any* lawful warrant.  Their *absence* would have substantially undermined the case for a

finding of good faith, but their *presence* adds relatively little to an inquiry that patrols the

boundary between "isolated negligence" and reckless or deliberate misconduct.  By the same

token, *Groh* places a heavy thumb on the scale against assigning too much weight to the fact that

Blake and his investigators only searched for and seized evidence of the criminal offense for

which probable cause had been shown.  After all, *Groh* unequivocally rejected the argument that

a facially deficient warrant that fails to incorporate an affidavit can be cured by evidence that the

search was conducted in accordance with the underlying application.  *See* 540 U.S. at 560-61;

*see also United States v. Voustianiouk*, 685 F.3d 206, 214 (2d Cir. 2012) ("The Supreme Court

. . . has made clear that the mere fact that officials were in possession of evidence that *would*

*have* provided probable cause for the search that they ultimately conducted is irrelevant in

determining whether a search violated the Fourth Amendment of the Constitution." (collecting

---

[12] It is also possible that another consideration influenced the outcome of *Rosa*: the fact that, at
the time Blake conducted his search, governing Second Circuit law provided that, in at least
some situations, an unincorporated and unattached affidavit could cure an unparticularized
warrant.  *See Bianco*, 998 F.2d at 1115.  *Rosa* was the first Second Circuit case to hold that *Groh*
abrogated *Bianco*.  Because a reasonable officer arguably could have believed, pre-*Rosa*, in the
lawfulness of Blake's actions, that fact would have cut in favor of a finding of good faith.  Of
course, now that this law has been clearly established by the Supreme Court and recognized by
the Second Circuit, any such reliance on the unsettled state of the law would no longer be
justified.

cases)).  It would be odd if an argument squarely rejected by the Supreme Court in setting forth clearly established Fourth Amendment law could then be relied upon by the Government to claim that an officer acted in good faith while violating that very same law.

Ultimately, then, *Rosa*'s conclusion that Blake had acted negligently, despite his violation of clearly established law, rested principally on the exigencies of his situation and the fact that Blake was physically present and in charge at every step of the investigation.  *See Rosa*, 626 F.3d at 65 n.3 ("Investigator Blake's misstep, made in the course of a time-sensitive and ongoing investigation, was in failing to notice that this limiting language (or any specific language of incorporation) was absent from the search warrant itself.  We conclude that suppressing physical evidence on the basis of such an instance of 'isolated negligence' would be incompatible with the principles underlying the exclusionary rule." (citing *Herring*, 555 U.S. at 140-43)); *Id.* at 66 ("Because there is no evidence that Investigator Blake and his team of officers actually relied on the defective warrant, as opposed to their knowledge of the investigation and the contemplated limits of the town justice's authorization, in executing the search, the requisite levels of deliberateness and culpability justifying suppression are lacking." (citations omitted)).  Again, however, this gap between the objectively unreasonable execution of a warrant and the presence of good faith is a narrow one grounded in the particular circumstances surrounding Blake's search.  *See id.* (emphasizing that the good faith ruling reflected "the facts of this case," reiterating "the importance of law enforcement's compliance with the probable cause and particularity requirements," and emphasizing that "application of the exclusionary rule will vary in accordance with the facts of each case.").  *Rosa*'s finding of negligence, in turn, controlled good faith analysis under *Herring* and required the Second Circuit to conclude that suppression was not an appropriate remedy.  *Id.* at 65-66.

48

In sum, under *Groh*, *Herring*, and *Rosa*, the Court must first consider whether the officers in this case acted in an objectively reasonable manner. If the answer to that question is no, and if the officers violated clearly established law, then the Court must determine whether the officers nonetheless fall into the narrow gap described in *Rosa* between violations of clearly established law and circumstances where an officer's conduct nonetheless constituted isolated negligence.

### a.        Objective Reasonableness

As explained above, "the same standard of objective reasonableness that [applies] in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer who obtained or relied on an allegedly invalid warrant." *Messerschmidt*, 132 S. Ct. at 1245, 1245 n.1 (citations omitted). Thus, where denial of qualified immunity would be appropriate in the civil context because clearly established law establishes a warrant's invalidity, so too must a court conclude that an officer's conduct was objectively unreasonable for purposes of the good faith inquiry.

All of the law governing the particularity analysis set forth *supra* was clearly established at the time of the Tri-State search. It was clearly established that a warrant which fails to specify the crimes for which the search was being undertaken lacks particularity. *See George*, 975 F.2d at 76; *see also Vilar*, 2007 WL 1075041, at *22 (collecting cases). It was clearly established that a warrant with unduly broad, ambiguous, or catch-all categories lacks particularity. *See Buck*, 813 F.2d at 491; *see also Vilar*, 2007 WL 1075041, at *22 (collecting cases). Courts had warned officers against reliance on warrants that, in addition to other deficiencies, fail to specify a temporal limitation. *See Cohan*, 628 F. Supp. 2d at 366 (collecting cases). And it was settled that attached or incorporated affidavits could confer the requisite particularity on facially deficient warrants, but that unattached and unincorporated affidavits could not do so. *See, e.g.*,

*Groh*, 540 U.S. at 557; *Rosa*, 626 F.3d at 64; *George*, 975 F.3d at 74.  Given that all applicable

law was clearly established at the time of the Tri-State Search, and that the Government's agents

nonetheless violated the law, the officers acted in an objectively unreasonable manner.

### b.    Culpability and Deterrence

Even though its agents violated clearly established law with which they are presumed to

be familiar, the Government could still avail itself of the good faith exception by showing that

the agents' conduct was insufficiently culpable and did not implicate deterrence concerns.  In

*Rosa*, an unusual confluence of mitigating factors supported a finding of good faith.  Here, by

contrast, the violation did not result from isolated negligence and does call for deterrence.

