UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,

    - against –                     S 18 12 Cr. 171 (JPO)

MIKHAIL ZEMLYANSKY,

               Defendant.
-------------------------------------------------------x

### MEMORANDUM IN SUPPORT OF MIKHAIL ZEMLYANSKY'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33(a), Fed.R.Crim.P.[1]

**Introduction**

      This case involves a grave violation of the government's constitutional, statutory, and ethical obligations to disclose evidence and information in its possession that is favorable to the defense or otherwise "material to preparing the defense" under Rule 16(a)(1)(E), Fed.R.Crim.P. During the course of a nearly two-month long trial in February and March of this year, the government came before this Court and a jury and argued that Mikhail Zemlyansky ("Zemlyansky") and Michael Danilovich ("Danilovich") were "the nerve center, the organizers and controllers of the Lyons Ward and Rockford Group scams." Tr. 2644-45. Zemlyansky was said to be a mastermind of both schemes, responsible for the formation of both companies, the creation of their websites, the production and distribution of their "glossy" brochures, the leasing of their office space, the hiring of their employees, and the laundering of millions of dollars in their ill-gotten gains.

---

[1] But for the correction of typographical errors, this memorandum is substantively identical to that filed November 5, 2015..

All along, the government knowingly concealed and suppressed that the United States Attorney's Office for the Eastern District of New York had conducted its own comprehensive investigation of the Rockford Group and another bogus settlement funding company, Grayson Hewitt, and had identified and prosecuted several individuals for their participation in the frauds, including two persons thought to be its leaders, Ruslan Rapoport and Peter Liounis. Others prosecuted for their involvement in the Rockford Group fraud were Genadi Yagodayev and Roman Tsimerman. The investigation, undertaken in conjunction with the Department of Homeland Security, the U.S. Postal Service, the United States Secret Service, and state law enforcement agencies, spanned several years, and relied on an extraordinarily broad range of sophisticated law enforcement techniques, including wiretaps, GPS tracking devices, cell tower location monitoring, mail intercepts, grand jury subpoenas for telephone, credit card, airline, EZ pass and bank records, physical surveillances, surveillance photographs and video; a voice "line-up," interviews with scores of persons, and photo spreads.

The EDNY investigation generated in excess of 65,000 pages of discoverable documents underlying the Rockford Group and other related frauds that were produced under Rule 16, Fed.R.Crim.P., to the Rockford Group defendants in the Eastern District prosecutions but withheld in their entirety from Zemlyansky in the proceedings before this Court. Not once in the EDNY investigation, or in any of the tens of thousands of pages produced in discovery in the EDNY, did Zemlyansky's name or identity surface as having any connection to the Rockford Group fraud or to any of the individuals involved in it.

Following the arrest of one of the principal participants, Peter Liounis, he gave a detailed confession, credited by the government, in which he purportedly described the entire

scheme involving Rockford and the two other frauds in which he was charged, and identified Ruslan Rapoport as the leader of the scheme, and another conspirator, Dimitri Mishiev as an important participant.[2] Rapoport, not Zemlyansky, was said to be the one who "set up the scheme," "was in charge of the money," "paid everyone," oversaw the website, hired cold-callers, and arranged for the printing of the "glossy" brochures. Another Rockford conspirator, separately charged, was Genadi Yagodayev. Documentary proof, withheld from Zemlyansky, established that it was Yagodayev who retained a small accounting firm to incorporate and register the Rockford Group; opened a bank account in its name at JP Morgan Chase; leased the Rockford office space at Regus at 80 Broad Street; and contracted with Voice Nation, a telephone answering service, to take the firm's telephone calls and pass them on to his co-conspirators. An exhaustive search of Yagodayev's telephone records and other documents failed to produce any evidence that in the thousands of calls he had made and received he had ever been in touch with a telephone number associated with Zemlyansky.

In the EDNY, the government argued that it was Liounis, Rapoport, and Yagodayev who orchestrated the approximately $11 million Rockford Group scheme, claims very much at odds with those made before this Court. In his opening statement to the jury in the EDNY trial of Liounis, the AUSA said to the jury "you will learn about [Liounis'] partner who helped him hide money overseas. You will learn that when the defendant's money man was stopped at JFK Airport on his way overseas, he was carrying a note with the name Innovative Commerce…the same overseas company which the defendant had some of his victims send money." Tr. 113-14.

---

[2] Remarkably, despite repeated defense demands for the production of the notes and report of Liounis' confession, the government has continued to withhold it.

The United States Attorney's Office for the Southern District of New York has now been investigating and prosecuting Zemlyansky for years, yet at no time did it even volunteer that its counter-parts in the EDNY had prosecuted several individuals in the Rockford Group scam, let alone produce any materials or information underlying the EDNY investigation. The defense learned of the Eastern District prosecutions fortuitously. And notwithstanding the government's assertion in the Eastern District that Liounis made a detailed confession that identified the leaders of the Rockford Group scheme and it *modus operandi* the government has steadfastly rejected Zemlyansky's repeated demands for production of the notes and report of the federal agent who took Liounis's confession and testified at his trial.