First, there is no evidence that the Tri-State search involved any sort of exigency that

might excuse the failure to incorporate or attach Agent Kelley's affidavit.  This case is thus

distinguishable from *Rosa*, where—due to the nature of the alleged crime and the haste of the

investigation—Blake was forced to gather evidence, write his affidavit, bring his warrant before

a magistrate, and execute his search and seizure in a three-hour span before sunrise.  626 F.3d at

64-65.  Kelley received his warrant on February 27, 2012, after a lengthy investigation of the

underlying conspiracy, and the warrant itself was not executed until two days later.  (*See* NAUM

3501-A.)  Moreover, Agent Naum, the leader of the of the search and the Government's sole

witness at the Court's suppression hearing, testified that he knew of no exigencies relating to the

search of the Tri-State Office.[13]  (Transcript of the Suppression Hearing, May 9, 2013 ("Supp.

Tr.") at 65:21-66:10.)

---

[13] The Court held a suppression hearing on May 9, 2013 to ascertain certain objective facts about the Tri-State search that bear on its analysis of good faith under *Rosa* and *Herring*.

Next, unlike in *Rosa*, the affiant in this case, Agent Kelley, did not lead the Tri-State search team.  In fact, Agent Kelley was not a member of the search team and none of the officers conducting the search were given copies of the Kelley Affidavit.  (*Id*. at 50:15-19 ("I did not read the affidavit.").).[14]  Further, Agent Kelley does not appear to have related the sum and substance of his affidavit to the searching officers.[15]  Rather, Agent Kelley briefed Agent Naum on some specifics of the case, and Agent Naum and his team were given an "Operations Order Form" that provided some detail about the "large scale Eurasian Criminal Enterprise" at issue in this case, including the crimes being investigated.  (Gx 8.)  Agent Naum also testified that he was informed "[i]n general terms" about the nature of Tri-State's business, and that Kremerman and Zayonts were somehow involved in that business.  (Supp. Tr. at 69:3-72:6.)  Agent Naum does not appear to have been told about many other facts contained in the Kelley Affidavit that implicated the scope of the search—most importantly, which modality clinics were under investigation, how many clients Tri-State had and who they were, what role Kremerman and Zayonts were thought to play in the scheme, and the timeframe of the alleged criminal activity.  (*Id*.)

In *Rosa*, Blake's failure to incorporate or attach the affidavit constituted isolated negligence where, under intense time pressure and less than two hours after consulting a magistrate judge, Blake personally executed a search warrant based on his affidavit.  But if the

---

[14] Agent Kelley did stop by the Tri-State office for a short period during the beginning of the search.  (*See* GX-7).  However, Agent Naum could not offer any specifics about what role, if any, Agent Kelley played in the search during his brief visit to Tri-State.  Further, though Agent Naum stated that he would have called Agent Kelley mid-search if the need arose, he does not recall making any such calls and does not recall that Agent Kelley—either in person or on the phone—played any role in shaping his team's execution of the warrant.  (Supp. Tr. at 125:19-126:12.)  The Court therefore accords little weight to these facts.

[15] This is not to say that doing so would have sufficed to create a good faith basis for the search.  Rather, it may have contributed—if joined to other mitigating factors—to a finding of good faith.

rule announced in *Groh* still stands as clearly established law, then surely *Groh* prohibits officers from claiming good faith whenever they execute a deficient warrant and insist that they came to learn the contents of the affidavit through some other means. That is especially true in cases like this one, where the affiant did not oversee execution of the warrant, the search team leader and his team had never read the affidavit, and the agents relied principally on a briefing that purported to convey the gist of the relevant information. *See Rosa*, 626 F.3d at 66 (noting that Blake and his team relied on "their knowledge of the investigation and the *contemplated limits of the town justice's authorization*") (emphasis added). Whereas an affidavit is a sworn legal document that bears immediately on the contemplated limits of the magistrate's authorization, a briefing session generates substantial room for slippage between the magistrate's authorization and the searching officers' understanding of their authority. *See Voustianiouk*, 685 F.3d at 211 (noting that probable cause known only to the police is irrelevant in determining whether a warrant issued by a magistrate complied with the Fourth Amendment). More importantly, *Groh* emphasized the historic notice function served by a lawful warrant—a function that would fall by the wayside if officers could claim good faith each time they disregarded *Groh*'s clear command, so long as they had read or been briefed about the affidavit beforehand. *Groh*, 540 U.S. at 561.

Moreover, even if some combination of the briefing and "Operations Order Form" did help limit the search of physical evidence, the Government has proffered no evidence regarding the officers tasked with the search of all electronics seized from Tri-State. Agent Naum, the Government's sole witness at the hearing, disavowed any knowledge of how the electronic searches are being carried out. (Supp. Tr. at 97:4-8 ("Q. You had no participation whatsoever with the search of these electronic storage devices? A. No. Q. You don't know how that was

conducted, correct?  A.  No.")[16]  Because no evidence has been proffered to the contrary—and

because the Government bears the burden of proving good faith, *see George*, 975 F.2d at 77—

the Court must assume that the unknown officers conducting the search of all electronics seized

from Tri-State have no knowledge whatsoever of Agent Kelley, his affidavit, or even of the few

specifics of the case provided to Agent Naum and his team.[17]

In sum, whereas the officer in *Rosa* acted under extraordinary pressures, had personal

knowledge of the affidavit, and did not "actually rel[y]on the defective warrant," 626 F.3d at 66,

Agent Naum repeatedly admitted that he relied on the defective warrant and its rider to conduct

his search and decide which items to seize.  (*See, e.g.*, Supp. Tr. at 33:23-25 ("The binders

weren't taken based on my understanding of the case, what it is that they're looking for, based

on the search warrant and rider"); *id.* at 45:7-8 ("We were asked to seize what was listed on the

rider, which could be potential evidence in this investigation."); *id*. at 75:21-22 ("My

understanding is that we could seize information that related to bank accounts based on the

---

[16] At the suppression hearing, the Government conceded that it has begun to search the electronic evidence.  (Supp. Tr. at 153:15-17.)  When asked by the Court if there were "evidence as to the good faith [of] those searches," the Government replied, "Only the representations that we have made, that . . . We have been searching them using the names of some of the target subjects, the names of the PCs that have come up in this case that are related to this entity . . . ."  (*Id*. at 153:18-22.)  These unsworn statements of counsel do not constitute evidence sufficient for the Government to meet its burden of demonstrating good faith.  *See United States v. Washington*, No. 12 Cr. 146, 2012 WL 5438909, at *9 (S.D.N.Y. Nov. 7, 2012) (explaining that unsworn statements of counsel do not suffice to create a genuine dispute of fact for purposes of a suppression hearing).