The information and materials generated in the Eastern District investigation, and disclosed to the Rockford defendants there, would have been a treasure trove for Zemlyansky's trial team had the government honored its obligations to disclose them. Zemlyansky could have used the disclosures to support his defense that he was uninvolved in Lyons Ward Associates and the Rockford Group, to impeach the credibility of government witnesses William Shternfeld and Igor Katsman, and to contrast the comprehensiveness of the Eastern District investigation of Rockford, with the paper-thin evidence that the Southern District of New York had adduced linking Zemlyansky to the fraud.

The Rockford Group recordings made in the EDNY investigation, bearing the voices of Liounis and his conspirators that are clearly distinguishable from Zemlyansky's could have supported Zemlyansky's defense that he was not the Bob Hamilton speaker on GX 700. Had Zemlyansky been privy to the fruits of the EDNY investigation, the special emphasis that the government placed on the similarities between the Lyons Ward Associates and Rockford Group, repeatedly referring to Rockford as Lyons Ward 2.0." Tr. 2660 and 2687,

such that "the evidence of one reinforces the evidence of the other," Tr. 2661, could have been turned on its head by pointing out the logical converse of that proposition.

The stunning absence of evidence adduced by the EDNY linking Zemlyansky to Rockford *undermines* the evidence of his involvement in Lyons Ward Associates. Indeed, in the EDNY, the government stressed the important similarities between the Rockford Group scheme and the Grayson Hewitt scheme (another settlement funding company with glossy brochures, false promises of guaranteed double digit returns, etc.) to argue that evidence of the Liounis' involvement in one reinforced the evidence of his involvement in the other. That would have been a powerful argument for Zemlyansky's defense: given the similarities of the three schemes at issue, Lyons Ward Associates, Rockford Group, and Grayson Hewitt, Zemlyansky could have defended the Lyons Ward allegations as being the handiwork of the EDNY defendants.

The government's suppression of this mountain of evidence violated Zemlyansky's due process right to receive material evidence favorable to his defense. *Brady v. Maryland*, 373 U.S. 83, 86, 83 S.Ct. 1194 (1963), and its progeny. It also violated Zemlyansky's Rule 16 statutory right to disclosure of all documents and objects that are "material to preparing the defense," a much more liberal standard than *Brady*.

Accordingly, Mr. Zemlyansky respectfully submits this Memorandum of Law in support of his motion for a new trial pursuant Rule 33(a) of the Federal Rules of Criminal Procedure. That rule gives the Court broad discretion to "vacate any judgment and grant a new trial if the interest of justice so requires." Additionally, Zemlyansky moves for production of additional discovery and exculpatory information related to this motion.

**The Facts**

In September and October of 2013, Mr. Zemlyansky and Michael Danilovich were tried before this Court on a nine-count Superseding Indictment S13 12 Cr. 171, alleging that each had engaged in health care fraud conspiracy, health care fraud, mail fraud conspiracy, mail fraud, money laundering conspiracy, money laundering, and conspiracy to violate the RICO statute – all related to an alleged no-fault insurance scheme.   On November 4, 2013, following a nearly two-month trial, the jury acquitted Zemlyansky of all counts except RICO conspiracy on which it could not reach a verdict.  The jury could not reach a verdict as to any of the charges against Danilovich.

In January 2014, the government filed a superseding indictment (S18) against Zemlyansky and Danilovich. As the Court is aware, Danilovich's trial was severed from Zemlyansky's because of his counsel's unavailability.   Count One of S18 charged both defendants in a broader RICO conspiracy count that encompassed "two separate, but nearly identical, securities fraud schemes" involving settlement claim funding that Zemlyansky and Danilovich had allegedly set up, operated and controlled – Lyons Ward Associates and the Rockford Group.   The two fraudulent investment schemes bore many similar, if not identical characteristics, including the methods used, the same glossy brochures filled with the same false statements, and websites with exactly the same format.  *See, e.g*., Gov't Summation, at Tr. 2559-60.  The Rockford Group brochure was admitted as GX 88.  The government took the position, and repeatedly impressed on the jury, that Lyons Ward and Rockford Group were inextricably linked – it repeatedly referred to Rockford (which post-dated Lyons Ward)

as Lyons Ward 2.0." Tr. 2660 and 2687, such that "the evidence of one reinforces the evidence of the other." Tr. 2661.

### Throughout the Proceedings Before this Court the Government asserted that Its Available Evidence Proved that Zemlyansky Conceived, Operated, and Controlled Lyons Ward Associates and the Rockford Group and that his Conspirators Were Persons Other than those Charged in the EDNY

In both its pre-trial filings and at trial, the government asserted that the evidence in its possession proved that Zemlyansky and Danilovich were "the nerve center, the organizers and controllers of the Lyons Ward and Rockford Group scams." Tr. 2644-45. The two "Mikes" were, in the government's view interchangeable, such that evidence offered against one could be considered against the other. Tr. 2642.

In its pre-trial motion *in limine*, the government asserted that "as specified in the Indictment," in or about 2007, the defendants opened a sham investment firm, Lyons Ward Associates, which purported to be a settlement claim funding company that made investments in annuities and other claims for less than the total amount of the expected payout at a future date and further guaranteed a payout of approximately 18% per year. In addition to recruiting an individual who would be the paper owner of the company, open its bank account at JP Morgan Chase and sign an office lease with Regus at 590 Madison Avenue, Zemlyansky allegedly "generated promotional materials – including a brochure explaining the purported investment product – that were sent out to potential investors;" hired employees to obtain checks from the mail and make bank deposits; generated and mailed false account statements reflecting unrealized gains in investors' accounts, and "caused more than $6 million to be transferred into overseas bank accounts in Latvia."