[17] Again, the contrast between the situation here and the facts of *Rosa* is noteworthy.  In *Rosa*, the Second Circuit noted that the affiant, Blake, personally seized *and searched* all electronic evidence.  626 F.3d at 59 ("Investigator Blake subsequently performed a forensic analysis of the computers and related storage media, during which he discovered several thousand images and over a hundred videos of child pornography.").

rider."). There is no reason to see Agent Naum's actions, or those of his fellow agents, as a mere instance of circumstance-specific isolated negligence.

Nor do the remaining *Rosa* factors alter this conclusion.[18] To the contrary, the application of at least two of those factors increases the officers' level of culpability. First, unlike the warrants in *Rosa* and *Groh*, the Tri-State warrant was overbroad. While the inadequacy of its probable cause foundation does not provide a distinct ground for suppression, it contributes to a finding of reckless or deliberate conduct, and bolsters the case for a suppression remedy designed to deter future reliance on similarly deficient warrants. Second, whereas *Rosa* noted that Blake's search was executed as if he were holding the unincorporated affidavit, here the search was both over- and under-inclusive when set against the Tri-State warrant. On the one hand, as Agent Naum acknowledged at the hearing, his search team decided *not* to seize evidence that the Government now believes is "directly relevant" to the investigation—*e.g.*, a folder in photograph E18. On the other hand, Agent Naum's team *did* seize account statements and credit card statements from Saks Fifth Avenue and American Express for a person who was not, and has never been, identified by the Government as related to this investigation. Further, Agent Naum admitted several times that he understood the warrant to sweep very broadly and that he relied heavily on his independent judgment and training in deciding what to seize. (*See, e.g.*, Supp. Tr. at 86:18-21 (admitting that the warrant gave the officers' the discretion to seize from any employees' desk any check, irrespective of who wrote it or who it was made out to or any cash); *see also id.* at 89:11-90:25 (testifying that he is not sure whether credit cards, financial contracts, insurance contracts, real estate titles constitute "financial instruments").) This

---

[18] The Tri-State warrant was less obviously deficient than the warrant in *Rosa*, but *Rosa* did not purport to define the minimum required level of deficiency. The Tri-State warrant, like the warrant in *Rosa*, was based on truthful statements to the magistrate judge.

evidence suggests that, in practice, the extremely broad Tri-State warrant was executed by the officers on the basis of a general sense of the investigation, not on the basis of an affidavit that had been presented to a neutral, detached magistrate.  In other words, arbitrariness in the execution of a deficient warrant substantially undermines the case for a finding of good faith, since law enforcement officers are presumed to know that a warrant which fails to offer particular guidance is unlawful.  Indeed, by placing these officers in the undeniably difficult position of relying on its vague terms and a short briefing session, and by subjecting everyone with a cognizable interest in Tri-State to a search defined largely by the officers' unguided discretion, the Tri-State warrant immediately implicated the animating purposes of the particularity requirement.  *See Riley*, 906 F.2d at 844.

Ultimately, the culpability and deterrence concerns articulated in *Herring* are very much at stake in this case.  The officers violated clearly established Fourth Amendment law in two respects, by executing a warrant that lacked both particularly and overbreadth.  Moreover, they did so even though they are presumed to be familiar with the governing law and even though they acted on the basis of extensive training and experience.  *See United States v. Lindsey*, 596 F. Supp. 2d 55, 62 (D.D.C. 2009) ("The Court also notes that agent Sparks, the affiant, has extensive law enforcement knowledge and experience, which is a factor to be taken into account when determining whether an officer would know if a search was illegal despite the magistrate's authorization." (citing *Herring*, 555 U.S. at 135)).  Unlike the officers in *Herring*, who negligently relied upon apparently reliable information input by a clerk in another jurisdiction, the officers here were involved in the criminal investigation and decided to rely on a facially invalid warrant.  *See United States v. Ryan*, 07 Cr. 35, 2009 WL 1545794, at *4 (D. Vt. May 26, 2009) ("This is a critical distinction from *Herring*.  The law enforcement officers in *Herring* relied upon apparently reliable

information that existed.  In this case, the agents relied upon a facially invalid warrant that failed to particularly describe the items to be seized." (citations omitted)).  While all evidence suggests that the searching officers meant well, that question is not presently at issue.  *Voustianiouk*, 685 F.3d at 216-17 ("We do not doubt that the officers involved in this case were well-meaning: they were trying to catch a criminal.  But simply because they were trying to do the right thing does not mean that they reasonably concluded that the warrant in their possession authorized the search they conducted." (citation omitted)).  This was not an instance of mere negligence.  Rather, the officers appear to have acted with at least gross negligence or recklessness in executing the search warrant.

This conduct is deterrable, and the Constitution requires its deterrence.  After *Groh* and *Rosa*, it is be clear that unincorporated, unattached affidavits do not confer particularity on a facially deficient warrant.  *Ryan*, 2009 WL 1545794, at *5 ("A warrant lacking particularity will no doubt be brought promptly to the attention of the United States Attorney's Office for correction.  Thus, as the Court explained in its prior ruling, suppressing the evidence here will have a significant deterrent effect.").  Here, Agent Kelley erred in failing to attach or incorporate the warrant, Agent Naum erred in executing a warrant that lacked both particularity and probable cause (though particularity ultimately controls the outcome), and their colleagues erred in failing to identify these problems.  *See Leon*, 401 U.S. at 568 n.24 (noting that, when multiple officers are involved in an illegal search, "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination.").  By allowing an exception to the good faith rule for cases where officers acted with gross negligence, recklessness, or deliberate indifference to what the law requires, *Leon* and *Herring* require law

enforcement officials to play a minor, but important role as the last line of defense between

magistrates and vulnerable citizens.  Here, the agents did not live up to that expectation.[19]

Accordingly, the good faith exception cannot save the Tri-State warrant.