The government continued in its motion *in limine* that "[a]fter the Lyons Ward scheme ended in early 2009 the defendants initiated and created a nearly identical scheme through a different company called the Rockford Group LLC (the "Rockford Group")."

The government's summation also left no doubt that, in its view, the available evidence proved that while Zemlyansky took steps to insulate himself, he was hardly an absentee owner of Lyons Ward Associates or the Rockford Group but rather had direct and personal involvement in every critical aspect of both schemes. It told the jury that he: "cooked up a bogus investment scheme, settlement claim funding;" "recruited a paper owner to incorporate Lyons Ward and open a bank account;" "subleased a tiny office from Regus on the 21st floor of the IBM building in midtown Manhattan;" and "created a fake web site and glossy brochure." Tr. 2649.

The government spent considerable time in its summation talking about the relationship of Lyons Ward to the Rockford Group and stressing to the jury that "you only have to find that Zemlyansky committed one for purposes of the RICO conspiracy count" Tr. 2659-62 and the jury was so advised of this by the Court in its charge to the jury.

**The Meager Trial Evidence Against Zemlyansky on Lyons Ward and Rockford Group**

The actual evidence introduced at trial against Zemlyansky to prove his involvement and control of Lyons Ward and the Rockford Group was quite meager and did not come close to supporting the bold claims made by the government.[3] The weaknesses in the government's proof, which we highlight here, are highly relevant to the Court's evaluation of

---

[3] Zemlyansky reserves his right to argue on appeal that the evidence was insufficient as a matter of law.

Zemlyansky's new trial motion inasmuch as relief for a *Brady* violation necessitates a finding that had the suppressed materials been disclosed, there would have been a "reasonable probability" that the outcome of the proceedings would have been different, a calculus that obviously varies depending on the strength of the proof at trial. "Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin." *United States v. Triumph Capital Group*, 544 F.3d 149, 163 (2d Cir. 2008)(citation omitted).

Similarly, in considering whether the Rule 16 violations that occurred here merit *vacatur* of Zemlyansky's conviction in the interest of justice, the strength of the government's proof is obviously a relevant consideration.

Given the breath and scope of the government's investigation of Zemlyansky, the absence of evidence presented at trial tying him to either investment scheme is striking. The government wiretapped Zemlyansky's cell phone for approximately five months and intercepted approximately 3,747 calls yet not once did it produce any evidence of Zemlyansky's involvement in either scheme. Nor did it produce any evidence that Zemlyansky ever spoke with any of the individuals charged in the EDNY. The government went to extraordinary lengths to try to make its case against Zemlyansky on the securities fraud charges. When it learned that two female, former employees of Lyons Ward had returned to their native Poland, it flew the FBI case agent to Poland to interview them rather than have an agent in a field office in Poland take on the task. The government subpoenaed thousands of pages of bank and telephone records but that too turned up nothing of any value to the government's case on the securities fraud charges.

The government said that Zemlyansky recruited a "paper owner" of Lyons Ward, Anatoly Khoklov, to set up the company, open its bank account, and lease its office space at Regus, 590 Madison Avenue, yet it produced not a shred of evidence at trial of any contact between Zemlyansky and Khoklov, or even of an intermediary between Zemlyansky and Khoklov. The government argued that Zemlyansky was responsible for hiring the two Polish women who worked for Lyons Ward, "Anna" and "Edyta," yet neither could identify him at trial, and no proof was offered demonstrating any connection to either of the two women or to any intermediary supposedly working on Zemlyansky's behalf to hire them.

The government urged that Zemlyansky was responsible for creating and setting up the websites of both sham companies yet it failed to produce a scrap of evidence in the way of internet protocol information, emails, correspondence, telephone calls, meetings, or anything else supporting this claim. The government noted the similarities in the brochures for Lyons Ward and Rockford, and contended that Zemlyansky was responsible for both (arguing that if it could prove one the jury should infer the other since they were nearly identical) yet it offered no concrete evidence of this either.

**The Limited Lyons Ward Evidence Against Zemlyansky**

In the absence of documentary proof tying Zemlyansky to the scheme, the government relied principally on vague testimony from two cooperating witnesses, William Shternfeld, and Igor Katsman; a single, hotly-disputed voice recording between an Alabama securities investigator and an individual who went by the name "Bob Hamilton;" and the uncorroborated and contradicted recollection of Regus receptionist Elaine Morgan of having seen Zemlyansky at 590 Madison Avenue on several occasions approximately six years earlier.

Shternfeld, a serial fraudster who was brought in as a cold-caller in the Lyons Ward scheme by his long-time criminal associate "Gino," said he knew Zemlyansky well and over the course of fifteen years had participated with him in legitimate real estate transactions and allegedly in illicit transactions as well.    But though Shternfeld, deeply involved in the Lyons Ward fraud, was close with Zemlyansky and had spoken with him "thousands of times" he could offer no personal knowledge of Zemlyansky's involvement and conceded that neither he nor Zemlyansky had ever brought up the subject of Lyons Ward. Shternfeld gave this testimony:

> Q: Now to be clear, you never had a direct conversation with Michael Zemlyansky about Lyons Ward, is that right?
>
> A: That is correct, I never did.
>
> Q: How did you know that he was involved?[4]
>
> A: Benjamin told me and Gino told me." That was it.