**c.      Conclusion: Suppression is Warranted**

"The Fourth Amendment's requirements regarding search warrants are not 'formalities.'"

*Voustianiouk*, 685 F.3d at 210 (quoting *McDonald*, 335 U.S. at 455).  Because the Government's

agents violated the Fourth Amendment and do not fall within the shield of the good faith

exception, suppression of evidence from the Tri-State search is warranted.

The Court will determine the appropriate scope of this suppression remedy following

further submissions by the parties and a subsequent hearing.[20]

**III.     Motion to Suppress Wiretap Evidence**

**A.      Minimization**

Defendant Zemlyansky has moved to suppress all communications intercepted pursuant

to the wiretap of his phone for failure to abide by Title III of the Omnibus Crime Control and

Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq.*

Title III requires that eavesdropping "be conducted in such a way as to minimize the

interception of communications not otherwise subject to interception under this chapter."  18

U.S.C. § 2518(5).  To that end, "[e]very order and extension thereof shall contain a provision

---

[19]  Though his subjective intent is irrelevant, Agent Naum's statements at the suppression hearing are illustrative of this concern.  He candidly testified that "I don't question if the [magistrate judge] made the appropriate decision," adding in response to further questioning that he might do so only if a warrant were "so far out of the realm" and it "made absolutely no sense."  (Supp. Tr. at 47:18-48:2.)

[20] Because Defendants' motion is granted, the Court need not reach their argument in the alternative that evidence from the Tri-State electronics must be suppressed as a result of the Government's delay in searching the computers.

57

that the authorization to intercept shall be executed as soon as practicable, [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." *Id.* This obligation to minimize serves as a safeguard against undue intrusion of privacy. *United States v. Terry*, 702 F.2d 299, 312 (2d Cir. 1983). This requirement "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States,* 436 U.S. 128, 140 (1978); *see also United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989) (when assessing the reasonableness of agents' minimization efforts, the "government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required"). Compliance with the minimization requirement is determined by an analysis of the reasonableness of the surveilling agents' conduct based on the totality of circumstances. *Scott*, 436 U.S. at 139.

The Government has the burden to show good faith compliance with minimization requirements. *United States v. Rizzo*, 491 F.2d 215, 217 n.7 (2d Cir. 1974). If "a prima facie showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, a substantial number of non-pertinent conversations have been intercepted unreasonably." *United States v. Rajaratnam*, No. 09 Cr. 1184, 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010) (internal quotation marks and citations omitted). "Where a defendant cannot make such a showing, courts generally reject a claim of improper minimization without a hearing." *Kazarian*, 2012 WL 1810214, at *14 (citing cases).

### 1.    The Government's Steps to Minimize

The Government can establish that it has taken reasonable steps to minimize by showing:

58

> 1) maintenance of monitoring logs; 2) judicial supervision of the progress of the surveillance; 3) provision of written and oral instructions to monitoring personnel regarding the legal requirements for minimization; 4) requiring all monitoring personnel to read the court orders and applications, and posting of the minimization instructions, court orders and applications at the monitoring plant; and 5) supervision by the prosecutor.

*United States v. Marroquin-Corzo*, No. 10 Cr. 892, 2012 WL 3245473, at *7 (S.D.N.Y. Aug. 7, 2012) (citations omitted); *see also United States v. Salas*, No. 07 Civ. 557, 2008 WL 4840872, at *8 (S.D.N.Y. Nov. 5, 2008) (the Government meets its *prima facie* burden by demonstrating that it has taken the appropriate steps "to increase likelihood of compliance with § 2518(5)" (citation omitted)).

The Government has sufficiently demonstrated that it has followed the requisite steps to ensure proper minimization. The Government assiduously kept monitoring logs; sought and received judicial supervision for each wiretap (*see* Gov't Mem., Exs. 1, 3-5); provided accurate periodic reports to the Court (*see* Zemlyansky Mem., Ex. B); provided written and oral instructions to monitoring personnel and translators (*see* Gov't Mem., Exs. 2, 6); required all monitoring personnel and translators to read the relevant court orders and applications and posted those materials in the wiring room; and ensured the wiretapping was monitored by an AUSA. Thus, the Government has met its *prima facie* burden of compliance with the minimization requirements. *Cf. Marroquin-Corzo*, 2012 WL 3245473, at *8 (holding that the Government made its prima facie case even where, unlike here, it did not submit minimization instructions signed by the monitoring agents).

### 2.    Unreasonable Interception of Calls

The burden therefore shifts to Zemlyansky to demonstrate that "a substantial number of non-pertinent conversations [were] intercepted unreasonably." *Rajaratnam*, 2010 WL 4867402, at \*27 (citation omitted); *see also Kazarian*, 2012 WL 1810214, at \*16.

The Supreme Court has listed several nonexclusive factors that courts should assess in determining whether agents acted reasonably in minimizing intercepted communications: (1) the length of non-pertinent calls; (2) whether the non-pertinent calls were "one-time" calls; (3) the ambiguous nature of the conversations or pattern of calls; (4) whether the investigated conduct involved a widespread conspiracy; (5) the public or private nature of the target phone; and (6) the stage of the surveillance. *Scott*, 436 U.S. at 140-42 (1978). "Minimization efforts are to be judged by a standard of 'reasonableness in the context of the entire wiretap, as opposed to a chat-by-chat analysis.'" *United States v. McGuinness,* 764 F. Supp. 888, 900 (S.D.N.Y.1991) (*citing United States v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir. 1987); *see also United States v. Ianniello*, 621 F. Supp. 1455, 1471 (S.D.N.Y. 1985) ("The statutory requirement of minimization does not mean that only communications exclusively devoted to criminal subjects may be intercepted."); *Uribe*, 890 F.2d at 557 ("[P]erfection is usually not attainable, and is certainly not legally required."). Because this is an *ad hoc* analysis, there is no particular percentage of non-minimized, non-pertinent calls that renders the entirety of the wiretap unreasonable. *See Scott*, 436 U.S. at 140 (noting that, while the "percentages [of non-pertinent calls intercepted] may provide assistance" to courts in determining the reasonableness of a wiretap, there are nonetheless cases "where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable").