Tr. 2205.

And that was it.  Shternfeld said that on one occasion Gino told him that "Zemlyansky and Fat Mike were running" Lyons Ward, and that on another occasion Shternfeld's partner Ben Koifman told him that Zemlyansky had confided in Ben that he "ran" Lyons Ward and had complained that Shternfeld was "not pulling his weight."

The other cooperating witness relied on by the government to implicate Zemlyansky in Lyons Ward Associates was Igor Katsman. Though Katsman insisted that he understood

---

[4] This question was clearly improper because it lacked foundation, assumed a fact not in evidence, suggested to the jury that the prosecutor had personal knowledge that Zemlyansky *was* involved, and was leading.

Lyons Ward Associates to belong to Danilovich alone, the government led him to testify that, on occasion, he gave the money to Zemlyansky to pass on to Danilovich.

In early 2009, following the receipt of numerous complaints by aggrieved Lyons Ward investors, law enforcement investigators went to the Lyons Ward Offices at 590 Madison Avenue and found them abandoned save for some records left behind which were seized. We presume they made inquiries regarding the identify of all Lyons Ward personnel who worked in its offices there and acquired evidence from building security as to the identity of such persons. Yet despite our written requests, the government has refused to produce any seizure reports pertaining to 590 Madison Avenue, or reports of interviews conducted there in 2009. (Regus employee Natasha Moonie testified that all visitors to 590 Madison were logged in at the security desk in the lobby, and that tenants of the building were issued special passes by building security after being photographed. Tr. 2409.)

The government's investigation at 590 Madison Avenue in 2009 surely did not turn up any evidence linking Zemlyansky to the address – itself information that the government should have disclosed under *Brady* – because at trial the only evidence on this point was given by Elaine Morgan, a receptionist for Regus at 590 Madison Avenue, who identified Zemlyansky from a photo array as someone she had seen on numerous occasions there six years earlier, sometimes accompanied by either or both of Lyons Ward two female employees, "Anna" and "Edyta." But both Anna and Edyta disclaimed having ever seen or been with Zemlyansky and the government conceded on rebuttal summation that Ms. Morgan had "misremembered" seeing Zemlyansky in the company of either Anna or Edyta, although it still insisted she had seen Zemlyansky in the offices. Tr. 2561.

But this claim was undermined by two other Regus employees, manager Natasha Moonie and another Client Services Representative, Nichelle Abney, who worked along side Morgan and was interviewed by the government, 3544-1 and 2. Neither Ms. Moonie nor Ms. Abney was able to identify Zemlyansky. In October 2015, a former FBI Special Agent and FBI Polygrapher, Frank J. Lazarra administered a lie detector test to Zemlyansky. He concluded that Zemlyansky's statements that he had never been in the building at 590 Madison Avenue, much less on the 21st floor where Lyons Ward had its office were indicative of truthfulness.[5]

Finally, the government placed great reliance on the hotly disputed recorded call from "Bob Hamilton" of Lyons Ward Associates to Michael Gantt, an Investigator with the Alabama Securities Commission who was investigating a claim made by an aggrieved investor in Lyons Ward Associates. The government argued that the recording, GX 700, was a "devastating" and "crushing piece of evidence" against Zemlyansky whose voice they said was Bob Hamilton's. Tr. 2797.[6] It played the approximately ten-minute long recording for the jury multiple times throughout the trial and again in its summation. Although the government surely knew the telephone number from which the call had been placed it did not introduce it at trial. The government had many means at its disposal to try to prove that it was Zemlyansky's voice on the call. Having monitored Zemlyansky's cell phone, 718-986-0103, from March 2011 to July 2011, it could have called to the stand any of the law

---

[5] Due to time constraints in meeting the Court's deadline for filing this memorandum, Mr. Lazarra's report and other documents referenced in this memorandum are not submitted herewith but will be produced and filed as exhibits promptly.

[6] Zemlyansky's trial counsel was so confident that the government had failed to prove that he was Bob Hamilton, that he told the jury they should convict Zemlyansky if it found otherwise.

enforcement agents who had monitored the Title III recordings and were obviously familiar with his voice. That is what the EDNY did at Peter Liounis's trial to identify his voice on disputed recordings. *See* Liounis Trial Transcript, January 29, 2014, Tr. 450, testimony of Postal Investigator Michelle Purnavel. Or, it could have sought an order compelling Mr. Zemlyansky to provide voice exemplars for comparison. Or, it could have conducted a voice line-up, comparing Zemlyansky's voice to others, as the EDNY also did in its investigation of Liounis. But rather than rely on any of these conventional law-enforcement techniques to identify Zemlyansky's voice on the recording, the government put its trust principally in admitted serial fraudster William Shternfeld and admitted money launderer Igor Katsman, and in Leya Albanase a former employee of Zemlyansky who had not spoken to him in years. The government played the recording for her repeatedly, until she finally said she believed it was Zemlyansky. The defense also presented a lay witness who swore that she was familiar with Zemlyansky's voice and that the Bob Hamilton on GX 700 was not Zemlyansky.