In this Circuit, there is a general rule that, in complex cases such as this one, the minimization requirement does not extend to calls under two minutes in length; stated

differently, there is a strong presumption that the Government has not acted unreasonably by failing to suppress such calls. *See United States v. Bynum,* 485 F.2d 490, 500 (2d Cir. 1973) ("eliminat[ing] [] from consideration" the minimization requirement for calls of two minutes in length or less in a case involving "wide-ranging criminal activity"), *vacated and remanded on other grounds*, 417 U.S. 903; *see also United States v. Capra*, 501 F.2d 267, 275-76 (2d Cir. 1974) ("Although the trial court's analysis of these interceptions revealed that many non-pertinent calls had been intercepted, a vast majority of these did not exceed two minutes, 'too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation,' especially under the circumstances of this case." (quoting *Bynum*, 501 F.2d at 500)); *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1215 (11th Cir. 2010) (same).

However, while there is a strong presumption that calls under two minutes need not be minimized, officers may nevertheless be expected in certain circumstances to minimize in a shorter period of time.[21]  Generally, calls in which the two-minute rule is inapplicable fall into two categories: (1) where a "pattern of innocence" has been established between the target phone and certain other persons or telephone numbers, so that it should be immediately evident that the

---

[21] Other courts in this district have indicated that non-pertinent, non-minimized calls under two minutes may be *per se* reasonable. *See, e.g., Kazarian*, 2012 WL 1810214, at *16 (calls under two minutes "not subject to a minimization requirement"); *Salas*, 2008 WL 4840872, at *6 ("The minimization requirement does not extend to calls lasting two minutes or less.") (citing cases); *United States v. Pichardo*, No. 97 Cr. 233, 1999 WL 649020, at *6 (S.D.N.Y. Aug. 25, 1999) ("The length of the calls is also significant; courts have held that the minimization requirement does not even apply to calls lasting less than two minutes." (citation omitted)).  The uncertainty about whether there is a bright line two-minute rule or a two-minute rule of thumb stems from the lack of controlling law on the issue.  While both *Bynum* and *Capra* decline to consider calls under two minutes, neither case specifically reaches the question whether there are instances in which the two-minute rule *does not* apply.  *Bynum*, 485 F.2d at 500; *Capra*, 501 F.2d at 275-76. In any event, the Government's "Instructions for Wire Interception" do not suggest that it believes that its officers can listen to the first two minutes of any and all calls.  (*See generally* Gov't Mem., Exs. 1-2.)  Accordingly, the Court proceeds with the assumption that the two-minute rule articulated in *Bynum* is a presumption rather than a bright line rule.

call is intrusive and not pertinent, *United States v. DePalma*, 461 F. Supp. 800, 820-21 (S.D.N.Y.
1978); *accord Scott*, 436 U.S. at 141 ("Interception of those same types of calls might be
unreasonable later on, however, once the nonpertinent categories have been established and it is
clear that this particular conversation is of that type."); and (2) where the call is so patently
irrelevant that a reasonable officer should know almost immediately that minimization is
appropriate. *United States v. Goffer*, 756 F. Supp. 2d 588, 595 (S.D.N.Y. 2011) (failure to
minimize unreasonable where "it was clear from very early in the call" that the call was
irrelevant to the investigation). This second exception to the two-minute rule, however, must be
a limited one, given that, in most instances, it is appropriate for an officer to assume—absent a
pattern of innocence, at least—that the conversation may move from a non-pertinent topic to a
pertinent one. *See Ianniello*, 621 F. Supp. at 1471 ("It is common . . . for conversations to treat
more than one subject, and entirely possible for such dialogues to be comprised of discussion of
innocent matters, interspersed with topics of a criminal nature."); *see also United States v.
Santiago*, 389 F. Supp. 2d 124, 130 (D. Mass. 2005) ("As courts have recognized, it is difficult
for agents to determine whether brief calls are innocuous, and therefore limit interception, before
their termination. In this case, the agents' listening to a call for two minutes, even if it turned out
to be innocuous, was reasonable.").

The Government monitored 3,747 calls in this wiretap, and only a small fraction of the
calls—short of one hundred—were non-pertinent, over two minutes in length, and not
minimized. Such a small percentage of non-minimized calls over two minutes strongly suggests
that the wiretap was reasonable in its totality. *Accord Marroquin-Corzo*, 2012 WL 3245473, at
*9 (two percent of calls not minimized but nonetheless deemed non-pertinent "weighs heavily in
favor of finding the minimization efforts here were reasonable," especially where the vast

majority of the non-minimized calls were under three minutes long). This is particularly true in a case such as this, where the wiretap was in place to monitor a "widespread conspiracy," *Scott*, 436 U.S. at 140, and where many of the calls moved in and out of Russian, *see Kazarian*, 2012 WL 1810214, at *16 (minimization of wiretap found reasonable in part because "[t]he intercepted conversations largely took place in various dialects of Armenian. While translators worked simultaneously with agents monitoring the wiretaps, it is evident from this Court's review of transcripts of a number of the intercepted conversations that the meaning of many of these conversations would not have been immediately apparent"); *see also DePalma*, 461 F. Supp. at 820 (noting the difficulty of monitoring calls that "lapsed at times into foreign language").

Zemlyanksy nonetheless argues that roughly twenty percent of the calls monitored were improperly minimized, including the majority of the calls between Zemlyanksy and his wife; the majority of the calls between Zemlyanksy and his family members; and calls between Zemlyanksy and paramours and prostitutes.[22] The Court is not persuaded that such a large percentage of the intercepted calls were improperly minimized. As to the vast majority of these calls, Zemlyansky has failed to establish that the Government had a duty to minimize before two minutes.[23] For example, the Government has adequately persuaded the Court that the pertinence

---

[22] Zemlyansky also suggests that an unspecified number of calls concerning gambling were inappropriately minimized. This is a dubious claim, considering the fact that the "operation of illegal gambling business" was listed as a target offense in each wiretap order. In any event, Zemlyansky has failed to specify which calls in particular were inappropriately monitored, which is fatal to his claim. *See Kazarian*, 2012 WL 1810214, at *17 ("Failure to provide the required specificity warrants rejection of a defendant's minimization objections.").