In September 2015, respected forensic voice examiner Tom Owen, of Owens Forensics, took voice exemplars from Zemlyansky and compared his voice with the Bob Hamilton recording using a variety of scientific instruments. Mr. Owen concluded to a reasonable degree of scientific certainty that Zemlyansky was not the speaker on the Bob Hamilton recording. (Mr. Owen's report will be filed ECF as an exhibit together with the other documents referenced in this memorandum promptly).

**The Limited Rockford Group Evidence Offered at Trial**

As with Lyons Ward, the evidence against Zemlyansky regarding the Rockford Group consisted mostly of vague, hearsay testimony offered by cooperating witnesses William

Shternfeld and testimony by Igor Katsman about occasionally giving to Zemlyansky cash that was intended for Danilovich. Shternfeld testified that at a meeting with Gino at a Sheepshead Bay movie theater Gino told him that Zemlyansky and Danilovich were starting another scheme and handed Shternfeld the Rockford brochure, GX 88. Tr. 2211. This is the identical brochure produced in the EDNY discovery, a brochure that Liounis reported had been prepared by Ruslan Rapoport.

### Post-Trial Events and Disclosures

Following the jury's verdict, in late May 2015, newly retained undersigned counsel learned fortuitously that unbeknownst to the defense at trial, the United States Attorney's Office for the Eastern District of New York had conducted its own extensive investigation for the Rockford Group, and had identified and prosecuted several individuals for their participation in the fraud. The persons prosecuted included: Peter Liounis, Ruslan Rapoport, Genadi Yagodayev and Roman Tsimerman. Specifically, on April 17, 2012, the government filed a 50-page Complaint and Affidavit in Support of a Search and Arrest Warrant against Peter Liounis, *United States v. Liounis*, 12-379 M, and a separate forty-five page Complaint and Affidavit in Support of a Search and Arrest Warrant against Ruslan Rapoport and Roman Tsimerman, detailing how the defendants and their co-conspirators had "executed three successive fraudulent investment schemes [including Rockford] through which they obtained millions of dollars from investors based on false promises about investment opportunities." *United States v. Peter Liounis and Ruslan Rapoport*, 12 Cr. 350 (ILG). Genadi Yagodayev was indicted for his role in the Rockford Group scheme on May 2, 2014, *United States v. Yagodayev*, 14 Cr. 250.

The Complaints alleged that with respect to both Rockford and the second scheme, a General Motors IPO Scheme, Liounis (acting as James Weston and Andrew Black), had instructed unsuspecting investors to send funds to an address operated by Regus. The third investment scam with which Liounis was linked, Grayson Hewitt, like Rockford (and Lyons Ward) falsely promised investors double digit fixed rates of return on purchases of plaintiff's rights to future recoveries in personal injury and other lawsuits. Complaint, ¶27.

The Complaint against Liounis noted the striking similarities between Grayson Hewitt and Rockford, including the similarities in their brochures and websites, their detailed descriptions of their purported business of funding lawsuits, their reliance on a commercial telephone answering service to field investors phone calls and much more.

Upon learning of the Eastern District of New York prosecutions, undersigned counsel promptly notified AUSA Goldman of his discovery and expressed concern that the government had been obligated to disclose the Eastern District prosecutions to Zemlyansky's defense counsel. Mr. Goldman confirmed his awareness of the Eastern District cases and invited undersigned counsel to provide him with a written request for production of materials and information we were seeking.

On June 5, 2015, undersigned counsel provided the government with a detailed, written request pursuant to Brady and Rule 16 for disclosure of materials and information primarily generated in the Eastern District's Rockford investigation. The nature of the requests was for disclosures of information and materials that was favorable to Zemlyansky insofar as it provided a means to argue that persons other than he were responsible for Rockford, and by association Lyons Ward Associates.

By letter dated, June 23, 2015, the government produced to the defense for the first time four DVD's containing approximately 65,000 pages of Bates Stamped documents, marked "DOJ [No.]" that had been produced under Rule 16 to the Eastern District Rockford Group defendants. Most of the records were produced in non-searchable form, which compounded the time and difficulty in analyzing them. But it seems apparent that nowhere in the tens of thousands of pages of discovery on Rockford produced by the government, is there any mention of Zemlyansky, let alone any document that implicates him in the scheme. That fact, alone, would have been a powerful weapon in the hands of Zemlyansky's trial counsel had the government honored its duties to make him aware of it.

The government declined in its June 23, 2015 letter to respond to the specific disclosure requests Zemlyansky had made, such as whether it had produced reports showing that persons other than Zemlyansky were responsible for Rockford or that others had confessed to the crime. The government's refusal prompted several additional written demands for disclosure from Zemlyansky, all of which the government rejected.

Additionally, the government produced the transcript of the trial proceedings against Peter Liounis held before the Honorable I. Leo Glasser. *United States v. Liounis*, 12 Cr.350 (ILG). There can be no doubt that, in the government's view, Zemlyansky was a co-conspirator of Liounis, Rapoport, Tsimerman and Yagodayev in the Rockford Group scheme. Had he been charged in the Eastern District with that crime, the government no doubt would have produced to him under Rule 16 the same 65,000 pages of discovery that it had produced to the other Rockford defendants. Zemlyansky was no less entitled to those materials because he was prosecuted in the Southern District of New York. Yet the

government continues to insist otherwise and invokes its familiar refrain that it has honored all its discovery obligations.