[23] Some of the calls highlighted by Zemlyansky were non-pertinent and were not minimized within two minutes. However, those calls have been accounted for in the Court's general

of various calls between Zemlyansky and his wife rendered it impossible to establish a pattern of

innocence between them.  (*See, e.g.*, session 825 (Zemlyansky telling his wife the activities of

his purported co-conspirators); sessions 2099 and 5312 (Zemlyansky and his wife discussing

several of Zemlyansky's clinics as well as a law office purportedly involved in the scheme);

session 7563 (Zemlyansky and his wife discussing whether "the new attorney" is "going to come

on board")); *cf. Goffer*, 756 F. Supp. 2d at 591 (spousal calls should have been minimized in

under two minutes where "[n]one of th[e] calls provided agents with any incriminating evidence

relating to the charges in this case.  To the contrary, the Drimals' marital conversations dealt

almost exclusively with personal and family matters").[24]  Similarly, relevant—and in some

---

analysis of calls violating the *Bynum* rule, *supra*.  Here, the Court solely considers whether
certain types of calls should have been minimized *before* the two minute mark.

[24]  Additionally, this Court rejects Defendant's contention that the privileged nature of the phone
calls between spouses *per se* requires immediate minimization.  As Judge Gleeson has noted,

> Courts frequently simply assume that privileged communications
> are 'not otherwise subject to interception' and that their
> interception must therefore be minimized pursuant to § 2518(5),
> but the statute does not support that assumption. Communications
> undoubtedly occur that are both pertinent to the crimes enumerated
> in an order issued pursuant to 18 U.S.C. § 2518 and privileged
> under some other body of law, and nothing in Title III prohibits the
> interception of such communications based on their privileged
> status. Indeed, the statute expressly contemplates that privileged
> communications will be intercepted, and provides that such
> communications 'intercepted *in accordance with,* or in violation
> of, the provisions of this chapter' shall not lose their privileged
> character. 18 U.S.C. § 2517(4) (emphasis added). This provision
> supports the inference that pertinent but privileged
> communications may properly be intercepted, and nothing in the
> statute provides otherwise.

*United States v. Simels*, No. 08 Cr. 640 (JG), 2009 WL 1924746, at *5 (E.D.N.Y. July 2, 2009)
(footnote omitted); *see also Goffer*, 756 F. Supp. 2d at 593 (agreeing with Judge Gleeson that
"there is no per se bar to *monitoring* privileged calls as long as the agents' minimization of such

cases, suspicious—calls between Zemlyansky and his mother and father precluded the agents from establishing a pattern of innocence between Zemlyansky and his parents. (*See, e.g.*, session 187 (conversation between Zemlyansky and his father indicating that Zemlyansky's father was collected money for his son); session 7916 (conversation between Zemlyansky and his mother about one of Zemlyansky's clinics).) Moreover, while it does appear that minimization could have taken place earlier in several calls between Zemlyansky and his children, the telephone numbers associated with these calls were the same as those associated with the calls between Zemlyansky and his wife, rendering any failure to immediate minimize less questionable. And indeed, the monitoring logs suggest that, as the wiretap progressed, the agents became more adept as quickly minimizing calls between Zemlyansky and his children.

The Court also agrees with the Government that the calls between Zemlyansky and his paramours were by and large properly minimized. The calls were made to nine different telephone numbers, and the calls to each number were generally too infrequent and too far apart to establish a pattern of innocence. Nor, generally, did the subject matter of these calls immediately and definitively indicate their irrelevance to the case. Therefore, neither exception to the two minute rule is applicable to this group of calls.

More troubling is the Government's monitoring of the calls between Zemlyansky and apparent prostitutes. While it is true that the 62 calls went to over 30 telephone numbers and to as many, if not more, different individuals, it is nonetheless the case that the private nature, as

---

calls is conducted in a reasonable manner"). Thus, non-pertinent spousal calls must be minimized before two minutes only if they fall into the two categories outlined *supra*.

well as the irrelevance, of many of these calls should "have been apparent within seconds." *Goffer*, 756 F. Supp. 2d at 595.[25]

Despite the fact that the Government improperly failed to minimize a number of deeply private calls between Zemlyansky and prostitutes, the Government's minimization, when viewed as a whole, was nonetheless not unreasonable.  Accordingly, total suppression in this instance would be "drastic and excessive."  *DePalma*, 461 F. Supp. at 823; *see also Goffer*, 756 F. Supp. 2d at 595-96 (noting that "district courts in this Circuit have favored the approach of suppressing only the improperly minimized calls"); *United States v. Hoffman*, 832 F. 2d 1299, 1309 (1st Cir. 1987) (total suppression appropriate, if at all, in "a particularly horrendous case").  Total suppression would also be unprecedented in this Circuit.  Zemlyansky points to one case, *United States v. Simels*, No. 08 Civ. 640 (JG), 2009 WL 1924746 (E.D.N.Y. July 2, 2009), where suppression of an entire wiretap was granted.  In *Simels*, however, Judge Gleeson was faced not with discrete calls that were improperly minimized, but rather with an entire method of wiretapping that was determined to violate the Fourth Amendment.  *Simels* is thus inapposite here.[26]

Accordingly, Zemlyansky's motion to suppress the entire wiretap is denied.  *Accord Kazarian*, 2012 WL 1810214, at *17.

### B. The Necessity of the Wiretap after the Sukhman Cooperation Agreement

---

[25] Nor is the Court persuaded by the Government's contention at oral argument that the officers might have surmised that Zemlyansky was violating the Mann Act.

[26] It is unnecessary for the Court to suppress the calls between Zemlyansky and prostitutes, as the Government has already represented to the Court that they will not be used at trial.  The Court will hold the Government to that representation.

Zemlyansky also argues that the monitoring of Zemlyansky's phone after Robert Sukhman agreed to begin cooperating with the Government on July 13, 2011 was in violation of Title III.  While "not contesting the Court's wiretap authorization on [June] 28, 2011," Zemlyansky contends that "the Court's finding of continued 'necessity' on July 15, 2011 was erroneous because the [G]overnment now had access to a cooperator intimately involved in the alleged criminal conduct."  (Zemlyansky Mem. at 37.)