### The Disclosures By the Government In June 2015

On or about June 23, 2015, the government produced four DVDs containing approximately 65,000 pages of materials that were produced in discovery to the Rockford defendants in the Eastern District pursuant to Rule 16. It is difficult to over-state the breath and scope of the Eastern District criminal investigation of Liounis and his co-conspirators. It began no later than 2009, when an investigator for the Kansas Securities Commission arranged for an aggrieved Rockford investor to make a series of tape-recorded telephone calls to his account representative at Rockford by calling the same telephone number listed on the Rockford brochure introduced at trial against Zemlyansky. GX 88.

The Kansas investigator stated at the beginning of the recordings that he was working with Postal Investigator Michelle Purnavel of the United States Postal Service. Investigator Purnavel, in turn, was working in conjunction with Special Agent Brian Colica and other special agents in Homeland Security Investigations at the Department of Homeland Security. Over the ensuing month and years, the government obtained a multitude of court orders in furtherance of its investigation of the Rockford Group and its participants and pursued dozens of additional investigative techniques.

On December 8, 2009, the Securities and Exchange Commission obtained an order in the Southern District of New York, freezing all assets that the Rockford Group held in the United States.

The tens of thousands of pages in discovery produced to the defendants in the Eastern District, much, but not all of which, was produced to Zemlyansky for the first time after his

18

trial, confirms that these investigative techniques included: (1) applications and Orders for pen registers and telephone GPS telephone location warrants; (2) Title III Applications and Orders authorizing the interception of communications over three telephones used by Liounis and his conspirators; (3) consensually monitored and recorded telephone calls made to Rockford personnel by aggrieved investors under the guidance of state securities investigators; (4) applications and orders for GPS tracking warrants for numerous automobiles used by the conspirators; (5) applications and Orders for search warrants for numerous email accounts traced to the frauds; (6) application and order for search warrant for express mail shipments sent among the conspirators; (7) applications and orders for searches of homes and businesses; (8) acquisition of domestic and overseas bank records [Rockford overseas bank records alone span 1,219 pages of records, DOJ 49,125 to 50,344].; (9) search of Rockford Group's offices at Regus, 80 Broad Street as evidenced in Inventory of Items recovered from the Rockford Group's office at 80 Broad Street; (10) seizure of two Rockford Group computers from its office at 80 Broad Street; (11) documents downloaded from the Rockford Group website; (12) articles of incorporation, P.O. box registration and approximately 1,500 pages of other Rockford Group business records; (13) emails from Voice Nation phone answering service to info@rockfordgroupllc.com passing on messages from callers [DOJ 29043];  (14) voice line-up with Peter Liounis; (15) documents pertaining to the Rockford Group's EIN acquisition; (16) subpoenas to Federal Express; (17) Department of Motor Vehicle Records; (18) EZ Pass Records;  (19) security video at a Regus facility used by the conspirators in Plaza City, New Jersey; (20) grand jury subpoenas to airlines, banks, credit card companies, telephone companies, commercial mail facilities, Voice Nation commercial telephone service; and other businesses; (21) data obtained from

search of Ruslan Rapoport cell phone; (22) physical surveillances documented in photographs and videos; (23) an imaging of a Rockford computer and ESCAP report that requires computer program FTK Imager for viewing; (24) hard drive containing imaging of Liounis home computer; (25) documents obtained from unindicted co-conspirators; (26) photographic line-up of un-indicted co-conspirators; (27) Rockford "GoDaddy" documents; (28) Rockford Bank of America account records; (29) documents and witness testimony from the Federal Reserve Bank showing international wire transfers; (30) searches of Peter Liounis's home and trash; (31) post-arrest statements of Peter Liounis reflecting in arresting agent's notes and report.[7]

On April 30, 2015, the United States Attorney's Office for the Eastern District of New York issued a press release titled: "200 Investors Lost $11 Million in the Rockford Group Investment Scheme." It stated, in pertinent part:

> Earlier today, Genadi Yagodayev, a former officer of the Rockford Group, pleaded guilty to conspiracy to commit mail and wire fraud in connection with a scheme to defraud investors of more than $10 million. Today's plea is the fourth conviction in connection with the investigation into Rockford Group…Yagodayev and his cohorts scammed unsuspecting investors through a web of lies and deceit. When the money was stolen and sent overseas, Yagodayev fled the country… [Acting U.S. Attorney Kelly T. Currie] expressed his appreciation to the United States Postal Inspection Service, Homeland Security Investigations, and United States Secret Service… and also thanked the government of Cyprus and the Department of Justice, Office of International Affairs (OIA), for their substantial assistance in the extradition of Yagodayev.

**The Significance of the Suppressed EDNY Materials**

Had the government failed to disclose just a single material fact from the EDNY investigation, for example, that following his arrest Peter Liounis made a complete

---

[7] The government has refused to produce these notes or report despite our written requests.

confession that described Ruslan Rapoport as the leader or head of the multiple criminal schemes in which he was charged, that failure alone would likely give rise to a meritorious *Brady* and Rule 16 claim by Zemlyansky entitling him to a new trial. *See United States v. Thomas*, 981 F.Supp.2d 229 (S.D.N.Y. 2013)(reversing conviction for *Brady* violation involving one withheld document).