"While Title III allows for wiretaps in limited circumstances," Congress contemplated the courts playing an active role in preventing unwarranted electronic intrusions.  *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009).  To the end, § 2518(1)(c) requires that each application for a wiretap contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  It is the role of the reviewing judge to ensure this standard has been met, *see* § 2518(3)(c), "so that 'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Conception*, 579 F.3d at 218 (quoting *United States v. Kahn*, 415 U.S.143, 145 n.12 (1974)).  While "generalized and conclusory statements that other investigative procedures would not prove unsuccessful" are insufficient to satisfy Title III, the Government is not required to exhaust all possible investigative techniques before seeking a wiretap.  *Id.* (citations omitted); *see also Young*, 822 F.2d at 1237 ("[T]here is no requirement 'that any particular investigative procedures be exhausted before a wiretap may be authorized.'" (quoting *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983)).  Rather, "[t]he statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."  *Concepcion*, 579 F. 3d at 218 (quoting *United*

67

*States v. Diaz,* 176 F.3d 52, 111 (2d Cir.1999) (quotation marks omitted) (alteration in original)).

In other words, "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely.  What the provision envisions is that the showing be tested in a practical and commonsense fashion."  *Id.* (quoting S. Rep. No. 90–1097 (1968)).  A finding of necessity is more easily made "in complex and sprawling criminal cases involving large conspiracies," *id.*, as well as where "the telephone is routinely relied on to conduct the criminal enterprise under investigation," *Young*, 822 F.2d at 1237 (citing *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975)).

The defendant bears the burden of proving that necessity for the wiretap was lacking. *United States v. Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).  Moreover, as the Second Circuit recently underscored, a reviewing court must "grant considerable deference to the district court's decision whether to allow a wiretap, ensuring only that 'the facts set forth in the application were minimally adequate to support the determination that was made.'"  *Concepcion*, 579 F. 3d at 217 (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997)); *see also United States v. Gotti*, 42 F. Supp. 2d 252, 262 (S.D.N.Y. 1999) ("[D]oubts as to the existence of probable cause must be resolved in favor of the prior judicial authorization." (citing *Gates*, 462 U.S. at 237 n.10)); *Gigante*, 979 F. Supp. at 963 ("Unaided by the insights of adversarial scrutiny, the issuing judge may not readily perceive every question that might legitimately be raised regarding a requested surveillance; but so long as fundamental constitutional rights are preserved, the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking.'").  Thus, where one district court judge reviews the wiretap authorization of another, the latter must be afforded deference by the former.  *See Concepcion*,

579 F.3d at 219 (overturning Judge Scheindlin's suppression of wiretap evidence on the ground

that she failed to sufficiently defer to Judge Marrero's authorization of the wiretap).

On July 15, 2011, the Government sent a periodic report to Judge Jones, updating her on

her June 28, 2011 Order authorizing the wiretap of, *inter alia*, Zemlyansky's telephone.  (Gov't

Mem., Ex. B at US001307-US001315.)  The periodic report noted:

> On July 13, 2011, SUKHMAN and an attorney representing
> SUKHMAN met with the Government and SUKHMAN agreed to
> cooperate.  Based on SUKHMAN's willingness to cooperate with
> the Government, on July 13, 2011, the FBI stopped monitoring
> TARGET CELLPHONE-2 [Sukhman's phone] . . . .  The
> Government submits, however, the continued interception of wire
> communications occurring over the TARGET CELLPHONE-1 and
> TARGET CELLPHONE-3 is necessary to assist in revealing: (i)
> the nature, extent and methods of operation of the TARGET
> OFFENSES by the TARGET SUBJECTS; (ii) the identities and
> roles of the TARGET SUBJECTS, their accomplices, aiders and
> activities; (iii) the receipt and distribution of money involved in
> those activities; (iv) the locations and items, including
> telecommunications devices used in furtherance of those activities;
> (v) the existence and locations of records; (vi) the location and
> source of resources used to finance their illegal activities; and (vii)
> the location and disposition of the proceeds from those activities.

(*Id*. at US001314.)

The June 27, 2011 wiretap application (Gov't Mem, Ex. 5 ("June 2011 App.")), together

with the June 15, 2011 period report, adequately supported Judge Jones' finding that it was

necessary to continue the wiretap despite Sukhman's cooperation.  At that point, Sukhman's

cooperation had just begun, and it was simply not possible to foresee to what fruits, if any, the

agreement would yield.  *Accord United States v. Miller*, 116 F.3d 641, 664 (2d Cir. 1997)

(upholding lower court's finding of necessity where there was uncertainty regarding the utility of

a cooperator); *United States v. Muhammad*, No. 09 Cr. 265, 2010 WL 2232438, at *4 (D. Conn.

May 26, 2010) (in a complex drug conspiracy, wiretap was appropriate despite the fact that the

Government had five cooperating witnesses).  Moreover, the scheme being investigated was exceedingly complex, making it unlikely that Sukhman's involvement would eviscerate the necessity of the wiretap.  Indeed, the June 27, 2011 Application suggested that Sukhman might not be involved in every one of Zemlyansky's allegedly fraudulent clinics, which in and of itself made the continued monitoring Zemlyansky's phone appropriate.  (*See, e.g.*, June 2011 App., Ex. B at ¶ 41.)  Finally, the wiretap application indicated that the investigated schemes were being carried out—and new schemes were being hatched—over the target phones, meaning that the continued wiretap of Zemlyanksy's phone had unique value to the investigation.  (*Id.*, Ex. B at ¶ 16)

The Court declines to second guess Judge Jones's determination that the wiretap remained necessary even after Sukhman agreed to cooperate with the Government.  Accordingly, Zemlyansky's motion to suppress wiretap evidence is denied.