But here, the failures to disclose were breathtaking in their gravity and scope. Consider for a moment how different Zemlyansky's trial would have looked if, in response to the meager evidence offered by the government implicating Zemlyansky in Lyons Ward and Rockford – double, co-conspirator hearsay; monies meant for Danilovich that were occasionally handed to Zemlyansky first; highly dubious identification testimony from a receptionist; and a single, disputed "Bob Hamilton" voice recording – the defense had in its arsenal all the information and materials produced post-trial. Rather than the trial devolving into a referendum on whether the co-conspirator hearsay and lay opinion testimony regarding the Bob Hamilton call should be credited or rejected based on little more than the supposed incentives to lie or to be truthful under their cooperation agreements, the defense focus would have shifted to the Eastern District prosecution.

Defense counsel could have argued that the same government that said Zemlyansky was behind Rockford Group and Lyons Ward Associates (arguing that the similar brochures and websites was further proof that he was behind both) told a jury in Brooklyn that the principal players in Rockford and its related schemes were Rapoport, Liounis, and Yagodayev and that it could be inferred that the same players were behind the three schemes because the brochures and websites of Rockford and Grayson Hewitt were so similar. Igor Katsman's unsupported testimony that he laundered funds for Rockford Group that were passed on to Danilovich, at

times through Zemlyansky, could have been countered with hard evidence that Ruslan Rapoport was in charge of all that.

The defense could have contrasted the dearth of law enforcement investigative steps relied on to implicate Zemlyansky in the securities frauds with the more reliable and fruitful techniques employed in the Eastern District, techniques that led the investigators to Peter Liounis and his cohorts. and which failed to produce a scintilla of evidence against Zemlyansky.

For example, GPS tracking data in the EDNY case proved that the burner cell phone often used by Liounis when speaking with investors and with his confederates, was pinpointed as being within a few square block area of his home in Staten Island while in use.  Business records from Voice Nation, the commercial telephone answering service that Rockford had contracted with, showed that the company had been instructed to tell callers for Liounis that he was away on business and unavailable during the precise time period that airline records showed Liounis was vacationing in the Dominican Republic.

Rather than resort to highly dubious co-conspirator testimony to identify Liounis's voice on any of the intercepted calls, the government relied on the testimony of federal agents who had monitored Title III wiretaps of Liounis's phones and on a separate voice line-up.  Liounis's identity and voice was further corroborated by comparisons of known voice recordings that he had left on investors' voice mails.  A search of Liounis' trash produced handwritten notes of an investors' telephone number and name, as well as a bank account number where that investor's funds had been deposited.

The Eastern District investigation produced telephone calls from Rockford investors with Liounis's co-conspirators, recorded under the supervision of a Kansas Securities Investigator. The Rockford brochure sent to that investor was identical to the Rockford Brochure introduced

as Zemlyansky's trial, GX88. The Rockford account representatives identified themselves as Robert Jarvis and Michael Conley, two individuals depicted in the two brochures. Extensive records were gathered proving that Genadi Yagodayev retained a small firm to incorporate and register the Rockford Group; opened a bank account in its name; leased the office space at Regus at 80 Broad Street; and contracted with Voice Nation to take the firm's telephone calls. The Rule 16 discovery in the EDNY, produced post-trial to Zemlyansky, included no less than 407 pages of records reflecting more than 10,000 incoming, out-going, long-distance and international calls on Yagodayev's mobile phone and not a single call was associated with any telephone number associated with Zemlyansky.

Given the government's contention at trial that Zemlyansky hired the individual to undertake the tasks performed by Yagodayev, surely the absence of any connection between Yagodayev and Zemlyansky in the thousands of pages of records produced was favorable and material to the preparation of Zemlyansky's defense.

The EDNY investigation produced 2,425 pages of Federal Express records, including Federal Express records of Rockford's account. [DOJ 51576-54300.] Again, there was not any evidence in those records linking Zemlyansky to the fraud.

As noted, the government undertook Title III wiretapping of three telephones associated with Peter Liounis. The government monitored 1439 calls over target telephone number 347-465-0606 from December 6, 2011 through March 8, 2012, producing 2479 pages of line sheets, [DOJ 30,477 to 32,955.] Although many of the calls involved fraudulent claim funding schemes, there was not a single call to or from any number associated with Zemlyansky.

The government intercepted 4,454 calls over target telephone 917-370-6944 from February 9, 2012 to March 9, 2012.  This monitoring produced 5,280 pages of line sheets [DOJ 32956, to 38,235], many of which were between Liounis and his co-conspirators.  In several calls, Liounis speaks with co-conspirator Dimitri Mishiev who reported that he had purchased 2,000 leads of persons who had just filed personal injury lawsuits and discussed renting a virtual office from Regus to do business.  [DOJ 2299-2300; 2594; 2602, 4139 and 4684.]  Again, nowhere in the line sheets is there a single reference to Zemlyansky or to any telephone number associated with him.