## IV.    Motions for Government Disclosure of Various Materials

Defendants Geris, Shapiro, and Danilovich have moved for an order requiring the Government to immediately disclose certain materials, including those mandated by *Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995); *United States v. Giglio*, 405 U.S. 150 (1972); Rule 404(b) of the Federal Rules of Evidence; and Rule 16 of the Federal Rules of Criminal Procedure.  The Government has represented that it will turn over any and all *Brady*, *Kyles*, *Giglio* materials at least two weeks before trial, and that it will turn over all 404(b) evidence 30 days before trial.  The Court will hold the Government to its representations, but the motions are otherwise denied.  *Accord United States v. Gallo*, No. 98 Cr. 338, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying motion to compel production of *Brady*, *Giglio*, and Jencks

Act materials based on the Government's representations that "it is aware of its obligations . . . and will produce any [required] materials to the defense" at an appropriate period).[27]

## V.      Motion for Severance

Shapiro has moved for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure.  The Court agrees with the Government that this motion is premature.  Shapiro is not part of the first cohort to be tried, and the exact configuration of the co-defendants with whom he will be tried is far from determined.  Shapiro's motion to sever is therefore denied as premature, without prejudice to renewal at a later stage in the proceedings.  *Accord United States v. Rodriguez,* No. 08 Cr. 1311, 2009 WL 2569116, at *11 (S.D.N.Y. Aug. 20, 2009).

## VI.     Motions for a Bill of Particulars

Geris and Shapiro have each moved for a bill of particulars pursuant to Rule 7(f) of Criminal Procedure.  Defendants are both physicians, and seek nearly identical information, including, *inter alia*, lists of any treatment in which they were involved that were medically unnecessary or never provided and lists of all procedures for which they fraudulently billed third parties.

"Whether to grant a bill of particulars rests within the sound discretion of the district court."  *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984) (citation omitted).  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Chen,* 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks and citation omitted).  If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as

---

[27] In its opposition brief, the Government represented that it would comply with its obligations under Rule 16 by the end of March 2013.  (Gov't Mem. at 95.)  The Court therefore assumes that Shapiro's motion for Rule 16 materials is moot.

discovery, no bill of particulars is required.  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  Moreover, "[t]he Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed. Therefore, 'the Government is not required to give information that would, in effect, give the defendant a preview of the Government's case before trial.'"  *United States v. Triana-Mateus*, No. 98 Cr. 958, 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citation omitted); *see also United States v. Muyet*, 945 F. Supp. 586, 598-99 (S.D.N.Y. 1996) ("[I]t is improper to use a bill of particulars to compel the Government to disclose the manner in which it will prove the charges or preview its evidence or legal theory." (quotation marks and citations omitted)).

On October 5, 2012, Defendant Zayonts moved for a bill of particulars on behalf of all Defendants, seeking: "(1) specification of the victims of the frauds charged in the indictment; (2) specification of the false and fraudulent representations to the victims of the frauds charged in the indictment and the respect to which the statement is false."  (Dkt. No. 359 at 2.)  This Court denied that motion, holding that "there is sufficient particularity in the Government's submissions for the defendants to understand, for the purposes of preparing for trial, the alleged fraud."  (Tr. of Oral Arg., Dec. 5, 2012, at 67.)  This conclusion holds true for Geris and Shapiro as well.  The charges against Geris and Shapiro have been explained in sufficient detail via the Indictment and other documents filed in the course of this litigation.  Geris and Shapiro's motions for bills of particulars are therefore denied.

## VII.    Motions to Strike Surplusage from the Indictment

Shapiro and Danilovich have moved to strike surplusage in the Indictment, pursuant to Federal Rule of Criminal Procedure 7(d).  The Court has not yet determined whether the Indictment will be provided or read to the jury.  These motions are therefore denied as

premature, without prejudice to renewal at a later stage in the proceedings.  *Accord United States v. Wilson*, 493 F. Supp. 2d 364, 379 (E.D.N.Y. 2006).

## VIII.   Motion to Dismiss Count One as Duplicitous

Treysler moves to dismiss Count One of the Indictment as impermissibly duplicitous. For the reasons set forth below, that motion is denied.

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby."  *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (citation omitted); *see also United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (a count is impermissibly duplicitous only where "risks unfairness to the defendant").  The Second Circuit has explained:

> A conspiracy indictment presents "unique issues" in the duplicity analysis because "a single agreement may encompass multiple illegal objects." In this Circuit "it is well established that '[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for "[t]he conspiracy is the crime and that is one, however diverse its objects."'" . . . [U]nder the law of this Circuit, "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme."

*United States v. Araci*, 968 F.2d 1512, 1519 (2d Cir. 1992) (citations omitted); *see also United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) ("A single conspiracy may be found where there is mutual dependence and assistance among the [participants], a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture . . . . The members of the conspiracy do not have to conspire directly with every other member of it, or be aware of all acts committed in furtherance of the

73

conspiracy, or even know every other member.  There is no requirement that the same people be involved throughout the duration of the conspiracy.  Furthermore, a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." (internal quotation marks and citations omitted) (alteration in original)); *Urso*, 369 F. Supp. 2d at 271 (holding that the defendant's "assertion that this indictment is impermissibly duplicitous if the loansharking conspiracy had more than one target is baseless, as it is beyond dispute that a single criminal conspiracy may have multiple objects" (citing cases)).

If the Indictment sufficiently alleges a single conspiracy, the question whether one or several conspiracies exist is left to the jury.  *Rajaratnam*, 736 F. Supp. 2d at 688; *see also Araci*, 968 F.2d at 1519; *Urso*, 369 F. Supp. 2d at 271.  Here, Count One of the Indictment alleges a single RICO conspiracy.  (*See* Indictment.)

Accordingly, Treysler's motion to dismiss Count One is denied denied.

## IX.    Conclusion

For the foregoing reasons, the motion of Defendants Zaretskiy, Zayonts, and Kremerman to suppress evidence is GRANTED.  Defendants' other motions are DENIED.

The Clerk of the Court is directed to close the motions at Docket Numbers 433, 437, 446, 449, 451, 452, 457, 458, 463, 466, 470, and 472.

SO ORDERED.

Dated: New York, New York
       May 20, 2013

_____
J. PAUL OETKEN
United States District Judge

74