**Legal Argument**

**The Government Violated Its Constitutional and Statutory Disclosure Obligations Under *Brady* and Rule 16, Fed.R.Crim.P.**

**Applicable Law**

**Standard for Granting a New Trial Under Rule 33(a), Fed.R.Crim.P.**

Rule 33(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "This rule 'confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'"  *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009), *quoting United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). There is no requirement that the Court review the evidence in the light most favorable to the government.  Rather, the "test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)(citation omitted).  It cannot be disputed that a criminal

conviction obtained in violation of the government's constitutional and statutory disclosure obligations amounts to a "manifest justice" requiring *vacatur* of the conviction.

### The Government's Constitutional Obligation to Disclose Materials and Information Favorable to the Accused

The government has a constitutional duty to disclose all material evidence favorable to a criminal defendant on the issue of guilt or punishment. *United States v. Madori,* 419 F.3d 159, 169 (2d Cir. 2005) (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). When the government violates this duty and obtains a conviction, it deprives the defendant of his or her liberty without due process of law. *Id.* Evidence is "favorable" if it is either exculpatory or impeaching, *Stickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936 (1999), and it is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia,* 547 U.S. 867, 870, 126 S.Ct. 2188 (2006).

However, "a 'showing of materiality does *not* require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,' " *id. quoting* Kyles v. Whitley,  514 U.S. 419, 434, 115 S.Ct. 1555 (1995)(emphasis added). Rather, "a conviction must be reversed 'upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Mahaffy*, 693 F.3d 113 (2d Cir 2012), *quoting Youngblood*, 547 U.S. at 870. The assessment of materiality is made in light of the entire record. *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

The Second Circuit has readily reversed convictions on *Brady* grounds in circumstances far less compelling than those presented here. *See, e.g., United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)(although a single document withheld by the government would "not directly establish a defense" it provided enough circumstantial support for the defense case to render it "material" under *Brady*); *United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004)(reversing conviction where government failed to disclose a single statement of a prosecution witness, which though inculpatory in part, was also exculpatory "because it harmonized with the theory of the defense case."); *United States v. Triumph Capital Group, Inc.*, 544 F3d 149 (2d Cir. 2008)(reversing conviction under circumstance similar to those presented in *Riva, ante*).

### The Government's Statutory Obligation to Disclose Documents and Objects "Material to the Preparation of the Defendant's Defense," Rule 16(a)(1)(E)

Rule 16(a)(1)(E), Fed.R.Crim.P. obligates the government to disclose to the defendant all "books, papers, documents, data, photographs, tangible objects" and other items in its possession that are "material to preparing the defense." An item is "material to preparing the defense" under the Rule if it could be used to counter the Government's case or bolster a defense." *United States v. Stevens,* 985 F.2d 1175, 1180–81 (2d Cir.1993).

The "'materiality standard of Rule 16 normally is not a heavy burden....' " *United States v. Stein,* 488 F.Supp.2d 350, 356 (S.D.N.Y.2007) (quoting *United States v. Lloyd,* 992 F.2d 348, 351 (D.C.Cir.1993)). *See also* 2 Charles Alan Wright et al., *Federal Practice and Procedure Criminal* § 254 (4th ed. 2013) ("Too much should not be required in showing materiality."). Evidence is material "if it could be used to counter the government's case or to bolster a defense." *Stevens,* 985 F.2d at 1180. "There must be some indication that the

pretrial disclosure of the disputed evidence would ... enable[ ] the defendant significantly to alter the quantum of proof in his favor." *United States v. Maniktala,* 934 F.2d 25, 28 (2d Cir.1991) (citation omitted).  In such case, a defendant's substantial rights have been violated warranting reversal of the conviction.  *United States v. Chastain*, 198 F.3d 1338, 1348 (11th Cir. 1999).

As we have demonstrated above, the government in this case withheld a mountain of materials and information favorable to Zemlyansky and material to the preparation of his defense.   Had those disclosures been made, there seems little doubt that the quantum of proof would have been significantly altered in Zemlyansky's favor.   The jury would have been presented with hard evidence gathered in the EDNY undermining the already meager proof offered at trial tying Zemlyansky to the Lyons Ward Associates and Rockford Group schemes.  It would have seen first-hand the myriad investigative methods used to identify and prosecute the EDNY Rockford defendants which dwarfed in quality the nature of the evidence presented by the government at trial.

Mr. Zemlyansky was entitled to no less in discovery than what his alleged Rockford co-conspirators in the EDNY received under Rule 16.   And because the bulk of that discovery was favorable to him under *Brady*, its disclosure to Mr. Zemlyansky was mandated by the due process clause of the Constitution.

**Conclusion**

For all the above-stated reasons, the Court should vacate Zemlyansky's convictions in the interests of justice under Rule 33 and order a new trial.  The Court should also direct the

government to produce the additional Brady and Rule 16 materials specified in our written

demands to the government, which it has unjustifiably refused to disclose.

Dated: November 4, 2015
      Typographical errors corrected Nov. 12, 2015
      New York, NY

                            Respectfully submitted
                               /s/
                            Gary G. Becker
                            Gary G. Becker, PLLC
                            Attorney for Mikhail Zemlyansky
                            747 Third Avenue, FL 20
                            New York, NY 10017
                            212-785-7565
                            becker@garybeckerlaw.com